Exhibit B



SUPERIOR COURT OF CALIFORNIA    **SUMMONS**    COUNTY OF SAN FRANCISCO
*(CITACION JUDICIAL)*

**SUM-100**

**DEFENDANTS**
**NOTICE TO DEFENDANT** *(AVISO AL DEMANDADO):*

CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE FIRST BOSTON LLC; CREDIT
SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; DEUTSCHE BANK SECURITIES,
INC.; DEUTSCHE ALT-A SECURITIES, INC.; J.P. MORGAN SECURITIES, INC., F/K/A BEAR
STEARNS & CO., INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR
STEARNS COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.

**Additonal Parties Attachment form is attached.**

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDATE)*
FEDERAL HOME LOAN BANK OF SAN FRANCISCO

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.

The name and address of the court is: *(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, California 94102

CASE NUMBER *(Número del Caso):*
**CGC-10-497840**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ROBERT A. GOODIN, SBN 061302    415-392-7900    415-938-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California 94111
Additional Counsel listed on Additional Page form attached.

DATE: **JUN 0 9 2010**    CLERK OF THE COURT    Clerk, by **WESLEY RAMIREZ** , Deputy
*(Fecha)*    *(Secretario)*    *(Adjunto)*
(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*    Deutsche Bank Securities, Inc.
   under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (individual)
          ☐ other *(specify):*
4. ☒ by personal delivery on *(date):*    6/11/10

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]
**SUMMONS**
Code of Civil Procedure §§ 412.20, 465
SF-C83

SUPERIOR COURT OF CALIFORNIA **SUMMONS** COUNTY OF SAN FRANCISCO
*(CITACION JUDICIAL)*

**SUM-100**

**DEFENDANTS**
**NOTICE TO DEFENDANT:** *(AVISO AL DEMANDADO):*
CREDIT SUISSE SECURITIES (USA) LLC, FKA/A CREDIT SUISSE FIRST BOSTON LLC; CREDIT
SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; DEUTSCHE BANK SECURITIES,
INC.; DEUTSCHE ALT-A SECURITIES, INC.; J.P. MORGAN SECURITIES, INC., FK/A BEAR
STEARNS & CO., INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR
STEARNS COMPANIES, LLC, FKA/A THE BEAR STEARNS COMPANIES, INC.

Additonal Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE)*
FEDERAL HOME LOAN BANK OF SAN FRANCISCO

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

| The name and address of the court is: *(El nombre y dirección de la corte es):* | **CASE NUMBER** *(Número del Caso):* |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO | CGC-10-497840 |
| 400 McAllister Street | |
| San Francisco, California 94102 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ROBERT A. GOODIN, SBN 061302                415-392-7900            415-938-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California 94111
Additional Counsel listed on Additional Page form attached.

| DATE: JUN 0 9 2010 | CLERK OF THE COURT | Clerk, by | WESLEY RAMIREZ | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

[SEAL]

3. ☒ on behalf of *(specify):*    Deutsche Bank Securities, Inc.

under:  ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
        ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
        ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (individual)
        ☐ other *(specify):*
4. ☐ by personal delivery on *(date):* 6/11/10

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
SF-C53

SUM-200(A)

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA)LLC, et al. | CASE NUMBER: CGC-10-497840 |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff  ☒ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

RBS SECURITIES, INC., F/K/A GREENWICH CAPITAL MARKETS, INC.; RBS ACCEPTANCE, INC. F/K/A GREENWICH CAPITAL ACCEPTANCE, INC.; MORGAN STANLEY & CO. INCORPORATED; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; BANC OF AMERICA SECURITIES LLC; BANC OF AMERICA FUNDING CORPORATION; BANC OF AMERICA MORTGAGE SECURITIES, INC.; COUNTRYWIDE SECURITIES CORPORATIONS; CWALT, INC.; COUNTRYWIDE FINANCIAL CORPORATION; AND, DOES 1 - 50

Page 2 of 3
Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons


Legal
Solutions
Plus

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Credit Suisse Securities, (USA) LLC, et al. | CASE NUMBER: CGC-10-497840 |
|---|---|

1 | GRAIS & ELLSWORTH LLP

2 | DAVID J. GRAIS (pro hac vice)

3 | KATHRYN C. ELLSWORTH (pro hac vice)

4 | OWEN L. CYRULINK (pro hac vice)

5 | 70 East 55th Street

6 | New York, New York 10022

7 | Telephone: (212) 755-0100

8 | Facsimile: (212) 755-0052

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26 | *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers):*

27 | This page may be used with any Judicial Council form or any other paper filed with this court.    Page 3

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]
Optional Form

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper



CRC 201, 501

SUPERIOR COURT OF CALIFORNIA

# SUMMONS
## (CITACION JUDICIAL)

COUNTY OF SAN FRANCISCO

**SUM-100**

**NOTICE TO DEFENDANT:** *(AVISO AL DEMANDADO):*

CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE FIRST BOSTON LLC; CREDIT
SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; DEUTSCHE BANK SECURITIES,
INC.; DEUTSCHE ALT-A SECURITIES, INC.; J.F. MORGAN SECURITIES, INC., F/K/A BEAR
STEARNS & CO., INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR
STEARNS COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.

Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE)*
FEDERAL HOME LOAN BANK OF SAN FRANCISCO

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a
copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the
court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more
information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse
nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may
lose the case by default, and your wages, money, and property may be taken without further warning from the court.
   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an
attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services
program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California
Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito
en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por
escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted
pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de
California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no
puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta
su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
   Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un
servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios
legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de
California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California,
(www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.

| The name and address of the court is: *(El nombre y dirección de la corte es):* | **CASE NUMBER** *(Número del Caso):* |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, California 94102 | CGC-10-497840 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ROBERT A. GOODIN, SBN 061302          415-392-7900          415-938-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California 94111
Additional Counsel listed on Additional Page form attached.

| DATE:<br>*(Fecha)* | JUN 0 9 2010 | CLERK OF THE COURT | Clerk, by<br>*(Secretario)* | WESLEY RAMIREZ | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*     Deutsche Alt-A Securities, Inc.

under:   ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
         ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
         ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (individual)
         ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
SF-CS3

SUM-200(A)

| SHORT TITLE:  Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA)LLC, et al. | CASE NUMBER: CGC-10-497840 |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

RBS SECURITIES, INC., F/K/A GREENWICH CAPITAL MARKETS, INC.; RBS ACCEPTANCE, INC. F/K/A GREENWICH CAPITAL ACCEPTANCE, INC.; MORGAN STANLEY & CO. INCORPORATED; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; BANC OF AMERICA SECURITIES LLC; BANC OF AMERICA FUNDING CORPORTION; BANC OF AMERICA MORTGAGE SECURITIES, INC.; COUNTRYWIDE SECURITIES CORPORATIONS;. CWALT, INC.; COUNTRYWIDE FINANCIAL CORPORATION; AND, DOES 1 - 50

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

Legal
Solutions
Plus

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Credit Suisse Securities, (USA) LLC, et al. | CASE NUMBER: CGC-10-497840 |
|---|---|

1  GRAIS & ELLSWORTH LLP

2  DAVID J. GRAIS (pro hac vice)

3  KATHRYN C. ELLSWORTH (pro hac vice)

4  OWEN L. CYRULINK (pro hac vice)

5  70 East 55th Street

6  New York, New York 10022

7  Telephone:  (212) 755-0100

8  Facsimile:  (212) 755-0052

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26  (Required for verified pleading) The items on this page stated on information and belief (specify item numbers, not line numbers):
27  This page may be used with any Judicial Council form or any other paper filed with this court.    Page 3

Form Approved by the Judicial Council of California MC-020 [New January 1, 1987] Optional Form

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper


Legal Solutions Plus

CRO 201, 1601

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, s... ar number, and address): | FOR COURT USE ONLY |
|---|---|
| ROBERT A. GOODIN, State Bar No. 061302<br>FRANCINE T. RADFORD, State Bar No. 168269<br>GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP<br>505 Sansome, Suite 900<br>San Francisco, California  94111<br>TELEPHONE NO.: (415) 392-7900   FAX NO.: (415) 398-4321<br>ATTORNEY FOR (Name): Plaintiff Federal Home Loan Bank of SF | ENDORSED<br>F I L E D<br>San Francisco County Superior Court<br><br>MAR 1 5 2010<br><br>CLERK OF THE COURT<br>BY: ____PARAM NATT____<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, California 94102
BRANCH NAME: Civil Division

CASE NAME: Federal Home Loan Bank of San Francisco v. CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE FIRST BOSTON LLC

| CIVIL CASE COVER SHEET<br>[X] Unlimited    [ ] Limited<br>(Amount        (Amount<br>demanded      demanded is<br>exceeds $25,000)  $25,000 or less) | Complex Case Designation<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>CGC-10-497840 |
|---|---|---|
| | | JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [X] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [X] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve       in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive

4. Number of causes of action *(specify):* Five

5. This case [ ] is   [X] is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 12, 2010

ROBERT A. GOODIN, State Bar No. 061302      ▶ Robert A. Goodin /AHU
_____(TYPE OR PRINT NAME)_____      _____(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)_____

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|---|

**INSTRU⟋ ⟍ONS ON HOW TO COMPLETE THE CO⟍ SHEET**                CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)—Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) (*if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto*)
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability (*not asbestos or
    toxic/environmental*) (24)
  Medical Malpractice (45)
    Medical Malpractice—
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) (*not civil
    harassment*) (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      (*not medical or legal*)
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract (*not unlawful detainer
        or wrongful eviction*)
    Contract/Warranty Breach—Seller
      Plaintiff (*not fraud or negligence*)
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case—Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage (*not provisionally
    complex*) (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property (*not eminent
      domain, landlord/tenant, or
      foreclosure*)
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) (*if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential*)
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ—Administrative Mandamus
    Writ—Mandamus on Limited Court
      Case Matter
    Writ—Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal—Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    (*arising from provisionally complex
    case type listed above*) (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment (*non-
      domestic relations*)
    Sister State Judgment
    Administrative Agency Award
      (*not unpaid taxes*)
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint (*not specified
    above*) (42)
    Declaratory Relief Only
    Injunctive Relief Only (*non-
      harassment*)
    Mechanics Lien
    Other Commercial Complaint
      Case (*non-tort/non-complex*)
    Other Civil Complaint
      (*non-tort/non-complex*)
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition (*not specified
    above*) (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief from Late
      Claim
    Other Civil Petition

CM-010 [Rev. July 1, 2007]                **CIVIL CASE COVER SHEET**                Page 2 of 2

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>ROBERT A. GOODIN, State Bar No. 061302<br>FRANCINE T. RADFORD, State Bar No. 168269<br>GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP<br>505 Sansome, Suite 900<br>San Francisco, California 941111<br>TELEPHONE NO.: (415) 392-7900 FAX NO. *(Optional)*: (415) 398-4321<br>E-MAIL ADDRESS *(Optional)*: rgoodin@goodinmacbride.com<br>ATTORNEY FOR *(Name)*: Plaintiff Federal Home Loan Bank of SF | **ENDORSED**<br>**FILED**<br>Superior Court of California<br>County of San Francisco<br><br>MAR 1 5 2010<br><br>**CLERK OF THE COURT**<br>BY: **WESLEY RAMIREZ**<br>Deputy Clerk |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, California
BRANCH NAME: Civil Division

| PLAINTIFF/PETITIONER: FEDERAL HOME LOAN BANK OF SAN FRANCISCO | CASE NUMBER:<br>CGC-10-497840 |
|---|---|
| DEFENDANT/RESPONDENT: Credit Suisse Securities (USA) LLC, et al. | JUDICIAL OFFICER: |

| NOTICE OF RELATED CASE | DEPT.: |
|---|---|

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al.
   b. Case number:
   c. Court: [X] same as above
      [ ] other state or federal court *(name and address):*

   d. Department:
   e. Case type: [ ] limited civil  [X] unlimited civil  [ ] probate  [ ] family law  [ ] other *(specify):*

   f. Filing date: March 12, 2010
   g. Has this case been designated or determined as "complex?" [X] Yes  [ ] No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      [X] involves the same parties and is based on the same or similar claims.
      [X] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      [ ] involves claims against, title to, possession of, or damages to the same property.
      [X] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         [ ] Additional explanation is attached in attachment 1h
   i. Status of case:
      [X] pending
      [ ] dismissed  [ ] with  [ ] without prejudice
      [ ] disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: [ ] same as above
      [ ] other state or federal court *(name and address):*

   d. Department:

Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007]
**NOTICE OF RELATED CASE**
Legal Solutions Plus
Cal. Rules of Court, rule 3.300

**CM-015**

| PLAINTIFF/PETITIONER: FEDERAL HOME LOAN BANK OF SAN FRANCISCO | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Credit Suisse Securities (USA) LLC, et al. | |

2. *(continued)*

  e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

  f. Filing date:

  g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

  h. Relationship of this case to the case referenced above *(check all that apply):*
  - ☐ involves the same parties and is based on the same or similar claims.
  - ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
  - ☐ involves claims against, title to, possession of, or damages to the same property.
  - ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
    - ☐ Additional explanation is attached in attachment 2h

  i. Status of case:
  - ☐ pending
  - ☐ dismissed ☐ with ☐ without prejudice
  - ☐ disposed of by judgment

3.
  a. Title:

  b. Case number:

  c. Court: ☐ same as above
    - ☐ other state or federal court *(name and address):*

  d. Department:

  e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

  f. Filing date:

  g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

  h. Relationship of this case to the case referenced above *(check all that apply):*
  - ☐ involves the same parties and is based on the same or similar claims.
  - ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
  - ☐ involves claims against, title to, possession of, or damages to the same property.
  - ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
    - ☐ Additional explanation is attached in attachment 3h

  i. Status of case:
  - ☐ pending
  - ☐ dismissed ☐ with ☐ without prejudice
  - ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date:

Anne Hartman, Goodni MacBride
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

**NOTICE OF RELATED CASE**

CASE NUMBER: CGC-10-~7839 FEDERAL HOME LOANS B. K OF SAN FRANCISCO VS. [

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

    **DATE:**   **AUG-13-2010**

    **TIME:**   **9:00AM**

    **PLACE:**  **Department 212**
                **400 McAllister Street**
                **San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

### ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL.**
(SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

# Alternative Dispute Resolution (ADR) Program Information Package

# Alternatives to Trial

## There are other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint. (CRC 3.221(c))



**Superior Court of California**
**County of San Francisco**

# Introduction

**Did you know that most civil lawsuits settle without a trial?**

**And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?**

**These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.**

**In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.**

**ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.**

## Advantages of ADR

**ADR can have a number of advantages over a lawsuit.**

- ***ADR can save time.*** **A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.**

- ***ADR can save money.*** **Court costs, attorneys fees, and expert fees can be saved.**

- ***ADR can be cooperative.*** **This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.**

- ***ADR can reduce stress.*** **There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.**

- ***ADR encourages participation.*** **The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.**

- ***ADR is flexible.*** **The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.**

- ***ADR can be more satisfying.*** **For all the above reasons, many people have reported a high degree of satisfaction with ADR.**

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

1) Judicial Arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called judicial arbitration. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

### Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

## MEDIATION

### Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

## Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

## Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

## *Mediation Services of the Bar Association of San Francisco*

The Mediation Services is a coordinated effort of the San Francisco
Superior Court and The Bar Association of San Francisco (BASF) in which
a court approved mediator provides three hours of mediation at no charge
to the parties. It is designed to afford civil litigants the opportunity to
engage in early mediation of a case shortly after filing the complaint, in an
effort to resolve the matter before substantial funds are expended on the
litigation process. Although the goal of the program is to provide the
service at the outset of the litigation, the program may be utilized at
anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by
BASF pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution
form included in this ADR package the parties will be contacted by BASF.
Upon payment of the $250 per party administration fee, parties select a
specific mediator from the list of approved mediation providers or BASF will
help them select an appropriate mediator for the matter. The hourly
mediator fee beyond the first three hours will vary depending on the
mediator selected. Waiver of the administrative fee based on financial
hardship is available.

A copy of the Mediation Services rules can be found on the BASF website
at **www.sfbar.org/mediation** or you may call BASF at 415-982-1600.

### *Judicial Mediation*

The Judicial Mediation program is designed to provide early mediation of
complex cases by volunteer judges of the San Francisco Superior Court.
Cases considered for the program include construction defect, employment
discrimination, professional malpractice, insurance coverage, toxic torts
and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to
Alternative Dispute Resolution form attached to this packet indicating a joint
request for inclusion in the program. A preference for a specific judge may
be indicated. The court Alternative Dispute Resolution Coordinator will
coordinate assignment of cases that qualify for the program.

## Cost

Generally, the cost of Private Mediation ranges from $100 per hour to $800 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $250 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

## Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

## Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If the Court assigns a matter to the ESP, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

### Cost

All parties must submit a $250 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 782-9000 ext. 8717.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution,
400 McAllister Street, Room 103
San Francisco, CA   94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO
### 400 McAllister Street, San Francisco, CA  94102-4514

| | |
|---|---|
| Plaintiff<br><br>v.<br><br><br>Defendant | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE<br>DISPUTE RESOLUTION** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐   **Private Mediation**          ☐   **Mediation Services of BASF**   ☐   **Judicial Mediation**
☐   **Binding arbitration**                                                        **Judge** _____
☐   **Non-binding judicial arbitration**                                          **Judge** _____
☐   **BASF Early Settlement Program**
☐   **Other ADR process (describe)** _____

**Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____


| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

☐  *Additional signature(s) attached*

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| | |

TELEPHONE NO.:                                    FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|

*(Check one):*  ☐ **UNLIMITED CASE**            ☐ **LIMITED CASE**
(Amount demanded                (Amount demanded is $25,000
exceeds $25,000)                or less)

**A CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:                    Time:                    Dept.:            Div.:            Room:

Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by *(name)*:**

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted jointly by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:

Page 1 of 4

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2009]       **CASE MANAGEMENT STATEMENT**       Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

    ☐   *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request   ☐ a jury trial   ☐ a nonjury trial.    *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
  a. ☐ The trial has been set for *(date):*
  b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

  c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
  a. ☐ days *(specify number):*
  b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial   ☐ by the attorney or party listed in the caption   ☐ by the following:
  a. Attorney:
  b. Firm:
  c. Address:
  d. Telephone number:
  e. Fax number:
  f. E-mail address:
  g. Party represented:
  ☐ Additional representation is described in Attachment 8.

9. **Preference**
  ☐ This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
  a. Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
  b. ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
  c. ☐ The case has gone to an ADR process *(indicate status):*

   **CASE MANAGEMENT STATEMENT**   

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: | |
|---|---|---|
| DEFENDANT/RESPONDENT: | | |

10. d.    The party or parties are willing to participate in *(check all that apply):*
- (1) ☐ Mediation
- (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
- (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
- (4) ☐ Binding judicial arbitration
- (5) ☐ Binding private arbitration
- (6) ☐ Neutral case evaluation
- (7) ☐ Other *(specify):*

e.    ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

f.    ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

g.    ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**
☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**
a.    ☐ Insurance carrier, if any, for party filing this statement *(name):*
b.    Reservation of rights:    ☐ Yes    ☐ No
c.    ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**
Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
☐ Bankruptcy    ☐ Other *(specify):*
Status:

**14. Related cases, consolidation, and coordination**
a.    ☐ There are companion, underlying, or related cases.
- (1) Name of case:
- (2) Name of court:
- (3) Case number:
- (4) Status:
☐ Additional cases are described in Attachment 14a.
b.    ☐ A motion to    ☐ consolidate    ☐ coordinate    will be filed by *(name party):*

**15. Bifurcation**
☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**
☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|
| | | |

c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

21. Total number of pages attached *(if any)*: _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

▶

| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |
|---|---|

▶

| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |
|---|---|

☐ Additional signatures are attached.



# Superior Court of California
## County of San Francisco



**HON. JAMES J. McBRIDE**
**PRESIDING JUDGE**

## Judicial Mediation Program

**JENIFFER B. ALCANTARA**
**ADR ADMINISTRATOR**

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable Gail Dekreon
The Honorable Ernest H. Goldsmith
The Honorable Curtis Karnow
The Honorable Charlene P. Kiesselbach
The Honorable Tomar Mason
The Honorable Anne-Christine Massullo
The Honorable Ronald Quidachay

The Honorable A. James Robertson, II
The Honorable Jeffrey S. Ross
The Honorable Lillian Sing
The Honorable John K. Stewart
The Honorable Richard Ulmer
The Honorable Monica F. Wiley
The Honorable Mary E. Wiss

Parties interested in Judicial Mediation should file the Stipulation to Alternative Dispute Resolution form indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated on the form but assignment to a particular judge is not guaranteed. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

02/2010 (ja)

# MEDIATION SERVICES



THE BAR ASSOCIATION OF SAN FRANCISCO

PROCEDURES, FORMS, MEDIATOR BIOGRAPHIES AND PHOTOGRAPHS:

# www.sfbar.org/mediation

QUESTIONS?

## adr@sfbar.org or 415-982-1600

## EXPERIENCED MEDIATORS AVAILABLE IN THE FOLLOWING AREAS

- Business
- Civil Rights
- Commercial
- Construction
- Contracts
- Disability
- Discrimination
- Education
- Employment/Workplace
- Environmental
- Family
- Fee Disputes
- Financial
- Gay/Lesbian/Bisexual/Transgender Issues
- Government
- Insurance
- Intellectual Property
- Intra-Organizational
- Labor
- Landlord/Tenant
- Land Use
- Malpractice
- Legal-Medical-Professional
- Partnership Dissolutions
- Personal Injury
- Probate/Trust
- Products Liability
- Real Estate
- Securities
- Taxation
- Uninsured Motorist
- Women's Issues
- And more...

## What is BASF's Mediation Service?

Mediation is a voluntary, private dispute resolution process in which a trained mediator assists the parties in reaching an outcome that is mutually agreeable.

Mediation Services was established by The Bar Association of San Francisco (BASF) with extensive input from experienced mediators, litigators and judges. This traditional mediation service is an approved alternative to court ordered Arbitration or Early Settlement.

## How Does it Work?

BASF's Mediation Services works quickly, matching a qualified mediator to a case within days. The assignment process is flexible; experienced BASF staff can suggest a mediator, or you can request three biographies to choose from, or request a particular mediator from our Web site.

## How Much Does the Service Cost?

Mediators generously provide one hour of preparation and two hours of session time free of charge as a service to BASF and the community. To qualify for the pro-bono hours, parties must file the Consent to Mediate form with BASF. Hourly fees beyond those three hours vary depending on the mediator selected. BASF charges a small administrative fee, which pays for the costs of running the program.

## Who Can Use the Service?

The service can be utilized by anyone whether or not the dispute has been filed in a court. If a legal action is already underway, it can be used at any time during the litigation process and is not limited to San Francisco County litigants.

## Who Are the Mediators?

Experienced mediation professionals are available to assist in most areas of dispute, ranging from multi-party commercial matters to individuals in conflict. Each has been pre-approved pursuant to strict educational and experience requirements. In fact, our mediators average 15 years of mediation experience and 125 hours of formal mediation training.

## More Information

Our Web site - www.sfbar.org/mediation - provides photographs, short biographies and hourly rates of our mediators. You can search by name or by area of law.

If you don't see the area you need in our 30+ panels, just contact us at adr@sfbar.org; it is very likely we can match your need with one of our panelists.

WWW.SFBAR.ORG/MEDIATION • ADR@SFBAR.ORG • 415.982.1600

1   GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
    ROBERT A. GOODIN, State Bar No. 061302
2       rgoodin@goodinmacbride.com
    FRANCINE T. RADFORD, State Bar No. 168269
3       fradford@goodinmacbride.com
    ANNE H. HARTMAN, State Bar No. 184556
4       ahartman@goodinmacbride.com
    505 Sansome Street, Suite 900
5   San Francisco, California 94111
    Telephone:    (415) 392-7900
6   Facsimile:    (415) 398-4321

7   GRAIS & ELLSWORTH LLP
    DAVID J. GRAIS (*pro hac application submitted herewith*)
8   KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
    OWEN L. CYRULNIK (*pro hac application submitted herewith*)
9   LEANNE M. WILSON (*pro hac application submitted herewith*)
    70 East 55th Street
10  New York, New York 10022
    Telephone:    (212) 755-0100
11  Facsimile:    (212) 755-0052

12  Attorneys for Plaintiff
    Federal Home Loan Bank of San Francisco
13

14          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

15          IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

16

17  FEDERAL HOME LOAN BANK OF SAN          No. CGC-10-497840
    FRANCISCO,
18                                         FIRST AMENDED COMPLAINT FOR
                Plaintiff,                 RESCISSION AND DAMAGES FOR:
19
    v.                                     (1) VIOLATIONS OF §§ 25401 AND
20                                             25501 OF THE CALIFORNIA
    CREDIT SUISSE SECURITIES (USA) LLC,        CORPORATE SECURITIES ACT;
21  F/K/A CREDIT SUISSE FIRST BOSTON
    LLC;                                   (2) VIOLATIONS OF §§ 11 AND 15 OF
22  CREDIT SUISSE FIRST BOSTON                 THE SECURITIES ACT OF 1933;
    MORTGAGE SECURITIES CORP.;
23  DEUTSCHE BANK SECURITIES, INC.;        (3) VIOLATIONS OF §§ 12(a)(2) AND
    DEUTSCHE ALT-A SECURITIES, INC.;           15 OF THE SECURITIES ACT OF
24  J.P. MORGAN SECURITIES, INC., F/K/A        1933;
    BEAR STEARNS & CO., INC.;
25  STRUCTURED ASSET MORTGAGE             (4) VIOLATIONS OF §§ 1572 AND 1710
    INVESTMENTS II, INC.;                     OF THE CALIFORNIA CIVIL
26  THE BEAR STEARNS COMPANIES, LLC,          CODE (NEGLIGENT
    F/K/A THE BEAR STEARNS COMPANIES,         MISREPRESENTATION); and
27  INC.;
    RBS SECURITIES, INC., F/K/A
28  GREENWICH CAPITAL MARKETS, INC.;

    ─────────────────────────────────────────────────────
              FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

| | | |
|---|---|---|
| 1 | RBS ACCEPTANCE, INC. F/K/A GREENWICH CAPITAL ACCEPTANCE, | **(5) RESCISSION OF CONTRACTS UNDER § 1689 ET SEQ. OF THE** |
| 2 | INC.; MORGAN STANLEY & CO. | **CALIFORNIA CIVIL CODE** |
| 3 | INCORPORATED; UBS SECURITIES, LLC; | |
| 4 | MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; | |
| 5 | BANC OF AMERICA SECURITIES LLC; BANC OF AMERICA FUNDING | |
| 6 | CORPORATION; BANC OF AMERICA MORTGAGE | |
| 7 | SECURITIES, INC.; COUNTRYWIDE SECURITIES | |
| 8 | CORPORATION; CWALT, INC.; | |
| 9 | COUNTRYWIDE FINANCIAL CORPORATION; AND, | |
| 10 | DOES 1-50, | |
| 11 | Defendants. | |

Plaintiff, FEDERAL HOME LOAN BANK OF SAN FRANCISCO (referred to in this complaint as **the Bank**) complains of defendants and for causes of action alleges as follows:

## NATURE OF THIS ACTION

1.    This is an action for rescission and damages as a result of the violation by the Defendants of the California Corporate Securities Act, the California Civil Code, the federal Securities Act of 1933, and the common law. As alleged in detail below, the Defendants sold or issued to the Bank 95 certificates in 78 securitization trusts backed by residential mortgage loans. The Bank paid more than $13.5 billion for those certificates. When they offered and then sold these certificates to the Bank, the Defendants made numerous statements to the Bank about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue as to material facts. Moreover, the Defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the Defendants made untrue statements, or omitted important information, about such material facts as the Loan-to-Value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary

-2-

1   residences), and the extent to which the entities that made the loans departed from their own

2   standards in doing so.

3       2.      Defendants made such untrue or misleading statements about at least the following

4   numbers of the loans in each of the 78 securitizations.

5

| Securitization No. | Number of Loans About Which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans About Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 2,198 | 4,345 | 50.6% |
| 2 | 1,149 | 3,139 | 36.6% |
| 3 | 662 | 3,633 | 18.2% |
| 4 | 1,380 | 2,531 | 54.5% |
| 5 | 557 | 2,934 | 19.0% |
| 6 | 1,725 | 4,186 | 41.2% |
| 7 | 1,401 | 3,026 | 46.3% |
| 8 | 1,132 | 1,728 | 65.5% |
| 9 | 2,146 | 4,463 | 48.1% |
| 10 | 1,525 | 3,976 | 38.4% |
| 11 | 518 | 963 | 53.8% |
| 12 | 1,839 | 2,862 | 64.3% |
| 13 | 10,909 | 24,129 | 45.2% |
| 14 | 1,461 | 3,328 | 43.9% |
| 15 | 183 | 2,060 | 8.9% |
| 16 | 1,315 | 2,758 | 47.7% |
| 17 | 1,941 | 5,929 | 32.7% |
| 18 | 3,441 | 7,330 | 47.0% |
| 19 | 1,982 | 4,274 | 46.4% |
| 20 | 1,667 | 3,422 | 48.7% |
| 21 | 1,061 | 1,962 | 54.1% |
| 22 | 200 | 404 | 49.5% |
| 23 | 2,160 | 4,403 | 49.1% |
| 24 | 2,846 | 6,683 | 42.6% |
| 25 | 2,078 | 4,983 | 41.7% |
| 26 | 1,160 | 2,837 | 40.9% |

-3-

| Securitization No. | Number of Loans About Which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans About Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 27 | 1,299 | 2,651 | 49.0% |
| 28 | 2,384 | 6,544 | 36.4% |
| 29 | 2,396 | 6,450 | 37.2% |
| 30 | 2,057 | 5,522 | 37.3% |
| 31 | 2,272 | 6,480 | 35.1% |
| 32 | 923 | 1,496 | 61.7% |
| 33 | 2,348 | 8,075 | 29.1% |
| 34 | 1,509 | 2,438 | 61.9% |
| 35 | 3,096 | 5,001 | 61.9% |
| 36 | 824 | 1,336 | 61.7% |
| 37 | 1,737 | 6,391 | 27.2% |
| 38 | 541 | 1,323 | 40.9% |
| 39 | 1,867 | 4,779 | 39.1% |
| 40 | 3,094 | 4,781 | 69.7% |
| 41 | 2,418 | 6,357 | 38.0% |
| 42 | 2,025 | 4,508 | 44.9% |
| 43 | 2,281 | 7,343 | 31.1% |
| 44 | 2,868 | 8,138 | 35.2% |
| 45 | 1,508 | 3,090 | 48.8% |
| 46 | 2,241 | 4,833 | 46.4% |
| 47 | 923 | 1,941 | 47.6% |
| 48 | 602 | 1,355 | 44.4% |
| 49 | 1,235 | 2,539 | 48.6% |
| 50 | 1,086 | 1,567 | 69.3% |
| 51 | 515 | 1,064 | 48.4% |
| 52 | 1,002 | 2,046 | 49.0% |
| 53 | 1,044 | 3,339 | 31.3% |
| 54 | 768 | 1,346 | 57.1% |
| 55 | 1,289 | 2,835 | 45.5% |
| 56 | 1,777 | 2,535 | 70.1% |
| 57 | 2,018 | 3,914 | 51.6% |
| 58 | 1,651 | 3,420 | 48.8% |

-4-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

| Securitization No. | Number of Loans About Which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans About Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 59 | 902 | 1,804 | 50.0% |
| 60 | 871 | 1,338 | 65.1% |
| 61 | 1,073 | 1,549 | 69.3% |
| 62 | 543 | 1,231 | 44.1% |
| 63 | 3,615 | 7,007 | 51.6% |
| 64 | 966 | 3,478 | 27.8% |
| 65 | 1,038 | 2,411 | 43.1% |
| 66 | 805 | 3,053 | 26.4% |
| 67 | 666 | 2,566 | 26.% |
| 68 | 1,703 | 2,399 | 71.0% |
| 69 | 475 | 1,353 | 35.1% |
| 70 | 302 | 1,824 | 16.6% |
| 71 | 1,474 | 2,630 | 56.1% |
| 72 | 303 | 2,027 | 15.0% |
| 73 | 1,280 | 2,422 | 52.9% |
| 74 | 1,505 | 2,869 | 52.5% |
| 75 | 1,462 | 3,307 | 44.2% |
| 76 | 943 | 2,000 | 47.2% |
| 77 | 2,642 | 4,236 | 62.4% |
| 78 | 655 | 2,097 | 31.2% |

The Bank is informed and believes, and based thereon alleges, that even more mortgage loans than those listed in the table above were the subject of untrue or misleading statements by the Defendants.[1]

3.     The certificates are "securities" within the meaning of the California Corporate Securities Act and the Securities Act of 1933. Under those Acts, the California Civil Code, and the common law, the Bank is entitled to rescind its purchase of the certificates or to be paid damages for its losses on the certificates.

---

[1] Allegations pled on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

-5-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    4.    Eight securities dealers sold these certificates to the Bank. The eight dealers are

2  Defendants Credit Suisse Securities (USA) LLC (which sold to the Bank certificates in 10

3  securitization trusts, which are referred to in this complaint as Securitizations Nos. 1 through 10),

4  Deutsche Bank Securities, Inc. (21 securitizations, Nos. 11 through 31), Bear Stearns & Co. Inc.

5  (10 securitizations, Nos. 32 through 41), Greenwich Capital Markets, Inc. (three securitizations,

6  Nos. 42 through 44), Morgan Stanley & Co. Inc. (three securitizations, Nos. 45 through 47), UBS

7  Securities, LLC (12 securitizations, Nos. 48 through 59), Banc of America Securities LLC (14

8  securitizations, Nos. 60 through 73), and Countrywide Securities Corporation (five

9  securitizations, Nos. 74 through 78). The other Defendants named in this complaint are liable to

10  the Bank because they were the issuers of some of those certificates or because they controlled

11  one of those issuers.

12                                    **PARTIES**

13    5.    Plaintiff is a bank created by the Federal Home Loan Bank Act. The headquarters

14  of the Bank are in the City and County of San Francisco. Under its Organization Certificate, the

15  Bank is to operate in Federal Home Loan Bank District 11, which comprises the States of

16  Arizona, California, and Nevada. The Bank does operate in each of those three States.

17    6.    Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse

18  First Boston LLC and referred to as **Credit Suisse**) is a limited liability company organized under

19  the laws of Delaware. Credit Suisse sold the Bank 10 of the certificates.

20    7.    Defendant Credit Suisse First Boston Mortgage Securities Corp. (referred to as

21  **CSFB Mortgage Securities**) is a corporation organized under the laws of Delaware. CSFB

22  Mortgage Securities was the issuer of five of the certificates that Credit Suisse sold to the Bank.

23    8.    Defendant Deutsche Bank Securities, Inc. (referred to as **Deutsche**) is a

24  corporation organized under the laws of Delaware. Deutsche sold the Bank 21 of the certificates.

25    9.    Defendant Deutsche Alt-A Securities, Inc. (referred to as **Deutsche Alt-A**) is a

26  corporation organized under the laws of Delaware. Deutsche Alt-A was the issuer of five of the

27  certificates that Deutsche sold to the Bank.

28

-6-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1       10.    Defendant J.P. Morgan Securities, Inc. (formerly known as Bear, Stearns & Co.

2 Inc. and referred to as **Bear Stearns**) is a corporation organized under the laws of Delaware. Bear

3 Stearns sold the Bank 10 of the certificates.

4       11.    Defendant Structured Asset Mortgage Investments II, Inc. (referred to as **SAMI II**)

5 is a corporation organized under the laws of Delaware. SAMI II was the issuer of six of the

6 certificates that Bear Stearns sold to the Bank.

7       12.    Defendant The Bear Stearns Companies, LLC (formerly known as and referred to

8 as **The Bear Stearns Companies, Inc.**) is a limited liability company organized under the laws

9 of Delaware. The Bank is informed and believes, and based thereon alleges, that SAMI II existed

10 for no purpose other than to receive and deposit loans into the trusts. The Bear Stearns

11 Companies, Inc. controls or controlled SAMI II. Under Section 15 of the Securities Act of 1933,

12 15 U.S.C. §77o, The Bear Stearns Companies, Inc. therefore is liable to the Bank jointly and

13 severally with, and to the same extent as, SAMI II.

14       13.    Defendant RBS Securities, Inc. (formerly known as Greenwich Capital Markets,

15 Inc. and referred to as **Greenwich Capital**) is a corporation organized under the laws of

16 Delaware. Greenwich Capital sold the Bank three of the certificates.

17       14.    Defendant RBS Acceptance, Inc. (formerly known as Greenwich Capital

18 Acceptance, Inc. and referred to as **Greenwich Capital Acceptance**) is a corporation organized

19 under the laws of Delaware. Greenwich Capital Acceptance was the issuer of one of the

20 certificates that Greenwich Capital sold to the Bank.

21       15.    Defendant Morgan Stanley & Co. Incorporated (referred to as **Morgan Stanley**) is

22 a corporation organized under the laws of Delaware. Morgan Stanley sold the Bank three of the

23 certificates.

24       16.    Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company

25 organized under the laws of Delaware. UBS sold the Bank 12 of the certificates.

26       17.    Defendant Mortgage Asset Securitization Transactions, Inc. (referred to as **MAST**)

27 is a corporation organized under the laws of Delaware. MAST was the issuer of six of the

28 certificates that UBS sold to the Bank.

-7-

1   18.   Defendant Banc of America Securities LLC (referred to as **Banc of America**) is a

2   limited liability company organized under the laws of Delaware. Banc of America sold the Bank

3   14 of the certificates.

4   19.   Defendant Banc of America Funding Corporation (referred to as **Banc of America**

5   **Funding**) is a corporation organized under the laws of Delaware. Banc of America Funding was

6   the issuer of six of the certificates that Banc of America sold to the Bank.

7   20.   Defendant Banc of America Mortgage Securities, Inc. (referred to as **Banc of**

8   **America Mortgage Securities**) is a corporation organized under the laws of Delaware. Banc of

9   America Mortgage Securities was the issuer of seven of the certificates that Banc of America sold

10  to the Bank.

11  21.   Defendant Countrywide Securities Corporation (referred to as **Countrywide**) is a

12  corporation organized under the laws of California. Countrywide sold the Bank five of the

13  certificates.

14  22.   Defendant CWALT, Inc. (referred to as **CWALT**) is a corporation organized

15  under the laws of Delaware. CWALT was the issuer of three of the certificates that Credit Suisse

16  sold to the Bank, 15 of the certificates that Deutsche sold to the Bank, one of the certificates that

17  Bear Stearns sold to the Bank, two of the certificates that Greenwich Capital Markets sold to the

18  Bank, three of the certificates that Morgan Stanley sold to the Bank, six of the certificates that

19  UBS sold to the Bank, one of the certificates that Banc of America sold to the Bank, and four of

20  the certificates that Countrywide sold to the Bank.

21  23.   Defendant Countrywide Financial Corporation is a corporation organized under

22  the laws of Delaware. The Bank is informed and believes, and based thereon alleges, that

23  CWALT existed for no purpose other than to receive and deposit loans into the trusts.

24  Countrywide Financial Corporation controls or controlled CWALT. Under Section 15 of the

25  Securities Act Countrywide Financial Corporation therefore is liable to the Bank jointly and

26  severally with, and to the same extent as, CWALT.

27  24.   Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

28  Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will

-8-

FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1 | amend this complaint to allege the true names and capacities of these Defendants when

2 | ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants

3 | is responsible in some manner for the occurrences alleged herein and proximately caused the

4 | Bank's damages.

5 | ### JURISDICTION AND VENUE

6 | 25. This action is an unlimited civil case within the meaning of California Code of

7 | Civil Procedure section 88, in that, *inter alia*, the amount in controversy (as defined in California

8 | Code of Civil Procedure section 85(a)) exceeds 25 thousand dollars ($25,000).This Court has

9 | subject-matter jurisdiction of the Bank's causes of action for rescission under Sections 25401 and

10 | 25501 of the California Corporate Securities Act, damages for negligent misrepresentation, and

11 | rescission of its contracts to purchase the certificates. Under Section 22(a) of the Securities Act of

12 | 1933, 15 U.S.C. § 77v(a), this Court also has jurisdiction over the Bank's causes of action for

13 | violation of Sections 11, 12(a)(2), and 15 of that Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

14 | 26. Under Section 22(a) of the Securities Act, "no case arising under this title and

15 | brought in any State court of competent jurisdiction shall be removed to any court of the United

16 | States." Because its activities are not localized in one state, the Bank is not a citizen of any state

17 | under 28 U.S.C. § 1332(c), so the Federal courts have no jurisdiction of this action under 28

18 | U.S.C. § 1332(a). This action is not removable to Federal court.

19 | 27. Credit Suisse, Deutsche, Bear Stearns, Greenwich Capital, Morgan Stanley, UBS,

20 | Banc of America, Countrywide, and CWALT are subject to personal jurisdiction in California

21 | because each of them is registered to do business, and does business, in California. All of the

22 | Defendants are subject to personal jurisdiction in California because they offered and sold or

23 | controlled persons that offered and sold the certificates to the Bank "in California" within the

24 | meaning of Section 25008 of the California Corporate Securities Act.

25 | 28. Venue is proper in this County because, among other reasons, the Defendants

26 | offered and sold the certificates to the Bank in this County and because the violations of law

27 | alleged in this complaint, including the making of material untrue or misleading statements,

28 | occurred in this County.

-9-

| | |
|---|---|
| 1 | **SECURITIZATION OF MORTGAGE LOANS** |
| 2 | 29. The securities that the Defendants sold the Bank are so-called **residential** |
| 3 | **mortgage-backed** securities, or **RMBS**, created in a process known as **securitization**. |
| 4 | Securitization begins with loans on which the borrowers are to make payments, usually monthly. |
| 5 | The entity that makes the loans is known as the **originator** of the loans. The process by which the |
| 6 | originator decides whether to make particular loans is known as the **underwriting** of loans. The |
| 7 | purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit |
| 8 | standing to repay them and only against sufficient collateral. In the loan underwriting process, the |
| 9 | originator applies its **underwriting standards.** |
| 10 | 30. In general, residential mortgage lenders may hold some of the mortgage loans they |
| 11 | originate in their own portfolio and may sell other mortgage loans they originate into |
| 12 | securitizations. |
| 13 | 31. In a securitization, a large number of loans, usually of a similar type, are grouped |
| 14 | into a **collateral pool**. The originator of those loans sells them (and, with them, the right to |
| 15 | receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The |
| 16 | trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors |
| 17 | such as the Bank. Each certificate entitles its holder to an agreed part of the cash flow from the |
| 18 | loans in the collateral pool. |
| 19 | 32. In a simple securitization, the holder of each certificate is entitled to a *pro rata* part |
| 20 | of the overall monthly cash flow from the loans in the collateral pool. |
| 21 | 33. In a more complex securitization, the cash flow is divided into different parts, |
| 22 | usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into |
| 23 | different **classes**, each with different rights. Each class of certificates is entitled to the cash flow |
| 24 | in the tranche corresponding to that class. |
| 25 | 34. One way in which the cash flow is divided — and the rights of different classes of |
| 26 | certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The |
| 27 | most **senior** class of certificates usually is entitled to be paid in full before the next most senior |
| 28 | class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool |

-10-

1   are allocated first to the most **subordinate** class of certificates, then to the class above that, and so

2   on. The interest rate on each class of certificates is usually proportional to the amount of risk that

3   that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of

4   interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as

5   the **waterfall**.

6         35.     The risk of a particular class of certificate is a function of both the riskiness of the

7   loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying

8   loans are quite risky, the senior classes of certificates may bear so little of that risk that they may

9   be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest

10   quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky

11   loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a

12   senior class of $50 million and a subordinate class of $50 million. Even though the underlying

13   loans are quite risky, the senior class of certificates would be paid in full as long as the $100

14   million of loans produced payments of at least $50 million plus interest, that is, unless the loss

15   rate on those loans exceeded 50%, fully 10 times the historical average.

16         36.     All of the certificates referred to in this complaint were senior certificates that

17   were rated triple-A when the Bank purchased them.

18                                        *

19         37.     Each securitization has a **sponsor**, the prime mover of the securitization.

20   Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the

21   collateral pool usually contains loans made by the originator that is sponsoring the securitization.

22   Other times, the sponsor may be an investment bank, which purchases loans from one or more

23   originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The

24   sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which

25   then transfers title to the loans to the trust.

26         38.     The obligor of the certificates in a securitization is the trust that purchases the

27   loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it

28

-11-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law

2    therefore treats the depositor as the issuer of a residential mortgage-backed certificate.

3                                          *

4            39.    **Securities dealers,** like eight of the Defendants, play a critical role in the process

5    of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates

6    from the trust and then sell them to investors. Equally important, securities underwriters provide

7    to potential investors the information that they need to decide whether to purchase certificates.

8            40.    Because the cash flow from the loans in the collateral pool of a securitization is the

9    source of funds to pay the holders of the certificates issued by the trust, the credit quality of those

10   certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the

11   place of each certificate in the waterfall). The most important information about the credit quality

12   of those loans is contained in the files that the originator develops while making the loans, the so-

13   called loan files. For residential mortgage loans, each loan file normally contains comprehensive

14   information from such important documents as the borrower's application for the loan, credit

15   reports on the borrower, and an appraisal of the property that will secure the loan. The loan file

16   also includes notes from the person who underwrote the loan about whether and how the loan

17   complied with the originator's underwriting standards, including documentation of any

18   "compensating factors" that justified any departure from those standards.

19           41.    Potential investors in certificates are not given access to loan files. Instead, the

20   securities dealers that underwrite the sale of the certificates in a securitization are responsible for

21   gathering, verifying, and presenting to potential investors the information about the credit quality

22   of the loans that will be deposited into the trust. They do so by using information about the loans,

23   which has been compiled into a database known as a **loan tape.** The securities dealers use the

24   loan tape to compile numerous statistics about the loans, which are presented to potential

25   investors in a **prospectus supplement,** a disclosure document that the dealers are required to file

26   with the Securities and Exchange Commission.

27

28

                                          -12-

                    FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    42.    As alleged in detail below, the information that the Defendants presented to the

2    Bank about the credit quality of the loans in the collateral pools of the trusts contained many

3    statements that were material to the credit quality of those loans, but were untrue or misleading.

4                           **TOLLING OF THE STATUTE OF LIMITATIONS**

5    43.    The Bank is a member of the proposed classes in *Luther v. Countrywide Financial*

6    *Corporation*, Superior Court for the State of California County of Los Angeles No. BC 380698,

7    filed on November 11, 2007, *New Jersey Carpenters Health Fund v. Residential Capital LLC*,

8    United States District Court for the Southern District of New York No. 08-cv-8781, filed on

9    September 22, 2008, and *New Jersey Carpenters Health Fund v. Bear Stearns Mortgage Funding*

10   *Trust 2006-AR1*, United States District Court for the Southern District of New York No. 08-cv-

11   08093, filed on August 20, 2008, the pendency of which actions has tolled the running of the

12   statute of limitations on causes of action alleged in this complaint.

13                           **THE SALES OF THE CERTIFICATES**

14   44.    The Defendants sold to the Bank 95 certificates in Securitizations Nos. 1 through

15   78. Details of each trust and each certificate are stated in Item 44 of Schedules 1 through 78 of

16   this complaint, which correspond to Securitizations Nos. 1 through 78. The Bank incorporates

17   into this paragraph 44, and alleges as though fully set forth in this paragraph, the contents of Item

18   44 of the schedules.

19                     **DEFENDANTS' MATERIAL UNTRUE OR MISLEADING**
                       **STATEMENTS ABOUT THE CERTIFICATES**
20

21   45.    In connection with their offers and sales of the certificates to the Bank, each of the

22   nine dealer Defendants sent numerous documents to the Bank at its office in San Francisco. For

23   each certificate, these documents included a term sheet (or its equivalent), the prospectus

24   supplement for the certificates that was filed with the SEC, drafts of some of the statistical tables

25   to be included in the prospectus supplement, and a computer model of the financial structure of

26   the securitization. In each of these documents, each dealer made statements of material fact about

27

28

                                              -13-

1  the certificate that it offered and sold to the Bank.[2] A true copy of the prospectus supplement for

2  each securitization is available from the Securities and Exchange Commission's website.[3]

3      46.     Many of the statements of material fact that each dealer made in these documents

4  were untrue or misleading. These untrue or misleading statements included the following.

5  I.    Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the
       Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools
6

7      A.     LTVs

8          1.     The materiality of LTVs

9      47.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of

10 the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property

11 when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000

12 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of

13 the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in

14 the collateral pool of a securitization are therefore one of the most crucial measures of the risk of

15 certificates sold in that securitization. LTV is a primary determinant of the likelihood of default.

16 The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less

17 likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby

18 give the owner an incentive to stop making mortgage payments and abandon the property, a so-

19 called strategic default. LTV is also a primary determinant of the severity of losses for those loans

20 that do default. The lower the LTV, the lower the severity of losses on those loans that do default.

21 Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the

22 proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

23     48.     Beyond these fundamental effects on the likelihood and severity of default, LTVs

24 also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage

25      [2] Three of the certificates that the Bank purchased were certificates in re-securitizations of existing
     certificates of mortgage-backed securities. In connection with the sale of those three certificates, the
26   dealers sent to the Bank a private placement memorandum for the re-securitization and prospectus
     supplements filed with the SEC for the underlying securitizations. Details of the re-securitizations are
27   included in their respective schedules.

28      [3] A URL for each prospectus supplement is included in Item 44 of each schedule.

-14-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1 loans before maturity and when they do so) and therefore the expected lives of the loans and the
2 associated certificates. Prepayment patterns affect many aspects of certificates that are material to
3 the investors that purchase them, including the life of the certificate and the timing and amount of
4 cash that the investor will receive during that life.

5     49. In addition, rating agencies use LTVs to determine the proper structuring and
6 credit enhancement necessary for securities, such as the certificates that the Bank purchased, to
7 receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a
8 securitization are incorrect, the ratings of certificates sold in that securitization will also be
9 incorrect.

10     50. An accurate denominator (that is, the value of the property) is essential to an
11 accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk
12 of a loan. To return to the example above, if the property whose actual value is $500,000 is
13 valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to
14 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the
15 LTV based on the incorrect appraised value understates the risk of the loan. It is also important to
16 note that, the higher the correct LTV, the more the risk is understated by an error in value of any
17 given magnitude. In the example above, though the risk of a loan with an LTV of 60% is greater
18 than the risk of one with an LTV of 54.5%, both imply a relatively safe loan because of the large
19 equity cushions. But a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%.
20 In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former,
21 only 10%, just over half as much. Thus, a denominator that overvalues a property by just 10%
22 produces an overstatement of more than 80% in the homeowner's equity.

23     51. For these reasons, a reasonable investor considers LTV critical to the decision
24 whether to purchase a certificate in a securitization of mortgage loans. Even small differences in
25 the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a
26 significant effect on both the risk and the rating of each certificate sold in that securitization and,
27 thus, are essential to the decision of a reasonable investor whether to purchase any such
28 certificate.

-15-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

2

    **2.**  **Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations**

3  52.  In the prospectus supplements and other documents they sent to the Bank, the

4 Defendants made material untrue or misleading statements about the LTVs of the mortgage loans

5 in the collateral pools of these securitizations. Each such statement is identified in Item 52 of the

6 schedules of this complaint. The Bank incorporates into this paragraph 52, and alleges as though

7 fully set forth in this paragraph, the contents of Item 52 of the schedules.

8  53.  The mortgage loans in the collateral pools of these securitization were divided into

9 groups. Payments on the certificates that the Bank purchased were to be made primarily from the

10 cash flows from the loans in the particular groups that were designated to support the Bank's

11 certificates. Because of the structure of the securitizations, however, in most cases the credit

12 quality of the loans in the other groups in the securitizations also was material to the risk of the

13 certificates that the Bank purchased.

14  54.  The Defendants made these statements as statements of fact. The Bank is informed

15 and believes, and based thereon alleges, that Defendants intended that these statements be

16 understood as statements of fact. The Bank did understand the statements about the LTVs as

17 statements of fact. The Bank had no access to appraisal reports or other documents or information

18 from which it could verify the LTVs of the mortgage loans other than the statements that the

19 Defendants made about those LTVs.

20

21

    **3.**  **These statements were untrue because the stated LTVs of many of those mortgage loans were lower than their actual LTVs.**

22  55.  The stated LTVs of many of the mortgage loans in each securitization were

23 significantly lower than the true LTVs because the denominators (that is, the value of the

24 properties that secured those loans) that were used to determine the disclosed LTVs were

25 overstated to a material extent.[4] The weighted-average LTVs presented in the prospectus

26 supplements were also, therefore, untrue and misleading.

27

28

[4] References in this complaint and the schedules to the denominator in the LTVs are to the appraised value of the properties as stated in the loan tapes. For the overwhelming majority of mortgage loans, the appraised value was used to calculate the stated LTVs in the loan tapes.

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

2

        **a.** **Use of an automated valuation model demonstrates that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

3        56.    Using a comprehensive, industry-standard automated valuation model (AVM), it is

4 possible to determine the true market value of a certain property as of a selected date. An AVM is

5 based on objective criteria like the condition of the property and the actual sale prices of

6 comparable properties in the same locale shortly before the specified date and is more consistent,

7 independent, and objective than other methods of appraisal. AVMs have been in widespread use

8 for many years. The AVM on which these allegations are based incorporates a database of 500

9 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more

10 than 99% of the population, in the United States. Independent testing services have determined

11 that this AVM is the most accurate of all such models.

12       57.    On many of the properties that secured the mortgage loans, the model reported that

13 LTVs were understated. In particular, the model reported that the denominator (that is, the

14 appraised value of the property as stated in the loan tape) that was used to determine the disclosed

15 LTV was 105% or more of the true market value as determined by the model as of the time the

16 loan was originated. The model reported that the denominator that was used to determine the

17 disclosed LTV was 95% or less of the true market value on a much smaller number of properties.

18 Thus, the number of properties on which the value was overstated exceeded by far the number on

19 which the value was understated, and the aggregate amount overstated exceeded by far the

20 aggregate amount understated.

21       58.    To take an example, in Securitization No. 1, there were 4,345 mortgage loans in

22 the collateral pool. There was sufficient information for the model to determine the value of the

23 properties that secured 2,578 of those loans. On 1,741 of those 2,578 properties, the model

24 reported that the denominator that was used to determine the disclosed LTV was 105% or more of

25 the true market value and the amount by which the stated values of those properties exceeded

26 their true market values in the aggregate was $159,299,961. The model reported that the

27 denominator that was used to determine the disclosed LTV was 95% or less of true market value

28 on only 289 properties, and the amount by which the true market values of those properties

-17-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    exceeded the values reported in the denominator was $18,366,289. Thus, the number of properties

2    on which the value was overstated exceeded by more than six times the number on which the

3    value was understated, and the aggregate amount overstated was more than eight times the

4    aggregate amount understated.

5        59.    On one of the loans in Securitization No. 1, the amount of the loan was $665,000

6    and the stated value of the property was $950,000, resulting in a stated LTV of 70%. The model,

7    however, determined that the true value of the property was $628,000, resulting in a true LTV

8    106%. Thus, the stated value was higher than the true value by 51%, and the stated LTV was

9    lower than the true LTV by 34%. Both of these were huge discrepancies that were material to the

10   credit quality of the loan.

11       60.    The overstated values of 1,741 properties made virtually every statement by

12   Defendants about the LTVs of the mortgage loans untrue or misleading. For example, Defendants

13   stated that all mortgage loans had an LTV of 100% or less. In fact, the mortgage loans on 414 of

14   the 2,578 properties valued by the model had LTVs of over 100%. Defendants also stated that the

15   weighted average LTV of the loans in the loan group from which the Bank's bonds were to be

16   paid was 72.2%. In fact, among the loans in that group that the AVM was able to value, the

17   weighted average LTV was 86.6%. These differences were material, for the reasons stated above.

18       61.    The results of the valuations by the automated model in this example are

19   summarized in the following table.

20   / / /

21

22

23

24

25

26

27

28

-18-

| | |
|---|---|
| Number of loans | 4,345 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,578 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,741 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $159,299,961 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 289 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $18,366,289 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 414 |
| Weighted-average LTV, as stated by Defendants (group 4) | 72.2% |
| Weighted-average LTV, as determined by the model (group 4) | 86.6% |

62.     The model produced similar results for the mortgage loans in the collateral pool of

each securitization. Details of the results of the model for each securitization are stated in Item 62

of the schedules of this complaint. The Bank incorporates into this paragraph 62, and alleges as

though fully set forth in this paragraph, the contents of Item 62 of the schedules.

> **b.     Subsequent sales of refinanced properties in the collateral pools indicate that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

63.     Of the mortgage loans in the collateral pools of these securitizations, many were

taken out to refinance, rather than to purchase, properties. For those loans, the appraisal was the

only basis for determining the value of the property because there is no sale price in a refinancing.

A substantial number of those properties have since been sold. In nearly all the pools, those

properties were sold for much less than the value ascribed to them in the LTV data reported in the

prospectus supplements and other documents that the Defendants sent to the Bank. The

differences cannot be explained by the declines in house prices in the areas in which those

properties were located. Analysis of indices that track home prices in various geographic areas

shows that the differences between the values ascribed to these properties and the prices at which

the properties were sold are significantly greater than the declines in house prices in the same

geographical areas over the same periods (that is, between the making of each mortgage loan and

the corresponding sale). Thus, the large differences show that the values ascribed to those

-19-

1  properties, and to all properties in the collateral pools, in the LTV data reported in the prospectus

2  supplements and other documents that the Defendants sent to the Bank were too high, that the

3  resulting LTVs were too low, and thus that the statements in the prospectus supplements and

4  other documents sent to the Bank about the LTVs were untrue or misleading.

5      64.    To return to the example of Securitization No. 1, of the 4,345 mortgage loans in

6  the collateral pool, 1,353 were taken out to refinance, rather than to purchase, properties. For

7  those 1,353 loans, the value (denominator) in the LTV was an appraised value rather than a sale

8  price. Of those 1,353 properties, 275 were subsequently sold for a total of approximately

9  $92,632,213. The total value ascribed to those same properties in the LTV data reported in the

10 prospectus supplements and other documents sent to the Bank was $137,028,900. Thus, those

11 properties were sold for 67.6% of the value ascribed to them, a difference of 32.4%. This

12 difference is significantly greater than would have been predicted by the declines in house prices

13 in the areas in which those properties were located.

14     65.    The results of this analysis for the securitizations are stated in Item 65 of the

15 schedules of this Complaint. The Bank incorporates into this paragraph 65, and alleges as though

16 fully set forth in this paragraph, the contents of Item 65 of the schedules.

17         **4.    These statements were misleading because the Defendants omitted to
state that there were additional liens on a material number of the
18                  properties that secured the mortgage loans in the collateral pools.**

19     66.    As mentioned above, the LTV of a mortgage loan is a key determinant of the

20 likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

21 less likely that a decline in the value of the property will wipe out the owner's equity and thereby

22 give the owner an incentive to stop making mortgage payments and abandon the property.

23 Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to

24 predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the

25 severity of loss on those loans that do default. The power of LTV to predict defaults,

26 prepayments, and severities is a major reason why reasonable investors consider the LTVs of

27 mortgage loans important to the decision whether to purchase a certificate in the securitization of

28 those loans.

-20-

1    67.    The predictive power of the LTV of a mortgage loan is much reduced if there are
2    additional liens on the same property. Additional liens reduce the owner's equity in the property
3    and thereby increase the owner's incentive to stop making mortgage payments and abandon the
4    property if the value of the property falls below the combined amount of all of the liens on the
5    property (a strategic default). Additional liens also exacerbate delinquencies and defaults because
6    they complicate the servicing of mortgage loans and the management of delinquencies and
7    defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also
8    with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may
9    want to grant a borrower forbearance while the borrower is unemployed and allow him or her to
10   add missed payments to the principal of the loan and to resume payments when he or she is
11   employed again. But the servicer of the second-lien mortgage may refuse such forbearance and
12   initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

13   68.    According to land records, many of the properties that secured mortgage loans in
14   the collateral pool of each securitization were subject to liens in addition to the lien of the
15   mortgage in the pool at the time of the closing of these securitizations.[5] In 66 of the
16   securitizations, the Defendants failed to disclose any of these additional liens in the prospectus
17   supplements and other documents they sent to the Bank. These additional liens reduced the equity
18   of the owners of the properties subject to them, and thereby increased the risk that those owners
19   would default in payment of the mortgage loan in the pool.

20   69.    To take an example, of the 4,345 properties that secured the mortgage loans in
21   Securitization No. 1 at least 221 were subject to undisclosed liens in addition to the lien of the
22   mortgage in the pool. The undisclosed additional liens on these properties reduced the owners'
23   equity in those properties by a weighted average of 76.6% and by an aggregate amount of
24   $28,493,227.

25   70.    On one of the loans in Securitization No. 1, the original balance of the mortgage
26   loan was $40,000, the represented value of the property was $680,000 the owner's ostensible

27   —————————
     [5] Additional liens referred to in this complaint and the schedules exclude liens on the loan tapes
28   that were originated on or before the date on which the mortgage loans in the pools were originated.

-21-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    equity was $140,000, and the reported LTV was 79.4%. On the date of the closing of this
2    securitization, however, there were undisclosed additional liens on this property of $100,000.
3    Thus, the owner's true equity was only $40,000, fully 71.4% less than the equity implied by the
4    disclosed loan amount and value of the property. In many cases, the amounts of the undisclosed
5    additional liens were precisely equal to the owner's ostensible equity, thereby reducing that
6    equity by 100%, to zero. And in some cases, the amount of the undisclosed additional liens was
7    much greater than the owner's ostensible equity, putting the owner "under water" on the day on
8    which this securitization closed.

9        71.    Similar numbers of additional undisclosed liens were found in each securitization
10   where the defendants did not disclose the existence of additional liens. Details of the undisclosed
11   additional liens in each securitization are stated in Item 71 of the schedules of this complaint. The
12   Bank incorporates into this paragraph 71, and alleges as though fully set forth in this paragraph,
13   the contents of Item 71 of the schedules. The Bank is informed and believes, and based thereon
14   alleges, that discovery will demonstrate that the number of loans with additional liens is
15   substantially higher than those disclosed in the schedules.

16       72.    Because the Defendants did not disclose the existence or the amounts of these
17   additional liens, all statements that they made about the LTVs of the mortgage loans were
18   misleading.

19       **B.    Appraisals**

20       73.    As discussed above in paragraph 49, an accurate denominator (value of the
21   mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in
22   turn, is essential to an accurate denominator.

23       74.    In connection with these securitizations, there was undisclosed upward bias in
24   appraisals of properties that secured mortgage loans and consequent understatement of the LTVs
25   of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and
26   loan officers who were not paid unless loans closed and properties changed hands, and who thus
27   had a strong incentive to pressure appraisers to appraise properties at values high enough to
28   enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close

-22-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  was known as "hitting the bid." In a purchase, this meant ensuring that the appraised value was

2  equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid"

3  meant ensuring that the appraised value was high enough to enable the proposed loan to comply

4  with the lender's requirements for LTV.)

5      75.    This upward bias in appraisals caused the denominators that were used to

6  determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore

7  to be understated. The statements that the Defendants made about the LTVs of the mortgage loans

8  in the collateral pools were misleading because they omitted to state that the appraisals of a

9  material number of the properties that secured those loans were biased upwards. In addition, the

10  Defendants stated that the appraisals conformed to the Uniform Standards of Professional

11  Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or

12  to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP).

13  Those statements were false because upwardly biased appraisals do not conform to USPAP.

14      **1.**    **These statements that the Defendants made about the LTVs of the**

15  **mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties**

16  **that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those**

17  **mortgage loans.**

18      76.    Defendants omitted to state that brokers and loan officers pressured appraisers by

19  threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by

20  refusing to pay for completed appraisals that did not "hit the bid." This pressure came in many

21  forms, including the following:

22      •    the withholding of business if the appraisers refused to inflate
   values,

24      •    the withholding of business if the appraisers refused to guarantee
   a predetermined value,

25      •    the withholding of business if the appraisers refused to ignore
   deficiencies in the property,

27      •    refusing to pay for an appraisal that does not give the brokers and
   loans officers the property values that they want,

28

-23-

1    •    black listing honest appraisers in order to use "rubber stamp"
          appraisers, etc.

2    77.    The appraisals used to compute the LTVs of many of the mortgage loans in the

3    collateral pools were biased upwards. As alleged in paragraphs 63 through 65 above, the

4    appraisals of refinanced properties that were subsequently sold were overstated. Moreover, as

5    alleged in paragraphs 56 through 62, in each trust, the number of properties on which the value

6    was overstated exceeded by far the number on which the value was understated, and the

7    aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for

8    each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties Whose Value was Overstated to Number Whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 6.0 | 8.7 |
| 2 | 4.8 | 7.3 |
| 3 | 2.4 | 2.7 |
| 4 | 3.6 | 3.7 |
| 5 | 2.2 | 2.2 |
| 6 | 3.3 | 3.1 |
| 7 | 6.4 | 6.6 |
| 8 | 12.0 | 15.9 |
| 9 | 3.6 | 3.4 |
| 10 | 2.0 | 1.5 |
| 11 | 10.9 | 20.9 |
| 12 | 9.7 | 13.7 |
| 13 | 4.5 | 4.3 |
| 14 | 6.0 | 6.1 |
| 15 | 3.3 | 2.6 |
| 16 | 1.6 | 1.6 |
| 17 | 2.3 | 2.3 |
| 18 | 6.8 | 7.2 |
| 19 | 5.3 | 5.0 |
| 20 | 5.1 | 5.3 |
| 21 | 4.8 | 5.5 |
| 22 | 6.1 | 7.5 |

-24-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

| Securitization No. | Ratio of Number of Properties Whose Value was Overstated to Number Whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 23 | 4.2 | 4.4 |
| 24 | 3.2 | 3.1 |
| 25 | 2.9 | 2.7 |
| 26 | 2.8 | 3.1 |
| 27 | 2.9 | 3.2 |
| 28 | 2.0 | 2.1 |
| 29 | 1.8 | 1.4 |
| 30 | 2.2 | 1.7 |
| 31 | 2.4 | 2.1 |
| 32 | 12.7 | 21.8 |
| 33 | 2.8 | 3.0 |
| 34 | 2.8 | 2.7 |
| 35 | 3.0 | 2.6 |
| 36 | 2.6 | 2.7 |
| 37 | 2.2 | 2.1 |
| 38 | 2.4 | 1.7 |
| 39 | 2.6 | 2.3 |
| 40 | 10.5 | 11.4 |
| 41 | 2.4 | 1.7 |
| 42 | 3.0 | 3.2 |
| 43 | 2.2 | 1.6 |
| 44 | 2.1 | 1.7 |
| 45 | 6.6 | 7.4 |
| 46 | 3.6 | 3.5 |
| 47 | 3.0 | 2.6 |
| 48 | 9.9 | 11.0 |
| 49 | 3.2 | 4.0 |
| 50 | 3.1 | 3.3 |
| 51 | 2.9 | 3.2 |
| 52 | 2.9 | 3.1 |
| 53 | 1.7 | 1.3 |
| 54 | 7.6 | 9.6 |
| 55 | 3.8 | 3.7 |
| 56 | 4.1 | 3.8 |

-25-

| Securitization No. | Ratio of Number of Properties Whose Value was Overstated to Number Whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 57 | 2.7 | 3.6 |
| 58 | 2.8 | 3.4 |
| 59 | 2.9 | 4.2 |
| 60 | 14.5 | 18.0 |
| 61 | 10.6 | 14.6 |
| 62 | 8.5 | 16.7 |
| 63 | 3.5 | 3.5 |
| 64 | 1.7 | 1.5 |
| 65 | 1.9 | 1.9 |
| 66 | 1.4 | 1.1 |
| 67 | 1.3 | 1.3 |
| 68 | 3.5 | 4.1 |
| 69 | 1.4 | 1.0 |
| 70 | 1.3 | 1.3 |
| 71 | 2.0 | 2.4 |
| 72 | 1.3 | 0.9 |
| 73 | 3.2 | 3.9 |
| 74 | 8.1 | 10.0 |
| 75 | 4.6 | 5.2 |
| 76 | 3.8 | 3.1 |
| 77 | 3.8 | 4.0 |
| 78 | 4.0 | 3.6 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

78.     The Bank is informed and believes, and based thereon alleges, that a material number of the upwardlybiased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation, but rather were the result of pressure on the appraiser to "hit the bid."

-26-

1               **2.**     **The statements by the Defendants about compliance with USPAP were**
                          **untrue because the appraisals of a large number of the properties that**

2                           **secured the mortgage loans were biased upward.**

3      79.     Appraisers and appraisals are governed by USPAP, which is promulgated by the

4 Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and

5 maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac

6 require that appraisals comply with USPAP.

7      80.     USPAP includes the following provisions:

8                a.     Third USPAP Ethics Conduct Rule: "An appraiser must perform

9 assignments with impartiality, objectivity, and independence, and without accommodation of

10 personal interests."

11                b.     Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an

12 assignment that includes the reporting of predetermined opinions and conclusions."

13                c.     Second USPAP Ethics Management Rule:

14                It is unethical for an appraiser to accept an assignment, or to have a
               compensation arrangement for an assignment, that is contingent on any

15                of the following:

16                1.     the reporting of a predetermined result (*e.g.*, opinion of value);

17                2.     a direction in assignment results that favors the cause of the client;

18                3.     the amount of a value opinion;

19                4.     the attainment of a stipulated result; or

20                5.     the occurrence of a subsequent event directly related to the
                     appraiser's opinions and specific to the assignment's purpose.

21

22      81.     The Appraisal Standards Board, which promulgates USPAP, also issues Advisory

23 Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP,

24 they "are issued to illustrate the applicability of appraisal standards in specific situations."

25 Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal

26 Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests

27 for their services accompanied by such conditions as: "Approximate (or Minimum) value needed:

28

1 ____"; "If this property will not appraise for at least ____, stop and call us immediately"; etc.

2 About such conditions, Advisory Opinion 19 states:

3  Certain types of conditions are unacceptable in any assignment because
performing an assignment under such conditions violates USPAP.
4  Specifically, an assignment condition is unacceptable when it:

5  • precludes an appraiser's impartiality. Because such a condition
destroys the objectivity and independence required for the
6  development and communication of credible results;

7  • limits the scope of work to such a degree that the assignment
results are not credible, given the intended use of the assignment;
8  or

9  • limits the content of a report in a way that results in the report
being misleading.
10

11  82.  In the prospectus supplements and other documents they sent to the Bank, the

12 Defendants made statements that the appraisals of properties that secured the mortgage loans in

13 the collateral pools were made in compliance with USPAP or with the appraisal standards of

14 Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such

15 statement are stated in Item 82 of the schedules of this complaint. The Bank incorporates into this

16 paragraph 82, and alleges as though fully set forth in this paragraph, the contents of Item 82 of the

17 schedules.

18  83.  The Bank is informed and believes, and based thereon alleges, that a material

19 number of mortgage loans in the collateral pools had appraisals conducted that deviated from

20 USPAP.

21  84.  Each of these statements referred to in paragraph 82 was untrue because the

22 appraisals of a material number of the properties referred to in each such statement did not

23 conform to USPAP.

24  *

25  85.  By each of the untrue and misleading statements referred to in paragraphs 52 and

26 82 above, the Defendants materially understated the risk of the certificates that they offered and

27 sold to the Bank.

28

-28-

**II.    Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

       **A.    The materiality of occupancy status**

86.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

87.    Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

       **B.    Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

88.    In the prospectus supplements and other documents they sent to the Bank, the Defendants made statements about the number of properties in the collateral pool of each securitization that were the primary homes of their owners. To return to the example of Securitization No. 1, the Defendants stated that, of the 4,345 mortgage loans in the collateral pool, 2,731 were secured by primary residences and 1,614 were not. Details of each such statement in each securitization are stated in Item 88 of the schedules of this complaint. The Bank incorporates into this paragraph 88, and alleges as though fully set forth in this paragraph, the contents of Item 88 of the schedules.

89.    These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans not secured by primary residences was lower

-29-

1 than the actual number of loans in that category; or (iii) the Defendants omitted to state that the

2 occupancy status of a significant number of the properties that secured the mortgage loans in the

3 collateral pools was misstated because of fraud.

4
    **C.    Basis of the allegations above that these statements about the occupancy
5
          status of the properties that secured the mortgage loans in the collateral pools
          were untrue or misleading**

6
    90.    Because they are less risky than other mortgage loans, mortgage loans on primary

7 residences usually have more favorable terms, including lower interest rates and more lenient

8 underwriting standards, than mortgage loans on second homes and investment properties.

9 Applicants for loans on second homes and investment properties therefore have an incentive to

10 state that the property will be their primary residence even when it will not. The Bank is informed

11 and believes, and based thereon alleges, that borrowers many nonconforming securitized loans

12 did so.

13
    91.    A significant number of the properties in the collateral pool of each securitization

14 that were stated to be primary residences actually were not. Moreover, the Bank is informed and

15 believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the

16 loan files of many more of the mortgage loans in the collateral pool.

17
    92.    With respect to some of the properties that were stated to be primary residences,

18 the borrower instructed local tax authorities to send the bills for the taxes on the property to the

19 borrower at an address other than the property itself. This is strong evidence that the mortgaged

20 property was not the borrower's primary residence.

21
    93.    In some states and counties, owners of a property are able to designate whether

22 that property is his or her "homestead," which may reduce the taxes on that property or exempt

23 the property from assets available to satisfy the owner's creditors, or both. An owner may

24 designate only one property, which he or she must occupy, as his or her homestead. The fact that

25 an owner in one of these jurisdictions does not designate a property as his or her homestead when

26 he or she can do so is strong evidence that the property was not his or her primary residence. With

27 respect to some of the properties that were stated to be primary residences, the owner could have

28

-30-

FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

94.    With respect to some of the properties that were stated to be primary residences, the borrower owned three or more properties. Thus it was reasonably likely that the borrower did not live in the property that was stated to be owner-occupied.

95.    When a borrower who lives in a mortgaged property falls behind in his or her payments, it is normally many months before foreclosure ensues, during which time the borrower tries to become current in his or her payments or to modify the mortgage so as not to lose his or her home. During this time, the borrower becomes progressively more delinquent (30 days past due, 60 days past due, etc.). In the very rare circumstances in which a mortgage loan goes straight from being current to either foreclosure or ownership by the lender, it is usually because the borrower did not live in the property and so made no effort to remain in it, but instead abandoned the property to the lender soon after he or she became unable to make the payments. In many of the securitizations, there were mortgage loans in the collateral pools that were secured by properties that were stated to be primary residences and that went straight from current to foreclosure or ownership by the lender. It is more likely than not that the properties that secured these mortgage loans were actually not primary residences.

96.    In Securitization No. 1, 243 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on that property to them at a different address; 325 owners of properties that were stated to be primary residences could have, but did not, designate that property as their homestead and; 30 owners of properties that were stated to be primary residences owned three or more properties. Eliminating duplicates, 521 properties that were stated to be primary residences actually were not, for one or more of these reasons. Thus, of the 2,731 properties that were stated to be primary residences, 521 actually were not, and the number of properties that were not primary residences was not 1,614, as the defendants stated, but actually 2,135, a material difference. The numbers of such loans in the collateral pool of each securitization are stated in Item 96 of the schedules of this Complaint. The

-31-

1 │ Bank incorporates into this paragraph 96, and alleges as though fully set forth in this paragraph,

2 │ the contents of Item 96 of the schedules.

3 │          *

4 │   97.  By each of the untrue and misleading statements referred to in paragraph 88, the

5 │ Defendants materially understated the risk of the certificates that they offered and sold to the

6 │ Bank.

7 │ **III.** **Untrue or Misleading Statements About the Underwriting Standards of the**
    **Originators of the Mortgage Loans in the Collateral Pools**

8 │

9 │   **A.** **The materiality of underwriting standards and the extent of an originator's**
      **departures from them**

10 │   98.  Originators of mortgage loans have written standards by which they underwrite

11 │ applications for loans. An important purpose of underwriting is to ensure that the originator

12 │ makes mortgage loans only in compliance with those standards and that its underwriting decisions

13 │ are properly documented. An even more fundamental purpose of underwriting mortgage loans is

14 │ to ensure that loans are made only to borrowers with credit standing and financial resources to

15 │ repay the loans and only against collateral with value, condition, and marketability sufficient to

16 │ secure the loans. An originator's underwriting standards, and the extent to which the originator

17 │ departs from its standards, are important indicators of the risk of mortgage loans made by that

18 │ originator and of certificates sold in a securitization in which mortgage loans made by that

19 │ originator are part of the collateral pool. A reasonable investor considers the underwriting

20 │ standards of originators of mortgage loans in the collateral pool of a securitization, and the extent

21 │ to which each originator departs from its standards, important to the decision whether to purchase

22 │ a certificate in that securitization.

23 │   **B.** **Untrue or misleading statements about the underwriting standards of**
      **originators of the mortgage loans in the collateral pools and about the extent**

24 │       **to which those originators departed from their standards**

25 │     **1.** **The untrue or misleading statements**

26 │   99.  In the prospectus supplements and other documents they sent to the Bank, the

27 │ Defendants made statements about the underwriting standards of the originators of the mortgage

28 │ loans in the collateral pool. Details of each such statement are stated in Item 99 of the schedules

               -32-

1    of this complaint. They included statements that the originators made mortgage loans in

2    compliance with their underwriting standards and made exceptions to those standards only when

3    compensating factors were present. The Bank incorporates into this paragraph 99, and alleges as

4    though fully set forth in this paragraph, the contents of Item 99 of the schedules.

5          100.      The Bank is informed and believes, and based thereon alleges, that these

6    statements were untrue or misleading because the Defendants omitted to state that: (a) the

7    originators were departing extensively from those underwriting standards; (b) the originators were

8    making extensive exceptions to those underwriting standards when no compensating factors were

9    present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those

10    underwriting standards; (d) the originators were making mortgage loans that borrowers could not

11    repay; and (e) the originators were failing frequently to follow quality-assurance practices

12    necessary to detect and prevent fraud intended to circumvent their underwriting standards.

13          **2.**      **Basis of the allegations that these statements about the underwriting**
                **standards of the originators of the mortgage loans in the collateral**
14              **pools, and about the extent of their departures from those standards,**
                **were untrue or misleading**

15

                **a.**      **The deterioration in undisclosed credit characteristics of**
16                     **mortgage loans made by these originators**

17

18          101.      The Bank is informed and believes, and based thereon alleges, before and during

19    the time of these securitizations, many originators of mortgage loans relaxed their actual lending

20    practices for loans they sold into securitizations, even though their stated underwriting standards

21    may have remained unchanged. As a result of this relaxation, securitized mortgage loans made

22    between 2004 and the dates of these securitizations have experienced high rates of delinquency

23    and default.

24          102.      Based on an extensive empirical study of mortgage loans made and sold into

25    securitizations during this period, economists at the University of Michigan and elsewhere found

26    that the high rates of delinquency and default were caused not so much by any deterioration in

27    credit characteristics of the loans that were expressly embodied in underwriting standards and

28

-33-

1   disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed
2   to investors.

3       103.    What these economists found about recent securitized mortgage loans in general
4   was true in particular of loans originated by the entities that originated the loans in the collateral
5   pools of these securitizations, as the following figures demonstrate. Taking the originator
6   Countrywide Home Loans, Inc. as an example, Figure 1 shows the rising incidence of early
7   payment defaults (or EPDs), that is, the percent of loans (by outstanding principal balance) that
8   were originated and sold into securitizations by Countrywide Home Loans, Inc. and that became
9   60 or more days delinquent within six months after they were made. An EPD is strong evidence
10  that the originator departed from its underwriting standards in making the loan, often by failing to
11  detect fraud in the application. Underwriting standards are intended to ensure that loans are made
12  only to borrowers who can and will make their mortgage payments. Because an EPD occurs so
13  soon after the mortgage loan was made, it is much more likely that the default occurred because
14  the borrower could not afford the payments in the first place (and thus that the underwriting
15  standards were not followed), than because of changed external circumstances unrelated to the
16  underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in
17  Figure 1 depict the incidence of EPDs in loans originated by Countrywide Home Loans, Inc. that
18  were sold into securitizations. The steady increase in EPDs is further evidence that the
19  deterioration in the credit quality of those loans was caused by departures from its underwriting
20  standards.

21

22

23

24

25

26

27

28

-34-

1
2
3
4
5
6
7
8
9
10
11
12
13



Figure 1: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

14

15   104.   Figure 2 shows the weighted-average disclosed LTVs of the same loans and

weighted-average disclosed credit scores of the borrowers. These were nearly constant,

16   confirming the finding of the economists at the University of Michigan that the deterioration in

17   the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed

18   factors.

19
20
21
22
23
24
25
26
27
28

-35-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 2: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

105.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of the following Exhibits to this Complaint:

| Exhibit | Originator |
|---------|------------|
| A | Bank of America N.A. |
| B | Bear Stearns Residential Mortgage Corp., and EMC Mortgage Corp. |
| C | Countrywide Home Loans, Inc |
| D | Credit Suisse First Boston Corp. and DLJ Mortgage Capital |
| E | GMAC Mortgage Corp. |
| F | Greenpoint Mortgage Funding |
| G | MortgageIT, Inc. |

-36-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

| Exhibit | Originator |
|---------|-----------|
| H | Wells Fargo Bank, N.A. |

The Bank incorporates into this paragraph 105, and alleges as though fully set forth in this paragraph, the contents of figures 1 and 2 of each Exhibit.

              **b.**    **The poor performance of the loans in these pools demonstrates that the originators departed extensively from their underwriting guidelines when making these loans.**

106.   As noted above, an EPD is strong evidence that the originator may have departed from its underwriting standards in making the loan. The mortgage loans in the collateral pools of these securitization experienced very high rates of EPDs, some much higher than the rate of EPDs suffered by all securitized prime (including Alt-A) mortgage loans made in the United States during the same time in which those loans were made. This much higher-than-normal rate of EPDs is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs, and the percent of all securitized non-agency prime (including Alt-A) mortgage loans made at the same time that suffered EPDs, are stated in Item 106 of the schedules of this Complaint. The Bank incorporates into this paragraph 106, and alleges as though fully set forth in this paragraph, the contents of Item 106 of the schedules.

107.   A higher-than-normal rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have departed from their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure, some much higher than the rate of such delinquencies suffered by all securitized prime (including Alt-A) mortgage loans made in the United States during the same time in which those loans were made. This much higher-than-normal rate of delinquencies is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days

-37-

1   delinquencies, and the percent of all securitized prime (including Alt-A) mortgage loans made at

2   the same time that suffered such delinquencies, are stated in Item 107 of the schedules of this

3   Complaint. The Bank incorporates into this paragraph 107, and alleges as though fully set forth in

4   this paragraph, the contents of Item 107 of the schedules.

5       108.    A second common measure of delinquency is the number of loans on which the

6   borrowers are 30 or more days delinquent now. The mortgage loans in the collateral pools have

7   experienced very high rates of delinquencies by this measure, some as high as 54.9% of the loans

8   in some pools as of March 31, 2010. By contrast, only 14.7% of all mortgage loans made in the

9   United States (including millions of loans of lower ostensible credit quality) were 30+ days

10   delinquent on the same date. This much higher-than-normal rate of delinquencies is strong

11   evidence that the originators of those loans may have departed extensively from their

12   underwriting standards when making those loans. The number and percent of the loans in each

13   pool that were 30 or more days delinquent on March 31, 2010, are stated in Item 108 of the

14   schedules of this Complaint. The Bank incorporates into this paragraph 108, and alleges as

15   though fully set forth in this paragraph, the contents of Item 108 of the schedules.

16                     **c.     Governmental investigations also concluded that the largest**

17                         **originator in these securitizations departed from its**
                      **underwriting standards.**

18       109.    In addition to the statistical data cited above, governmental investigations also

19   concluded that Countrywide Home Loans, Inc. (which originated 54% of all the loans in the

20   collateral pools of these securitizations), made extensive, undisclosed departures from its stated

21   underwriting standards.

22       110.    The Securities and Exchange Commission conducted an extensive investigation of

23   the lending practices of Countrywide. Based on the findings of its investigation, the SEC sued

24   three former senior officers of Countrywide. In its complaint, the SEC alleged that these three

25   senior officers committed securities fraud by hiding from investors "the high percentage of loans

26   [Countrywide] originated that were outside its already widened underwriting guidelines due to

27   loans made as exceptions to guidelines."

28

-38-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    111.   Among the support for the SEC's allegations is a memorandum dated December

2  13, 2007, in which the enterprise risk assessment officer at Countrywide stated that "borrower

3  repayment capacity was not adequately assessed by the bank during the underwriting process for

4  home equity mortgage loans." The SEC also based its allegations on an email dated June 1, 2007,

5  in which Countrywide's Chairman and CEO Angelo Mozilo wrote that borrowers "are going to

6  experience a payment shock which is going to be difficult if not impossible for them to manage."

7    112.   The Attorneys General of many states also investigated Countrywide's lending

8  practices. Among these, the Attorney General of California found, and alleged in a suit against

9  Countrywide, that Countrywide "viewed borrowers as nothing more than the means for producing

10  more loans, originating loans with little or no regard to borrowers' long-term ability to afford

11  them." The Attorneys General of several other states also reached the same conclusion.

12         •    The Attorney General of Washington alleged that "[t]o increase market share,
                [Countrywide] dispensed with many standard underwriting guidelines . . . to place
13              unqualified borrowers in loans which ultimately they could not afford."

14         •    The Attorney General of Illinois alleged in a suit against Countrywide that
                Countrywide was "indifferen[t] to whether homeowners could afford its loans."
15

16         •    The Attorney General of West Virginia alleged that "Countrywide sold West
                Virginia consumers loans when there was no reasonable probability of the
17              consumers being able to pay the loan in full."

18    113.   The Bank is informed and believes, and based thereon alleges, that Countrywide

19  did not adhere to its own underwriting standards, but instead abandoned or ignored them.

20  According to internal Countrywide documents, Mozilo admitted that loans "had been originated

21  'through our channels with disregard for process [and] compliance with guidelines.'" Similarly,

22  the Attorney General of California alleged that "Countrywide did whatever it took to sell more

23  loans, faster – including by . . . disregarding the minimal underwriting criteria it claimed to

24  require."

25    114.   The Bank is informed and believes, and based thereon alleges, that Countrywide

26  made exceptions to its underwriting standards where no compensating factors existed, resulting in

27  higher rates of default. According to the SEC in its action against former officers of Countrywide:

28

-39-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

> [T]he actual underwriting of exceptions was severely compromised. According to Countrywide's official underwriting guidelines, exceptions were only proper where "compensating factors" were identified which offset the risks caused by the loan being outside of guidelines. In practice, however, **Countrywide used as "compensating factors" variables such as FICO and loan to value, <u>which had already been assessed [in determining the loan to be outside of guidelines]</u>**.

(Emphasis in original.) Such "compensating factors" did not actually compensate for anything and did not "offset" any risk.

115.    Finally, the Bank is informed and believes, and based thereon alleges, that Countrywide did not apply its underwriting standards in accordance with all federal, state, and local laws. Countrywide has entered into agreements to settle charges of violation of predatory lending, unfair competition, false advertising, and banking laws with the Attorneys General of at least 39 states, including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Maine, Michigan, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The Attorneys General of these states alleged that Countrywide violated state predatory lending laws by (i) making loans it could not have reasonably expected borrowers to be able to repay; (ii) using high pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (iii) failing to disclose to borrowers important information about the loans, including the costs and difficulties of refinancing, the availability of lower cost products, the existence and nature of prepayment penalties, and that advertised low interest rates were merely "teaser" rates that would adjust upwards dramatically as soon as one month after closing.

*

116.    By each of the untrue and misleading statements referred to in paragraph 99 above, the Defendants materially understated the risk of the certificates that they offered and sold to the Bank. Moreover, the Bank is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators departed extensively from their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

-40-

1     **IV. The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements**
2     **About the Ratings of the Bank's Certificates Untrue and Misleading.**

3     117. In the prospectus supplements and other documents they sent to the Bank, the

4     Defendants made statements about the rating of each certificate by Moody's Investors Service,

5     Standard & Poor's Rating Service, and Fitch Ratings. They stated that one or more of those

6     agencies rated each such certificate triple-A, the highest rating available from either agency.

7     Details of each such statement are stated in Item 117 of the schedules of this complaint. The Bank

8     incorporates into this paragraph 117, and alleges as though fully set forth in this paragraph, the

9     contents of Item 117 of the schedules.

10     118. The ratings were important to the decision of any reasonable investor whether to

11     purchase the certificates. Many investors, including the Bank, have investment policies that

12     require a certain minimum rating for all investments. The policy of the Bank was to purchase only

13     certificates that were rated triple-A.

14     119. These statements by the Defendants about the ratings of the certificates they sold

15     to the Bank were misleading because the Defendants omitted to state that the ratings did not take

16     into account all the material untrue or misleading statements about specific mortgage loans in the

17     collateral pool. These include:

18         a. loans in which the LTVs were materially understated;

19         b. loans in which the owner's equity in the property was reduced by 5% or

20     more by undisclosed additional liens;

21         c. loans that suffered EPDs, strong evidence that the originators may have

22     made undisclosed departures from the underwriting standards in making those loans; and

23         d. loans in which the properties were stated to be owner-occupied, but were

24     not.

25     120. In Securitization No. 1, there were 1,741 loans whose LTVs were materially

26     understated, 221 loans in which the owner's equity was reduced by 5% or more by undisclosed

27     additional liens, 261 loans that suffered EPDs, and 521 loans in which the properties were stated

28     to be owner-occupied but were not. Eliminating duplicates, there were 2,198 loans (or 50.6% of

-41-

1    the loans in the collateral pool) about which the defendants made untrue or misleading statements.

2    The numbers of such loans in the collateral pool of each securitization are stated in Item 120 of

3    the schedules of this Complaint. The Bank incorporates into this paragraph 120, and alleges as

4    though fully set forth in this paragraph, the contents of Item 120 of the schedules.

5        121.    The Bank is informed and believes, and based thereon alleges, that loan files and

6    other documents available only through discovery will prove that those statements were untrue or

7    misleading with respect to many more loans as well.

8        122.    By these untrue and misleading statements, the Defendants materially understated

9    the risk of the certificates that they offered and sold to the Bank. Moreover, the Bank is informed

10   and believes, and based thereon alleges, that the Defendants materially understated the risk of the

11   certificates that they offered and sold to the Bank.

12                                    **FIRST CAUSE OF ACTION**

13   **UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES**
             **(California Corporations Code §§ 25401, 25501)**
14
         123.    This cause of action is alleged against the following Defendants:
15

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| Credit Suisse | Securitizations Nos. 1 through 5, and 7 through 10 |
| Deutsche | Securitizations Nos. 11 through 16, and 18 through 31 |
| Bear Stearns | Securitizations Nos. 32 through 35, 40, and 41 |
| Greenwich Capital | Securitizations Nos. 42 and 44 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 48 through 51, and 53 through 59 |
| Banc of America | Securitizations Nos. 60 through 70 |
| Countrywide | Securitizations Nos. 74 through 78 |

23       124.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1

24   through 122.

25       125.    In doing the acts alleged in the sale to the Bank of the certificates in the

26   securitizations referred to above, the Defendants named above violated Sections 25401 and 25501

27   of the California Corporations Code by offering or selling securities in this State by means of

28

                                              -42-

                     FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   written communications that included untrue statements of material fact or omitted to state

2   material facts necessary in order to make the statements made, in light of the circumstances under

3   which they were made, not misleading.

4        126.    This action is brought within two years after the discovery of the untrue and

5   misleading statements in the prospectus supplements and other documents that the Defendants

6   sent to the Bank, and within five years of the Bank's purchase of these certificates, or within any

7   applicable period as tolled by the pendency of the class actions referred to above or others.

8   Despite having exercised reasonable diligence, the Bank did not and could not reasonably have

9   discovered earlier the untrue and misleading statements in the prospectus supplements and other

10  documents.

11       127.    Under California Corporations Code §§ 25401 and 25501, the Bank is entitled to

12  recover the consideration that it paid for each of these certificates, plus interest at the legal rate

13  from the date of purchase to the date on which it recovers the purchase price, minus the amount of

14  income it has received on the certificate. Pursuant to § 25501 and in anticipation of the remedies

15  thereunder, the Bank hereby offers to tender each certificate.

16                          **SECOND CAUSE OF ACTION**

17                   **UNTRUE OR MISLEADING STATEMENTS**
                       **IN REGISTRATION STATEMENTS**
18                     **(Section 11 of the Securities Act of 1933)**

19       128.    This cause of action is alleged against the following Defendants:

20

21

22

23

24

25

26

27

28
                                    -43-

| Against Defendant: | In connection with Securitizations: |
|---|---|
| Credit Suisse | Securitizations Nos. 7 through 10 |
| Deutsche | Securitizations Nos. 18 through 31 |
| Bear Stearns | Securitizations Nos. 40 and 41 |
| SAMI II | Securitization No. 40 |
| Greenwich Capital | Securitization No. 44 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 54 through 59 |
| Countrywide | Securitizations Nos. 75 through 78 |
| CWALT | Securitizations Nos. 7, 9, 10, 18 through 31, 41, 44 through 47, 54 through 59, 75 through 78 |

129.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 127.

130.    In doing the acts alleged, the Defendants named above violated Section 11 of the Securities Act of 1933 in connection with the sale to the Bank of the certificates in the securitizations referred to above.

131.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 44 of the schedules.

132.    SAMI II and CWALT are depositors of the securitizations listed above and therefore are the issuers of the certificates in those securitizations. Credit Suisse, Deutsche, Bear Stearns, Greenwich Capital, Morgan Stanley, UBS and Countrywide acted as underwriters of the certificates listed above.

133.    This action is brought within one year after the discovery of the untrue and misleading statements in the registration statements, as amended by the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements.

-44-

FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    134.    The registration statements, as amended by the prospectus supplements, contained

2    untrue statements of material fact and omitted to state material facts necessary in order to make

3    the statements, in the light of the circumstances under which they were made, not misleading.

4    These untrue and misleading statements included all of the untrue and misleading statements

5    described in paragraphs 45 through 122.

6    135.    The Bank expressly excludes from this cause of action any allegation that could be

7    construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

8    on claims of strict liability or negligence under the Securities Act of 1933.

9    136.    The Bank did not know when it purchased these certificates that the statements in

10   the registration statements, as amended by the prospectus supplements, were untrue or

11   misleading.

12   137.    The Bank has suffered a loss on each of these certificates.

13   138.    The Bank is entitled to recover damages as described in 15 U.S.C. § 77k(e).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-45-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

## THIRD CAUSE OF ACTION

2

**UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES**
(Section 12(a)(2) of the Securities Act of 1933)

3

139.    This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| **Credit Suisse** | **Securitizations Nos. 7 through 10** |
| **Deutsche** | **Securitizations Nos. 18 through 31** |
| **Bear Stearns** | **Securitizations Nos. 40 and 41** |
| **SAMI II** | **Securitization No. 40** |
| **Greenwich Capital** | **Securitization No. 44** |
| **Morgan Stanley** | **Securitizations Nos. 45 through 47** |
| **UBS** | **Securitizations Nos. 54 through 59** |
| **Countrywide** | **Securitizations Nos. 75 through 78** |
| **CWALT** | **Securitizations Nos. 7, 9, 10, 18 through 31, 41, 44 through 47, 54 through 59, 75 through 78** |

4

5

6

7

8

9

10

11    140.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1

12    through 138.

13    141.    In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of

14    the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred

15    to above.

16    142.    This action is brought within one year after the discovery of the untrue and

17    misleading statements in the prospectus supplements and other written offering materials and oral

18    communications that the dealers sent to the Bank, and within three years of these certificates

19    having been sold to the public, or within any applicable period as tolled by the pendency of the

20    class actions referred to above or others. Despite having exercised reasonable diligence, the Bank

21    did not and could not reasonably have discovered earlier the untrue and misleading statements in

22    the prospectus supplements and other written offering materials and oral communications that the

23    dealers sent to the Bank.

24    143.    SAMI II and CWALT are depositors of the securitizations listed above and

25    therefore are the issuers of the certificates in those securitizations. In connection with the offer

26    and sale of these certificates to the Bank, the issuers also made all of the statements of material

27    fact about these certificates that were in the prospectus supplements and other written offering

28    materials and oral communications that that the dealers sent to the Bank.

-46-

1    144.    The Bank expressly excludes from this cause of action any allegation that could be

2    construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

3    on claims of strict liability or negligence under the Securities Act of 1933.

4    145.    The Defendants named above solicited the Bank to purchase these certificates, and

5    sold the certificates to the Bank, by means of the prospectus supplements and other written

6    offering materials and oral communications.

7    146.    The prospectus supplements and other written offering materials and oral

8    communications that the dealers sent to the Bank contained untrue statements of material fact and

9    omitted to state material facts necessary in order to make the statements, in the light of the

10   circumstances under which they were made, not misleading.

11   147.    The Bank did not know when it purchased these certificates that the statements in

12   the prospectus supplements and other written offering materials and oral communications that the

13   dealers sent to the Bank were untrue or misleading.

14   148.    The Bank has suffered a loss on each of these certificates.

15   149.    The Bank is entitled to recover the consideration that it paid for each of these

16   certificates, plus interest at the legal rate from the date of purchase to the date on which it

17   recovers the purchase price, minus the amount of income it has received on each certificate.

18   Pursuant to Section 12(a)(2) and in anticipation of the remedies thereunder, the Bank hereby

19   offers to tender each certificate.

20                              **FOURTH CAUSE OF ACTION**

21                      **LIABILITY OF CONTROLLING PERSON**
                        **(Section 15 of the Securities Act of 1933)**
22

       150.    This cause of action is alleged against the following Defendants:
23

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| **The Bear Stearns Companies, Inc..** | **Securitization No. 40** |
| **Countrywide Financial Corporation** | **Securitizations Nos. 7, 9, 10, 18 through 31, 41, 44 through 47, 54 through 59, 75 through 78** |

27   151.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1

28   through 149.

                                        -47-

                    FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    152.    The Defendants named above are liable because, in doing the acts alleged, persons

2    they controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to the

3    Bank of the certificates in the securitizations referred to above.

4    153.    The Bear Stearns Companies, Inc. by or through stock ownership, agency, or

5    otherwise, controlled SAMI II within the meaning of Section 15 of the Securities Act of 1933.

6    154.    Countrywide Financial Corporation by or through stock ownership, agency, or

7    otherwise, controlled CWALT within the meaning of Section 15 of the Securities Act of 1933.

8    155.    In doing the acts alleged, each controlled person named in paragraphs 153 and 154

9    is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in

10   paragraphs 1 through 149.

11   156.    Each Defendant named above is therefore jointly and severally liable with and to

12   the same extent as the person it controlled.

-48-

FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
(California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)

157.    This cause of action is alleged against the following defendants:

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| **Credit Suisse** | **Securitizations Nos. 1 through 10** |
| **CSFB Mortgage Securities** | **Securitizations Nos. 1 through 3, 5, and 6** |
| **Deutsche** | **Securitizations Nos. 11 through 31** |
| **Deutsche Alt-A** | **Securitizations Nos. 12 through 16** |
| **Bear Stearns** | **Securitizations Nos. 32 through 41** |
| **SAMI II** | **Securitizations Nos. 32, 33, 35, 37, 39, and 40** |
| **Greenwich Capital** | **Securitizations Nos. 42 through 44** |
| **Greenwich Capital Acceptance** | **Securitization No. 42** |
| **Morgan Stanley** | **Securitizations Nos. 45 through 47** |
| **UBS** | **Securitizations Nos. 48 through 59** |
| **MAST** | **Securitizations Nos. 48 through 53** |
| **Banc of America** | **Securitizations Nos. 60 through 73** |
| **Banc of America Funding** | **Securitizations Nos. 60 through 63, 68 and 71** |
| **Banc of America Mortgage Securities** | **Securitizations Nos. 64 through 67, 69, 70, and 72** |
| **Countrywide** | **Securitizations Nos. 74 through 78** |
| **CWALT** | **Securitizations Nos. 7, 9, 10, 17 through 31, 41, 43 through 47, 54 through 59, 73, and 75 through 78** |

158.    The Bank hereby incorporates by reference, as though fully set forth paragraphs 1 through 156.

159.    As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

160.    In making the representations referred to above, the Defendants intended to induce the Bank to rely on those representations in making its decision to purchase these certificates in these securitizations.

161.    When the Defendants made these representations, they had no reasonable ground for believing them to be true. The Bank is informed and believes, and based thereon alleges, that Defendants had access to the files on the mortgage loans in the collateral pools for these

-49-

FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1   securitizations, and, had the Defendants inspected those files, they would have learned that the

2   information they gave the Bank contained untrue or misleading statements. In addition, the Bank

3   is informed and believes, and based thereon alleges, that Defendants hired one or more "due-

4   diligence contractors" to ascertain whether the mortgage loans in the collateral pools complied

5   with the representations and warranties made about those loans, and these contractors reported to

6   the Defendants that a material number of the loans in the collateral pools were different from the

7   descriptions of those loans in the prospectus supplements. Thus, the Bank is informed and

8   believes, and based thereon alleges, that Defendants had access to information that either did

9   make the Defendants aware, or should have made them aware had they heeded that information,

10  that the representations they made to the Bank contained material untrue or misleading statements

11  about the mortgage loans in the collateral pools.

12      162.    When it purchased these certificates, the Bank did not know about the untrue and

13  misleading statements alleged herein.

14      163.    The Bank reasonably and justifiably relied on the representations described above

15  in analyzing and deciding to purchase these certificates. Had the Defendants not made these false

16  and misleading representations, the Bank would not have purchased these certificates.

17      164.    As a direct and proximate result of the negligent misrepresentations by the

18  Defendants, the Bank was damaged in an amount to be proved at trial.

19

20

21

22

23

24

25

26

27

28

-50-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

## SIXTH CAUSE OF ACTION

2

### RESCISSION OF CONTRACT
### (California Civil Code §§ 1689 and 1710, and Common Law)

3

4

165.     This cause of action is alleged against the following defendants:

5

| Against Defendant: | In connection with Securitizations: |
|---|---|
| Credit Suisse | Securitizations Nos. 1 through 10 |
| Deutsche | Securitizations Nos. 11 through 31 |
| Bear Stearns | Securitizations Nos. 32 through 41 |
| Greenwich Capital | Securitizations Nos. 42 through 44 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 48 through 59 |
| Banc of America | Securitizations Nos. 60 through 73 |
| Countrywide | Securitizations Nos. 74 through 78 |

6

7

8

9

10

166.     The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1

11

through 164.

12

167.     The Bank purchased each certificate pursuant to a contract in writing between the

13

Bank and the dealer from which it purchased that certificate. Each contract stated the

14

consideration that the Bank paid each dealer for each certificate.

15

168.     In making each contract to purchase the certificates, the Bank relied on the truth of

16

the statements that the Defendants named above made in the prospectus supplements and other

17

offering materials. Because those statements were untrue or misleading, the Bank was mistaken

18

about its basic assumptions underlying its purchase of each certificate, and this mistake had a

19

material adverse effect on the agreed-upon exchange represented by the Bank's purchase of each

20

certificate. Because the Defendants named above were responsible to provide accurate

21

information in the prospectus supplements, the Bank did not assume, nor does it bear, the risk of

22

the fundamental mistake underlying its decision to purchase these certificates.

23

169.     The Defendants named above obtained the consent of the Bank to the contracts to

24

purchase the certificates by means of their assertion, as facts, of that which was not true, when

25

those Defendants had no reasonable ground for believing those assertions to be true.

26

170.     Pursuant to California Civil Code. § 1689 et seq., the Bank is entitled to rescind,

27

and does hereby demand the rescission of, each contract for the sale and purchase of these

28

-51-

FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    certificates. The Bank offers to restore all benefits that it has received under those contracts and is

2    entitled to recover all consideration that it paid under them.

3                                    **PRAYER FOR RELIEF**

4         WHEREFORE, the Bank respectfully demands judgment as follows:

5         A.    On the first cause of action, the consideration that the Bank paid for each

6    certificate with interest thereon, less the amount of any income that the Bank has received

7    thereon, upon the Bank's tender of each certificate;

8         B.    On the second cause of action, damages in an amount to be determined at trial;

9         C.    On the third cause of action, the consideration that the Bank paid for each

10   certificate with interest thereon, less the amount of any income that the Bank has received

11   thereon, upon the Bank's tender of each certificate;

12        D.    On the fourth cause of action, the consideration that the Bank paid for each

13   certificate with interest thereon, less the amount of any income that the Bank has received

14   thereon, upon the Bank's tender of each certificate;

15        E.    On the fifth cause of action, damages in an amount to be determined at trial;

16        F.    On the sixth cause of action, the consideration that the Bank paid for each

17   certificate with interest thereon, less the amount of any income that the Bank has received

18   thereon, upon the Bank's tender of each certificate;

19        G.    All together with the costs of this action, the reasonable fees of the Bank's

20   attorneys in this action, and such other and further relief as the Court may deem just.

21   Dated: June 10, 2010                      GOODIN, MACBRIDE, SQUERI,
                                               DAY & LAMPREY, LLP
22
                                               GRAIS & ELLSWORTH LLP
23

24
                                               By
25                                                  Robert A. Goodin
                                                   **Attorneys for Plaintiff**
26                                                 Federal Home Loan Bank of San Francisco

27   3428/001/X119864.v1

28
                                        -52-

**FIRST AMENDED COMPLAINT** (*Credit Suisse*, 497840)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

# EXHIBIT A TO THE AMENDED COMPLAINT

2

3



Figure 1: Percent of Loans Originated by Bank of America N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Bank of America N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

28

---

**EXHIBIT A TO THE FIRST AMENDED COMPLAINT** (*Credit Suisse*, 497840)

1

# EXHIBIT B TO THE AMENDED COMPLAINT

2

3



Figure 1: Percent of Loans Originated by Bear Stearns Residential Mortgage Corp., EMC Mortgage Corp., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Bear Stearns Residential Mortgage Corp., EMC Mortgage Corp., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-2-

**EXHIBIT B TO THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)**

1

2 **EXHIBIT C TO THE AMENDED COMPLAINT**

3



Figure 1: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-3-

**EXHIBIT C TO THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### EXHIBIT D TO THE AMENDED COMPLAINT



Figure 1: Percent of Loans Originated by Credit Suisse First Boston Corp., DLJ Mortgage Capital Inc., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Credit Suisse First Boston Corp., DLJ Mortgage Capital Inc., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-4-

EXHIBIT D TO THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1
2

**EXHIBIT E TO THE AMENDED COMPLAINT**

3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28



**EXHIBIT E TO THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## EXHIBIT F TO THE AMENDED COMPLAINT



Figure 1: Percent of Loans Originated by Greenpoint Mortgage Funding or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Greenpoint Mortgage Funding or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-6-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

## EXHIBIT G TO THE AMENDED COMPLAINT

3

4

5

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26



27

28

-7-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT H TO THE AMENDED COMPLAINT



Figure 1: Percent of Loans Originated by Wells Fargo Bank N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Wells Fargo Bank N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

3428/001/X119829.v1

-8-

1 | GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
   | ROBERT A. GOODIN, State Bar No. 061302
2 |     rgoodin@goodinmacbride.com
3 | FRANCINE T. RADFORD, State Bar No. 168269
   |     fradford@goodinmacbride.com
4 | ANNE H. HARTMAN, State Bar No. 184556
   |     ahartman@goodinmacbride.com
5 | 505 Sansome Street, Suite 900
   | San Francisco, California 94111
6 | Telephone:   (415) 392-7900
7 | Facsimile:    (415) 398-4321

8 | GRAIS & ELLSWORTH LLP
   | DAVID J. GRAIS *(pro hac application submitted herewith)*
9 | KATHRYN C. ELLSWORTH *(pro hac app. submitted herewith)*
   | OWEN L. CYRULNIK *(pro hac application submitted herewith)*
10 | 70 East 55th Street
11 | New York, New York 10022
   | Telephone:   (212) 755-0100
12 | Facsimile:    (212) 755-0052

13 | Attorneys for Plaintiff
14 | Federal Home Loan Bank of San Francisco

15 |       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
16 |       IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO
17 |

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SAN FRANCISCO, | No. CGC-10-497840 |
| Plaintiff, | **VOLUME I OF SCHEDULES OF FIRST AMENDED COMPLAINT (SCHEDULES 1-20)** |
| v. | |
| CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE FIRST BOSTON LLC; | |
| CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; | |
| DEUTSCHE BANK SECURITIES, INC.; | |
| DEUTSCHE ALT-A SECURITIES, INC.; | |
| J.P. MORGAN SECURITIES, INC., F/K/A BEAR STEARNS & CO., INC.; | |
| STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; | |

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1 | THE BEAR STEARNS COMPANIES, LLC,
F/K/A THE BEAR STEARNS COMPANIES,
2 | INC.;
3 | RBS SECURITIES, INC., F/K/A
GREENWICH CAPITAL MARKETS, INC.;
4 | RBS ACCEPTANCE, INC. F/K/A
GREENWICH CAPITAL ACCEPTANCE,
5 | INC.;
MORGAN STANLEY & CO.
6 | INCORPORATED;
7 | UBS SECURITIES, LLC;
MORTGAGE ASSET SECURITIZATION
8 | TRANSACTIONS, INC.;
BANC OF AMERICA SECURITIES LLC;
9 | BANC OF AMERICA FUNDING
CORPORATION;
10 | BANC OF AMERICA MORTGAGE
SECURITIES, INC.;
11 | COUNTRYWIDE SECURITIES
12 | CORPORATION;
CWALT, INC.;
13 | COUNTRYWIDE FINANCIAL
CORPORATION; AND,
14 | DOES 1-50,

15 |     Defendants.

16
17
18
19
20
21
22
23
24
25
26
27
28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    **SCHEDULE 1 TO FIRST AMENDED COMPLAINT**

2        To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Credit Suisse and CSFB Mortgage

4    Securities.

5    **Item 44.     Details of trust and certificate(s).**

6        (a)     **Dealer that sold the certificate(s) to the Bank:** Credit Suisse

7        (b)     **Description of the trust:** Adjustable Rate Mortgage-Backed Pass-Through

8    Certificates, Series 2007-1 was a securitization in February 2007 of 4,345 mortgage loans, in five

9    groups. The mortgage loans in the collateral pool of this securitization were originated by DLJ

10   Mortgage Capital, Inc., Countrywide Home Loans, Inc., Credit Suisse Financial Corporation,

11   Suntrust Mortgage Inc., and various undisclosed originators. DLJ Mortgage Capital, Inc.

12   originated or acquired 24.6% of the loans in loan groups 1 through 4; Countrywide Home Loans,

13   Inc. originated or acquired 20.94%; Credit Suisse Financial Corporation originated or acquired

14   12.59%; and Suntrust Mortgage Inc. originated or acquired 11.59%. ARMT 2007-1 Pros. Sup. S-

15   5 and S-36. Credit Suisse Financial Corporation originated or acquired 35.8% of the loans in loan

16   group 5, and DLJ Mortgage Capital, Inc. originated or acquired 32.74%. ARMT 2007-1 Pros.

17   Sup. S-5 and S-36.

18       (c)     **Description of the certificate(s) that the Bank purchased:** Credit Suisse offered

19   and sold to the Bank a senior certificate in this securitization, in tranche 5-A-3-1, for which the

20   Bank paid $85,000,000 plus accrued interest on February 28, 2007.

21       (d)     **Ratings of the certificate(s) when the Bank purchased them:** Standard &

22   Poor's – AAA; Moody's – Aaa.

23       (e)     **Current ratings of the certificate(s):** Standard & Poor's – B3; Moody's – Aaa.

24       (f)     **URL of prospectus supplement for this securitization:**

25   http://www.sec.gov/Archives/edgar/data/1390414/000089109207000737/e26061_424b5.txt

26       **Item 52.       Untrue or misleading statements about the LTVs of the mortgage**

27   **loans:**

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

2    following statements about the LTVs of the mortgage loans.

3    (a)    The weighted-average original LTV of the mortgage loans in loan group 1 was

4    69.97%. ARMT 2007-1 Pros. Sup. S-17.

5    (b)    The weighted-average original LTV of the mortgage loans in loan group 2 was

6    73.06%. ARMT 2007-1 Pros. Sup. S-17.

7    (c)    The weighted-average original LTV of the mortgage loans in loan group 3 was

8    72.24%. ARMT 2007-1 Pros. Sup. S-17.

9    (d)    The weighted-average original LTV of the mortgage loans in loan group 4 was

10    73.26%. ARMT 2007-1 Pros. Sup. S-17.

11    (e)    The weighted-average original LTV of the mortgage loans in loan groups 1-4 was

12    72.46%. ARMT 2007-1 Pros. Sup. S-17.

13    (f)    The weighted-average original LTV of the mortgage loans in loan group 5 was

14    78%. ARMT 2007-1 Pros. Sup. S-17.

15    (g)    "All of the mortgage loans as of the Cut-off Date had LTV ratios at origination of

16    100% or less." ARMT 2007-1 Pros. Sup. S-32.

17    (h)    In Annex III of the prospectus supplement ("Mortgage Loan Statistical

18    Information"), Credit Suisse and CSFB Mortgage Securities presented tables of statistics about

19    the mortgage loans in the collateral pool. ARMT 2007-1 Pros. Sup. III-1 to III-46. Each table

20    focused on a certain characteristic of the loans (for example, cut-off date mortgage loan principal

21    balance) and divided the mortgage loans into categories based on that characteristic (for example

22    loans with cut-off date principal balances of $50,000.01 to $75,000, $75,000.01 to $100,000,

23    $100,000.01 to $125,000, etc.). Each table then presented various data about the mortgage loans

24    in each category. One of the tables, entitled "Group 1 Original LTV Ratios," divided the loans in

25    loan group 1 into 10 categories of original LTV (for example, Less than or Equal to 50%, 50.01%

26    to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the

27    number of mortgage loans, the aggregate principal balance outstanding, and the percent of

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
   ROBERT A. GOODIN, State Bar No. 061302
2        rgoodin@goodinmacbride.com
3  FRANCINE T. RADFORD, State Bar No. 168269
         fradford@goodinmacbride.com
4  ANNE H. HARTMAN, State Bar No. 184556
         ahartman@goodinmacbride.com
5  505 Sansome Street, Suite 900
   San Francisco, California 94111
6  Telephone:    (415) 392-7900
7  Facsimile:    (415) 398-4321

8  GRAIS & ELLSWORTH LLP
   DAVID J. GRAIS (pro hac application submitted herewith)
9  KATHRYN C. ELLSWORTH (pro hac app. submitted herewith)
   OWEN L. CYRULNIK (pro hac application submitted herewith)
10 70 East 55th Street
   New York, New York 10022
11 Telephone:    (212) 755-0100
12 Facsimile:    (212) 755-0052

13 Attorneys for Plaintiff
   Federal Home Loan Bank of San Francisco
14

15              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

16              IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

17

18 FEDERAL HOME LOAN BANK OF SAN           No. CGC-10-497840
19 FRANCISCO,
                                           **VOLUME 1 OF SCHEDULES OF**
20           Plaintiff,                    **FIRST AMENDED COMPLAINT**
                                           **(SCHEDULES 1-20)**
21 v.

22 CREDIT SUISSE SECURITIES (USA) LLC,
   F/K/A CREDIT SUISSE FIRST BOSTON
23 LLC;
24 CREDIT SUISSE FIRST BOSTON
   MORTGAGE SECURITIES CORP.;
25 DEUTSCHE BANK SECURITIES, INC.;
   DEUTSCHE ALT-A SECURITIES, INC.;
26 J.P. MORGAN SECURITIES, INC., F/K/A
   BEAR STEARNS & CO., INC.;
27 STRUCTURED ASSET MORTGAGE
28 INVESTMENTS II, INC.;

   SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1  THE BEAR STEARNS COMPANIES, LLC,
   F/K/A THE BEAR STEARNS COMPANIES,
2  INC.;
3  RBS SECURITIES, INC., F/K/A
   GREENWICH CAPITAL MARKETS, INC.;
4  RBS ACCEPTANCE, INC. F/K/A
   GREENWICH CAPITAL ACCEPTANCE,
5  INC.;
   MORGAN STANLEY & CO.
6  INCORPORATED;
7  UBS SECURITIES, LLC;
   MORTGAGE ASSET SECURITIZATION
8  TRANSACTIONS, INC.;
   BANC OF AMERICA SECURITIES LLC;
9  BANC OF AMERICA FUNDING
   CORPORATION;
10 BANC OF AMERICA MORTGAGE
   SECURITIES, INC.;
11 COUNTRYWIDE SECURITIES
12 CORPORATION;
   CWALT, INC.;
13 COUNTRYWIDE FINANCIAL
   CORPORATION; AND,
14 DOES 1-50,

15           Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*) 497840

1

### SCHEDULE 1 TO FIRST AMENDED COMPLAINT

2

To the extent that this Schedule is incorporated by reference into allegations in the

3

complaint, those allegations are made against Defendants Credit Suisse and CSFB Mortgage

4

Securities.

5

**Item 44.     Details of trust and certificate(s).**

6

(a)     **Dealer that sold the certificate(s) to the Bank:** Credit Suisse

7

(b)     **Description of the trust:** Adjustable Rate Mortgage-Backed Pass-Through

8

Certificates, Series 2007-1 was a securitization in February 2007 of 4,345 mortgage loans, in five

9

groups. The mortgage loans in the collateral pool of this securitization were originated by DLJ

10

Mortgage Capital, Inc., Countrywide Home Loans, Inc., Credit Suisse Financial Corporation,

11

Suntrust Mortgage Inc., and various undisclosed originators. DLJ Mortgage Capital, Inc.

12

originated or acquired 24.6% of the loans in loan groups 1 through 4; Countrywide Home Loans,

13

Inc. originated or acquired 20.94%; Credit Suisse Financial Corporation originated or acquired

14

12.59%; and Suntrust Mortgage Inc. originated or acquired 11.59%. ARMT 2007-1 Pros. Sup. S-

15

5 and S-36. Credit Suisse Financial Corporation originated or acquired 35.8% of the loans in loan

16

group 5, and DLJ Mortgage Capital, Inc. originated or acquired 32.74%. ARMT 2007-1 Pros.

17

Sup. S-5 and S-36.

18

(c)     **Description of the certificate(s) that the Bank purchased:** Credit Suisse offered

19

and sold to the Bank a senior certificate in this securitization, in tranche 5-A-3-1, for which the

20

Bank paid $85,000,000 plus accrued interest on February 28, 2007.

21

(d)     **Ratings of the certificate(s) when the Bank purchased them:** Standard &

22

Poor's – AAA; Moody's – Aaa.

23

(e)     **Current ratings of the certificate(s):** Standard & Poor's – B3; Moody's – Aaa.

24

(f)     **URL of prospectus supplement for this securitization:**

25

http://www.sec.gov/Archives/edgar/data/1390414/000089109207000737/e26061_424b5.txt

26

**Item 52.     Untrue or misleading statements about the LTVs of the mortgage**

27

**loans:**

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

2    following statements about the LTVs of the mortgage loans.

3    (a)    The weighted-average original LTV of the mortgage loans in loan group 1 was

4    69.97%. ARMT 2007-1 Pros. Sup. S-17.

5    (b)    The weighted-average original LTV of the mortgage loans in loan group 2 was

6    73.06%. ARMT 2007-1 Pros. Sup. S-17.

7    (c)    The weighted-average original LTV of the mortgage loans in loan group 3 was

8    72.24%. ARMT 2007-1 Pros. Sup. S-17.

9    (d)    The weighted-average original LTV of the mortgage loans in loan group 4 was

10   73.26%. ARMT 2007-1 Pros. Sup. S-17.

11   (e)    The weighted-average original LTV of the mortgage loans in loan groups 1-4 was

12   72.46%. ARMT 2007-1 Pros. Sup. S-17.

13   (f)    The weighted-average original LTV of the mortgage loans in loan group 5 was

14   78%. ARMT 2007-1 Pros. Sup. S-17.

15   (g)    "All of the mortgage loans as of the Cut-off Date had LTV ratios at origination of

16   100% or less." ARMT 2007-1 Pros. Sup. S-32.

17   (h)    In Annex III of the prospectus supplement ("Mortgage Loan Statistical

18   Information"), Credit Suisse and CSFB Mortgage Securities presented tables of statistics about

19   the mortgage loans in the collateral pool. ARMT 2007-1 Pros. Sup. III-1 to III-46. Each table

20   focused on a certain characteristic of the loans (for example, cut-off date mortgage loan principal

21   balance) and divided the mortgage loans into categories based on that characteristic (for example

22   loans with cut-off date principal balances of $50,000.01 to $75,000, $75,000.01 to $100,000,

23   $100,000.01 to $125,000, etc.). Each table then presented various data about the mortgage loans

24   in each category. One of the tables, entitled "Group 1 Original LTV Ratios," divided the loans in

25   loan group 1 into 10 categories of original LTV (for example, Less than or Equal to 50%, 50.01%

26   to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the

27   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   aggregate principal balance outstanding in each of these categories. ARMT 2007-1 Pros. Sup. III-
2   3.

3          (i)     "The minimum original LTV ratio and the maximum original LTV ratio for the
4   mortgage loans in loan group 1 are 9.38% and 95.00%, respectively. As of the cut-off date, the
5   weighted average original LTV ratio for the mortgage loans in group 1 will be approximately
6   69.97%." ARMT 2007-1 Pros. Sup. III-3.

7          (j)     In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table
8   entitled "Group 2 Original LTV Ratios." This table divided the mortgage loans in group 2 into 10
9   categories of original LTV (for example, Less than or Equal to 50%, 50.01% to 55%, 55.01% to
10  60%, etc.). The table made untrue and misleading statements about the number of mortgage
11  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance
12  outstanding in each of these categories. ARMT 2007-1 Pros. Sup. III-9.

13         (k)     "The minimum original LTV ratio and the maximum original LTV ratio for the
14  mortgage loans in loan group 2 are 22.75% and 95.00%, respectively. As of the cut-off date, the
15  weighted average original LTV ratio for the mortgage loans in loan group 2 will be approximately
16  73.06%." ARMT 2007-1 Pros. Sup. III-9.

17         (l)     In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table
18  entitled "Group 3 Original LTV Ratios." This table divided the mortgage loans in loan group 3
19  into 11 categories of original LTV (for example, 50.01% to 55%, 55.01% to 60%, 60.01% to
20  65%, etc.). The table made untrue and misleading statements about the number of mortgage
21  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance
22  outstanding in each of these categories. ARMT 2007-1 Pros. Sup. III-16.

23         (m)     "The minimum original LTV ratio and the maximum original LTV ratio for the
24  mortgage loans in loan group 3 are 16.86% and 100.00%, respectively. As of the cut-off date, the
25  weighted average original LTV ratio for the mortgage loans in loan group 3 will be approximately
26  72.24%." ARMT 2007-1 Pros. Sup. III-16.

27         (n)     In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table
28  entitled "Group 4 Original LTV Ratios." This table divided the mortgage loans in loan group 4



1    into 11 categories of original LTV (for example, Less than or Equal to 50%, 50.01% to 55%,

2    55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

3    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

4    principal balance outstanding in each of these categories. ARMT 2007-1 Pros. Sup. III-23.

5         (o)     "The minimum original LTV ratio and the maximum original LTV ratio for the

6    mortgage loans in loan group 4 are 16.67% and 100.00%, respectively. As of the cut-off date, the

7    weighted average original LTV ratio for the mortgage loans in loan group 4 will be approximately

8    73.26%." ARMT 2007-1 Pros. Sup. III-23.

9         (p)     In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table

10   entitled "Groups 1-4 Original LTV Ratios." This table divided the mortgage loans in loan groups

11   1 through 4 into 11 categories of original LTV (for example, Less than or Equal to 50%, 50.01%

12   to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the

13   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

14   aggregate principal balance outstanding in each of these categories. ARMT 2007-1 Pros. Sup. III-

15   30.

16         (q)     "The minimum original LTV ratio and the maximum original LTV ratio for the

17   mortgage loans in loan groups 1-4 are 9.38% and 100.00%, respectively. As of the cut-off date,

18   the weighted average original LTV ratio for the mortgage loans in loan groups 1-4 will be

19   approximately 72.46%." ARMT 2007-1 Pros. Sup. III-30.

20         (r)     In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table

21   entitled "Groups [sic] 5 Original LTV Ratios." This table divided the mortgage loans in loan

22   group 5 into 11 categories of original LTV (for example, 50.01% to 55%, 55.01% to 60%,

23   60.01% to 65%, etc.). The table made untrue and misleading statements about the number of

24   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

25   principal balance outstanding in each of these categories. ARMT 2007-1 Pros. Sup. III-39.

26         (s)     "The minimum original LTV ratio and the maximum original LTV ratio for the

27   mortgage loans in loan group 5 are 10.66% and 100.00%, respectively. As of the cut-off date, the

28

weighted average original LTV ratio for the mortgage loans in loan group 5 will be approximately

78.00%." ARMT 2007-1 Pros. Sup. III-39.

**Item 62.    Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 4,345 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,578 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,741 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $159,299,961 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 289 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $18,366,289 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 414 |
| Weighted-average LTV, as stated by Defendants (group 3) | 72.2% |
| Weighted-average LTV, as determined by the model (group 3) | 86.6% |

**Item 65.    Evidence from subsequent sales of refinanced properties:**

Of the 4,345 mortgage loans in the collateral pool, 1,353 were taken out to refinance, rather than to purchase, properties. For those 1,353 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,353 properties, 275 were subsequently sold for a total of approximately $92,632,213. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $137,028,900. Thus, those properties were sold for 67.6% of the value ascribed to them, a difference of 32.4%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71.    Undisclosed additional liens:**

    **(a)    Minimum number of properties with additional liens: 221**

    **(b)    Total reduction in equity from additional liens: $28,493,227**

    **(c)    Weighted-average reduction in equity from additional liens: 76.6%**

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   **Item 82.    Untrue or misleading statements about compliance with USPAP:**

2        In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

3   following statement about the appraisals of the properties that secured the mortgage loans in this

4   securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal

5   Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on

6   forms acceptable to Fannie Mae and/or Freddie Mac." ARMT 2007-1 Pros. Sup. S-37.

7        In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

8   following statement about the appraisals of the properties that secured the mortgage loans that

9   were originated or acquired by Countrywide Home Loans: "All appraisals are required to

10  conform to Fannie Mae or Freddie Mac appraisal standards then in effect." ARMT 2007-1 Pros.

11  Sup. S-38.

12       In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

13  following statement about the appraisals of the properties that secured the mortgage loans that

14  were originated or acquired by DLJ Mortgage Capital, Inc.: "All appraisals conform to the

15  Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board

16  of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie

17  Mac." ARMT 2007-1 Pros. Sup. S-46.

18       In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

19  following statement about the appraisals of the properties that secured the mortgage loans that

20  were originated or acquired by Credit Suisse Financial Corporation: "All appraisals conform to

21  the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards

22  Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or

23  Freddie Mac." ARMT 2007-1 Pros. Sup. S-47.

24  **Item 88.    Untrue or misleading statements about owner-occupancy of the properties**

25  **that secured the mortgage loans:**

26       In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

27  following statements about the occupancy status of the properties that secured the mortgage loans

28  in the collateral pool of this securitization.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1       (a)     The percentage of the mortgage loans in loan group 1 that were secured by a

2   "Primary" residence was 81.88%. ARMT 2007-1 Pros. Sup. S-17.

3       (b)     The percentage of the mortgage loans in loan group 2 that were secured by a

4   "Primary" residence was 87.5%. ARMT 2007-1 Pros. Sup. S-17.

5       (c)     The percentage of the mortgage loans in loan group 3 that were secured by a

6   "Primary" residence was 78.01%. ARMT 2007-1 Pros. Sup. S-17.

7       (d)     The percentage of the mortgage loans in loan group 4 that were secured by a

8   "Primary" residence was 75.52%. ARMT 2007-1 Pros. Sup. S-17.

9       (e)     The percentage of the mortgage loans in loan groups 1-4 that were secured by a

10   "Primary" residence was 80.86%. ARMT 2007-1 Pros. Sup. S-17.

11       (f)     The percentage of the mortgage loans in loan group 5 that were secured by a

12   "Primary" residence was 61.73%. ARMT 2007-1 Pros. Sup. S-17.

13       (g)     In Annex III of the prospectus supplement, described in Item 52, Credit Suisse and

14   CSFB Mortgage Securities presented a table entitled "Group 1 Occupancy Types." This table

15   divided the mortgage loans in loan group 1 into the categories "Primary," "Investment," and

16   "Second Home." The table made untrue and misleading statements about the number of mortgage

17   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

18   outstanding in each of these categories. ARMT 2007-1 Pros. Sup. III-2.

19       (h)     In the "Group 1 Occupancy Types" table, Credit Suisse and CSFB Mortgage

20   Securities stated that 81.88% of the mortgage loans in loan group 1 were secured by a "Primary"

21   residence, 9.3% by an "Investment" property, and 8.82% by a "Second Home." ARMT 2007-1

22   Pros. Sup. III-2.

23       (i)     In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table

24   entitled "Group 2 Occupancy Types." This table divided the mortgage loans in loan group 2 into

25   the categories "Primary," "Investment," and "Second Home." The table made untrue and

26   misleading statements about the number of mortgage loans, the aggregate principal balance

27   outstanding, and the percent of aggregate principal balance outstanding in each of these

28   categories. ARMT 2007-1 Pros. Sup. III-8.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (j)    In the "Group 2 Occupancy Types" table, Credit Suisse and CSFB Mortgage

2 Securities stated that 87.5% of the mortgage loans in loan group 2 were secured by a "Primary"

3 residence, 7.07% by an "Investment" property, and 5.43% by a "Second Home." ARMT 2007-1

4 Pros. Sup. III-8.

5    (k)    In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table

6 entitled "Group 3 Occupancy Types." This table divided the mortgage loans in loan group 3 into

7 the categories "Primary," "Investment," and "Second Home." The table made untrue and

8 misleading statements about the number of mortgage loans, the aggregate principal balance

9 outstanding, and the percent of aggregate principal balance outstanding in each of these

10 categories. ARMT 2007-1 Pros. Sup. III-15.

11    (l)    In the "Group 3 Occupancy Types" table, Credit Suisse and CSFB Mortgage

12 Securities stated that 78.01% of the mortgage loans in loan group 3 were secured by a "Primary"

13 residence, 11.02% by an "Investment" property, and 10.97% by a "Second Home." ARMT 2007-

14 1 Pros. Sup. III-15.

15    (m)    In Annex III, Credit Suisse and CSFB Mortgage Securities presented a table

16 entitled "Group 4 Occupancy Types." This table divided the mortgage loans in loan group 4 into

17 the categories "Primary," "Investment," and "Second Home." The table made untrue and

18 misleading statements about the number of mortgage loans, the aggregate principal balance

19 outstanding, and the percent of aggregate principal balance outstanding in each of these

20 categories. ARMT 2007-1 Pros. Sup. III-22.

21    (n)    In the "Group 4 Occupancy Types" table, Credit Suisse and CSFB Mortgage

22 Securities stated that 75.52% of the mortgage loans in loan group 4 were secured by a "Primary"

23 residence, 21.21% by an "Investment" property, and 3.27% by a "Second Home." ARMT 2007-1

24 Pros. Sup. III-22.

25    (o)    In Annex III, Credit Suisse and CSFB Mortgage Securities presented another table

26 entitled "Groups 1-4 Occupancy Types." This table divided the mortgage loans in loan groups 1

27 through 4 into the categories "Primary," "Investment," and "Second Home." The table made

28 untrue and misleading statements about the number of mortgage loans, the aggregate principal

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

2  categories. ARMT 2007-1 Pros. Sup. III-30.

3      (p)      In the "Groups 1-4 Occupancy Types" table, Credit Suisse and CSFB Mortgage

4  Securities stated that 80.86% of all of the mortgage loans in loan groups 1 through 4 were secured

5  by a "Primary" residence, 11.31% by an "Investment" property, and 7.83% by a "Second Home."

6  ARMT 2007-1 Pros. Sup. III-30.

7      (q)      In Annex III, Credit Suisse and CSFB Mortgage Securities presented another table

8  entitled "Groups [sic] 5 Occupancy Types." This table divided the mortgage loans in loan group 5

9  into the categories "Primary," "Investment," and "Second Home." The table made untrue and

10  misleading statements about the number of mortgage loans, the aggregate principal balance

11  outstanding, and the percent of aggregate principal balance outstanding in each of these

12  categories. ARMT 2007-1 Pros. Sup. III-38.

13      (r)      In the "Groups [sic] 5 Occupancy Types" table, Credit Suisse and CSFB Mortgage

14  Securities stated that 61.73% of the mortgage loans in loan group 5 were secured by a "Primary"

15  residence, 30.58% by an "Investment" property, and 7.69% by a "Second Home." ARMT 2007-1

16  Pros. Sup. III-38.

17  **Item 96.      Details of properties that were stated to be owner-occupied, but were not:**

18      **(a)      Number of loans on which the owner of the property instructed tax**

19              **authorities to send property tax bills to him or her at a different address: 243**

20      **(b)      Number of loans on which the owner of the property could have, but did not,**

21              **designate the property as his or her homestead: 325**

22      **(c)      Number of loans on which the owner of the property owned three or more**

23              **properties: 30**

24      **(d)      Eliminating duplicates, number of loans about which one or more of**

25              **statements (a) through (c) is true: 521**

26

27

28

1   **Item 99.        Untrue or misleading statements about the underwriting standards of the**
2               **originators of the mortgage loans:**

3           On pages S-36 through S-37 of the prospectus supplement, Credit Suisse and CSFB
4   Mortgage Securities made statements about the underwriting guidelines applied in the origination
5   or acquisition of all of the mortgage loans in the collateral pool. All of those statements are
6   incorporated herein by reference. In particular, Credit Suisse and CSFB Mortgage Securities
7   stated that:

8           (a)      "[E]xceptions to the underwriting standards described herein are made in the event
9   that compensating factors are demonstrated by a prospective borrower." ARMT 2007-1 Pros.
10  Sup. S-36.

11          On pages S-37 though S-44 of the prospectus supplement, Credit Suisse and CSFB
12  Mortgage Securities made statements about the underwriting guidelines of Countrywide Home
13  Loans, Inc. All of those statements are incorporated herein by reference. In particular, Credit
14  Suisse and CSFB Mortgage Securities stated that:

15          (a)      "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if
16  compensating factors are demonstrated by a prospective borrower." ARMT 2007-1 Pros. Sup. S-
17  38.

18          (b)      "Countrywide Home Loans' underwriting standards are applied by or on behalf of
19  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment
20  ability and the value and adequacy of the mortgaged property as collateral." ARMT 2007-1 Pros.
21  Sup. S-38.

22          On pages S-44 through S-46 of the prospectus supplement, Credit Suisse and CSFB
23  Mortgage Securities made statements about the underwriting guidelines of DLJ Mortgage Capital,
24  Inc. All of those statements are incorporated herein by reference. In particular, Credit Suisse and
25  CSFB Mortgage Securities stated that:

26          (a)      "[E]xceptions to the underwriting standards described herein are made in the event
27  that compensating factors are demonstrated by a prospective borrower." ARMT 2007-1 Pros.
28  Sup. S-45.

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1       On pages S-46 through S-47 of the prospectus supplement, Credit Suisse and CSFB

2 Mortgage Securities made statements about the underwriting guidelines of Credit Suisse Financial

3 Corporation. All of those statements are incorporated herein by reference. In particular, Credit

4 Suisse and CSFB Mortgage Securities stated that:

5    (a)   "[E]xceptions to the underwriting standards described herein are made in the event

6 that compensating factors are demonstrated by a prospective borrower." ARMT 2007-1 Pros.

7 Sup. S-46.

8    (b)   "Based on the data provided in the application and certain verification (if

9 required), a determination is made by the original lender that the mortgagor's monthly income (if

10 required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on

11 the mortgage loan and other expenses related to the property." ARMT 2007-1 Pros. Sup. S-46.

12 **Item 106.**   **Early payment defaults:**

13    **(a)**   **Number of the mortgage loans that suffered EPDs: 261**

14    **(b)**   **Percent of the mortgage loans that suffered EPDs: 6.0%**

15    **(c)**   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

16       **made at the same time as the loans in the collateral pool that experienced**

17       **EPDs: 0.83%**

18 **Item 107.**   **90+ days delinquencies:**

19    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies: 2,253**

20    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies: 51.9%**

21    **(c)**   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

22       **made at the same time as the loans in the collateral pool that suffered 90+**

23       **days delinquencies: 33.9%**

24 **Item 108.**   **30+ days delinquencies in this securitization:**

25    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on March 31,**

26       **2010: 2,058**

27    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on March 31,**

28       **2010: 47.4%**

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse* 497840)

1      (c)     **Percent of all mortgage loans in the United States that were 30+ days**

2              **delinquent on March 31, 2010: 14.7%**

3  **Item 117.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

4         On page S-7 of the prospectus supplement, Credit Suisse and CSFB Mortgage Securities

5  made statements about the ratings assigned to the certificates issued in this securitization. Credit

6  Suisse and CSFB Mortgage Securities stated that the Bank's certificate was rated Aaa by

7  Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the

8  highest ratings available from these two rating agencies.

9         Credit Suisse and CSFB Mortgage Securities also stated: "When issued, the offered

10  certificates will receive ratings that are not lower than those listed in the table on page S-7 of this

11  prospectus supplement." ARMT 2007-1 Pros. Sup. S-16.

12         Credit Suisse and CSFB Mortgage Securities also stated: "It is a condition to the issuance

13  of the offered certificates that they be rated as indicated on page S-7 of this prospectus

14  supplement by Moody's Investors Service ('Moody's') and Standard & Poor's Ratings Services

15  ('S&P')." ARMT 2007-1 Pros. Sup. S-136.

16  **Item 120.**     **Summary of loans about which the Defendants made untrue or misleading**

17             **statements:**

18      (a)     **Number of loans whose LTVs were materially understated: 1,741**

19      (b)     **Number of loans in which the owner's equity was reduced by 5% or more by**

20             **undisclosed additional liens: 196**

21      (c)     **Number of loans that suffered EPDs: 261**

22      (d)     **Number of loans in which the properties were stated to be owner-occupied**

23             **but were not: 521**

24      (e)     **Eliminating duplicates, number of loans about which the Defendants made**

25             **untrue or misleading statements: 2,198**

26      (f)     **Eliminating duplicates, percent of loans about which the Defendants made**

27             **untrue or misleading statements: 50.6%**

28

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    **SCHEDULE 2 TO FIRST AMENDED COMPLAINT**

2         To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Credit Suisse and CSFB Mortgage

4    Securities.

5    **Item 44.    Details of trust and certificate(s).**

6         **(a)    Dealer that sold the certificate(s) to the Bank:** Credit Suisse

7         **(b)    Description of the trust:** Adjustable Rate Mortgage-Backed Pass-Through

8    Certificates, Series 2006-1 was a securitization in February 2006 of 3,139 mortgage loans, in six

9    groups.[1] The mortgage loans in the collateral pool of this securitization were originated or

10   acquired by Countrywide Home Loans, Inc., Own-It Mortgage Solutions, Inc., Credit Suisse

11   Financial Corporation, and various undisclosed originators. Countrywide Home Loans, Inc.

12   originated or acquired 48.63% of the loans in loan groups 1 through 5. ARMT 2006-1 Pros. Sup.

13   S-6 and S-37.

14        **(c)    Description of the certificate(s) that the Bank purchased:** Credit Suisse offered

15   and sold to the Bank a senior certificate in this securitization, in tranche 3-A-1, for which the

16   Bank paid $165,863,672 plus accrued interest on February 28, 2006.

17        **(d)    Ratings of the certificate(s) when the Bank purchased them:** Standard &

18   Poor's – AAA; Moody's – Aaa.

19        **(e)    Current ratings of the certificate(s):** Standard & Poor's – Caa1; Moody's – Aaa.

20        **(f)    URL of prospectus supplement for this securitization:**

21   http://www.sec.gov/Archives/edgar/data/1354935/000089109206000528/e23488-424b5.txt

22   **Item 52.    Untrue or misleading statements about the LTVs of the mortgage loans:**

23        In the prospectus supplement, Credit Suisse and CSFB Mortgage Securities made the

24   following statements about the LTVs of the mortgage loans in the collateral pool of this

25   securitization.

26

27

28        [1] The Bank makes no allegations about the mortgage loans in group 6.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (a)    The weighted-average original LTV of the mortgage loans in loan group 1 was

2    74.69%. ARMT 2006-1 Pros. Sup. S-17.

3    (b)    The weighted-average original LTV of the mortgage loans in loan group 2 was

4    74.25%. ARMT 2006-1 Pros. Sup. S-17.

5    (c)    The weighted-average original LTV of the mortgage loans in loan group 3 was

6    73.34%. ARMT 2006-1 Pros. Sup. S-17.

7    (d)    The weighted-average original LTV of the mortgage loans in loan group 4 was

8    70.83%. ARMT 2006-1 Pros. Sup. S-17.

9    (e)    The weighted-average original LTV of the mortgage loans in loan group 5 was

10   75.98%. ARMT 2006-1 Pros. Sup. S-17.

11   (f)    The weighted-average original LTV of all of the mortgage loans in loan groups 1

12   through 5 was 73.61%. ARMT 2006-1 Pros. Sup. S-17.

13   (g)    "All of the mortgage loans as of the Cut-off Date had LTV ratios at origination of

14   100% or less." ARMT 2006-1 Pros. Sup. S-34.

15   (h)    In Annex III of the prospectus supplement ("Mortgage Loan Statistical

16   Information"), Credit Suisse and CSFB Mortgage Securities presented tables of statistics about

17   the mortgage loans in the collateral pool. ARMT 2006-1 Pros. Sup. III-1 to III-50. Each table

18   focused on a certain characteristic of the loans (for example, cut-off date mortgage loan principal

19   balance) and divided the mortgage loans into categories based on that characteristic (for example,

20   mortgage loans with a cut off date principal balance of $50,000.01 to $75,000, $75,000.01 to

21   $100,000, etc.). Each table then presented various data about the mortgage loans in each category.

22   One of the tables, entitled "Group 1 Original LTV Ratios," divided the mortgage loans in loan

23   group 1 into 11 categories of original LTV (for example, less than 50%, 50.01% to 55%, 55.01%

24   to 60%, etc.). The table made untrue and misleading statements about the number of mortgage

25   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

26   outstanding in each of these categories. ARMT 2006-1 Pros. Sup. III-3.

27   (i)    "The minimum original LTV ratio and the maximum original LTV ratio for the

28   mortgage loans in loan group 1 are 23.58% and 100.00%, respectively. As of the cut-off date, the

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)