1      (e)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

2   of the Initial Mortgage Loans in loan group 2 is approximately 75.94%." CWALT 2005-1CB

3   Pros. Sup. S-31.

4      (f)    In "The Mortgage Pool" section, Deutsche and CWALT presented similar tables

5   of statistics about the mortgage loans in loan group 3. In these tables, Deutsche and CWALT

6   similarly made hundreds of statements about the original LTVs of the loans in loan group 3.

7   CWALT 2005-1CB Pros. Sup. S-35 to S-41.

8      (g)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

9   of the Initial Mortgage Loans in loan group 3 is approximately 78.59%." CWALT 2005-1CB

10   Pros. Sup. S-38.

11      (h)    In "The Mortgage Pool" section, Deutsche and CWALT presented similar tables

12   of statistics about the mortgage loans in loan group 4. In these tables, Deutsche and CWALT

13   similarly made hundreds of statements about the original LTVs of the loans in loan group 4.

14   CWALT 2005-1CB Pros. Sup. S-42 to S-47.

15      (i)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

16   of the Initial Mortgage Loans in loan group 4 is approximately 79.27%." CWALT 2005-1CB

17   Pros. Sup. S-44.

-3-

**Item 62.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 6,480 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,950 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,461 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $58,658,607 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 611 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $27,495,780 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 299 |
| Weighted-average LTV, as stated by Defendants (group 1) | 74.3% |
| Weighted-average LTV, as determined by the model (group 1) | 79.1% |

**Item 71.      Undisclosed additional liens:**

   **(a)      Minimum number of properties with additional liens: 313**

   **(b)      Total reduction in equity from additional liens: $15,025,519**

   **(c)      Weighted-average reduction in equity from additional liens: 78.7%**

**Item 82.      Untrue or misleading statements about compliance with USPAP:**

      In the prospectus supplement, Deutsche and CWALT made the following statement about

the appraisals of the properties that secured the mortgage loans originated or acquired by

Countrywide: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal

standards then in effect." CWALT 2005-1CB Pros. Sup. S-53.

**Item 88.      Untrue or misleading statements about owner-occupancy of the properties**

            **that secured the mortgage loans:**

      In the prospectus supplement, Deutsche and CWALT made the following statements

about the occupancy status of the properties that secured the mortgage loans in the collateral pool

of this securitization.

      (a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item

52, Deutsche and CWALT presented a table entitled "Occupancy Types." This table divided the

mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property,"

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    and "Secondary Residence." The table made untrue and misleading statements about the number

2    of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

3    principal balance outstanding in each of these categories. CWALT 2005-1CB Pros. Sup. S-27.

4        (b)    In the "Occupancy Types" table, Deutsche and CWALT stated that 83.28% of the

5    mortgage loans in loan group 1 were secured by a "Primary Residence," 14.98% by an

6    "Investment Property," and 1.74% by a "Secondary Residence." CWALT 2005-1CB Pros. Sup.

7    S-27.

8        (c)    In "The Mortgage Pool" section, Deutsche and CWALT presented another table

9    entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the

10   categories "Primary Residence," "Investment Property," and "Secondary Residence." The table

11   made untrue and misleading statements about the number of mortgage loans, the aggregate

12   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

13   of these categories. CWALT 2005-1CB Pros. Sup. S-33.

14       (d)    In the "Occupancy Types" table, Deutsche and CWALT stated that 94.14% of the

15   mortgage loans in loan group 2 were secured by a "Primary Residence," 3.69% by an "Investment

16   Property," and 2.16% by a "Secondary Residence." CWALT 2005-1CB Pros. Sup. S-33.

17       (e)    In "The Mortgage Pool" section, Deutsche and CWALT presented another table

18   entitled "Occupancy Types." This table stated that 100% of the mortgage loans in loan group 3

19   were secured by a "Primary Residence." CWALT 2005-1CB Pros. Sup. S-40.

20       (f)    In "The Mortgage Pool" section, Deutsche and CWALT presented another table

21   entitled "Occupancy Types." This table divided the mortgage loans in loan group 4 into the

22   categories "Investment Property" and "Secondary Residence." The table made untrue and

23   misleading statements about the number of mortgage loans, the aggregate principal balance

24   outstanding, and the percent of aggregate principal balance outstanding in each of these

25   categories. CWALT 2005-1CB Pros. Sup. S-46.

26       (g)    In the "Occupancy Types" table, Deutsche and CWALT stated that 85.64% of the

27   mortgage loans in loan group 4 were secured by an "Investment Property" and 14.36% by a

28   "Secondary Residence." CWALT 2005-1CB Pros. Sup. S-46.

-5-

**Item 96.**     Details of properties that were stated to be owner-occupied, but were not:

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 384

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 572

(c)     Number of loans on which the owner of the property owned three or more properties: 27

(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 2

(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 860

**Item 99.**     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:

On pages S-51 to S-56 of the prospectus supplement, Deutsche and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, Deutsche and CWALT stated that:

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-1CB Pros. Sup. S-52.

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-1CB Pros. Sup. S-52.

**Item 106.**     Early payment defaults:

(a)     Number of the mortgage loans that suffered EPDs: 28

(b)     Percent of the mortgage loans that suffered EPDs: 0.4%

-6-

1      (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

2               **made at the same time as the loans in the collateral pool that experienced**

3               **EPDs: 0.18%**

4 **Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

5      On page S-3 of the prospectus supplement, Deutsche and CWALT made statements about

6 the ratings assigned to the certificates issued in this securitization. Deutsche and CWALT stated

7 that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by

8 Standard & Poor's Rating Services.

9      Deutsche and CWALT also stated that: "The classes of certificates listed below will not

10 be offered unless they are assigned the following ratings by Moody's Investors Service, Inc.

11 ('Moody's') and by Standard & Poor's . . . ." The requirement for classes 1-A-1 and 1-A-2, from

12 which these certificates were to be paid, was AAA for Standard & Poor's and Aaa for Moody's.

13 CWALT 2005-1CB Pros. Sup. S-3.

14      Deutsche and CWALT also stated that: "It is a condition to the issuance of the senior

15 certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors

16 Service, Inc. ('Moody's')." CWALT 2005-1CB Pros. Sup. S-117.

17 **Item 120.**    **Summary of loans about which the Defendants made untrue or misleading**

18           **statements:**

19      **(a)**    **Number of loans whose LTVs were materially understated: 1,461**

20      **(b)**    **Number of loans in which the owner's equity was reduced by 5% or more by**

21               **undisclosed additional liens: 313**

22      **(c)**    **Number of loans that suffered EPDs: 28**

23      **(d)**    **Number of loans in which the properties were stated to be owner-occupied**

24               **but were not: 860**

25      **(e)**    **Eliminating duplicates, number of loans about which the Defendants made**

26               **untrue or misleading statements: 2,272**

27      **(f)**    **Eliminating duplicates, percent of loans about which the Defendants made**

28               **untrue or misleading statements: 35.1%**

-7-

1              **SCHEDULE 32 TO THE AMENDED COMPLAINT**

2         To the extent that this Schedule is incorporated by reference into allegations in the

3  complaint, those allegations are made against Defendants Bear Stearns and SAMI II.

4  **Item 44.**      **Details of trust and certificate(s).**

5         **(a)**      **Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

6         **(b)**      **Description of the trust:** *:* Structured Asset Mortgage Investments II Trust,

7  Mortgage Pass-Through Certificates, Series 2007-AR5 was a securitization in August 2007 of

8  1,496 mortgage loans, in one group. The mortgage loans in the collateral pool of this

9  securitization were originated by GreenPoint Mortgage Funding, Inc., Bear Stearns Residential

10  Mortgage Corporation, and various undisclosed originators. GreenPoint Mortgage Funding, Inc.

11  originated 66.46% of the loans in the collateral pool of this securitization and Bear Stearns

12  Residential Mortgage Corporation originated 14.1%. SAMI 2007-AR5 Pros. Sup. S-9 and S-43.

13         **(c)**      **Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

14  and sold to the Bank a senior certificate in this securitization, in tranche A-1, for which The Bank

15  paid $328,000,000 plus accrued interest on August 31, 2007.

16         **(d)**      **Ratings of the certificate(s) when the Bank purchased them:** Standard &

17  Poor's— AAA; Fitch— AAA.

18         **(e)**      **Current ratings of the certificate(s):** Standard & Poor's— AAA; Fitch— BB.

19         **(f)**      **URL of prospectus supplement for this securitization:**

20  http://www.sec.gov/Archives/edgar/data/1409424/000091142007000599/d238500425.txt

21  **Item 52.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

22         In the prospectus supplement, Bear Stearns and SAMI II made the following statements

23  about the LTVs of the mortgage loans in the collateral pool of this securitization.

24         **(a)**      The weighted-average LTV at origination of all of the mortgage loans in the

25  collateral pool was 73.07%. SAMI 2007-AR5 Pros. Sup. S-10 and A-2.

26         **(b)**      In Schedule A of the prospectus supplement ("Certain Characteristics of the

27  Mortgage Loans"), Bear Stearns and SAMI II presented tables of statistics about the mortgage

28  loans in the collateral pool. Each table focused on a certain characteristic of the loans (for

1   example, principal balance at origination) and divided the loans into categories based on that

2   characteristic (for example, loans with principal balances at origination of $0 to $100,000,

3   $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about

4   the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios in Total"

5   divided all of the loans in the collateral pool into 12 categories of original LTV (for example, 0%

6   to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements

7   about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

8   of aggregate principal balance outstanding in each of these categories. SAMI 2007-AR5 Pros.

9   Sup. A-2.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

**Item 62.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,496 |
| Number of properties on which there was enough information for the model to determine a true market value | 969 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 761 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $98,557,389 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 60 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,512,150 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 257 |
| Weighted-average LTV, as stated by Defendants | 73.1% |
| Weighted-average LTV, as determined by the model | 97.3% |

**Item 65.      Evidence from subsequent sales of refinanced properties:**

Of the 1,496 mortgage loans in the collateral pool, 1,201 were taken out to refinance, rather than to purchase, properties. For those 1,201 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,201 properties, 108 were subsequently sold for a total of approximately $39,697,154. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $66,798,500. Thus, those properties were sold for 59.4% of the value ascribed to them, a difference of 40.6%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71.      Undisclosed additional liens:**

    **(a)      Minimum number of properties with additional liens: 98**

    **(b)      Total reduction in equity from additional liens: $9,590,666**

    **(c)      Weighted-average reduction in equity from additional liens: 52.0%**

**Item 82.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Bear Stearns and SAMI II made the following statement about the appraisals of the properties that secured the mortgage loans originated by GreenPoint Mortgage Funding, Inc.: "All appraisals are required to conform the [*sic*] Uniform Standards of

-3-

1   Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal

2   Foundation." SAMI 2007-AR5 Pros. Sup. S-46.

3   **Item 88.       Untrue or misleading statements about owner-occupancy of the properties**

4   **that secured the mortgage loans:**

5       In the prospectus supplement, Bear Stearns and SAMI II made the following statements

6   about the occupancy status of the properties that secured the mortgage loans in the collateral pool

7   of this securitization.

8       (a)      In Schedule A of the prospectus supplement, described in Item 52, Bear Stearns

9   and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Total." This

10   table divided all of the mortgage loans in the collateral pool into the categories "Owner

11   Occupied," "Investor," and "Second Home." The table made untrue and misleading statements

12   about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

13   of aggregate principal balance outstanding in each of these categories. SAMI 2007-AR5 Pros.

14   Sup. A-4.

15       (b)      In the "Occupancy Status of Mortgage Properties in Total" table, Bear Stearns and

16   SAMI II stated that 85.63% of the mortgage loans in the collateral pool were secured by an

17   "Owner Occupied" property, 12.47% by an "Investor" property, and 1.9% by a "Second Home."

18   SAMI 2007-AR5 Pros. Sup. A-4.

19   **Item 96.       Details of properties that were stated to be owner-occupied, but were not:**

20       **(a)      Number of loans on which the owner of the property instructed tax**

21               **authorities to send property tax bills to him or her at a different address: 123**

22       **(b)      Number of loans on which the owner of the property could have, but did not,**

23               **designate the property as his or her homestead: 221**

24       **(c)      Number of loans on which the owner of the property owned three or more**

25               **properties: 32**

26       **(d)      Number of loans that went straight from current to foreclosure or ownership**

27               **by lender: 1**

28

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1        (e)     Eliminating duplicates, number of loans about which one or more of

2                 statements (a) through (d) is true: 322

3    Item 99.     Untrue or misleading statements about the underwriting standards of the

4                 originators of the mortgage loans:

5          On pages S-44 through S-46 of the prospectus supplement, Bear Stearns and SAMI II

6    made statements about the underwriting guidelines of GreenPoint Mortgage Funding, Inc. All of

7    those statements are incorporated here by reference. In particular, Bear Stearns and SAMI II

8    stated that:

9        (a)     "Exceptions to the guidelines are permitted where compensating factors are

10   present." SAMI 2007-AR5 Pros. Sup. S-44.

11       (b)     "Generally, the GreenPoint underwriting guidelines are applied to evaluate the

12   prospective borrower's credit standing and repayment ability and the value and adequacy of the

13   mortgaged property as collateral." SAMI 2007-AR5 Pros. Sup. S-44.

14   Item 106.    Early payment defaults:

15       (a)    Number of the mortgage loans that suffered EPDs: 25

16       (b)    Percent of the mortgage loans that suffered EPDs: 1.7%

17       (c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans

18             made at the same time as the loans in the collateral pool that experienced

19             EPDs: 0.83%

20   Item 107.    90+ days delinquencies:

21       (a)    Number of the mortgage loans that suffered 90+ days delinquencies: 484

22       (b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 32.4%

23       (c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans

24             made at the same time as the loans in the collateral pool that suffered 90+

25             days delinquencies: 33.9%

26   Item 108.    30+ days delinquencies in this securitization:

27       (a)    Number of the mortgage loans that were 30+ days delinquent on March 31,

28             2010: 485

-5-

1        (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31,**

2                    **2010: 32.4%**

3        (c)    **Percent of all mortgage loans in the United States that were 30+ days**

4                    **delinquent on March 31, 2010: 14.7%**

5    **Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

6    On page S-7 of the prospectus supplement, Bear Stearns and SAMI II made statements

7    about the ratings assigned to the certificates issued in this securitization. Bear Stearns and SAMI

8    II stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA

9    by Standard & Poor's Rating Services. These were the highest ratings available from these two

10   rating agencies.

11       Bear Stearns and SAMI II also stated: "It is a condition to the issuance of the certificates

12   that the offered certificates receive the following ratings from Standard & Poor's Rating Services

13   . . . and Fitch Ratings . . . ." The requirement for class A-1, from which this certificate was to be

14   paid, was for AAA from Standard & Poor's and from Fitch. SAMI 2007-AR5 Pros. Sup. S-16.

15       Bear Stearns and SAMI II also stated: "It is a condition to the issuance of each class of

16   Offered Certificates that it receives at least the ratings set forth below from S&P and Fitch." The

17   requirement for class A-1, from which this certificate was to be paid, was for AAA from Standard

18   & Poor's and from Fitch. SAMI 2007-AR5 Pros. Sup. S-113.

19   **Item 120.**    **Summary of loans about which the Defendants made untrue or misleading**

20                   **statements:**

21       (a)    **Number of loans whose LTVs were materially understated: 761**

22       (b)    **Number of loans in which the owner's equity was reduced by 5% or more by**

23                   **undisclosed additional liens: 98**

24       (c)    **Number of loans that suffered EPDs: 25**

25       (d)    **Number of loans in which the properties were stated to be owner-occupied**

26                   **but were not: 322**

27       (e)    **Eliminating duplicates, number of loans about which the Defendants made**

28                   **untrue or misleading statements: 923**

-6-

1      (f)      **Eliminating duplicates, percent of loans about which the Defendants made**

2                **untrue or misleading statements: 61.7%**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

1    **SCHEDULE 33 TO THE AMENDED COMPLAINT**

2

3        To the extent that this Schedule is incorporated by reference into allegations in the

4    complaint, those allegations are made against Defendants Bear Stearns and SAMI II.

5    **Item 44.        Details of trust and certificate(s).**

6        (a)    **Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

7        (b)    **Description of the trust:** Bear Stearns Alt-A Trust, Mortgage Pass-Through

8    Certificates, Series 2005-9 was a securitization in September 2005 of 8,075 mortgage loans, in

9    two groups. The mortgage loans in the collateral pool of this securitization were originated by

10   Countrywide Home Loans, Inc., EMC Mortgage Corporation, Bear Stearns Residential Mortgage

11   Corporation, and various undisclosed originators. EMC Mortgage Corporation originated 52.9%

12   of the loans in the collateral pool and Countrywide Home Loans, Inc. originated 31.56%. EMC

13   Mortgage Corporation originated 75.81% of the loans in group I and Countrywide Home Loans,

14   Inc. originated 12.01%. Countrywide Home Loans, Inc. originated 20.98% of the subset of loans

15   in sub-group II-1 and EMC Mortgage Corporation originated 15.87%. EMC Mortgage

16   Corporation originated 88.39% of the loans in sub-group II-2. EMC Mortgage Corporation

17   originated 72.54% of the loans in sub-group II-3 and Countrywide Home Loans, Inc. originated

18   21.44%. Countrywide Home Loans, Inc. originated 47.65% of the loans in sub-group II-4 and

19   EMC Mortgage Corporation originated 39.75%. Countrywide Home Loans, Inc. originated

20   53.43% of the loans in sub-loan group II-5 and EMC Mortgage Corporation originated 28.63%.

21   Countrywide Home Loans, Inc. originated 95.38% of the loans in sub-loan group II-6. BALTA

22   2005-9 Pros. Sup. S-5, S-46, and S-52.

23       (c)    **Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

24   and sold to the Bank a senior certificate in this securitization, in tranche Il-5A-1, for which the

25   Bank paid $102,238,423 plus accrued interest on September 30, 2005.

26       (d)    **Ratings of the certificate(s) when the Bank purchased them:** Standard &

27   Poor's— AAA; Moody's— Aaa.

28       (e)    **Current ratings of the certificate(s):** Standard & Poor's— CCC; Moody's— B1.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)



1      (f)    URL of prospectus supplement for this securitization:

2    http://www.sec.gov/Archives/edgar/data/1243106/000112528205005084/b409035_424b5.txt

3    **Item 52.    Untrue or misleading statements about the LTVs of the mortgage loans:**

4          In the prospectus supplement, Bear Stearns and SAMI II made the following statements

5    about the LTVs of the mortgage loans in the collateral pool of this securitization.

6          (a)    The weighted-average LTV at origination of the mortgage loans in group I was

7    77.7%. BALTA 2005-9 Pros. Sup. S-7 and A-3.

8          (b)    The weighted-average LTV at origination of the mortgage loans in sub-loan group

9    II-1 was 76.88%. BALTA 2005-9 Pros. Sup. S-7 and A-14.

10         (c)    The weighted-average LTV at origination of the mortgage loans in sub-loan group

11   II-2 was 76.57%. BALTA 2005-9 Pros. Sup. S-8 and A-24.

12         (d)    The weighted-average LTV at origination of the mortgage loans in sub-loan group

13   II-3 was 73.89%. BALTA 2005-9 Pros. Sup. S-8 and A-36.

14         (e)    The weighted-average LTV at origination of the mortgage loans in sub-loan group

15   II-4 was 75.09%. BALTA 2005-9 Pros. Sup. S-9 and A-47.

16         (f)    The weighted-average LTV at origination of the mortgage loans in sub-loan group

17   II-5 was 75.60%. BALTA 2005-9 Pros. Sup. S-9 and A-57.

18         (g)    The weighted-average LTV at origination of the mortgage loans in sub-loan group

19   II-6 was 74.56%. BALTA 2005-9 Pros. Sup. S-10 and A-68.

20         (h)    The weighted-average LTV at origination for the mortgage loans in group II was

21   75.55%. BALTA 2005-9 Pros. Sup. S-10 and A-76.

22         (i)    In Schedule A of the prospectus supplement ("Certain Characteristics of the

23   Mortgage Loans"), Bear Stearns and SAMI II presented tables of statistics about the mortgage

24   loans in the collateral pool. BALTA 2005-9 Pros. Sup. A-1 to A-84. Each table focused on a

25   certain characteristic of the loans (for example, principal balance at origination) and divided the

26   loans into categories based on that characteristic (for example, loans with principal balances at

27   origination of $0 to $100,000, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then

28   presented various data about the loans in each category. One of the tables, entitled "Original

-2-

1    Loan-to-Value Ratios in Total Group I," divided the loans in group I into 13 categories original
2    LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and
3    misleading statements about the number of mortgage loans, the aggregate principal balance
4    outstanding, and the percent of aggregate principal balance outstanding in each of these
5    categories. BALTA 2005-9 Pros. Sup. A-3.

6    (j)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original
7    Loan-to-Value Ratios in Loan Group II-1." This table divided the mortgage loans in sub-loan
8    group II-1 into 12 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%
9    to 50%, etc.). The table made untrue and misleading statements about the number of mortgage
10    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance
11    outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-14.

12    (k)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original
13    Loan-to-Value Ratios in Loan Group II-2." This table divided the mortgage loans in sub-loan
14    group II-2 into 13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%
15    to 50%, etc.). The table made untrue and misleading statements about the number of mortgage
16    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance
17    outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-24.

18    (l)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original
19    Loan-to-Value Ratios in Loan Group II-3." This table divided the mortgage loans in sub-loan
20    group II-3 into nine categories of original LTV (for example, 40.01% to 50%, 50.01% to 55%,
21    55.01% to 60%, etc.). The table made untrue and misleading statements about the number of
22    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate
23    principal balance outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-36.

24    (m)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original
25    Loan-to-Value Ratios in Loan Group II-4." This table divided the mortgage loans in sub-loan
26    group II-4 into 12 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%
27    to 50%, etc.). The table made untrue and misleading statements about the number of mortgage
28

-3-

1   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

2   outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-47.

3       (n)    In Schedule A, Bear Stearns and SAMl II presented a table entitled "Original

4   Loan-to-Value Ratios in Loan Group II-5." This table divided the mortgage loans in sub-loan

5   group II-5 into 11 categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%,

6   50.01% to 60%, etc.). The table made untrue and misleading statements about the number of

7   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

8   principal balance outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-57.

9       (o)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

10  Loan-to-Value Ratios in Loan Group II-6." This table divided the mortgage loans in sub-loan

11  group II-6 into nine categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%,

12  50.01% to 60%, etc.). The table made untrue and misleading statements about the number of

13  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

14  principal balance outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-68.

15      (p)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

16  Loan-to-Value Ratios in Total Group II." This table divided the mortgage loans in group II into

17  13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%, etc.).

18  The table made untrue and misleading statements about the number of mortgage loans, the

19  aggregate principal balance outstanding, and the percent of aggregate principal balance

20  outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-76.

21

22

23

24

25

26

27

28

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

**Item 62.    Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 8,075 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,280 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,754 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $144,836,759 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 620 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $47,999,918 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 359 |
| Weighted-average LTV, as stated by Defendants | 75.60 |
| Weighted-average LTV, as determined by the model | 85.8% |

**Item 65.    Evidence from subsequent sales of refinanced properties:**

Of the 8,075 mortgage loans in the collateral pool, 1,725 were taken out to refinance, rather than to purchase, properties. For those 1,725 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,725 properties, 125 were subsequently sold for a total of approximately $64,563,293. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $72,284,875. Thus, those properties were sold for 89.3% of the value ascribed to them, a difference of 10.7%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71.    Undisclosed additional liens:**

    **(a)    Minimum number of properties with additional liens: 349**

    **(b)    Total reduction in equity from additional liens: $36,278,782**

    **(c)    Weighted-average reduction in equity from additional liens: 79.5%**

**Item 82.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Bear Stearns and SAMI II made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide:

-5-

1  "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

2  effect." BALTA 2005-9 Pros. Sup. S-49.

3      In the prospectus, Bear Stearns and SAMI II made the following statement about the

4  appraisals of the properties that secured the mortgage loans in this securitization: "All appraisals

5  by licensed appraisers are required to be on forms acceptable to Fannie Mae or Freddie Mac."

6  BALTA 2005-9 Pros. 13.

7  **Item 88.     Untrue or misleading statements about owner-occupancy of the properties**

8  **that secured the mortgage loans:**

9      In the prospectus supplement, Bear Stearns and SAMI II made the following statements

10  about the occupancy status of the properties that secured the mortgage loans in the collateral pool

11  of this securitization.

12      (a)   In Schedule A of the prospectus supplement, described in Item 52, Bear Stearns

13  and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Total Group

14  I." This table divided the mortgage loans in group I into the categories "Owner Occupied,"

15  "Investor," and "Second Home." The table made untrue and misleading statements about the

16  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

17  aggregate principal balance outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-

18  5.

19      (b)   In the "Occupancy Status of Mortgage Properties in Total Group I" table, Bear

20  Stearns and SAMI II stated that 60.01% of the mortgage loans in group I were secured by an

21  "Owner Occupied" property, 32.99% by an "Investor" property, and 7% by a "Second Home."

22  BALTA 2005-9 Pros. Sup. A-5.

23      (c)   In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

24  Status of Mortgage Properties in Loan Group II-1." This table divided the mortgage loans in sub-

25  loan group II-1into the categories "Owner Occupied," "Investor," and "Second Home." The table

26  made untrue and misleading statements about the number of mortgage loans, the aggregate

27  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

28  of these categories. BALTA 2005-9 Pros. Sup. A-16.

-6-

1      (d)    In the "Occupancy Status of Mortgage Properties in Loan Group II-1" table, Bear

2  Stearns and SAMI II stated that 82.82% of the mortgage loans in sub-loan group II-1 were

3  secured by an "Owner Occupied" property, 9.97% by an "Investor" property, and 7.21% by a

4  "Second Home." BALTA 2005-9 Pros. Sup. A-16.

5      (e)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

6  Status of Mortgage Properties in Loan Group II-2." This table divided the mortgage loans in sub-

7  loan group II-2 into the categories "Owner Occupied," "Investor," and "Second Home." The table

8  made untrue and misleading statements about the number of mortgage loans, the aggregate

9  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

10  of these categories. BALTA 2005-9 Pros. Sup. A-27.

11      (f)    In the "Occupancy Status of Mortgage Properties in Loan Group II-2" table, Bear

12  Stearns and SAMI II stated that 69.9% of the mortgage loans in sub-loan group II-2 were secured

13  by an "Owner Occupied" property, 23.32% by an "Investor" property, and 6.79% by a "Second

14  Home." BALTA 2005-9 Pros. Sup. A-27.

15      (g)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

16  Status of Mortgage Properties in Loan Group II-3." This table divided the mortgage loans in sub-

17  loan group II-3 into the categories "Owner Occupied," "Investor," and "Second Home." The table

18  made untrue and misleading statements about the number of mortgage loans, the aggregate

19  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

20  of these categories. BALTA 2005-9 Pros. Sup. A-38.

21      (h)    In the "Occupancy Status of Mortgage Properties in Loan Group II-3" table, Bear

22  Stearns and SAMI II stated that 83.01% of the mortgage loans in sub-loan group II-3 were

23  secured by an "Owner Occupied" property, 10.72% by an "Investor" property, and 6.28% by a

24  "Second Home." BALTA 2005-9 Pros. Sup. A-38.

25      (i)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

26  Status of Mortgage Properties in Loan Group II-4." This table divided the mortgage loans in sub-

27  loan group II-4 into the categories Owner Occupied," "Investor," and "Second Home." The table

28  made untrue and misleading statements about the number of mortgage loans, the aggregate

-7-

1   principal balance outstanding, and the percent of aggregate principal balance outstanding in each
2   of these categories. BALTA 2005-9 Pros. Sup. A-50.

3       (j)     In the "Occupancy Status of Mortgage Properties in Loan Group II-4" table, Bear
4   Stearns and SAMI II stated that 87.3% of the mortgage loans in sub-loan group II-4 were secured
5   by an "Owner Occupied" property, 5.44% by an "Investor" property, and 7.26% by a "Second
6   Home." BALTA 2005-9 Pros. Sup. A-50.

7       (k)     In Schedule A, Bear Stearns and SAMI II presented a similar table entitled
8   "Occupancy Status of Mortgage Properties in Loan Group II-5." This table divided the mortgage
9   loans in sub-loan group II-5 into the categories "Owner Occupied," "Investor," and "Second
10  Home." The table made untrue and misleading statements about the number of mortgage loans,
11  the aggregate principal balance outstanding, and the percent of aggregate principal balance
12  outstanding in each of these categories. BALTA 2005-9 Pros. Sup. A-60.

13      (l)     In the "Occupancy Status of Mortgage Properties in Loan Group II-5" table, Bear
14  Stearns and SAMI II stated that 84.33% of the mortgage loans in sub-loan group II-5 were
15  secured by an "Owner Occupied" property, 10.44% by an "Investor" property, and 5.23% by a
16  "Second Home." BALTA 2005-9 Pros. Sup. A-60.

17      (m)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy
18  Status of Mortgage Properties in Loan Group II-6." This table divided the mortgage loans in sub-
19  loan group II-6 into the categories "Owner Occupied," "Investor," and "Second Home." The table
20  made untrue and misleading statements about the number of mortgage loans, the aggregate
21  principal balance outstanding, and the percent of aggregate principal balance outstanding in each
22  of these categories. BALTA 2005-9 Pros. Sup. A-69.

23      (n)     In the "Occupancy Status of Mortgage Properties in Loan Group II-6" table, Bear
24  Stearns and SAMI II stated that 86.76% of the mortgage loans in sub-loan group II-6 were
25  secured by an "Owner Occupied" property, 8.15% by an "Investor" property, and 5.09% by a
26  "Second Home." BALTA 2005-9 Pros. Sup. A-69.

27      (o)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy
28  Status of Mortgage Properties in Total Group II." This table divided the mortgage loans in group

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1  II into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue

2  and misleading statements about the number of mortgage loans, the aggregate principal balance

3  outstanding, and the percent of aggregate principal balance outstanding in each of these

4  categories. BALTA 2005-9 Pros. Sup. A-78.

5      (p)    In the "Occupancy Status of Mortgage Properties in Total Group II" table, Bear

6  Stearns and SAMI II stated that 81.06% of the mortgage loans in group II, by aggregate stated

7  principal balance outstanding, were secured by an "Owner Occupied" property,12.67% by an

8  "Investor" property, and 6.28% by a "Second Home." BALTA 2005-9 Pros. Sup. A-78.

9  **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

10      **(a)**    **Number of loans on which the owner of the property instructed tax**

11                **authorities to send property tax bills to him or her at a different address: 294**

12      **(b)**    **Number of loans on which the owner of the property could have, but did not,**

13                **designate the property as his or her homestead: 469**

14      **(c)**    **Number of loans on which the owner of the property owned three or more**

15                **properties: 28**

16      **(d)**    **Number of loans that went straight from current to foreclosure or ownership**

17                **by lender: 1**

18      **(e)**    **Eliminating duplicates, number of loans about which one or more of**

19                **statements (a) through (d) is true: 665**

20  **Item 99.**    **Untrue or misleading statements about the underwriting standards of the**

21                **originators of the mortgage loans:**

22      On pages S-46 through S-52 of the prospectus supplement, Bear Stearns and SAMI II

23  made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those

24  statements are incorporated here by reference. In particular, Bear Stearns and SAMI II stated that:

25      (a)    "Exceptions to Countrywide's underwriting guidelines may be made if

26  compensating factors are demonstrated by a prospective borrower." BALTA 2005-9 Pros. Sup. S-

27  48.

28

-9-

1        (b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of

2   Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

3   ability and the value and adequacy of the mortgaged property as collateral." BALTA 2005-9 Pros.

4   Sup. S-47.

5        On pages S-53 through S-54 of the prospectus supplement, Bear Stearns and SAMI II

6   made statements about the underwriting guidelines of EMC Mortgage Corporation. All of those

7   statements are incorporated here by reference. In particular, Bear Stearns and SAMI II stated that:

8        (a)     "Exceptions to the underwriting standards are permitted where compensating

9   factors are present." BALTA 2005-9 Pros. Sup. S-53.

10       (b)     "Such underwriting standards are applied to evaluate the prospective borrower's

11   credit standing and repayment ability and the value and adequacy of the mortgaged property as

12   collateral." BALTA 2005-9 Pros. Sup. S-53.

13   **Item 106.**    **Early payment defaults:**

14       **(a)**     **Number of the mortgage loans that suffered EPDs: 103**

15       **(b)**     **Percent of the mortgage loans that suffered EPDs: 1.3%**

16       **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

17             **made at the same time as the loans in the collateral pool that experienced**

18             **EPDs: 0.18%**

19   **Item 107.**    **90+ days delinquencies:**

20       **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies: 2,614**

21       **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies: 32.4%**

22       **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

23             **made at the same time as the loans in the collateral pool that suffered 90+**

24             **days delinquencies: 16.5%**

25   **Item 108.**    **30+ days delinquencies in this securitization:**

26       **(a)**     **Number of the mortgage loans that were 30+ days delinquent on March 31,**

27             **2010: 2,493**

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31,**

2    **2010: 30.9%**

3    (c)    **Percent of all mortgage loans in the United States that were 30+ days**

4    **delinquent on March 31, 2010:** 14.7%

5    **Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:**

6    On pages S-2 to S-4 of the prospectus supplement, Bear Stearns and SAMI II made

7    statements about the ratings assigned to the certificates issued in this securitization. Bear Stearns

8    and SAMI II stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc.

9    and AAA by Standard & Poor's Rating Services. These were the highest ratings available from

10   these two rating agencies.

11   Bear Stearns and SAMI II also stated: "It is a condition to the issuance of the certificates

12   that the offered certificates receive the following ratings from Standard & Poors [sic] Rating

13   Services . . . which is referred to here as S&P, and Moody's Investors Service, Inc. . . ." The

14   requirement for class II-5A-1, from which this certificate was to be paid, was for AAA from

15   Standard & Poor's and Aaa from Moody's. BALTA 2005-9 Pros. Sup. S-18 to S-19.

16   Bear Stearns and SAMI II also stated: "It is a condition to the issuance of each class of

17   Offered Certificates that it receives at least the ratings set forth below from S&P and Moody's."

18   The requirement for class II-5A-1, from which this certificate was to be paid, was for AAA from

19   Standard & Poor's and Aaa from Moody's. BALTA 2005-9 Pros. Sup. S-113.

20   **Item 120.    Summary of loans about which the Defendants made untrue or misleading**

21   **statements:**

22   (a)    **Number of loans whose LTVs were materially understated:** 1,754

23   (b)    **Number of loans in which the owner's equity was reduced by 5% or more by**

24   **undisclosed additional liens:** 349

25   (c)    **Number of loans that suffered EPDs:** 103

26   (d)    **Number of loans in which the properties were stated to be owner-occupied**

27   **but were not:** 665

28

-11-

1    (e)    **Eliminating duplicates, number of loans about which the Defendants made**
2           **untrue or misleading statements: 2,348**
3    (f)    **Eliminating duplicates, percent of loans about which the Defendants made**
4           **untrue or misleading statements: 29.1%**
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-12-

1    **SCHEDULE 34 TO THE AMENDED COMPLAINT**

2

3       To the extent that this Schedule is incorporated by reference into allegations in the

4    complaint, those allegations are made against Defendant Bear Stearns.

5    **Item 44.        Details of trust and certificate(s).**

6        **(a)        Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

7        **(b)        Description of the trust:** First Horizon Alternative Mortgage Securities Trust,

8    Mortgage Pass-Through Certificates, Series 2005-AA6 was a securitization in June 2005 of 2,438

9    mortgage loans, in three pools. The mortgage loans in the collateral pool of this securitization

10   were originated or acquired by First Horizon Home Loan Corporation. FHAMS 2005-AA6 Pros.

11   Sup. S-6.

12       **(c)        Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

13   and sold to the Bank a senior certificate in this securitization, in tranche II-A-1, for which the

14   Bank paid $290,952,545 plus accrued interest on June 30, 2005.

15       **(d)        Ratings of the certificate(s) when the Bank purchased them:** Standard &

16   Poor's— AAA; Moody's— Aaa.

17       **(e)        Current ratings of the certificate(s):** Standard & Poor's— A; Moody's— Ba1.

18       **(f)        URL of prospectus supplement for this securitization:**

19   http://www.sec.gov/Archives/edgar/data/1081915/000095011705002529/a40061.txt

20   **Item 52.        Untrue or misleading statements about the LTVs of the mortgage loans:**

21       In the prospectus supplement, Bear Stearns made the following statements about the LTVs

22   of the mortgage loans in the collateral pool of this securitization.

23       **(a)        "No mortgage loan has a loan-to-value ratio at origination of more than 95%."**

24   FHAMS 2005-AA6 Pros. Sup. S-21.

25       **(b)        In Annex I of the prospectus supplement, Bear Stearns presented tables of statistics**

26   about the mortgage loans in Pool I. FHAMS 2005-AA6 Pros. Sup. I-1 to I-2. Each table focused

27   on a certain characteristic of the loans (for example, current principal balance) and divided the

28   loans into categories based on that characteristic (for example, loans with current principal

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    balances of less than $250,001, $250,001 to $300,000, $300,001 to $350,000, etc.). Each table

2    then presented various data about the loans in each category. One of the tables, entitled "Original

3    Loan-to-Value Ratios For The Mortgage Loans in Pool I," divided the loans in Pool I into 10

4    categories of original LTV (for example, 50% and below, 50.01% to 55%, 55.01% to 60%, etc.).

5    The table made untrue and misleading statements about the number of mortgage loans, the

6    aggregate principal balance outstanding, and the percent of aggregate principal balance

7    outstanding in each of these categories. FHAMS 2005-AA6 Pros. Sup. I-1.

8            (c)      "The weighted average original loan-to-value ratio of the mortgage loans in Pool I

9    is expected to be approximately 73.49%." FHAMS 2005-AA6 Pros. Sup. I-1.

10           (d)      In Annex II of the prospectus supplement, Bear Stearns presented similar tables of

11    statistics about the mortgage loans in Pool II. FHAMS 2005-AA6 Pros. Sup. II-1 to II-2. One of

12    the tables, entitled "Original Loan-to-Value Ratios For The Mortgage Loans in Pool II," divided

13    the loans in Pool II into 10 categories of original LTV (for example, 50% and below, 50.01% to

14    55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number

15    of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

16    principal balance outstanding in each of these categories. FHAMS 2005-AA6 Pros. Sup. II-1.

17           (e)      "The weighted average original loan-to-value ratio of the mortgage loans in Pool II

18    is expected to be approximately 75.73%." FHAMS 2005-AA6 Pros. Sup. II-1.

19           (f)      In Annex III of the prospectus supplement, Bear Stearns presented similar tables of

20    statistics about the mortgage loans in Pool III. FHAMS 2005-AA6 Pros. Sup. III-1 to III-2. One

21    of the tables, entitled "Original Loan-to-Value Ratios For The Mortgage Loans in Pool III,"

22    divided the loans in Pool III into nine categories of original LTV (for example, 50% and below,

23    50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about

24    the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

25    aggregate principal balance outstanding in each of these categories. FHAMS 2005-AA6 Pros.

26    Sup. III-1.

27           (g)      "The weighted-average original loan-to-value ratio of the mortgage loans in Pool

28    III is expected to be approximately 73.28%." FHAMS 2005-AA6 Pros. Sup. III-1.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

**Item 62.    Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,438 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,389 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 655 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $33,182,619 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 235 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $12,227,507 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 78 |
| Weighted-average LTV, as stated by Defendants (pool II) | 75.7% |
| Weighted-average LTV, as determined by the model (pool II) | 81.9% |

**Item 71.    Undisclosed additional liens:**

(a)    **Minimum number of properties with additional liens: 1,119**

(b)    **Total reduction in equity from additional liens: $60,187,927**

(c)    **Weighted-average reduction in equity from additional liens: 85.1%**

**Item 82.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus, Bear Stearns made the following statement about the appraisals of the properties that secured the mortgage loans originated by First Horizon Home Loan Corporation: "First Horizon's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac, except for maximum loan size. In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property." FHAMS 2005-AA6 Pros. 27.

-3-

1    **Item 88.    Untrue or misleading statements about owner-occupancy of the properties**
2    **that secured the mortgage loans:**

3    In the prospectus supplement, Bear Stearns made the following statements about the
4    occupancy status of the properties that secured the mortgage loans in the collateral pool of this
5    securitization.

6    (a)    In Annex I of the prospectus supplement, described in Item 52, Bear Stearns
7    presented a table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table
8    divided the mortgage loans in Pool I into the categories "Primary Residence," "Investor
9    Property," and "Second Residence." The table made untrue and misleading statements about the
10   number of mortgage loans, the aggregate principal balance outstanding, and the percent of
11   aggregate principal balance outstanding in each of these categories. FHAMS 2005-AA6 Pros.
12   Sup. I-2.

13   (b)    In the "Occupancy Types for the Mortgage Loans in Pool I" table, Bear Stearns
14   stated that 71.08% of the mortgage loans in Pool I were secured by a "Primary Residence,"
15   24.83% by an "Investor Property," and 4.09% by a "Second Residence." FHAMS 2005-AA6
16   Pros. Sup. I-2.

17   (c)    In Annex II of the prospectus supplement, described in Item 52, Bear Stearns
18   presented a similar table entitled "Occupancy Types for the Mortgage Loans in Pool II." This
19   table divided the mortgage loans in Pool II into the categories "Primary Residence," "Investor
20   Property," and "Second Residence." The table made untrue and misleading statements about the
21   number of mortgage loans, the aggregate principal balance outstanding, and the percent of
22   aggregate principal balance outstanding in each of these categories. FHAMS 2005-AA6 Pros.
23   Sup. II-2.

24   (d)    In the "Occupancy Types for the Mortgage Loans in Pool II" table, Bear Stearns
25   stated that 74.3% of the mortgage loans in Pool II were secured by a "Primary Residence,"
26   21.58% by an "Investor Property," and 4.12% by a "Second Residence." FHAMS 2005-AA6
27   Pros. Sup. II-2.

28

-4-

1       (e)    In Annex III of the prospectus supplement, described in Item 52, Bear Stearns

2   presented a table entitled "Occupancy Types for the Mortgage Loans in Pool III." This table

3   divided the mortgage loans in Pool III into the categories "Primary Residence," "Investor

4   Property," and "Second Residence." The table made untrue and misleading statements about the

5   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

6   aggregate principal balance outstanding in each of these categories. FHAMS 2005-AA6 Pros.

7   Sup. III-2.

8       (f)    In the "Occupancy Types for the Mortgage Loans in Pool III" table, Bear Stearns

9   stated that 82.28% of the mortgage loans in Pool III were secured by a "Primary Residence,"

10  14.74% by an "Investor Property," and 2.99% by a "Second Residence." FHAMS 2005-AA6

11  Pros. Sup. III-2.

12  **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

13      **(a)**    **Number of loans on which the owner of the property instructed tax**

14          **authorities to send property tax bills to him or her at a different address: 180**

15      **(b)**    **Number of loans on which the owner of the property could have, but did not,**

16          **designate the property as his or her homestead: 200**

17      **(c)**    **Number of loans on which the owner of the property owned three or more**

18          **properties: 10**

19      **(d)**    **Eliminating duplicates, number of loans about which one or more of**

20          **statements (a) through (c) is true: 342**

21  **Item 99.**    **Untrue or misleading statements about the underwriting standards of the**

22          **originators of the mortgage loans:**

23      On pages 26 through 28 of the prospectus, Bear Stearns made statements about the

24  underwriting guidelines of First Horizon Home Loan Corporation, which originated the mortgage

25  loans in the collateral pool of this securitization. All of those statements are incorporated here by

26  reference. In particular, Bear Stearns stated that:

27      (a)    "[A] mortgage loan will be considered to be originated in accordance with a given

28  set of underwriting standards if, based on an overall qualitative evaluation, the loan substantially

-5-

1    complies with the underwriting standards. For example, a mortgage loan may be considered to

2    comply with a set of underwriting standards, even if one or more specific criteria included in the

3    underwriting standards were not satisfied, if other factors compensated for the criteria that were

4    not satisfied or if the mortgage loan is considered to be in substantial compliance with the

5    underwriting standards." FHAMS 2005-AA6 Pros. 26.

6          (b)    "First Horizon's Underwriting standards are intended to evaluate the prospective

7    mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed

8    property as collateral." FHAMS 2005-AA6 Pros. 27.

9          (c)    "Underwriting standards are applied by or on behalf of a lender to evaluate a

10   borrower's credit standing and repayment ability, and the value and adequacy of the related

11   Property as collateral." FHAMS 2005-AA6 Pros. 27.

12   **Item 106.      Early payment defaults:**

13          **(a)    Number of the mortgage loans that suffered EPDs: 5**

14          **(b)    Percent of the mortgage loans that suffered EPDs: 0.2%**

15          **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

16                 **made at the same time as the loans in the collateral pool that experienced**

17                 **EPDs: 0.18%**

18   **Item 107.      90+ days delinquencies:**

19          **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 337**

20          **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 13.8%**

21          **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

22                 **made at the same time as the loans in the collateral pool that suffered 90+**

23                 **days delinquencies: 16.5%**

24   **Item 108.      30+ days delinquencies in this securitization:**

25          **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31,**

26                 **2010: 342**

27          **(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31,**

28                 **2010: 14.0%**

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1      (c)     Percent of all mortgage loans in the United States that were 30+ days

2            delinquent on March 31, 2010: 14.7%

3  Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:

4      On page S-9 of the prospectus supplement, Bear Stearns made statements about the

5  ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the Bank's

6  certificate was to be rated Aaa by Moody's Investors Service, Inc. and AAA by Standard &

7  Poor's Rating Services. These were the highest ratings available from these two rating agencies.

8      Bear Stearns also stated: "The . . . Class II-A-1 . . . Certificates will not be offered unless

9  they are rated "AAA" and "Aaa" by S&P and Moody's, respectively." FHAMS 2005-AA6 Pros.

10  Sup. S-9.

11      Bear Stearns also stated: "It is a condition to the issuance of the senior certificates that

12  they be rated "AAA" by S&P. It is a condition to the issuance of the Class I-A-1, Class I-A-R,

13  Class II-A-1, Class II-A-2, Class III-A-1, Class III-A-2 and Class III-A-IO Certificates, that they

14  be rated "Aaa" by Moody's." FHAMS 2005-AA6 Pros. Sup. S-53 to S-54.

15  Item 120.    Summary of loans about which the Defendants made untrue or misleading

16           statements:

17      (a)     Number of loans whose LTVs were materially understated: 655

18      (b)     Number of loans in which the owner's equity was reduced by 5% or more by

19            undisclosed additional liens: 1,119

20      (c)     Number of loans that suffered EPDs: 5

21      (d)     Number of loans in which the properties were stated to be owner-occupied

22            but were not: 342

23      (e)     Eliminating duplicates, number of loans about which the Defendants made

24            untrue or misleading statements: 1,509

25      (f)     Eliminating duplicates, percent of loans about which the Defendants made

26            untrue or misleading statements: 61.9%

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1           **SCHEDULE 35 TO THE AMENDED COMPLAINT**

2

3        To the extent that this Schedule is incorporated by reference into allegations in the

4 complaint, those allegations are made against Defendants Bear Stearns and SAMI II.

5 **Item 44.**     **Details of trust and certificate(s).**

6     **(a)**     **Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

7     **(b)**     **Description of the trust:** Bear Stearns Alt-A Trust, Mortgage Pass-Through

8 Certificates, Series 2005-3 was a securitization in March 2005 of 5,001 mortgage loans, in four

9 groups. The mortgage loans in the collateral pool of this securitization were originated by EMC

10 Mortgage Corporation, GMAC Mortgage Corporation, and various undisclosed originators. EMC

11 Mortgage Corporation originated 49.03% of the loans in the collateral pool and GMAC Mortgage

12 Corporation originated 16.03%. EMC Mortgage Corporation originated 41.28% of the loans in

13 Group 1 and 39.09% of the loans in Group II. EMC Mortgage Corporation originated 53.94% of

14 the loans in Group III and GMAC Mortgage Corporation originated 15.89%. EMC Mortgage

15 Corporation originated 47.58% of the loans in Group IV and GMAC Mortgage Corporation

16 originated 26.98%. BALTA 2005-03 Pros. Sup. S-4, S-28 and S-30.

17     **(c)**     **Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

18 and sold to the Bank two senior certificates in this securitization, in tranches III-A-1 and IV-A-1,

19 for which the Bank paid $252,617,188 and $180,536,016 plus accrued interest, respectively, on

20 March 31, 2005.

21     **(d)**     **Ratings of the certificate(s) when the Bank purchased them:**

22     Certificate: III-A-1; Standard & Poor's— AAA; Moody's— Aaa.

23     Certificate: IV-A-1; Standard & Poor's— AAA; Moody's— Aaa

24     **(e)**     **Current ratings of the certificate(s):**

25     Certificate: III-A-1; Standard & Poor's— BBB-; Moody's— Baa1.

26     Certificate: IV-A-1; Standard & Poor's— BBB-; Moody's— A1.

27

28

1       (f)     **URL of prospectus supplement for this securitization:**

2  http://www.sec.gov/Archives/edgar/data/1243106/000106823805000252/bsalta032905prosupp.ht

3  m

4  **Item 52.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

5       In the prospectus supplement, Bear Stearns and SAMI II made the following statements

6  about the LTVs of the mortgage loans in the collateral pool of this securitization.

7       (a)     The weighted-average LTV at origination of the mortgage loans in Group I was

8  78.91%. BALTA 2005-3 Pros. Sup. S-5.

9       (b)     The weighted-average LTV at origination of the mortgage loans in Group II was

10  74.61%. BALTA 2005-3 Pros. Sup. S-5.

11       (c)     The weighted-average LTV at origination of the mortgage loans in Group III was

12  78.45%. BALTA 2005-3 Pros. Sup. S-6.

13       (d)     The weighted-average LTV at origination of the mortgage loans in Group IV was

14  73.75%. BALTA 2005-3 Pros. Sup. S-7.

15       (e)     The weighted-average LTV at origination of all of the mortgage loans in the

16  collateral pool was 76.68%. BALTA 2005-3 Pros. Sup. S-7.

17  **Item 62.**     **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 5,001 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,934 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,466 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $77,078,075 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 481 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $29,093,359 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 261 |
| Weighted-average LTV, as stated by Defendants | 76.7% |
| Weighted-average LTV, as determined by the model | 85.3% |

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  **Item 71.**    **Undisclosed additional liens:**

2      **(a)**    **Minimum number of properties with additional liens: 2,213**

3      **(b)**    **Total reduction in equity from additional liens: $123,425,168**

4      **(c)**    **Weighted-average reduction in equity from additional liens: 85.1%**

5  **Item 99.**    **Untrue or misleading statements about the underwriting standards of the**
6                  **originators of the mortgage loans:**

7  On pages S-31 through S-33 of the prospectus supplement, Bear Stearns made statements

8  about the underwriting guidelines of EMC Mortgage Corporation. All of those statements are

9  incorporated here by reference. In particular, Bear Stearns stated that:

10      (a)    "Exceptions to the underwriting standards are permitted where compensating
11
12  factors are present." BALTA 2005-3 Pros. Sup. S-31.

13      (b)    "Such underwriting standards are applied to evaluate the prospective borrower's

14  credit standing and repayment ability and the value and adequacy of the mortgaged property as

15  collateral." BALTA 2005-3 Pros. Sup. S-31.

16  On pages S-33 through S-35 of the prospectus supplement, Bear Stearns made statements

17  about the underwriting guidelines of GMAC Mortgage Corporation. All of those statements are

18  incorporated here by reference. In particular, Bear Stearns stated that:
19
20      (a)    "[A] mortgage loan will be considered to be originated in accordance with a given

21  set of underwriting standards if, based on an overall qualitative evaluation, the loan is in

22  substantial compliance with those underwriting standards. For example, a mortgage loan may be

23  considered to comply with a set of underwriting standards, even if one or more specific criteria

24  included in those underwriting standards were not satisfied or if the mortgage loan is considered

25  to be in substantial compliance with the underwriting standards." BALTA 2005-3 Pros. Sup.
26  S-35.
27

28
                                    -3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

(b)    "In determining the adequacy of the mortgaged property as collateral under the GMACM Alt-A programs, an appraisal may be required of each property considered for financing. Such appraisals may be performed by an appraiser's independent from or affiliated with GMACM or its affiliates. Such appraisals, however, will not establish that the mortgaged properties provide assurance of repayment of the mortgage loans." BALTA 2005-3 Pros. Sup. S-33.

**Item 106.     Early payment defaults:**

    **(a)    Number of the mortgage loans that suffered EPDs: 49**

    **(b)    Percent of the mortgage loans that suffered EPDs: 1.0%**

    **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

**Item 107.     90+ days delinquencies:**

    **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 901**

    **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 18.0%**

    **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

**Item 108.     30+ days delinquencies in this securitization:**

    **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 784**

    **(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 15.7%**

    **(c)    Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 117.     Statements about the ratings of the certificate(s) that the Bank purchased:**

On page S-2 of the prospectus supplement, Bear Stearns made statements about the ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the Bank's

-4-

1    certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's

2    Rating Services. These were the highest ratings available from these two rating agencies.

3        Bear Stearns also stated: "It is a condition to the issuance of the certificates that the

4
5    offered certificates receive the following ratings from Standard & Poors [sic] Rating Services . . .

6    which is referred to here as S&P, and Moody's Investors Service, Inc. . . ." The requirement for

7    classes III-A-1 and IV-A-1, from which these certificates were to be paid, was for AAA from

8    Standard & Poor's and Aaa from Moody's. BALTA 2005-3 Pros. Sup. S-11.

9        Bear Stearns also stated: "It is a condition to the issuance of each class of Offered

10    Certificates that it receives at least the ratings set forth below from S&P and Moody's." The

11    requirement for classes III-A-1 and IV-A-1, from which these certificates were to be paid, was for

12
13    AAA from Standard & Poor's and Aaa from Moody's. BALTA 2005-3 Pros. Sup. S-74.

14    **Item 120.**      **Summary of loans about which the Defendants made untrue or misleading statements:**

15

16        **(a)**      **Number of loans whose LTVs were materially understated: 1,466**

17        **(b)**      **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 2,215**

18
19        **(c)**      **Number of loans that suffered EPDs: 49**

20        **(d)**      **Number of loans in which the properties were stated on the loan tape to be owner-occupied but were not: 704**

21        **(e)**      **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 3,096**

22

23        **(f)**      **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 61.9%**

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

**SCHEDULE 36 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Bear Stearns.

**Item 44.**      **Details of trust and certificate(s).**

    **(a)**      **Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

    **(b)**      **Description of the trust:** First Horizon Alternative Mortgage Securities Trust, Mortgage Pass-Through Certificates, Series 2005-AA1 was a securitization in January 2005 of 1,336 mortgage loans, in two pools. The mortgage loans in the collateral pool of this securitization were originated or acquired by First Horizon Home Loan Corporation. FHAMS 2005-AA1 Pros. Sup. S-6.

    **(c)**      **Description of the certificate(s) that the Bank purchased:** Bear Stearns offered and sold to the Bank a senior certificate in this securitization, in tranche II-A-1, for which the Bank paid $163,152,370 plus accrued interest on January 31, 2005.

    **(d)**      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's— AAA; Moody's— Aaa.

    **(e)**      **Current ratings of the certificate(s):** Standard & Poor's— BBB; Moody's— Aa3.

    **(f)**      **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1081915/000095011705000339/a39114.txt

**Item 52.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

    **(a)**      "No mortgage loan in the collateral pool has a loan-to-value ratio at origination of more than 95%." FHAMS 2005-AA1 Pros. Sup. S-20.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   (b)   In Annex I of the prospectus supplement, Bear Stearns presented tables of statistics

2   about the subset of mortgage loans in Pool I. FHAMS 2005-AA1 Pros. Sup. I-1 to I-3. Each table

3   focused on a certain characteristic of the loans (for example, current principal balance) and

4   divided the loans into categories based on that characteristic (for example, loans with current

5   principal balances of less than $250,001, $250,001 to $300,000, $300,001 to $350,000, etc.).

6   Each table then presented various data about the loans in each category. One of the tables, entitled

7   "Original Loan-to-Value Ratios for the Mortgage Loans in Pool I," divided the loans in Pool I

8   into 10 categories of original LTV (for example, 50% and below, 50.01% to 55%, 55.01% to

9   60%, etc.). The table made untrue and misleading statements about the number of mortgage

10   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

11   outstanding in each of these categories. FHAMS 2005-AA1 Pros. Sup. I-1.

12

13

14   (c)   "The weighted average original loan-to-value ratio of the mortgage loans in Pool I

15   is expected to be approximately 75.09%." FHAMS 2005-AA1 Pros. Sup. I-1.

16   (d)   In Annex II of the prospectus supplement, Bear Stearns presented tables of

17   statistics about the subset of mortgage loans in Pool II. FHAMS 2005-AA1 Pros. Sup. II-1 to II-3.

18   Each table focused on a certain characteristic of the loans (for example, current principal balance)

19   and divided the loans into categories based on that characteristic (for example, loans with current

20   principal balances of less than $250,001, $250,001 to $300,000, $300,001 to $350,000, etc.).

21

22   Each table then presented various data about the loans in each category. One of the tables, entitled

23   "Original Loan-to-Value Ratios for the Mortgage Loans in Pool II," divided the loans in Pool II

24   into 10 categories of original LTV (for example, 50% and below, 50.01% to 55%, 55.01% to

25   60%, etc.). The table made untrue and misleading statements about the number of mortgage

26   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

27   outstanding in each of these categories. FHAMS 2005-AA1 Pros. Sup. II-1.

28

-2-

1      (e)     "The weighted average original loan-to-value ratio of the mortgage loans in Pool II

2 is expected to be approximately 74.77%." FHAMS 2005-AA1 Pros. Sup. II-1.

3 **Item 62.**     **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,336 |
| Number of properties on which there was enough information for the model to determine a true market value | 761 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 343 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $20,309,183 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 132 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,631,942 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 44 |
| Weighted-average LTV, as stated by Defendants (pool I) | 75.1% |
| Weighted-average LTV, as determined by the model (pool I) | 83.5% |

14 **Item 71.**     **Undisclosed additional liens:**

15     **(a)**     **Minimum number of properties with additional liens: 613**

16     **(b)**     **Total reduction in equity from additional liens: $32,600,572**

17     **(c)**     **Weighted-average reduction in equity from additional liens: 80.4%**

18 **Item 88.**     **Untrue or misleading statements about owner-occupancy of the properties**
19                      **that secured the mortgage loans:**

20     In the prospectus supplement, Bear Stearns made the following statements about the

21 occupancy status of the properties that secured the mortgage loans in the collateral pool of this

22 securitization.

23     (a)     In Annex I of the prospectus supplement, described in Item 52, Bear Stearns
24
25 presented a table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table

26 divided the subset of mortgage loans in Pool I into the categories "Primary Residence," "Investor

27 Property," and "Second Residence." The table made untrue and misleading statements about the

28 number of mortgage loans, the aggregate principal balance outstanding, and the percent of

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1   aggregate principal balance outstanding in each of these categories. FHAMS 2005-AA1 Pros.

2   Sup. I-2.

3        (b)    In the "Occupancy Types for the Mortgage Loans in Pool I" table, Bear Stearns

4   stated that 75.61% of the subset of mortgage loans in Pool I were secured by a "Primary

5

6   Residence," 21.29% by an "Investor Property," and 3.09% by a "Second Home." FHAMS 2005-

7   AA1 Pros. Sup. I-2.

8        (c)    In Annex II of the prospectus supplement, described in Item 52, Bear Stearns

9   presented a table entitled "Occupancy Types for the Mortgage Loans in Pool II." This table

10   divided the subset of mortgage loans in Pool II into the categories "Primary Residence," "Investor

11   Property," and "Second Residence." The table made untrue and misleading statements about the

12

13   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

14   aggregate principal balance outstanding in each of these categories. FHAMS 2005-AA1 Pros.

15   Sup. II-2.

16        (d)    In the "Occupancy Types for the Mortgage Loans in Pool II" table, Bear Stearns

17   stated that 76.96% of the subset of mortgage loans in Pool II were secured by a "Primary

18   Residence," 19.06% by an "Investor Property," and 3.98% by a "Second Home." FHAMS 2005-

19   AA1 Pros. Sup. II-2.

20

21   **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

22        **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 101**

23

24        **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 133**

25        **(c)**    **Number of loans on which the owner of the property owned three or more properties: 8**

26

27        **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 206**

28

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    **Item 99.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

2

3         On pages 26 through 28 of the prospectus supplement, Bear Stearns made statements

4    about the underwriting guidelines of First Horizon Home Loan Corporation. All of those

5    statements are incorporated here by reference. In particular, Bear Stearns stated that:

6         (a)    "[A] mortgage loan will be considered to be originated in accordance with a given

7    set of underwriting standards if, based on an overall qualitative evaluation, the loan substantially

8    complies with the underwriting standards. For example, a mortgage loan may be considered to

9
     comply with a set of underwriting standards, even if one or more specific criteria included in the
10
     underwriting standards were not satisfied, if other factors compensated for the criteria that were
11
12   not satisfied or if the mortgage loan is considered to be in substantial compliance with the

13   underwriting standards." FHAMS 2005-AA1 Pros. 26.

14        (b)    "First Horizon's Underwriting standards are intended to evaluate the prospective

15   mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed

16   property as collateral." FHAMS 2005-AA1 Pros. 27.

17
          (c)    "Underwriting standards are applied by or on behalf of a lender to evaluate a
18
19   borrower's credit standing and repayment ability, and the value and adequacy of the related

20   Property as collateral." FHAMS 2005-AA1 Pros. 27.

21   **Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:**

22        On page S-9 of the prospectus supplement, Bear Stearns made statements about the

23   ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the Bank's

24   certificate was to be rated Aaa by Moody's Investors Service, Inc. and AAA by Standard &

25
     Poor's Rating Services. These were the highest ratings available from these two rating agencies.
26
27        Bear Stearns also stated: "The classes of senior certificates (excluding the Class II-A-2

28   Certificates) will not be offered unless they are assigned ratings "AAA" and "Aaa" by S&P and

                                              -5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    Moody's, respectively. The Class II-A-2 Certificates will not be offered unless they are assigned

2    ratings of "AAA" and "Aa1" by S&P and Moody's, respectively." FHAMS 2005-AA1 Pros. Sup.

3    S-9.

4         Bear Stearns also stated: "It is a condition to the issuance of the senior certificates that

5

6    they be rated "AAA" by S&P. It is a condition to the issuance of the senior certificates, excluding

7    the Class II-A-2 Certificates, that they be rated "Aaa" by Moody's. The Class II-A-2 Certificates

8    will not be offered unless they are assigned the rating of "Aa1" by Moody's." FHAMS 2005-AA1

9    Pros. Sup. S-51.

10   **Item 120.      Summary of loans about which the Defendants made untrue or misleading**
11   **statements:**

12        **(a)      Number of loans whose LTVs were materially understated: 343**

13        **(b)      Number of loans in which the owner's equity was reduced by 5% or more by**
14        **undisclosed additional liens: 613**

15        **(c)      Number of loans in which the properties were stated to be owner-occupied**
16        **but were not: 206**

17        **(d)      Eliminating duplicates, number of loans about which the Defendants made**
         **untrue or misleading statements: 824**
18
         **(e)      Eliminating duplicates, percent of loans about which the Defendants made**
19        **untrue or misleading statements: 61.7%**

20

21

22

23

24

25

26

27

28
                                          -6-

     SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

## SCHEDULE 37 TO THE AMENDED COMPLAINT

2

To the extent that this Schedule is incorporated by reference into allegations in the

3

complaint, those allegations are made against Defendants Bear Stearns and SAMI II.

4

**Item 44.        Details of trust and certificate(s).**

5

6

(a)        **Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

7

(b)        **Description of the trust:** Bear Stearns Alt-A Trust, Mortgage Pass-Through

8

Certificates, Series 2004-12 was a securitization in September 2005 of 6,391 mortgage loans, in

9

two groups. The mortgage loans the collateral pool of this securitization were originated by EMC

10

Mortgage Corporation, Countrywide Home Loans, Inc., and various undisclosed originators.

11

EMC Mortgage Corporation originated 46.23% of the loans in the collateral pool and

12

Countrywide Home Loans, Inc. originated 18.75%. EMC Mortgage Corporation originated

13

21.54% of the subset of loans in group I-1 and Countrywide Home Loans, Inc. originated

14

20.05%. EMC Mortgage Corporation originated all of the subset of loans in group I-2. EMC

15

Mortgage Corporation originated 42.49% of the subset of loans in group II-1. Countrywide Home

16

Loans, Inc. originated 59.34% of the subset of loans in group II-2. Countrywide Home Loans,

17

Inc. originated 52.66% of the subset of loans in group II-3 and EMC Mortgage Corporation

18

originated 24.34%. BALTA 2004-12 Pros. Sup. S-4, S-44 and S-49.

19

20

(c)        **Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

21

and sold to the Bank two senior certificates in this securitization, in tranches II-A-3 and II-A-5,

22

for which the Bank paid $86,103,121 and $47,648,672 plus accrued interest, respectively, on

23

November 30, 2004.

24

25

(d)        **Ratings of the certificate(s) when the Bank purchased them:**

26

Certificate: II-A-3; Standard & Poor's— AAA; Moody's— Aaa.

27

Certificate: II-A-5; Standard & Poor's— AAA; Moody's— Aaa.

28

1      **(e)      Current ratings of the certificate(s):**

2      Certificate: II-A-3; Standard & Poor's— AAA; Moody's— Aa1.

3      Certificate: II-A-5; Standard & Poor's— AAA; Moody's— A1.

4
       **(f)      URL of prospectus supplement for this securitization:**
5
6      http://www.sec.gov/Archives/edgar/data/1243106/000112528204005985/b402568_424b5.txt

7      **Item 52.      Untrue or misleading statements about the LTVs of the mortgage loans:**

8      In the prospectus supplement, Bear Stearns and SAMI II made the following statements

9      about the LTVs of the mortgage loans in the collateral pool of this securitization.

10     (a)      The weighted-average original LTV of the subset of mortgage loans in group I-1

11     was 77.01%. BALTA 2004-12 Pros. Sup. S-6 and A-3.

12
       (b)      The effective original LTV of the subset of mortgage loans in group I-1 was
13
14     76.9%. BALTA 2004-12 Pros. Sup. S-6 and A-4.

15     (c)      The weighted-average original LTV of the subset of mortgage loans in group I-2

16     was 79.04%. BALTA 2004-12 Pros. Sup. S-6 and A-13.

17     (d)      The effective original LTV of the subset of mortgage loans in group I-2 was

18     79.04%. BALTA 2004-12 Pros. Sup. S-6 and A-13.

19     (e)      The weighted-average original LTV of the subset of mortgage loans in group I was

20     77.9%. BALTA 2004-12 Pros. Sup. S-7 and A-22.
21
22     (f)      The effective original LTV of the subset of mortgage loans in group I was 77.9%.

23     BALTA 2004-12 Pros. Sup. S-7 and A-22.

24     (g)      The weighted-average original LTV of the subset of mortgage loans in group II-1

25     was 76.91%. BALTA 2004-12 Pros. Sup. S-7 and A-32.

26     (h)      The original LTV of the subset of mortgage loans in group II-1 was 76.91%.

27     BALTA 2004-12 Pros. Sup. S-7 and A-32.
28
                                           -2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1      (i)     The weighted-average original LTV of the subset of mortgage loans in group II-2

2  was 73.15%. BALTA 2004-12 Pros. Sup. S-8 and A-41.

3      (j)     The effective original LTV of the subset of mortgage loans in group II-2 was

4  73.15% S-8 and A-42.

5

6      (k)    The weighted-average original LTV of the subset of mortgage loans in group II-3

7  was 75.77%. BALTA 2004-12 Pros. Sup. S-8 and A-49.

8      (l)     The effective original LTV of the subset of mortgage loans in group II-3 was

9  75.77%. BALTA 2004-12 Pros. Sup. S-8 and A-49.

10     (m)   The weighted-average original LTV of the subset of mortgage loans in group II-4

11  was 78.23%. BALTA 2004-12 Pros. Sup. S-8 and A-57.

12     (n)    The effective original LTV of the subset of mortgage loans in group II-4 was

13

14  78.23%. BALTA 2004-12 Pros. Sup. S-8 and A-58.

15     (o)    The weighted-average original LTV of the subset of mortgage loans in group II

16  was 75.07%. BALTA 2004-12 Pros. Sup. S-9 and A-67.

17     (p)    The effective original LTV of the subset of mortgage loans in group II was

18  75.07%. BALTA 2004-12 Pros. Sup. S-9 and A-68.

19     (q)    In Schedule A of the prospectus supplement ("Certain Characteristics of the

20

21  Mortgage Loans"), Bear Stearns and SAMI II presented tables of statistics about the mortgage

22  loans in the collateral pool. BALTA 2004-12 Pros. Sup. A-1 to A-75. Each table focused on a

23  certain characteristic of the loans (for example, scheduled principal balance as of the cut-off date)

24  and divided the loans into categories based on that characteristic (for example, loans with

25  scheduled principal balances as of the cut-off date of $0 to $100,000, $100,001 to $200,000,

26  $200,001 to $300,000, etc.). Each table then presented various data about the loans in each

27  category. One of the tables, entitled "Original Loan-to-Value Ratios in Loan Group 1-1," divided

28

-3-

1   the subset of loans in group I-1 into 13 categories of original LTV (for example, 0% to 30%,

2   30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements about

3   the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

4   aggregate principal balance outstanding in each of these categories. BALTA 2004-12 Pros. Sup.

5   A-3.

6

7       (r)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective

8   Loan-to-Value Ratios in Loan Group I-2 [sic]." This table divided the subset of mortgage loans in

9   group I-1 into 13 categories of effective LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

10  to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

11  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

12  outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-4.

13

14      (s)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

15  Loan-to-Value Ratios in Loan Group I-2." This table divided the subset of mortgage loans in

16  group I-2 into 13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

17  to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

18  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

19  outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-13.

20

21      (t)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective

22  Loan-to-Value Ratios in Loan Group I-2." This table divided the subset of mortgage loans in

23  group I-2 into 13 categories of effective LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

24  to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

25  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

26  outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-13.

27

28

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    (u)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

2    Loan-to-Value Ratios in Total Group I." This table divided the subset of mortgage loans in group

3    I into 13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%,

4    etc.). The table made untrue and misleading statements about the number of mortgage loans, the

5
6    aggregate principal balance outstanding, and the percent of aggregate principal balance

7    outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-22.

8    (v)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective

9    Loan-to-Value Ratios in Total Group I." This table divided the subset of mortgage loans in group

10   I into 13 categories of effective LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%,

11   etc.). The table made untrue and misleading statements about the number of mortgage loans, the

12
13   aggregate principal balance outstanding, and the percent of aggregate principal balance

14   outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-23.

15   (w)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

16   Loan-to-Value Ratios in Loan Group II-1." This table divided the subset of mortgage loans in

17   group II-1 into 11 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

18   to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

19   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

20
21   outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-32.

22   (x)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective

23   Loan-to-Value Ratios in Loan Group II-1." This table divided the subset of mortgage loans in

24   group II-1 into 11 categories of effective LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

25   to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

26   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

27   outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-32.

28

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

(y)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original Loan-to-Value Ratios in Loan Group II-2." This table divided the subset of mortgage loans in group II-2 into 10 categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%, 50.01% to 55%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-41.

(z)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective Loan-to-Value Ratios in Loan Group II-2." This table divided the subset of mortgage loans in group II-2 into 10 categories of effective LTV (for example, 30.01% to 40%, 40.01% to 50%, 50.01% to 55%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-41.

(aa)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original Loan-to-Value Ratios in Loan Group II-3." This table divided the subset of mortgage loans in group II-3 into 13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-49.

(bb)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective Loan-to-Value Ratios in Loan Group II-3." This table divided the subset of mortgage loans in group II-3 into 13 categories of effective LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-50.

-6-

1    (cc)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original
2 Loan-to-Value Ratios in Loan Group II-4." This table divided the subset of mortgage loans in
3 group II-4 into 12 categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%,
4 50.01% to 55%, etc.). The table made untrue and misleading statements about the number of
5 mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate
6 principal balance outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-57.
7

8    (dd)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective
9 Loan-to-Value Ratios in Loan Group II-4." This table divided the subset of mortgage loans in
10 group II-4 into 12 categories of effective LTV (for example, 30.01% to 40%, 40.01% to 50%,
11 50.01% to 55%, etc.). The table made untrue and misleading statements about the number of
12 mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate
13 principal balance outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-58.
14

15    (ee)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original
16 Loan-to-Value Ratios in Total Group II." This table divided the subset of mortgage loans in group
17 II into 13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%,
18 etc.). The table made untrue and misleading statements about the number of mortgage loans, the
19 aggregate principal balance outstanding, and the percent of aggregate principal balance
20 outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-67.
21

22    (ff)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Effective
23 Loan-to-Value Ratios in Total Group II." This table divided the subset of mortgage loans in group
24 II into 13 categories of effective LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%,
25 etc.). The table made untrue and misleading statements about the number of mortgage loans, the
26 aggregate principal balance outstanding, and the percent of aggregate principal balance
27 outstanding in each of these categories. BALTA 2004-12 Pros. Sup. A-68.
28

-7-

**Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 6,391 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,447 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,173 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $64,030,632 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 525 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $30,964,987 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 241 |
| Weighted-average LTV, as stated by Defendants | 75.77% |
| Weighted-average LTV, as determined by the model | 84.5% |
| Weighted-average LTV, as stated by Defendants | 78.23% |
| Weighted-average LTV, as determined by the model | 87.7% |

**Item 71.     Undisclosed additional liens:**

    **(a)     Minimum number of properties with additional liens:** 332

    **(b)     Total reduction in equity from additional liens:** $23,290,380

    **(c)     Weighted-average reduction in equity from additional liens:** 84.3%

**Item 82.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Bear Stearns and SAMI II made the following statement

about the appraisals of the properties that secured the mortgage loans originated by Countrywide:

"All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

effect." BALTA 2004-12 Pros. Sup. S-46.

In the prospectus supplement, Bear Stearns and SAMI II made the following statement

about the appraisals of the properties that secured the mortgage loans in this securitization: "All

appraisals by licensed appraisers are required to be on forms acceptable to Fannie Mae or Freddie

Mac." BALTA 2004-12 Pros. 15.

-8-

1  **Item 88.    Untrue or misleading statements about owner-occupancy of the properties
2  that secured the mortgage loans:**

3          In the prospectus supplement, Bear Stearns and SAMI II made the following statements

4  about the occupancy status of the properties that secured the mortgage loans in the collateral pool

5  of this securitization.

6          (a)    In Schedule A of the prospectus supplement, described in Item 52, Bear Stearns

7  and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Loan Group

8  I-1." This table divided the subset of mortgage loans in group I-1 into the categories "Owner

9  Occupied," "Investor," and "Second Home." The table made untrue and misleading statements

10  about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

11  of aggregate principal balance outstanding in each of these categories. BALTA 2004-12 Pros.

12  Sup. A-6.

13

14          (b)    In the "Occupancy Status of Mortgage Properties in Loan Group I-1" table, Bear

15  Stearns and SAMI II stated that 82.29% of the subset of mortgage loans in group I-1 were secured

16  by an "Owner Occupied" property, 12.81% by an "Investor" property, and 4.91% by a "Second

17  Home." BALTA 2004-12 Pros. Sup. A-6.

18

19          (c)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

20  Status of Mortgage Properties in Loan Group I-2." This table divided the subset of mortgage

21  loans in group I-2 into the categories "Owner Occupied," "Investor," and "Second Home." The

22  table made untrue and misleading statements about the number of mortgage loans, the aggregate

23  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

24  of these categories. BALTA 2004-12 Pros. Sup. A-15.

25

26          (d)    In the "Occupancy Status of Mortgage Properties in Loan Group I-2" table, Bear

27  Stearns and SAMI II stated that 67.63% of the subset of mortgage loans in group I-2 were secured

28

-9-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  by an "Owner Occupied" property, 26.77% by an "Investor" property, and 5.6% by a "Second

2  Home." BALTA 2004-12 Pros. Sup. A-15.

3      (e)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

4
5  Status of Mortgage Properties in Total Group I." This table divided the subset of mortgage loans

6  in group I into the categories "Owner Occupied," "Investor," and "Second Home." The table

7  made untrue and misleading statements about the number of mortgage loans, the aggregate

8  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

9  of these categories. BALTA 2004-12 Pros. Sup. A-25.

10     (f)     In the "Occupancy Status of Mortgage Properties in Total Group I" table, Bear

11
12 Stearns and SAMI II stated that 75.85% of the subset of mortgage loans in group I were secured

13 by an "Owner Occupied" property, 18.93% by an "Investor" property, and 5.21% by a "Second

14 Home." BALTA 2004-12 Pros. Sup. A-25.

15     (g)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

16 Status of Mortgage Properties in Loan Group II-1." This table divided the subset of mortgage

17 loans in group II-1 into the categories "Owner Occupied," "Investor," and "Second Home." The

18 table made untrue and misleading statements about the number of mortgage loans, the aggregate

19 principal balance outstanding, and the percent of aggregate principal balance outstanding in each

20
21 of these categories. BALTA 2004-12 Pros. Sup. A-34.

22     (h)     In the "Occupancy Status of Mortgage Properties in Loan Group II-1" table, Bear

23 Stearns and SAMI II stated that 88.91% of the subset of mortgage loans in group II-1 were

24 secured by an "Owner Occupied" property, 6.7% by an "Investor" property, and 4.39% by a

25 "Second Home." BALTA 2004-12 Pros. Sup. A-34.

26     (i)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

27
28 Status of Mortgage Properties in Loan Group II-2." This table divided the subset of mortgage

-10-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1  loans in group II-2 into the categories "Owner Occupied," "Investor," and "Second Home." The

2  table made untrue and misleading statements about the number of mortgage loans, the aggregate

3  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

4  of these categories. BALTA 2004-12 Pros. Sup. A-43.

5

6  (j) In the "Occupancy Status of Mortgage Properties in Loan Group II-2" table, Bear

7  Stearns and SAMI II stated that 86.21% of the subset of mortgage loans in group II-2 were

8  secured by an "Owner Occupied" property, 5.44% by an "Investor" property, and 8.36% by a

9  "Second Home." BALTA 2004-12 Pros. Sup. A-43.

10  (k) In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

11  Status of Mortgage Properties in Loan Group II-3." This table divided the subset of mortgage

12  loans in group II-3 into the categories "Owner Occupied," "Investor," and "Second Home." The

13

14  table made untrue and misleading statements about the number of mortgage loans, the aggregate

15  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

16  of these categories. BALTA 2004-12 Pros. Sup. A-51.

17  (l) In the "Occupancy Status of Mortgage Properties in Loan Group II-3" table, Bear

18  Stearns and SAMI II stated that 91.62% of the subset of mortgage loans in group II-3 were

19  secured by an "Owner Occupied" property, 4.86% by an "Investor" property, and 3.52% by a

20

21  "Second Home." BALTA 2004-12 Pros. Sup. A-51.

22  (m) In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

23  Status of Mortgage Properties in Loan Group II-4." This table divided the subset of mortgage

24  loans in group II-4 into the categories "Owner Occupied," "Investor," and "Second Home." The

25  table made untrue and misleading statements about the number of mortgage loans, the aggregate

26  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

27  of these categories. BALTA 2004-12 Pros. Sup. A-60.

28

-11-

1    (n)    In the "Occupancy Status of Mortgage Properties in Loan Group II-4" table, Bear

2    Stearns and SAMI II stated that 87.61% of the subset of the mortgage loans in group II-4 were

3    secured by an "Owner Occupied" property, 4.09% by an "Investor" property, and 8.31% by a

4    "Second Home." BALTA 2004-12 Pros. Sup. A-60.

5

6    (o)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

7    Status of Mortgage Properties in Total Group II." This table divided the subset of mortgage loans

8    in group II into the categories "Owner Occupied," "Investor," and "Second Home." The table

9    made untrue and misleading statements about the number of mortgage loans, the aggregate

10   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

11   of these categories. BALTA 2004-12 Pros. Sup. A-70.

12

13   (p)    In the "Occupancy Status of Mortgage Properties in Total Group II" table, Bear

14   Stearns and SAMI II stated that 88.19% of the subset of mortgage loans in group II were secured

15   by an "Owner Occupied" property, 5.26% by an "Investor" property, and 6.55% by a "Second

16   Home." BALTA 2004-12 Pros. Sup. A-70.

17   **Item 96.    Details of properties that were stated to be owner-occupied, but were not:**

18       **(a)    Number of loans on which the owner of the property instructed tax
19               authorities to send property tax bills to him or her at a different address: 239**

20       **(b)    Number of loans on which the owner of the property could have, but did not,
                 designate the property as his or her homestead: 387**
21
22       **(c)    Number of loans on which the owner of the property owned three or more
                 properties: 24**

23       **(d)    Number of loans that went straight from current to foreclosure or ownership
24               by lender: 10**

25       **(e)    Eliminating duplicates, number of loans about which one or more of
                 statements (a) through (d) is true: 546**
26

27

28

                                        -12-

**Item 99.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-44 through S-49 of the prospectus supplement, Bear Stearns and SAMI II made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated here by reference. In particular, Bear Stearns and SAMI II stated that:

(a)     "Exceptions to Countrywide's underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." BALTA 2004-12 Pros. Sup. S-45.

(b)     "Countrywide's underwriting standards are applied by or on behalf of Countrywide to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." BALTA 2004-12 Pros. Sup. S-45.

On pages S-49 through S-51 of the prospectus supplement, Bear Stearns made statements about the underwriting guidelines of EMC Mortgage Corporation. All of those statements are incorporated here by reference. In particular, Bear Stearns and SAMI II stated that:

(a)     "Exceptions to the underwriting standards are permitted where compensating factors are present." BALTA 2004-12 Pros. Sup. S-50.

(b)     "Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." BALTA 2004-12 Pros. Sup. S-50.

**Item 106.**     **Early payment defaults:**

    **(a)**     **Number of the mortgage loans that suffered EPDs: 33**

    **(b)**     **Percent of the mortgage loans that suffered EPDs: 0.5%**

    **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.14%**

-13-

1  **Item 107.**    **90+ days delinquencies:**

2        **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 833

3        **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 13.0%

4        **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
5               made at the same time as the loans in the collateral pool that suffered 90+
               days delinquencies:** 7.2%

6
   **Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**
7
         On pages S-2 and S-3 of the prospectus supplement, Bear Stearns made statements about
8
9  the ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the

10  Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard &

11  Poor's Rating Services. These were the highest ratings available from these two rating agencies.

12        Bear Stearns also stated: "It is a condition to the issuance of the certificates that the

13  offered certificates receive the following ratings from Standard & Poors [sic] Rating Services, a

14  division of The McGraw-Hill Companies, Inc., which is referred to here as S&P, and Moody's
15
   Investors Service, Inc., which is referred to here as Moody's." The requirement for classes II-A-3
16
17  and II-A-5, from which these certificates were to be paid, was for AAA from Standard & Poor's

18  and Aaa from Moody's. BALTA 2004-12 Pros. Sup. S-18.

19        Bear Stearns also stated: "It is a condition to the issuance of each class of Offered

20  Certificates that it receives at least the ratings set forth below from S&P and Moody's." The

21  requirement for classes II-A-3 and II-A-5, from which these certificates were to be paid, was for
22
   AAA from Standard & Poor's and Aaa from Moody's. BALTA 2004-12 Pros. Sup. S-103
23
24  **Item 120.**    **Summary of loans about which the Defendants made untrue or misleading
               statements:**
25
26        **(a)**    **Number of loans whose LTVs were materially understated:** 1,173

27        **(b)**    **Number of loans in which the owner's equity was reduced by 5% or more by
               undisclosed additional liens:** 332
28
                                    -14-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

  (c)  **Number of loans that suffered EPDs: 33**

2

  (d)  **Number of loans in which the properties were stated to be owner-occupied but were not: 546**

3

4

  (e)  **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,737**

5

6

  (f)  **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 27.2%**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-15-

1

**SCHEDULE 38 TO THE AMENDED COMPLAINT**

2

To the extent that this Schedule is incorporated by reference into allegations in the

3

complaint, those allegations are made against Defendant Bear Stearns.

4

**Item 44.      Details of trust and certificate(s).**

5

6

(a)      **Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

7

(b)      **Description of the trust:** RALI Mortgage Asset-Backed Pass-Through

8

Certificates, Series 2004-QA5 was a securitization in November 2004 of 1,323 mortgage loans, in

9

three groups. The mortgage loans in the collateral pool of this securitization were acquired by

10

Residential Funding Corporation from Homecomings Financial, LLC, National City Mortgage

11

Company, First National Bank of Nevada, First Savings Mortgage Corporation, and various other

12

undisclosed originators. Homecomings Financial, LLC originated 27.4% of the loans in the

13

collateral pool, National City Mortgage Company originated 13.6%, and First National Bank of

14

Nevada originated 10.4%. Homecomings Financial, LLC originated 42.9% of the subset of loans

15

in Group I. Homecomings Financial, LLC originated 33.9 % of the subset of loans in Group II

16

and Fist Savings Mortgage Corporation originated 15.8%. Homecomings Financial, LLC

17

originated 22.2% of the subset of loans in Group III, National City Mortgage Company originated

18

17.8%, and First National Bank originated 11.4%. RALI 2004-QA5 Pros. Sup. S-29, S-37, and S-

19

46.

20

21

(c)      **Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

22

and sold to the Bank a senior certificate in this securitization, in tranche A-III-2, for which the

23

Bank paid $75,024,758 plus accrued interest on November 30, 2004.

24

25

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard &

26

Poor's— AAA; Moody's— Aaa.

27

(e)      **Current ratings of the certificate(s):** Standard & Poor's— BBB; Moody's— A3.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1

**(f)    URL of prospectus supplement for this securitization:**

2

http://www.sec.gov/Archives/edgar/data/949493/000095013604004157/file001.htm

3

**Item 52.    Untrue or misleading statements about the LTVs of the mortgage loans:**

4

5

In the prospectus supplement, Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

6

7

(a)    In the section of the prospectus supplement entitled "Description of the Mortgage

8

Pool," Bear Stearns presented tables of statistics about the mortgage loans in the collateral pool.

9

RALI 2004-QA5 Pros. Sup. S-28 to S-65. Each table focused on a certain characteristic of the

10

loans (for example, original principal balance) and divided the loans into categories based on that

11

characteristic (for example, loans with original principal balances of $100,000 or less, $100,001

12

to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans

13

in each category. Among these data was the "Weighted-Average Loan-to-Value Ratio." There

14

were 18 such tables in the "Description of Mortgage Pool" section for the subset of loans in

15

Group 1. In each table, the number of categories into which the loans were divided ranged from

16

two to 35. Thus, in the "Description of Mortgage Pool" section, Bear Stearns made hundreds of

17

18

statements about the LTVs of the loans in Group I. RALI 2004-QA5 Pros. Sup. S-28 to S-36.

19

(b)    "The weighted average loan-to-value ratio at origination of the Group I Loans will

20

be approximately 79.05%." RALI 2004-QA5 Pros. Sup. S-31.

21

22

(c)    In the "Description of Mortgage Pool" section, Bear Stearns presented similar

23

tables of statistics about the subset of mortgage loans in Group II. In these tables, Bear Stearns

24

similarly made hundreds of statements about the LTVs of the loans in Group II. RALI 2004-QA5

25

Pros. Sup. S-36 to S-45.

26

(d)    "The weighted average loan-to-value ratio at origination of the Group II Loans

27

will be approximately 75.94%." RALI 2004-QA5 Pros. Sup. S-40.

28

-2-

1    (e)    In the "Description of Mortgage Pool" section, Bear Stearns presented similar

2    tables of statistics about the subset of mortgage loans in Group III. In these tables, Bear Stearns

3    similarly made hundreds of statements about the LTVs of the loans in Group III. RALI 2004-

4    QA5 Pros. Sup. S-45 to S-55.

5

6    (f)    "The weighted average loan-to-value ratio at origination of the Group III Loans

7    will be approximately 77.29%." RALI 2004-QA5 Pros. Sup. S-49.

8    (g)    In the "Description of Mortgage Pool" section, Bear Stearns presented tables of

9    statistics about all of the mortgage loans in the collateral pool. RALI 2004-QA5 Pros. Sup. S-55

10   to S-65. In these tables, Bear Stearns similarly made hundreds of statements about the LTVs of all

11   of the loans in the collateral pool. RALI 2004-QA5 Pros. Sup. S-55 to S-65.

12

13   (h)    "The weighted average loan-to-value ratio at origination of all mortgage loans will

14   be approximately 77.41%." RALI 2004-QA5 Pros. Sup. S-59.

15   **Item 62.    Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,323 |
| Number of properties on which there was enough information for the model to determine a true market value | 737 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 326 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $15,290,153 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 137 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,738,168 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 60 |
| Weighted-average LTV, as stated by Defendants | 77.4% |
| Weighted-average LTV, as determined by the model | 83.5% |

25   **Item 71.    Undisclosed additional liens:**

26   **(a)    Minimum number of properties with additional liens: 138**

27   **(b)    Total reduction in equity from additional liens: $8,313,515**

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    (c)    **Weighted-average reduction in equity from additional liens: 68.2%**

2    **Item 88.    Untrue or misleading statements about owner-occupancy of the properties**
3    **that secured the mortgage loans:**

4    In the prospectus supplement, Bear Stearns made the following statements about the

5    occupancy status of the properties that secured the mortgage loans in the collateral pool of this

6    securitization.

7    (a)    In the "Description of Mortgage Pool" section, described in Item 52, Bear Stearns

8    presented a table entitled "Occupancy Types of the Group I Loans." This table divided the subset

9    of mortgage loans in Group I into the categories "Primary Residence," "Non-Owner Occupied,"
10
11   and "Second/Vacation." The table made untrue and misleading statements about the number of

12   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

13   principal balance outstanding in each of these categories. RALI 2004-QA5 Pros. Sup. S-33.

14   (b)    In the "Occupancy Types of the Group I Loans" table, Bear Stearns stated that

15   77.09% of the subset of mortgage loans in Group I were secured by a "Primary Residence,"

16   18.45% by a "Non-Owner Occupied" residence, and 4.46% by a "Second/Vacation" residence.
17
18   RALI 2004-QA5 Pros. Sup. S-33.

19   (c)    In the "Description of Mortgage Pool" section, Bear Stearns presented a table

20   entitled "Occupancy Types of the Group II Loans." This table divided the subset of mortgage

21   loans in Group II into the categories "Primary Residence," "Non-Owner Occupied," and

22   "Second/Vacation." The table made untrue and misleading statements about the number of

23   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate
24
25   principal balance outstanding in each of these categories. RALI 2004-QA5 Pros. Sup. S-41.

26   (d)    In the "Occupancy Types of the Group II Loans" table, Bear Stearns stated that

27   88.76% of the subset of mortgage loans in Group II were secured by a "Primary Residence,"

28
-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    7.62% by a "Non-Owner Occupied" residence, and 3.62% by a "Second/Vacation" residence.

2    RALI 2004-QA5 Pros. Sup. S-41.

3         (e)    In the "Description of Mortgage Pool" section, Bear Stearns presented a table

4    entitled "Occupancy Types of the Group III Loans." This table divided the subset of mortgage

5    loans in Group III into the categories "Primary Residence," "Non-Owner Occupied," and

6

7    "Second/Vacation." The table made untrue and misleading statements about the number of

8    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

9    principal balance outstanding in each of these categories. RALI 2004-QA5 Pros. Sup. S-51.

10        (f)    In the "Occupancy Types of the Group III Loans" table, Bear Stearns stated that

11   83.78% of the subset of loans in Group III were secured by a "Primary Residence," 12.21% by a

12   "Non-Owner Occupied" residence, and 4.01% by a "Second/Vacation" residence. RALI 2004-

13

14   QA5 Pros. Sup. S-51.

15        (g)    In the "Description of the Mortgage Pool" section, Bear Stearns presented a table

16   entitled "Occupancy Types of All Mortgage Loans." This table divided all of the mortgage loans

17   in the collateral pool into the categories "Primary Residence," "Non-Owner Occupied," and

18   "Second/Vacation." The table made untrue and misleading statements about the number of

19   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

20

21   principal balance outstanding in each of these categories. RALI 2004-QA5 Pros. Sup. S-61.

22        (h)    In the "Occupancy Types of All Mortgage Loans" table, Bear Stearns stated that

23   83.3% of the mortgage loans in the collateral pool, by principal balance, were secured by a

24   "Primary Residence," 12.66% by a "Non-Owner Occupied" residence, and 4.04% by a

25   "Second/Vacation" residence. RALI 2004-QA5 Pros. Sup. S-61.

26   **Item 96.        Details of properties that were stated to be owner-occupied, but were not:**

27        **(a)    Number of loans on which the owner of the property instructed tax**
28              **authorities to send property tax bills to him or her at a different address: 82**

-5-

1
2       **(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 120**

3       **(c)**     **Number of loans on which the owner of the property owned three or more properties: 8**

4
5       **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 183**

6   **Item 99.      Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**
7
8       On pages S-66 through S-67 of the prospectus supplement, Bear Stearns made statements

9   about the underwriting guidelines of Residential Funding Corporation. All of those statements are

10  incorporated here by reference.

11      On pages 12 through 16 of the prospectus, Bear Stearns made statements about the

12  underwriting guidelines of the originators of the mortgage loans in the collateral pool. All of

13  those statements are incorporated here by reference. In particular, Bear Stearns stated that:

14
15      (a)     "[A] mortgage loan may be considered to comply with a set of underwriting

16  standards, even if one or more specific criteria included in the underwriting standards were not

17  satisfied, if other factors compensated for the criteria that were not satisfied . . . .", RALI 2004-

18  QA5 Pros. 14.

19      (b)     "The depositor expects that the originator of each of the mortgage loans will have

20  applied, consistent with applicable federal and state laws and regulations, underwriting

21
22  procedures intended to evaluate the borrower's credit standing and repayment ability and/or the

23  value and adequacy of the related property as collateral." RALI 2004-QA5 Pros. 12.

24      (c)     "The adequacy of the mortgaged property as security for repayment of the related

25  mortgage loan will typically have been determined by an appraisal or an automated valuation, as

26  described above under ' -- Loan-to-Value Ratio.'" RALI 2004-QA5 Pros. 13.

27
28
                                              -6-

1       (d)     "The level of review by Residential Funding Corporation, if any, will vary

2 depending on several factors. Residential Funding Corporation on behalf of the depositor,

3 typically will review a sample of the mortgage loans purchased by Residential Funding

4 Corporation for conformity with the applicable underwriting standards and to assess the

5 likelihood of repayment of the mortgage loan from the various sources for such repayment,

6

7 including the mortgagor, the mortgaged property, and primary mortgage insurance, if any. Such

8 underwriting reviews will generally not be conducted with respect to any individual mortgage

9 pool related to a series of certificates." RALI 2004-QA5 Pros. 14.

10 **Item 106.**    **Early payment defaults:**

11       **(a)**     **Number of the mortgage loans that suffered EPDs: 2**

12       **(b)**     **Percent of the mortgage loans that suffered EPDs: 0.2%**

13       **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

14                  **made at the same time as the loans in the collateral pool that experienced**

15                  **EPDs: 0.14%**

16 **Item 107.**    **90+ days delinquencies:**

17       **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies: 124**

18       **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies: 9.4%**

19       **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

20                  **made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 7.2%**

21 **Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

22       On page S-6 of the prospectus supplement, Bear Stearns made statements about the

23 ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the Bank's

24 certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's

25

26 Rating Services. These were the highest ratings available from these two rating agencies.

27

28

-7-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    Bear Stearns also stated: "When issued, the offered certificates will receive ratings which

2 are not lower than those listed in the table on page S-6 of this prospectus supplement." RALI

3 2004-QA5 Pros. Sup. S-12.

4    Bear Stearns also stated: "It is a condition of the issuance of the Senior Certificates . . .

5

6 that they be rated "AAA" by Standard & Poor's . . . and "Aaa" by Moody's Investors Service,

7 Inc. . . ." RALI 2004-QA5 Pros. Sup. S-113.

8 **Item 120.    Summary of loans about which the Defendants made untrue or misleading
          statements:**

9

10    **(a)    Number of loans whose LTVs were materially understated: 326**

11    **(b)    Number of loans in which the owner's equity was reduced by 5% or more by
              undisclosed additional liens: 138**

12

13    **(c)    Number of loans that suffered EPDs: 2**

14    **(d)    Number of loans in which the properties were stated to be owner-occupied
              but were not: 183**

15

16    **(e)    Eliminating duplicates, number of loans about which the Defendants made
              untrue or misleading statements: 541**

17    **(f)    Eliminating duplicates, percent of loans about which the Defendants made
              untrue or misleading statements: 40.9%**

18

19

20

21

22

23

24

25

26

27

28

-8-

1

## SCHEDULE 39 TO THE AMENDED COMPLAINT

2      To the extent that this Schedule is incorporated by reference into allegations in the

3   complaint, those allegations are made against Defendants Bear Stearns and SAMI II.

4   **Item 44.      Details of trust and certificate(s).**

5

6      **(a)      Dealer that sold the certificate(s) to the Bank: Bear Stearns.**

7      **(b)      Description of the trust:** Bear Stearns Alt-A Trust, Mortgage Pass-Through

8   Certificates, Series 2004-11 was a securitization in September 2004 of 4,779 mortgage loans, in

9   two groups. The mortgage loans in the collateral pool of this securitization were originated by

10  EMC Mortgage Corporation, Countrywide Home Loans, Inc., GreenPoint Mortgage Funding,

11  Inc, and various undisclosed originators. EMC Mortgage Corporation originated 25.26% of the

12  loans in the collateral pool, Countrywide Home Loans, Inc. originated 35.03%, and GreenPoint

13  Mortgage Funding, Inc. originated 17.17%. EMC Mortgage Corporation originated 35.03% of the

14  subset of loans in group I, Countrywide Home Loans, Inc. originated 21.93%, and GreenPoint

15  Mortgage Funding, Inc. originated 20.03%. EMC Mortgage Corporation originated 23.09% of the

16

17  subset of loans in group II-1 and GreenPoint Mortgage Funding, Inc. originated 43.87%.

18  Countrywide Home Loans, Inc. originated 73.61% of the subset of loans in group II-2. EMC

19  Mortgage Corporation originated 32.51% of the subset of loans in group II-3. Countrywide Home

20  Loans, Inc. originated 46.76% of the subset of loans in group II-4 and EMC Mortgage

21  Corporation originated 15.26%. Countrywide Home Loans, Inc. originated 90.365% of the subset

22

23  of loans in group II-5. Countrywide Home Loans, Inc. originated 80.62% of the loans in group II-

24  6. BALTA 2004-11 Pros. Sup. S-4, S-36, S-38, and S-44.

25      **(c)      Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

26  and sold to the Bank a senior certificate in this securitization, in tranche I-A-1, for which the

27  Bank paid $170,650,000 plus accrued interest on October 14, 2004.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1         (d)     **Ratings of the certificate(s) when the Bank purchased them:** Standard &

2    Poor's— AAA; Moody's— Aaa.

3         (e)     **Current ratings of the certificate(s):** Standard & Poor's— AAA; Moody's—

4    Aa2.

5

6         (f)     **URL of prospectus supplement for this securitization:**

7    http://www.sec.gov/Archives/edgar/data/1243106/000112528204004778/b401259_424b5.txt

8    **Item 52.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

9    In the prospectus supplement, Bear Stearns and SAMI II made the following statements

10   about the LTVs of the mortgage loans in the collateral pool of this securitization.

11        (e)     The weighted-average original LTV of the subset of mortgage loans in group I was

12   77.45%. BALTA 2004-11 Pros. Sup. S-5 and A-3.

13        (f)     The weighted-average original LTV of the subset of mortgage loans in group II-1

14   was 78.55%. BALTA 2004-11 Pros. Sup. S-5 and A-12.

15

16        (g)     The weighted-average original LTV of the subset of mortgage loans in group II-2

17   was 73.24%. BALTA 2004-11 Pros. Sup. S-6 and A-19.

18        (h)     The weighted-average original LTV of the subset of mortgage loans in group II-3

19   was 75.51%. BALTA 2004-11 Pros. Sup. S-6 and A-26.

20        (i)     The weighted-average original LTV of the subset of mortgage loans in group II-4

21   was 73.74%. BALTA 2004-11 Pros. Sup. S-7 and A-33.

22

23        (j)     The weighted-average original LTV of the subset of mortgage loans in group II-5

24   was 74.17%. BALTA 2004-11 Pros. Sup. S-7 and A-40.

25        (k)     The weighted-average original LTV of the subset of mortgage loans in group II-6

26   was 72.16%. BALTA 2004-11 Pros. Sup. S-8 and A-46.

27

28

-2-

1    (l)    The weighted-average original LTV of the subset of mortgage loans in group II

2    was 74.35%. BALTA 2004-11 Pros. Sup. S-8 and A-53.

3    (m)    In Schedule A of the prospectus supplement ("Certain Characteristics of the

4    Mortgage Loans"), Bear Stearns and SAMI II presented tables of statistics about the mortgage

5    loans in the collateral pool. BALTA 2004-12 Pros. Sup. A-1 to A-60. Each table focused on a

6

7    certain characteristic of the loans (for example, principal balance at origination) and divided the

8    loans into categories based on that characteristic (for example, loans with principal balances at

9    origination of $0 to $100,000, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then

10    presented various data about the loans in each category. One of the tables, entitled "Original

11    Loan-to-Value Ratios in Loan Group I," divided the subset of loans in group I into 13 categories

12    of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made

13

14    untrue and misleading statements about the number of mortgage loans, the aggregate principal

15    balance outstanding, and the percent of aggregate principal balance outstanding in each of these

16    categories. BALTA 2004-11 Pros. Sup. A-3.

17    (n)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

18    Loan-to-Value Ratios in Loan Group II-1." This table divided the subset of mortgage loans in

19    group II-1 into 11 categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%,

20

21    50.01% to 55%, etc.). The table made untrue and misleading statements about the number of

22    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

23    principal balance outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-12.

24    (o)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

25    Loan-to-Value Ratios in Loan Group II-2." This table divided the subset of mortgage loans in

26    group II-2 into 11 categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%,

27    50.01% to 55%, etc.). The table made untrue and misleading statements about the number of

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

2  principal balance outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-19.

3      (p)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

4
5  Loan-to-Value Ratios in Loan Group II-3." This table divided the subset of mortgage loans in

6  group II-3 into 13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

7  to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

8  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

9  outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-26.

10      (q)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

11  Loan-to-Value Ratios in Loan Group II-4." This table divided the subset of mortgage loans in

12
13  group II-4 into nine categories of original LTV (for example, 40.01% to 50%, 50.01% to 55%,

14  55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

15  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

16  principal balance outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-33.

17      (r)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

18  Loan-to-Value Ratios in Loan Group II-5." This table divided the subset of mortgage loans in

19  group II-5 into 12 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

20
21  to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

22  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

23  outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-40.

24      (s)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

25  Loan-to-Value Ratios in Loan Group II-6." This table divided the subset of mortgage loans in

26  group II-6 into 12 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

27  to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

28

-4-

loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-46.

      (t)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

Loan-to-Value Ratios in Total Group II." This table divided the subset of mortgage loans in group

II into 13 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%,

etc.). The table made untrue and misleading statements about the number of mortgage loans, the

aggregate principal balance outstanding, and the percent of aggregate principal balance

outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-53.

**Item 62.**     **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 4,779 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,601 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,245 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $77,172,112 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 488 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $33,276,369 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 242 |
| Weighted-average LTV, as stated by Defendants (group I) | 77.5% |
| Weighted-average LTV, as determined by the model (group I) | 85.4% |

**Item 71.**     **Undisclosed additional liens:**

     **(a)**     **Minimum number of properties with additional liens: 354**

     **(b)**     **Total reduction in equity from additional liens: $31,058,122**

     **(c)**     **Weighted-average reduction in equity from additional liens: 67.4%**

**Item 82.**     **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Bear Stearns and SAMI II made the following statement

about the appraisals of the properties that secured the mortgage loans originated by Countrywide:

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1  "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

2  effect." BALTA 2004-11 Pros. Sup. S-40.

3      In the prospectus, Bear Stearns and SAMI II made the following statement about the

4  appraisals of the properties that secured the mortgage loans in this securitization: "All appraisals

5  by licensed appraisers are required to be on forms acceptable to Fannie Mae or Freddie Mac."

6

7  BALTA 2004-11 Pros. 15.

8  **Item 88.      Untrue or misleading statements about owner-occupancy of the properties
         that secured the mortgage loans:**

9

10      In the prospectus supplement, Bear Stearns and SAMI II made the following statements

11  about the occupancy status of the properties that secured the mortgage loans in the collateral pool

12  of this securitization.

13      (a)     In Schedule A of the prospectus supplement, described in Item 52, Bear Stearns

14  and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Loan Group

15  I." This table divided the subset of mortgage loans in group 1 into the categories "Owner

16  Occupied," "Investor," and "Second Home." The table made untrue and misleading statements

17

18  about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

19  of aggregate principal balance outstanding in each of these categories. BALTA 2004-11 Pros.

20  Sup. A-5.

21      (b)     In the "Occupancy Status of Mortgage Properties in Loan Group I" table, Bear

22  Stearns and SAMI II stated that 70.52% of the subset of mortgage loans in group I were secured

23  by an "Owner Occupied" property, 21.86% by an "Investor" property, and 7.62% by a "Second

24  Home." BALTA 2004-11 Pros. Sup. A-5.

25

26      (c)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

27  Status of Mortgage Properties in Loan Group II-1." This table divided the subset of mortgage

28  loans in group II-1 into the categories "Owner Occupied," "Investor," and "Second Home." The

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    table made untrue and misleading statements about the number of mortgage loans, the aggregate

2    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

3    of these categories. BALTA 2004-11 Pros. Sup. A-13.

4          (d)      In the "Occupancy Status of Mortgage Properties in Loan Group II-1" table, Bear

5    Stearns and SAMI II stated that 85.46% of the subset of mortgage loans in group II-1 were

6    secured by an "Owner Occupied" property, 13.2% by an "Investor" property, and 1.34% by a

7

8    "Second Home." BALTA 2004-11 Pros. Sup. A-13.

9          (e)      In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

10   Status of Mortgage Properties in Loan Group II-2." This table divided the subset of mortgage

11   loans in group II-2 into the categories "Owner Occupied," "Investor," and "Second Home." The

12

13   table made untrue and misleading statements about the number of mortgage loans, the aggregate

14   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

15   of these categories. BALTA 2004-11 Pros. Sup. A-21.

16         (f)      In the "Occupancy Status of Mortgage Properties in Loan Group II-2" table, Bear

17   Stearns and SAMI II stated that 91.4% of the subset of mortgage loans in group II-2 were secured

18   by an "Owner Occupied" property, 4.83% by an "Investor" property, and 3.77% by a "Second

19   Home." BALTA 2004-11 Pros. Sup. A-21.

20

21         (g)      In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

22   Status of Mortgage Properties in Loan Group II-3." This table divided the subset of mortgage

23   loans in group II-3 into the categories "Owner Occupied," "Investor," and "Second Home." The

24   table made untrue and misleading statements about the number of mortgage loans, the aggregate

25   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

26   of these categories. BALTA 2004-11 Pros. Sup. A-28.

27

28

-7-

(h) In the "Occupancy Status of Mortgage Properties in Loan Group II-3" table, Bear Stearns and SAMI II stated that 83.39% of the subset of mortgage loans in group II-3 were secured by an "Owner Occupied" residence, 13.5% by an "Investor" property, and 3.11% by a "Second Home." BALTA 2004-11 Pros. Sup. A-28.

(i) In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Loan Group II-4." This table divided the subset of mortgage loans in group II-4 into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-35.

(j) In the "Occupancy Status of Mortgage Properties in Loan Group II-4" table, Bear Stearns and SAMI II stated that 88.14% of the subset of mortgage loans in group II-4 were secured by an "Owner Occupied" property, 7.41% by an "Investor" property, and 4.45% by a "Second Home." BALTA 2004-11 Pros. Sup. A-35.

(k) In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Loan Group II-5." This table divided the subset of mortgage loans in group II-5 into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-41.

(l) In the "Occupancy Status of Mortgage Properties in Loan Group II-5" table, Bear Stearns and SAMI II stated that 95.96% of the subset of mortgage loans in group II-5 were secured by an "Owner Occupied" property, 3.17% by an "Investor" property, and 0.87% by a "Second Home." BALTA 2004-11 Pros. Sup. A-41.

-8-

(m)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Loan Group II-6." This table divided the subset of mortgage loans in group II-6 into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-48.

(n)     In the "Occupancy Status of Mortgage Properties in Loan Group II-6" table, Bear Stearns and SAMI II stated that 88.94% of the subset of mortgage loans in group II-6 were secured by an "Owner Occupied" property, 3.97% by an "Investor" property, and 7.08% by a "Second Home." BALTA 2004-11 Pros. Sup. A-48.

(o)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy Status of Mortgage Properties in Total Group II." This table divided the subset of mortgage loans in group II into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BALTA 2004-11 Pros. Sup. A-55.

(p)     In the "Occupancy Status of Mortgage Properties in Total Group II" table, Bear Stearns and SAMI II stated that 90.11% of the subset of mortgage loans in group II were secured by an "Owner Occupied" property, 6.79% by an "Investor" property, and 3.1% by a "Second Home." BALTA 2004-11 Pros. Sup. A-55.

**Item 96.        Details of properties that were stated to be owner-occupied, but were not:**

**(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 257**

**(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 400**

-9-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    (c)    **Number of loans on which the owner of the property owned three or more
2            properties: 28**

3    (d)    **Number of loans that went straight from current to foreclosure or ownership
             by lender: 1**

4    (e)    **Eliminating duplicates, number of loans about which one or more of
5            statements (a) through (d) is true: 571**

6    **Item 99.    Untrue or misleading statements about the underwriting standards of the
7                   originators of the mortgage loans:**

8    On pages S-36 through S-38 of the prospectus supplement, Bear Stearns made statements

9    about the underwriting guidelines of EMC Mortgage Corporation. All of those statements are

10   incorporated here by reference. In particular, Bear Stearns stated that:

11   (a)    "Exceptions to the underwriting standards are permitted where compensating

12   factors are present." BALTA 2004-11 Pros. Sup. S-37.

13   (b)    "Such underwriting standards are applied to evaluate the prospective borrower's

14   credit standing and repayment ability and the value and adequacy of the mortgaged property as

15   collateral." BALTA 2004-11 Pros. Sup. S-37.

16

17   On pages S-38 through S-43 of the prospectus supplement, Bear Stearns made statements

18   about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are

19   incorporated here by reference. In particular, Bear Stearns stated that:

20   (a)    "Exceptions to Countrywide's underwriting guidelines may be made if

21   compensating factors are demonstrated by a prospective borrower." BALTA 2004-11 Pros. Sup.

22   S-39.

23

24   (b)    "Countrywide's underwriting standards are applied by or on behalf of

25   Countrywide to evaluate the prospective borrower's credit standing and repayment ability and the

26   value and adequacy of the mortgaged property as collateral." BALTA 2004-11 Pros. Sup. S-39.

27

28

-10-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    On pages S-44 through S-45 of the prospectus supplement, Bear Stearns made statements

2    about the underwriting guidelines of GreenPoint Mortgage Funding, Inc. All of those statements

3    are incorporated here by reference. In particular, Bear Stearns stated that:

4        (a)    "Exceptions to the GreenPoint underwriting guidelines are permitted where

5    compensating factors are present." BALTA 2004-11 Pros. Sup. S-44.

6        (b)    "Generally, the GreenPoint underwriting guidelines are applied to evaluate the

7    prospective borrower's credit standing and repayment ability and the value and adequacy of the

8    mortgaged property as collateral." BALTA 2004-11 Pros. Sup. S-44.

9

10   **Item 106.    Early payment defaults:**

11       **(a)    Number of the mortgage loans that suffered EPDs: 37**

12       **(b)    Percent of the mortgage loans that suffered EPDs: 0.8%**

13       **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
14             made at the same time as the loans in the collateral pool that experienced
15             EPDs: 0.14%**

16   **Item 107.    90+ days delinquencies:**

17       **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 500**

18       **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 10.5%**

19       **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
20             made at the same time as the loans in the collateral pool that suffered 90+
             days delinquencies: 7.2%**

21   **Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:**

22       On page S-2 of the prospectus supplement, Bear Stearns made statements about the

23   ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the Bank's

24   certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's

25   Rating Services. These were the highest ratings available from these two rating agencies.

26

27       Bear Stearns also stated: "It is a condition to the issuance of the certificates that the

28   offered certificates receive the following ratings from Standard & Poors [sic] Rating Services, a

-11-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1  division of The McGraw-Hill Companies, Inc., which is referred to here as S&P, and Moody's

2  Investors Service, Inc., which is referred to here as Moody's." The requirement for class I-A-1,

3  from which this certificate was to be paid, was for AAA from Standard & Poor's and Aaa from

4  Moody's. BALTA 2004-11 Pros. Sup. S-15.

5

6  Bear Stearns also stated: "It is a condition to the issuance of each class of Offered

7  Certificates that it receives at least the ratings set forth below from S&P and Moody's." The

8  requirement for class I-A-1, from which this certificate was to be paid, was for AAA from

9  Standard & Poor's and Aaa from Moody's. BALTA 2004-11 Pros. Sup. S-94.

10  **Item 120.**    **Summary of loans about which the Defendants made untrue or misleading**
11                   **statements:**

12       **(a)**    **Number of loans whose LTVs were materially understated: 1,245**

13       **(b)**    **Number of loans in which the owner's equity was reduced by 5% or more by**
14                  **undisclosed additional liens: 354**

15       **(c)**    **Number of loans that suffered EPDs: 37**

16       **(d)**    **Number of loans in which the properties were stated to be owner-occupied**
17                  **but were not: 571**

18       **(e)**    **Eliminating duplicates, number of loans about which the Defendants made**
19                  **untrue or misleading statements: 1,867**

20       **(f)**    **Eliminating duplicates, percent of loans about which the Defendants made**
                    **untrue or misleading statements: 39.1%**

21

22

23

24

25

26

27

28

-12-

1

## SCHEDULE 40 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Bear Stearns, SAMI II, and The Bear Stearns Companies, Inc.

**Item 44.     Details of trust and certificate(s).**

    **(a)     Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

    **(b)     Description of the trust:** Bear Stearns Mortgage Funding Trust, Mortgage Pass-Through Certificates, Series 2006-AR5 was a securitization in December 2006 of 4,781 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by EMC Mortgage Corporation and Bear Stearns Residential Mortgage Corporation. EMC Mortgage Corporation originated 64.03% of the subset of loans in group I and Bear Stearns originated 35.97%. EMC Mortgage Corporation originated 63.8% of the subset of loans in group II and Bear Stearns Residential Mortgage Corporation originated 36.2%. BSMF 2006-AR5 Pros. Sup. S-1 and S-4.

    **(c)     Description of the certificate(s) that the Bank purchased:** Bear Stearns offered and sold to the Bank a senior certificate in this securitization, in tranche II-A-1, for which the Bank paid $215,417,000 plus accrued interest on December 29, 2006.

    **(d)     Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's— AAA; Moody's— Aaa.

    **(e)     Current ratings of the certificate(s):** Standard & Poor's— BB-; Moody's— Ba3.

    **(f)     URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1382891/000106823806001291/bsmf2006-ar5_424b5.htm

1     **(g)**     **Registration statement pursuant or traceable to which the certificate(s) were**

2    **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

3    pursuant or traceable to a registration statement filed by SAMI II with the SEC on form S-3 on

4
5    March 10, 2006. Annexed to the registration statement was a prospectus. The prospectus was

6    amended from time to time by prospectus supplements whenever a new series of certificates was

7    issued pursuant or traceable to that registration statement.

8    **Item 52.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

9        In the prospectus supplement, Bear Stearns and SAMI II made the following statements

10    about the loan-to-value ratios of the mortgage loans in the collateral pool of this securitization.

11        (a)     The weighted-average LTV at origination of the subset of mortgage loans in group

12    I was 77.64%. BSMF 2006-AR5 Pros. Sup. S-5 and A-2.

13
14        (b)     The weighted-average LTV at origination of the subset of mortgage loans in

15    Group II was 77.63%. BSMF 2006-AR5 Pros. Sup. S-6 and A-7.

16        (c)     In Schedule A of the prospectus supplement ("Certain Characteristics of the

17    Mortgage Loans"), Bear Stearns and SAMI II presented tables of statistics about the mortgage

18    loans in the collateral pool. BSMF Pros. Sup. A-1 to A-10. Each table focused on a certain

19    characteristic of the loans (for example, principal balance as of the cut-off date) and divided the

20
21    loans into categories based on that characteristic (for example, loans with principal balances as of

22    the cut-off date of $0 to $100,000, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table

23    then presented various data about the loans in each category. One of the tables, entitled "Original

24    Loan-to-Value Ratios of the Mortgage Loans as of the Cut-Off Date in Group I," divided the

25    subset of loans in group I into 13 categories of LTVs (for example, 0% to 30%, 30.01% to 40%,

26    40.01% to 50%, etc.). The table made untrue and misleading statements about the number of

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1 mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

2 principal balance outstanding in each of these categories. BSMF 2006-AR5 Pros. Sup. A-2.

3   (d)   In Schedule A of the prospectus supplement, Bear Stearns and SAMI II presented

4 a table entitled "Original Loan-to-Value Ratios of the Mortgage Loans as of the Cut-Off Date in

5 Group II." This table divided the subset of mortgage loans in group II into 12 categories of LTVs

6

7 (for example, 0% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

8 misleading statements about the number of mortgage loans, the aggregate principal balance

9 outstanding, and the percent of aggregate principal balance outstanding in each of these

10 categories. BSMF 2006-AR5 Pros. Sup. A-7.

11 **Item 62.**   **Details of the results of the AVM analysis:**

12

| | |
|---|---|
| Number of loans | 4,781 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,814 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 2,699 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $219,499,389 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 257 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $19,190,535 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 522 |
| Weighted-average LTV, as stated by Defendants (group II) | 77.6% |
| Weighted-average LTV, as determined by the model (group II) | 88.3% |

22 **Item 65.**   **Evidence from subsequent sales of refinanced properties:**

23   Of the 4,781 mortgage loans in the collateral pool, 2,502 were taken out to refinance,

24 rather than to purchase, properties. For those 2,502 loans, the value (denominator) in the LTV

25 was an appraised value rather than a sale price. Of those 2,502 properties, 593 were subsequently

26

27 sold for a total of approximately $172,866,954. The total value ascribed to those same properties

28 in the LTV data reported in the prospectus supplements and other documents sent to the Bank

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    was $319,704,573. Thus, those properties were sold for 54.1% of the value ascribed to them, a

2    difference of 45.9%. This difference cannot be accounted for by declines in house prices in the

3    areas in which those properties were located.

4    **Item 71.**    **Undisclosed additional liens:**

5        **(a)**    **Minimum number of properties with additional liens: 142**

6        **(b)**    **Total reduction in equity from additional liens: $16,174,643**

7        **(c)**    **Weighted-average reduction in equity from additional liens: 52.7%**

8    **Item 82.**    **Untrue or misleading statements about compliance with USPAP:**

9        In the prospectus supplement, Bear Stearns and SAMI II made the following statement

10   about the appraisals of the properties that secured the mortgage loans originated by EMC

11   Mortgage Corporation: "All appraisals are required to conform to the Uniform Standards of

12   Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal

13   Foundation." BSMF 2006-AR5 Pros. Sup. S-32.

14

15

16

17   **Item 88.**    **Untrue or misleading statements about owner-occupancy of the properties
                     that secured the mortgage loans:**

18       In the prospectus supplement, Bear Stearns and SAMI II made the following statements

19   about the occupancy status of the properties that secured the mortgage loans in the collateral pool

20   of this securitization.

21       (a)    In Schedule A of the prospectus supplement, described in Item 52, Bear Stearns

22   and SAMI II presented a table entitled "Occupancy Status of Mortgaged Properties in Group I."

23   This table divided the subset of mortgage loans in group I into the categories "Owner Occupied,"

24   "Investor," and "Second Home." The table made untrue and misleading statements about the

25   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

26

27

28

-4-

1 | aggregate principal balance outstanding in each of these categories. BSMF 2006-AR5 Pros. Sup.

2 | A-3.

3 |       (b)     In the "Occupancy Status of Mortgaged Properties in Group I" table, Bear Stearns

4

5 | and SAMI II stated that 90.16% of the subset of mortgage loans in group I were secured by an

6 | "Owner Occupied" property, 6.58% by an "Investor" property, and 3.26% by a "Second Home."

7 | BSMF 2006-AR5 Pros. Sup. A-3.

8 |       (c)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

9 | Status of Mortgaged Properties in Group II." This table divided the subset of mortgage loans in

10 | group II into the categories "Owner Occupied," "Investor," and "Second Home." The table made

11 | untrue and misleading statements about the number of mortgage loans, the aggregate principal

12

13 | balance outstanding, and the percent of aggregate principal balance outstanding in each of these

14 | categories. BSMF 2006-AR5 Pros. Sup. A-8.

15 |       (d)     In the "Occupancy Status of Mortgaged Properties in Group II" table, Bear Stearns

16 | and SAMI II stated that 94.17% of the subset of mortgage loans in group II were secured by an

17 | "Owner Occupied" property, 4.26% by an "Investor" property, and 1.57% by a "Second Home."

18 | BSMF 2006-AR5 Pros. Sup. A-8.

19 | **Item 96.**     **Details of properties that were stated to be owner-occupied, but were not:**

20

21 |       **(a)**     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 56**

22 |       **(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 691**

23

24 |       **(c)**     **Number of loans on which the owner of the property owned three or more properties: 66**

25

26 |       **(d)**     **Number of loans that went straight from current to foreclosure or ownership by lender: 9**

27 |       **(e)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 807**

28

-5-

**Item 99.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-30 through S-32 of the prospectus supplement, Bear Stearns made statements about the underwriting guidelines of EMC Mortgage Corporation. All of those statements are incorporated here by reference. In particular, Bear Stearns stated that:

(a)     "Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process." BSMF 2006-AR5 Pros. Sup. S-30.

(b)     "Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." BSMF 2006-AR5 Pros. Sup. S-30.

On pages S-32 through S-36 of the prospectus supplement, Bear Stearns made statements about the underwriting guidelines of Bear Stearns Residential Mortgage Corporation. All of those statements are incorporated here by reference. In particular, Bear Stearns stated that:

(c)     "Exceptions to the BSRM Underwriting Guidelines are considered with reasonable compensating factors on a case-by-case basis and at the sole discretion of senior management." BSMF 2006-AR5 Pros. Sup. S-33.

(d)     "During the underwriting process, BSRM calculates and verifies the loan applicant's sources of income (except documentation types, which do not require such information to be stated or independently verified), reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the BSRM Underwriting Guidelines." BSMF 2006-AR5 Pros. Sup. S-33.

**Item 106.**     **Early payment defaults:**

(a)     **Number of the mortgage loans that suffered EPDs:** 112

-6-

1      **(b)**    **Percent of the mortgage loans that suffered EPDs: 2.3%**

2      **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
              made at the same time as the loans in the collateral pool that experienced
3             EPDs: 0.44%**

4   **Item 107.    90+ days delinquencies:**

5      **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies: 2,977**

6      **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies: 62.3%**

7      **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
              made at the same time as the loans in the collateral pool that suffered 90+
8             days delinquencies: 32.7%**

9   **Item 108.    30+ days delinquencies in this securitization:**

10     **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31,
              2010: 2,888**

11
       **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31,
12            2010: 60.4%**

13     **(c)**    **Percent of all mortgage loans in the United States that were 30+ days
              delinquent on March 31, 2010: 14.7%**
14
    **Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:**
15
          On page S-2 of the prospectus supplement, Bear Stearns made statements about the
16
17  ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the Bank's

18  certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's

19  Rating Services. These were the highest ratings available from these two rating agencies.

20        Bear Stearns also stated: "It is a condition to the issuance of the certificates that the

21  offered certificates receive the following ratings from Standard & Poor's Rating Services . . . and
22
    Moody's Investors Service, Inc. . . ." The requirement for class II-A-1, from which this certificate
23
24  was to be paid, was for AAA from Standard & Poor's and Aaa from Moody's. BSMF 2006-AR5

25  Pros. Sup. S-11.

26

27

28
                                          -7-
    SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    Bear Stearns also stated: "It is a condition to the issuance of each class of Offered

2    Certificates that it receives at least the ratings set forth below from S&P and Moody's." BSMF

3    2006-AR5 Pros. Sup. S-97

4    **Item 120.    Summary of loans about which the Defendants made untrue or misleading**

5    **statements:**

6

7    (a)    **Number of loans whose LTVs were materially understated: 2,699**

8    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by**
           **undisclosed additional liens: 142**

9

     (c)    **Number of loans that suffered EPDs: 112**

10
     (d)    **Number of loans in which the properties were stated to be owner-occupied**
11          **but were not: 807**

12   (e)    **Eliminating duplicates, number of loans about which the Defendants made**
            **untrue or misleading statements: 3,094**
13

14   (f)    **Eliminating duplicates, percent of loans about which the Defendants made**
            **untrue or misleading statements: 64.7%**

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                              -8-

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
   ROBERT A. GOODIN, State Bar No. 061302
2       rgoodin@goodinmacbride.com
3  FRANCINE T. RADFORD, State Bar No. 168269
        fradford@goodinmacbride.com
4  ANNE H. HARTMAN, State Bar No. 184556
        ahartman@goodinmacbride.com
5  505 Sansome Street, Suite 900
   San Francisco, California 94111
6  Telephone:    (415) 392-7900
7  Facsimile:    (415) 398-4321

8  GRAIS & ELLSWORTH LLP
   DAVID J. GRAIS (pro hac application submitted herewith)
9  KATHRYN C. ELLSWORTH (pro hac app. submitted herewith)
   OWEN L. CYRULNIK (pro hac application submitted herewith)
10 70 East 55th Street
11 New York, New York 10022
   Telephone:    (212) 755-0100
12 Facsimile:    (212) 755-0052

13 Attorneys for Plaintiff
   Federal Home Loan Bank of San Francisco
14

15          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

16          IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

17

18 FEDERAL HOME LOAN BANK OF SAN          No. CGC-10-497840
19 FRANCISCO,
                                          **VOLUME 3 OF SCHEDULES OF**
20          Plaintiff,                    **FIRST AMENDED COMPLAINT**
                                          **(SCHEDULES 41-60)**
21 v.

22 CREDIT SUISSE SECURITIES (USA) LLC,
23 F/K/A CREDIT SUISSE FIRST BOSTON
   LLC;
24 CREDIT SUISSE FIRST BOSTON
   MORTGAGE SECURITIES CORP.;
25 DEUTSCHE BANK SECURITIES, INC.;
   DEUTSCHE ALT-A SECURITIES, INC.;
26 J.P. MORGAN SECURITIES, INC., F/K/A
   BEAR STEARNS & CO., INC.;
27 STRUCTURED ASSET MORTGAGE
28 INVESTMENTS II, INC.;

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  THE BEAR STEARNS COMPANIES, LLC,
   F/K/A THE BEAR STEARNS COMPANIES,
2  INC.;
3  RBS SECURITIES, INC., F/K/A
   GREENWICH CAPITAL MARKETS, INC.;
4  RBS ACCEPTANCE, INC. F/K/A
   GREENWICH CAPITAL ACCEPTANCE,
5  INC.;
   MORGAN STANLEY & CO.
6  INCORPORATED;
7  UBS SECURITIES, LLC;
   MORTGAGE ASSET SECURITIZATION
8  TRANSACTIONS, INC.;
   BANC OF AMERICA SECURITIES LLC;
9  BANC OF AMERICA FUNDING
   CORPORATION;
10 BANC OF AMERICA MORTGAGE
11 SECURITIES, INC.;
   COUNTRYWIDE SECURITIES
12 CORPORATION;
   CWALT, INC.;
13 COUNTRYWIDE FINANCIAL
   CORPORATION; AND,
14 DOES 1-50,

15         Defendants.

16
17
18
19
20
21
22
23
24
25
26
27
28
                      -2-
SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    **SCHEDULE 41 TO THE AMENDED COMPLAINT**

2        To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Bear Stearns, CWALT, and

4    Countrywide Financial Corporation.

5

6    **Item 44.        Details of trust and certificate(s).**

7        **(a)        Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

8        **(b)        Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

9    Certificates, Series 2005-46CB was a securitization in August 2005 of 6,027 mortgage loans,[1] in

10   one pool. The mortgage loans in the collateral pool of this securitization were originated or

11   acquired by Countrywide Home Loans, Inc. CWALT 2005-46CB Pros. Sup. S-4, S-14, and S-27.

12       **(c)        Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

13   and sold to the Bank a senior certificate in this securitization, in tranche A-16, for which the Bank

14   paid $110,640,356 plus accrued interest on August 30, 2005.

15

16       **(d)        Ratings of the certificate(s) when the Bank purchased them:** Moody's— Aaa;

17   Fitch— AAA.

18       **(e)        Current ratings of the certificate(s):** Moody's— Baa1; Fitch— BBB.

19       **(f)        URL of prospectus supplement for this securitization:**

20   http://www.sec.gov/Archives/edgar/data/1269518/000095012905008886/v11891e424b5.txt

21

22       **(g)        Registration statement pursuant or traceable to which the certificate(s) were**

23   **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

24   pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on

25

26   _____

     [1] CWALT 2005-46CB was a prefunded securitization. On the closing date of the
27   securitization there were 6,027 mortgage loans in the trust. After the closing date of the
     securitization, the trust purchased an additional 330 mortgage loans.
28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1   July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was

2   amended from time to time by prospectus supplements whenever a new series of certificates was

3   issued pursuant or traceable to that registration statement

4   **Item 52.       Untrue or misleading statements about the LTVs of the mortgage loans:**

5
6        In the prospectus supplement, Bear Stearns and CWALT made the following statements

7   about the LTVs of the mortgage loans in the collateral pool of this securitization.

8        (a)      "No initial mortgage loan had a Loan-to-Value Ratio at origination of more than

9   100%." CWALT 2005-46CB Pros. Sup. S-15.

10       (b)      In the section of the prospectus supplement entitled "The Mortgage Pool," Bear

11  Stearns and CWALT presented tables of statistics about the mortgage loans in the collateral pool.

12  Each table focused on a certain characteristic of the loans (for example, current mortgage loan
13
    principal balance) and divided the loans into categories based on that characteristic (for example,
14
15  loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01

16  to $150,000, etc.). Each table then presented various data about the loans in each category.

17  Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10

18  such tables in "The Mortgage Pool" section of the prospectus supplement for all of the loans in

19  the collateral pool. In each table, the number of categories into which the loans were divided
20
    ranged from three to 53. Thus, in "The Mortgage Pool" section of the prospectus supplement,
21
22  Bear Stearns and CWALT made hundreds of statements about the original LTVs of the loans in

23  the collateral pool. CWALT 2005-46CB Pros. Sup. S-17 to S-24.

24       (c)      "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

25  of the Initial Mortgage Loans is approximately 71.79%." CWALT 2005-46CB Pros. Sup. S-21.

26

27

28

-2-

**Item 62.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 6,357 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,137 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,520 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $71,024,117 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 621 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $40,741,368 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 200 |
| Weighted-average LTV, as stated by Defendants | 71.8% |
| Weighted-average LTV, as determined by the model | 76.9% |

**Item 71.      Undisclosed additional liens:**

  (a)    Minimum number of properties with additional liens: 434

  (b)    Total reduction in equity from additional liens: $22,712,424

  (c)    Weighted-average reduction in equity from additional liens: 66.4%

**Item 82.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Bear Stearns and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-46CB Pros. Sup. S-29.

**Item 88.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Bear Stearns and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

  (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Bear Stearns and CWALT presented a table entitled "Occupancy Types." This table divided

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   all of the mortgage loans in the collateral pool into the categories "Primary Residence,"

2   "Investment Property," and "Secondary Residence." The table made untrue and misleading

3   statements about the number of mortgage loans, the aggregate principal balance outstanding, and

4   the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-

5   46CB Pros. Sup. S-24.

6

7         (b)    In the "Occupancy Types" table, Bear Stearns and CWALT stated that 83.98% of

8   the mortgage loans in the collateral pool were secured by a "Primary Residence," 11.84% by an

9   "Investment Property," and 4.18% by a "Secondary Residence." CWALT 2005-46CB Pros. Sup

10   S-24.

11   **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

12         **(a)**    **Number of loans on which the owner of the property instructed tax**
13                **authorities to send property tax bills to him or her at a different address: 419**

14         **(b)**    **Number of loans on which the owner of the property could have, but did not,**
15                **designate the property as his or her homestead: 572**

16         **(c)**    **Number of loans on which the owner of the property owned three or more**
                 **properties: 39**
17

18         **(d)**    **Number of loans that went straight from current to foreclosure or ownership**
                 **by lender: 2**

19         **(e)**    **Eliminating duplicates, number of loans about which one or more of**
20                **statements (a) through (d) is true: 905**

21   **Item 99.**    **Untrue or misleading statements about the underwriting standards of the**
             **originators of the mortgage loans:**
22

23         On pages S-27 through S-32 of the prospectus supplement, Bear Stearns and CWALT

24   made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those

25   statements are incorporated here by reference. In particular, Bear Stearns stated that:

26

27

28

1    (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

2  if compensating factors are demonstrated by a prospective borrower." CWALT 2005-46CB Pros.

3  Sup. S-28.

4    (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

5
6  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

7  ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-46CB

8  Pros. Sup. S-28.

9  Item 106.    Early payment defaults:

10    (a)    Number of the mortgage loans that suffered EPDs: 19

11    (b)    Percent of the mortgage loans that suffered EPDs: 0.3%

12    (c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
13           made at the same time as the loans in the collateral pool that experienced
           EPDs: 0.18%
14
15  Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:

16    On page S-3 of the prospectus supplement, Bear Stearns and CWALT made statements

17  about the ratings assigned to the certificates issued in this securitization. Bear Stearns and

18  CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and

19  AAA by Standard & Poor's Rating Services. These were the highest ratings available from these

20  two rating agencies.

21    Bear Stearns and CWALT also stated: "The classes of certificates listed below will not be

22  offered unless they are assigned the following ratings by Fitch, Inc. ("Fitch") and Moody's
23
24  Investors Service, Inc. ("Moody's")." CWALT 2005-46CB Pros. Sup. S-3.

25    Bear Stearns and CWALT also stated: "It is a condition to the issuance of the senior

26  certificates that they be rated "AAA" by Fitch Ratings, Inc. ("Fitch") and "Aaa" by Moody's

27  Investors Service, Inc. ("Moody's")." CWALT 2005-46CB Pros. Sup. S-80.

28
                                    -5-

1    Item 120.    Summary of loans about which the Defendants made untrue or misleading
2                 statements:

3        (a)      Number of loans whose LTVs were materially understated: 1,520

4        (b)      Number of loans in which the owner's equity was reduced by 5% or more by
5                 undisclosed additional liens: 4334(c)        Number of loans that suffered
                  EPDs: 19
6
7        (d)      Number of loans in which the properties were stated to be owner-occupied
                  but were not: 905
8        (e)      Eliminating duplicates, number of loans about which the Defendants made
9                 untrue or misleading statements: 2,418

10       (f)      Eliminating duplicates, percent of loans about which the Defendants made
                  untrue or misleading statements: 38.0%
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          -6-

1    **SCHEDULE 42 TO THE AMENDED COMPLAINT**

2          To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Greenwich Capital and Greenwich

4    Capital Acceptance.

5
6    **Item 44.      Details of trust and certificate(s).**

7          **(a)      Dealer that sold the certificate(s) to the Bank:** Greenwich Capital.

8          **(b)      Description of the trust:** HarborView Mortgage Loan Trust, Mortgage Pass-

9    Through Certificates, Series 2005-3 was a securitization in May 2005 of 4,508 mortgage loans, in

10   two groups. The mortgage loans in the collateral pool of this securitization were originated by

11   Countrywide Home Loans, Inc. HVMLT 2005-3 Pros. Sup. S-4 and S-27.

12         **(c)      Description of the certificate(s) that the Bank purchased:** Greenwich Capital

13
     offered and sold to the Bank a senior certificate in this securitization, in tranche 2-A1B, for which
14
15   the Bank paid $153,063,000 plus accrued interest on May 31, 2005.

16         **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard &

17   Poor's— AAA; Moody's— Aaa.

18         **(e)      Current ratings of the certificate(s):** Standard & Poor's— BB+; Moody's—

19   Ba3.

20
     **(f)      URL of prospectus supplement for this securitization:**
21
22   http://www.sec.gov/Archives/edgar/data/826219/000112528205002847/b407025_424b5.txt

23   **Item 52.      Untrue or misleading statements about the LTVs of the mortgage loans:**

24         In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance

25   made the following statements about the LTVs of the mortgage loans in the collateral pool of this

26   securitization.

27

28

     SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

(a)     "With respect to approximately 28.58% of all the mortgage loans, and approximately 22.60% and 32.55% of the group 1 and group 2 mortgage loans, respectively . . . [t]he weighted average loan-to-value ratio of such mortgage loans is approximately 78.54% with respect to those group 1 mortgage loans and approximately 74.98% with respect to those group 2 mortgage loans." HVMLT 2005-3 Pros. Sup. S-25 to S-26.

(b)     "Approximately 3.01% of all of the mortgage loans, and approximately 5.97% and 1.05% of the group 1 and group 2 mortgage loans, respectively, have original loan-to-value ratios in excess of 80%." HVMLT 2005-3 Pros. Sup. S-29.

(c)     In the section of the prospectus supplement entitled "The Mortgage Loan Groups," Greenwich Capital and Greenwich Capital Acceptance presented tables of statistics about the mortgage loans in the collateral pool. HVMLT 2005-3 Pros. Sup. S-32 to S-57. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with principal balances of $32,930 to $50,000, $50,001 to $10,000, $100,001 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios of the Mortgage Loans," divided all of the loans in the collateral pool into 18 categories of original LTV (for example, 10% and below, 10.01% to 15%, 15.01% to 20%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. HVMLT 2005-3 Pros. Sup. S-35.

(d)     "The weighted average original loan-to-value ratio of the mortgage loans was approximately 74.11% as of the cut-off date." HVMLT 2005-3 Pros. Sup. S-35.

(e)     In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich Capital Acceptance presented another table entitled "Original Loan-to-Value Ratios of the Group

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    I Mortgage Loans." This table divided the subset of mortgage loans in Group I into 18 categories

2    of original loan-to-value ratios (for example, 10% and below, 10.01% to 15%, 15.01% to 20%,

3    etc.). The table made untrue and misleading statements about the number of mortgage loans, the

4    aggregate principal balance outstanding, and the percent of aggregate principal balance

5    outstanding in each of these categories. HVMLT 2005-3 Pros. Sup. S-43.

6

7        (f)    "The weighted average original loan to value ratio of the Group 1 mortgage loans

8    was approximately 74.76% as of the cut-off date." HVMLT 2005-3 Pros. Sup. S-43.

9        (g)    In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

10   Capital Acceptance presented another table entitled "Original Loan-to-Value Ratios of the Group

11   II Mortgage Loans." This table divided the subset of mortgage loans in Group II into 15

12   categories of original loan-to-value ratios (for example, 21.43% to 25%, 25.01% to 30%, 30.01%

13   to 35%, etc.). The table made untrue and misleading statements about the number of mortgage

14

15   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

16   outstanding in each of these categories. HVMLT 2005-3 Pros. Sup. S-53.

17       (h)    "The weighted average original loan to value ratio of the Group 2 mortgage loans

18   was approximately 73.68% as of the cut-off date." HVMLT 2005-3 Pros. Sup. S-53.

19

20

21

22

23

24

25

26

27

28
                                        -3-
     SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1 | **Item 62.** **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 4,508 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,095 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,535 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | \$125,414,782 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 512 |
| Aggregate amount by which the true market values of those properties exceed their stated values | \$38,766,309 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 236 |
| Weighted-average LTV, as stated by Defendants | 74.1% |
| Weighted-average LTV, as determined by the model | 83.0% |

**Item 65.** **Evidence from subsequent sales of refinanced properties:**

Of the 4,508 mortgage loans in the collateral pool, 2,774 were taken out to refinance, rather than to purchase, properties. For those 2,774 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 2,774 properties, 553 were subsequently sold for a total of approximately \$229,160,822. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was \$259,317,200. Thus, those properties were sold for 88.4% of the value ascribed to them, a difference of 11.6%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 82.** **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." HVMLT 2005-3 Pros. Sup. S-62.

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    **Item 88.     Untrue or misleading statements about owner-occupancy of the properties
2                   that secured the mortgage loans:**

3          In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance

4    made the following statements about the occupancy status of the properties that secured the

5    mortgage loans in the collateral pool of this securitization.

6          (a)     In "The Mortgage Loan Groups" section of the prospectus supplement, described

7    in Item 52, Greenwich Capital and Greenwich Capital Acceptance presented a table entitled

8    "Stated Occupancy Status of the Mortgage Loans." This table divided all of the mortgage loans in

9    the collateral pool into the categories "Primary," "Investor," and "Second Home." The table made

10

11   untrue and misleading statements about the number of mortgage loans, the aggregate principal

12   balance outstanding, and the percent of aggregate principal balance outstanding in each of these

13   categories. HVMLT 2005-3 Pros. Sup. S-34.

14         (b)     In the "Stated Occupancy Status of the Mortgage Loans" table, Greenwich Capital

15   and Greenwich Capital Acceptance stated that 80.87% of the mortgage loans in the collateral pool

16   were secured by a "Primary" residence, 14.09% by an "Investor" property, and 5.03% by a

17

18   "Second Home." HVMLT 2005-3 Pros. Sup. S-34.

19         (c)     In "The Mortgage Loan Groups" section of the prospectus supplement, Greenwich

20   Capital and Greenwich Capital Acceptance presented a table entitled "Stated Occupancy Status of

21   the Group 1 Mortgage Loans." This table divided the subset of mortgage loans in Group 1 into

22   the categories "Primary," "Investor," and "Second Home." The table made untrue and misleading

23   statements about the number of mortgage loans, the aggregate principal balance outstanding, and

24

25   the percent of aggregate principal balance outstanding in each of these categories. HVMLT 2005-

26   3 Pros. Sup. S-42.

27         (d)     In the "Stated Occupancy Status of the Group 1 Mortgage Loans" table,

28   Greenwich Capital and Greenwich Capital Acceptance stated that 70.77% of the subset of

-5-

1 mortgage loans in Group 1 were secured by a "Primary" residence, 24.27% by an "Investor"

2 property, and 4.97% by a "Second Home." HVMLT 2005-3 Pros. Sup. S-42.

3     (e)    In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

4 Capital Acceptance presented a table entitled "Stated Occupancy Status of the Group 2 Mortgage

5 Loans." This table divided the subset of mortgage loans in Group 2 into the categories "Primary,"

6 "Investor," and "Second Home." The table made untrue and misleading statements about the

7 number of mortgage loans, the aggregate principal balance outstanding, and the percent of

8 aggregate principal balance outstanding in each of these categories. HVMLT 2005-3 Pros. Sup.

9

10 S-52.

11     (f)    In the "Stated Occupancy Status of the Group 2 Mortgage Loans" table,

12 Greenwich Capital and Greenwich Capital Acceptance stated that 87.59% of the subset of

13

14 mortgage loans in Group 2 were secured by a "Primary" residence, 7.33% by an "Investor"

15 property, and 5.08% by a "Second Home." HVMLT 2005-3 Pros. Sup. S-52.

16 **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

17     **(a)**    **Number of loans on which the owner of the property instructed tax**
18         **authorities to send property tax bills to him or her at a different address: 368**

19     **(b)**    **Number of loans on which the owner of the property could have, but did not,**
        **designate the property as his or her homestead: 673**

20     **(c)**    **Number of loans on which the owner of the property owned three or more**
21         **properties: 45**

22     **(d)**    **Eliminating duplicates, number of loans about which one or more of**
23         **statements (a) through (c) is true: 865**

24 **Item 99.**    **Untrue or misleading statements about the underwriting standards of the**
        **originators of the mortgage loans:**

25 On page S-59 of the prospectus supplement, Greenwich Capital and Greenwich Capital

26 Acceptance made statements about the underwriting guidelines of the originators. All of those

27

28

-6-

1    statements are incorporated here by reference. In particular, Greenwich Capital and Greenwich

2    Capital Acceptance stated that:

3        (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate a

4    borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged

5    property as collateral." HVMLT 2005-3 Pros. Sup. S-59.

6

7        On pages S-59 through S-66 of the prospectus supplement, Greenwich Capital and

8    Greenwich Capital Acceptance made statements about the underwriting guidelines of

9    Countrywide Home Loans, Inc. All of those statements are incorporated here by reference. In

10   particular, Greenwich Capital and Greenwich Capital Acceptance stated that:

11       "Exceptions to Countrywide' [sic] underwriting guidelines may be made if compensating

12   factors are demonstrated by a prospective borrower." HVMLT 2005-3 Pros. Sup. S-61.

13

14   **Item 106.    Early payment defaults:**

15       **(a)    Number of the mortgage loans that suffered EPDs: 10**

16       **(b)    Percent of the mortgage loans that suffered EPDs: 0.2%**

         **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**
17       **made at the same time as the loans in the collateral pool that experienced**
         **EPDs: 0.18%**

18   **Item 107.    90+ days delinquencies:**

19       **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 903**

20

21       **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 20.0%**

         **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**
22       **made at the same time as the loans in the collateral pool that suffered 90+**
         **days delinquencies: 16.5%**

23

24   **Item 108.    30+ days delinquencies in this securitization:**

25       **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31,**
         **2010: 856**

26

         **(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31,**
27       **2010: 19.0%**

28

-7-

1   (c)   **Percent of all mortgage loans in the United States that were 30+ days**
2         **delinquent on March 31, 2010:** 14.7%

3   **Item 117.**   **Statements about the ratings of the certificate(s) that the Bank purchased:**

4   On page S-12 of the prospectus supplement, Greenwich Capital and Greenwich Capital

5   Acceptance made statements about the ratings assigned to the certificates issued in this

6   securitization. Greenwich Capital and Greenwich Capital Acceptance stated that the Bank's

7   certificate was to be rated Aaa by Moody's Investors Service, Inc. and AAA by Standard &

8   Poor's Rating Services. These were the highest ratings available from these two rating agencies.

9   Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the

10  issuance of the offered certificates that the certificates initially have the following ratings from

11  Moody's Investors Service, Inc. and Standard & Poor's Ratings Services . . . ." The requirement

12  for class 2-A1B, from which this certificate was to be paid, was for AAA from Standard & Poor's

13  and Aaa from Moody's. HVMLT 2005-3 Pros. Sup. S-12.

14  Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the

15  issuance of the offered certificates that the senior certificates be rated "Aaa" by Moody's

16  Investors Service, Inc. ("Moody's") and "AAA" by Standard & Poor's Ratings Services . . . ."

17  HVMLT 2005-3 Pros. Sup. S-130.

18  **Item 120.**   **Summary of loans about which the Defendants made untrue or misleading**
19                  **statements:**

20      (a)   **Number of loans whose LTVs were materially understated:** 1,535

21      (b)   **Number of loans that suffered EPDs:** 10

22      (c)   **Number of loans in which the properties were stated to be owner-occupied**
23            **but were not:** 865

24      (d)   **Eliminating duplicates, number of loans about which the Defendants made**
25            **untrue or misleading statements:** 2,025

26      (e)   **Eliminating duplicates, percent of loans about which the Defendants made**
27            **untrue or misleading statements:** 44.9%

-8-

1

## SCHEDULE 43 TO THE AMENDED COMPLAINT

2

To the extent that this Schedule is incorporated by reference into allegations in the

3

complaint, those allegations are made against Defendants Greenwich Capital and CWALT.

4

**Item 44.** **Details of trust and certificate(s).**

5

6

(a) **Dealer that sold the certificate(s) to the Bank:** Greenwich Capital.

7

(b) **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

8

Certificates, Series 2004-28CB was a securitization in November 2004 of 7,240 mortgage loans,[2]

9

in seven groups. The mortgage loans in the collateral pool of this securitization were originated or

10

acquired by Countrywide Home Loans, Inc. CWALT 2004-28CB Pros. Sup. S-4, S-14, and S-64.

11

(c) **Description of the certificate(s) that the Bank purchased:** Greenwich Capital

12

offered and sold to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which

13

the Bank paid $213,494,531 plus accrued interest, on January 31, 2005.

14

15

(d) **Ratings of the certificate(s) when the Bank purchased them:** Standard &

16

Poor's— AAA; Moody's— Aaa.

17

(e) **Current ratings of the certificate(s):** Standard & Poor's— AAA; Moody's— A1.

18

(f) **URL of prospectus supplement for this securitization:**

19

http://www.sec.gov/Archives/edgar/data/1269518/000095012904009424/v03470b5e424b5.txt

20

**Item 52.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

21

In the prospectus supplement, Greenwich Capital and CWALT made the following

22

statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

23

24

25

26

[2] CWALT 2004-28CB was a prefunded securitization. On the closing date of the

27

securitization there were 7,240 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 103 mortgage loans.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

(a)   "No initial mortgage loan had a Loan-to-Value Ratio at origination of more than

100%." CWALT 2004-28CB Pros. Sup. S-16.

(b)   In the section of the prospectus supplement entitled "The Mortgage Pool,"

Greenwich Capital and CWALT presented tables of statistics about the mortgage loans in

collateral pool. CWALT 2004-28CB Pros. Sup. S-18 to S-61. Each table focused on a certain

characteristic of the loans (for example, current principal balance) and divided the loans into

categories based on that characteristic (for example, loans with current principal balances of

$0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then

presented various data about the loans in each category. Among these data was the "Weighted-

Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool"

section for the subset of loans in loan group 1. In each table, the number of categories into which

the loans were divided ranged from three to 38. Thus, in "The Mortgage Pool" section,

Greenwich Capital and CWALT made hundreds of statements about the original LTVs of the

loans in loan group 1. CWALT 2004-28CB Pros. Sup. S-18 to S-24.

(c)   "The weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans

in loan group 1 is approximately 76.91%." CWALT 2004-28CB Pros. Sup. S-21.

(d)   In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

similar tables of statistics about the subset of mortgage loans in loan group 2. In these tables,

Greenwich Capital and CWALT similarly made hundreds of statements about the original LTVs

of the loans in loan group 2. CWALT 2004-28CB Pros. Sup. S-25 to S-30.

(e)   "The weighted average original Loan-to-Value Ratio of the mortgage loans in loan

group 3 is approximately 80.26%." CWALT 2004-28CB Pros. Sup. S-27.

(f)   In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

similar tables of statistics about the subset of mortgage loans in the loan group 3. In these tables,

-2-

1   Greenwich Capital and CWALT made hundreds of statements about the original LTVs of the

2   loans in loan group 3. CWALT 2004-28CB Pros. Sup. S-31 to S-37.

3       (g)    "The weighted average original Loan-to-Value Ratio of the mortgage loans in loan

4

5   group 3 is approximately 80.26%." CWALT 2004-28CB Pros. Sup. S-34.

6       (h)    In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

7   similar tables of statistics about the subset of mortgage loans in loan group 4. In these tables,

8   Greenwich Capital and CWALT similarly made hundreds of statements about the original LTVs

9   of the loans in loan group 4. CWALT 2004-28CB Pros. Sup. S-38 to S-43.

10      (i)    "The weighted average original Loan-to-Value Ratio of the mortgage loans in loan

11   group 4 is approximately 66.54%." CWALT 2004-28CB Pros. Sup. S-40.

12      (j)    In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

13   similar tables of statistics about the subset of mortgage loans in loan group 5. In these tables,

14

15   Greenwich Capital and CWALT similarly made hundreds of statements about the original LTVs

16   of the loans in loan group 5. CWALT 2004-28CB Pros. Sup. S-44 to S-49.

17      (k)    "The weighted average original Loan-to-Value Ratio of the mortgage loans in loan

18   group 5 is approximately 76.25%." CWALT 2004-28CB Pros. Sup. S-46.

19      (l)    In "the Mortgage Pool" section, Greenwich Capital and CWALT presented similar

20

21   tables of statistics about the subset of mortgage loans in loan group 6. In these tables, Greenwich

22   Capital and CWALT similarly made hundreds of statements about the original LTVs of the loans

23   in loan group 6. CWALT 2004-28CB Pros. Sup. S-50 to S-55.

24      (m)    "The weighted average original Loan-to-Value Ratio of the mortgage loans in loan

25   group 6 is approximately 75.18%." CWALT 2004-28CB Pros. Sup. S-52.

26      (n)    In "the Mortgage Pool" section, Greenwich Capital and CWALT presented similar

27   tables of statistics about the subset of mortgage loans in loan group 7. In these tables, Greenwich

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

Capital and CWALT similarly made hundreds of statements about the original LTVs of the loans in loan group 7. CWALT 2004-28CB Pros. Sup. S-56 to S-61.

(o)     "The weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 7 is approximately 70.43%." CWALT 2004-28CB Pros. Sup. S-58.

**Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 7,343 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,861 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,342 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $49,103,035 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 624 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $30,367,369 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 295 |
| Weighted-average LTV, as stated by Defendants (group 1) | 76.9% |
| Weighted-average LTV, as determined by the model (group 1) | 80.1% |

**Item 71.     Undisclosed additional liens:**

(a)     **Minimum number of properties with additional liens: 366**

(b)     **Total reduction in equity from additional liens: $17,250,606**

(c)     **Weighted-average reduction in equity from additional liens: 77.2%**

**Item 82.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Greenwich Capital and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2004-28CB Pros. Sup. S-66.

-4-

1

2

**Item 88.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

3     In the prospectus supplement, Greenwich Capital and CWALT made the following

4     statements about the occupancy status of the properties that secured the mortgage loans in the

5     collateral pool of this securitization.

6     (a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item

7     52, Greenwich Capital and CWALT presented a table entitled "Occupancy Types." This table

8

9     divided the subset of mortgage loans in loan group 1 into the categories "Primary Residence,"

10    "Investment Property," and "Secondary Residence." The table made untrue and misleading

11    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

12    the percent of aggregate principal balance outstanding in each of these categories. CWALT 2004-

13    28CB Pros. Sup. S-23.

14    (b)     In the "Occupancy Types" table, Greenwich Capital and CWALT stated that

15    77.49% of the subset of mortgage loans in loan group 1 were secured by a "Primary Residence,"

16    15.5% by an "Investment Property," and 7.01% by a "Secondary Residence." CWALT 2004-

17    28CB Pros. Sup. S-23.

18

19    (c)     In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

20    another table entitled "Occupancy Types." This table stated that 100% of the subset of mortgage

21    loans in loan group 2 were secured by a "Primary Residence." CWALT 2004-28CB Pros. Sup. S-

22    30.

23    (d)     In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

24    another table entitled "Occupancy Types." This table divided the subset of mortgage loans in loan

25    group 3 into the categories "Primary Residence" and "Secondary Residence." The table made

26

27    untrue and misleading statements about the number of mortgage loans, the aggregate principal

28

-5-

1    balance outstanding, and the percent of aggregate principal balance outstanding in each of these

2    categories. CWALT 2004-28CB Pros. Sup. S-37.

3        (e)    In the "Occupancy Types" table, Greenwich Capital and CWALT stated that

4    96.73% of the subset of mortgage loans in loan group 3 were secured by a "Primary Residence"

5

6    and 3.27% by a "Secondary Residence." CWALT 2004-28CB Pros. Sup. S-37.

7        (f)    In "the Mortgage Pool" section, Greenwich Capital and CWALT presented

8    another table entitled "Occupancy Types." This table stated that 100% of the subset of mortgage

9    loans in loan group 4 into were secured by a "Primary Residence." CWALT 2004-28CB Pros.

10   Sup. S-43.

11       (g)    In "the Mortgage Pool" section, Greenwich Capital and CWALT presented

12   another table entitled "Occupancy Types." This table divided the subset of mortgage loans in loan

13

14   group 5 into the categories "Investment Property" and "Secondary Residence." The table made

15   untrue and misleading statements about the number of mortgage loans, the aggregate principal

16   balance outstanding, and the percent of aggregate principal balance outstanding in each of these

17   categories. CWALT 2004-28CB Pros. Sup. S-49.

18       (h)    In the "Occupancy Types" table, Greenwich Capital and CWALT stated that

19   82.24% of the subset of mortgage loans were secured by an "Investment Property" and 17.76%

20

21   by a "Secondary Residence." CWALT 2004-28CB Pros. Sup. S-49.

22       (i)    In "the Mortgage Pool" section, Greenwich Capital and CWALT presented

23   another table entitled "Occupancy Types." This table stated that 100% of the subset of mortgage

24   loans in loan group 6 were secured by an "Investment Property." CWALT 2004-28CB Pros. Sup.

25   S-55.

26       (j)    In "the Mortgage Pool" section, Greenwich Capital and CWALT presented

27   another table entitled "Occupancy Types." This table divided the subset of mortgage loans in loan

28

-6-

1  group 7 into the categories "Investment Property" and "Secondary Residence." The table made

2  untrue and misleading statements about the number of mortgage loans, the aggregate principal

3  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

4  categories. CWALT 2004-28CB Pros. Sup. S-61.

5

6      (k)    In the "Occupancy Types" table, Greenwich Capital and CWALT stated that

7  72.35% of the subset of mortgage loans were secured by an "Investment Property" and 27.65%

8  by a "Secondary Residence." CWALT 2004-28CB Pros. Sup. S-61.

9  **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

10
11      **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 412**

12      **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 617**

13
14      **(c)**    **Number of loans on which the owner of the property owned three or more properties: 22**

15
16      **(d)**    **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

17      **(e)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 916**

18
19  **Item 99.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

20  On pages S-64 through S-70 of the prospectus supplement, Greenwich Capital and

21  CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc.

22  All of those statements are incorporated here by reference. In particular, Greenwich Capital and

23  Greenwich Capital Acceptance stated that:

24
25      (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

26  if compensating factors are demonstrated by a prospective borrower." CWALT 2004-28CB Pros.

27  Sup. S-65.

28

-7-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1      (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

2  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

3  ability and the value and adequacy of the mortgaged property as collateral." CWALT 2004-28CB

4  Pros. Sup. S-65.

5

6  **Item 106.    Early payment defaults:**

7      **(a)    Number of the mortgage loans that suffered EPDs: 27**

    **(b)    Percent of the mortgage loans that suffered EPDs: 0.4%**

8      **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans

9      made at the same time as the loans in the collateral pool that experienced

    EPDs: 0.14%**

10  **Item 107.    90+ days delinquencies:**

11      **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 639**

12      **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 8.7%**

13

14      **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans

    made at the same time as the loans in the collateral pool that suffered 90+

15      days delinquencies: 7.2%**

16  **Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:**

17      On page S-3 of the prospectus supplement, Greenwich Capital and CWALT made

18  statements about the ratings assigned to the certificates issued in this securitization. Greenwich

19  Capital and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors

20  Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings

21  available from these two rating agencies.

22

23      Greenwich Capital and CWALT also stated: "The classes of certificates listed below will

24  not be offered unless they are assigned the following ratings by Standard & Poor's Ratings

25  Services, . . . and by Moody's Investors Service, Inc. . . ." The requirement for class 1-A-1, from

26  which this certificate was to be paid, was for AAA from Standard & Poor's and Aaa from

27  Moody's. CWALT 2004-28CB Pros. Sup. S-3.

28

-8-

1   Greenwich Capital and CWALT also stated: "It is a condition to the issuance of the senior

2   certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill

3   Companies, Inc. ("S&P") and Aaa by Moody's Investors Service, Inc. ("Moody's")." CWALT

4   2004-28CB Pros. Sup. S-125.

5

6   **Item 120.    Summary of loans about which the Defendants made untrue or misleading
           statements:**

7

8       (a)   Number of loans whose LTVs were materially understated: 1,342

9       (b)   Number of loans in which the owner's equity was reduced by 5% or more by
             undisclosed additional liens: 366

10
11      (c)   Number of loans that suffered EPDs: 27

12      (d)   Number of loans in which the properties were stated to be owner-occupied
             but were not: 916

13      (e)   Eliminating duplicates, number of loans about which the Defendants made
14            untrue or misleading statements: 2,281

15      (f)   Eliminating duplicates, percent of loans about which the Defendants made
             untrue or misleading statements: 31.1%
16
17
18
19
20
21
22
23
24
25
26
27
28
                                        -9-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    **SCHEDULE 44 TO THE AMENDED COMPLAINT**

2    To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Greenwich Capital, CWALT, and

4    Countrywide Financial Corporation.

5

6    **Item 44.    Details of trust and certificate(s).**

7    (a)    **Dealer that sold the certificate(s) to the Bank:** Greenwich Capital.

8    (b)    **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

9    Certificates, Series 2005-3CB was a securitization in January 2005 of 6,699 mortgage loans,[3] in

10   two groups. The mortgage loans in the collateral pool of this securitization were originated or

11   acquired by Countrywide Home Loans, Inc. CWALT 2005-3CB Pros. Sup. S-4, S-13, and S-36.

12   (c)    **Description of the certificate(s) that the Bank purchased:** Greenwich Capital

13   offered and sold to the Bank three senior certificates in this securitization, in tranche 1-A-1,

14   tranche 1-A-10, and tranche 1-A-9, for which the Bank paid $101,226,563, $120,126,563, and

15

16   $43,718,125 plus accrued interest, on January 31, 2005, July 11, 2005, and July 25, 2005,

17   respectively.

18   (d)    **Ratings of the certificate(s) when the Bank purchased them:**

19   Certificate: 1-A-1; Standard & Poor's— AAA; Moody's— Aaa.

20   Certificate: 1-A-10; Standard & Poor's— AAA; Moody's— Aaa.

21

22   Certificate: 1-A-9; Standard & Poor's— AAA; Moody's— Aaa.

23   (e)    **Current ratings of the certificate(s):**

24   Certificate: 1-A-1; Standard & Poor's— BBB-; Moody's— Caa1.

25

26   _____

[3] CWALT 2005-3CB was a prefunded securitization. On the closing date of the
27   securitization there were 6,699 mortgage loans in the trust. After the closing date of the
securitization, the trust purchased an additional 1,439 mortgage loans.
28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    Certificate: 1-A-10; Standard & Poor's— BBB-; Moody's— Caa1.

2    Certificate: 1-A-9; Standard & Poor's— BBB-; Moody's— Caa1.

3    **(f)    URL of prospectus supplement for this securitization:**

4
5    http://www.sec.gov/Archives/edgar/data/1269518/000095012905000648/v04624b5e424b5.txt

6    **(g)    Registration statement pursuant or traceable to which the certificate(s) were**

7    issued: Certificates in this trust, including the certificates that the Bank purchased, were issued

8    pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3

9    on September 23, 2004. Annexed to the registration statement was a prospectus. The prospectus

10   was amended from time to time by prospectus supplements whenever a new series of certificates

11   was issued pursuant or traceable to that registration statement.

12   **Item 52.    Untrue or misleading statements about the LTVs of the mortgage loans:**

13   In the prospectus supplement, Greenwich Capital and CWALT made the following

14
15   statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

16   (a)    "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than

17   100.00%." CWALT 2005-3CB Pros. Sup. S-15.

18   (b)    In the section of the prospectus supplement entitled "The Mortgage Pool,"

19   Greenwich Capital and CWALT presented tables of statistics about the subset of mortgage loans

20
21   in loan group 1. Each table focused on a certain characteristic of the loans (for example, current

22   principal balance) and divided the loans into categories based on that characteristic (for example,

23   loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01

24   to $150,000, etc.). Each table then presented various data about the loans in each category.

25   Among these data was the "Weighted-Average Original Loan-to-Value Ratio." There were 10

26   such tables in "The Mortgage Pool" section of the prospectus supplement for loan group 1. In

27   each table, the number of categories into which the loans were divided ranged from three to 96.

28
                                    -2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  Thus, in "The Mortgage Pool" section. Greenwich Capital and CWALT made hundreds of

2  statements about the original LTVs of the loans in loan group 1. CWALT 2005-3CB Pros. Sup.

3  S-17 to S-26.

4
5      (c)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

6  of the Initial Mortgage loans in loan group 1 is approximately 72.79%." CWALT 2005-3CB Pros.

7  Sup. S-22.

8      (d)     In "The Mortgage Pool" section, Greenwich Capital and CWALT presented

9  similar tables of statistics about the subset of mortgage loans in loan group 2. In these tables,

10  Greenwich Capital and CWALT similarly made hundreds of statements about the original LTVs

11  of the loans in the loan group 2. CWALT 2005-3CB Pros. Sup. S-27 to S-32.

12
13      (e)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

14  of the Initial Mortgage Loans in loan group 2 is approximately 66.89%." CWALT 2005-3CB

15  Pros. Sup. S-29.

16  **Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 8,138 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,633 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,687 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $73,400,495 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 802 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $42,294,119 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 266 |
| Weighted-average LTV, as stated by Defendants (group 1) | 72.8% |
| Weighted-average LTV, as determined by the model (group 1) | 78.1% |

27  **Item 71.     Undisclosed additional liens:**

28      **(a)     Minimum number of properties with additional liens: 480**

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1       (b)     Total reduction in equity from additional liens: $23,234,412

2       (c)     Weighted-average reduction in equity from additional liens: 67.6%

3    **Item 82.**     **Untrue or misleading statements about compliance with USPAP:**

4        In the prospectus supplement, Greenwich Capital and CWALT made the following

5 statement about the appraisals of the properties that secured the mortgage loans originated by

6
7 Countrywide: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal

8 standards then in effect." CWALT 2005-3CB Pros. Sup. S-37.

9    **Item 88.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

10
11        In the prospectus supplement, Greenwich Capital and CWALT made the following

12 statements about the occupancy status of the properties that secured the mortgage loans in the

13 collateral pool of this securitization.

14       (a)     In "the Mortgage Pool" section of the prospectus supplement, Greenwich Capital

15 presented a table entitled "Occupancy Types." This table divided the subset of mortgage loans in

16 loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

17 Residence." The table made untrue and misleading statements about the number of mortgage

18
19 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

20 outstanding in each of these categories. CWALT 2005-3CB Pros. Sup. S-25.

21       (b)     In the "Occupancy Types" table, Greenwich Capital and CWALT stated that

22 85.48% of the subset of mortgage loans in loan group 1 were secured by a "Primary Residence,"

23 12.07% by an "Investment Property," and 2.44% by a "Secondary Residence." CWALT 2005-

24 3CB Pros. Sup. S-25.

25       (c)     In "The Mortgage Pool" section, Greenwich Capital presented another table

26
27 entitled "Occupancy Types." This table divided the subset of mortgage loans in loan group 2 into

28 the categories "Primary Residence," "Investment Property," and "Secondary Residence." The

table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-3CB Pros. Sup. S-32.

(d)     In the "Occupancy Types" table, Greenwich Capital and CWALT stated that 77.21% of the subset of mortgage loans in loan group 2 were secured by a "Primary Residence," 19.21% by an "Investment Property," and 3.35% by a "Secondary Residence." CWALT 2005-3CB Pros. Sup. S-32.

**Item 96.     Details of properties that were stated to be owner-occupied, but were not:**

   **(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 544**

   **(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 753**

   **(c)     Number of loans on which the owner of the property owned three or more properties: 44**

   **(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 1,164**

**Item 99.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-36 through S-41 of the prospectus supplement, Greenwich Capital and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated here by reference. In particular, Greenwich Capital and CWALT stated that:

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-3CB Pros. Sup. S-37.

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

-5-

1 ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-3CB

2 Pros. Sup. S-37.

3 **Item 106.** **Early payment defaults:**

4     **(a)** **Number of the mortgage loans that suffered EPDs: 14**

5     **(b)** **Percent of the mortgage loans that suffered EPDs: 0.2%**

6     **(c)** **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**
7         **made at the same time as the loans in the collateral pool that experienced**
        **EPDs: 0.18%**

8 **Item 117.** **Statements about the ratings of the certificate(s) that the Bank purchased:**

9     On page S-3 of the prospectus supplement, Greenwich Capital and CWALT made

10 statements about the ratings assigned to the certificates issued in this securitization. Greenwich

11 Capital and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors

12
13 Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings

14 available from these two rating agencies.

15     Greenwich Capital and CWALT also stated: "The following chart lists certain

16 characteristics of the classes of the offered certificates. The classes of certificates listed below

17 will not be offered unless they are assigned the following ratings by Standard & Poor's, a division

18 of The McGraw-Hill Companies, Inc. ("S&P") and by Moody's Investors Service Inc.

19 ("Moody's")." The requirement for classes 1-A-1, 1-A-10, 1-A-9, from which these certificates
20
21 were to be paid, was AAA for Standard & Poor's and Aaa for Moody's. CWALT 2005-3CB Pros.

22 Sup. S-3.

23     Greenwich Capital and CWALT also stated: "It is a condition to the issuance of the senior

24 certificates that they be rated AAA by Standard & Poor's, a division of The McGraw-Hill

25 Companies, Inc. ("S&P") and Aaa by Moody's Investors Service, Inc. ("Moody's")." CWALT

26 2005-3CB Pros. Sup. S-82.

27
28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

**Item 120.** Summary of loans about which the Defendants made untrue or misleading statements:

(a) Number of loans whose LTVs were materially understated: 1,687

(b) Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 480

(c) Number of loans that suffered EPDs: 14

(d) Number of loans in which the properties were stated to be owner-occupied but were not: 1,164

(e) Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 2,868

(f) Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 35.2%

-7-

1    **SCHEDULE 45 TO THE AMENDED COMPLAINT**

2    To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Morgan Stanley, CWALT, and

4    Countrywide Financial Corporation.

5

6    **Item 44.        Details of trust and certificate(s).**

7        (a)    **Dealer that sold the certificate(s) to the Bank:** Morgan Stanley.

8        (b)    **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

9    Certificates, Series 2007-17CB was a securitization in June 2007 of 3,090 mortgage loans, in two

10   groups. The mortgage loans in the collateral pool of this securitization were originated or

11   acquired by Countrywide Home Loans, Inc. CWALT 2007-17CB Pros. Sup. S-4, S-31, and S-36.

12       (c)    **Description of the certificate(s) that the Bank purchased:** Morgan Stanley

13   offered and sold to the Bank a senior certificate in this securitization, in tranche 2-A-1, for which

14   the Bank paid $156,681,250 plus accrued interest on June 29, 2007.

15

16       (d)    **Ratings of the certificate(s) when the Bank purchased them:** Standard &

17   Poor's— AAA; Fitch— AAA.

18       (e)    **Current ratings of the certificate(s):** Standard & Poor's— CCC; Fitch— CCC.

19       (f)    **URL of prospectus supplement for this securitization:**

20   http://www.sec.gov/Archives/edgar/data/1269518/000136231007001225/c70721e424b5.htm

21

22       (g)    **Registration statement pursuant or traceable to which the certificate(s) were**

23   **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

24   pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3

25   on April 24, 2007. Annexed to the registration statement was a prospectus. The prospectus was

26   amended from time to time by prospectus supplements whenever a new series of certificates was

27   issued pursuant or traceable to that registration statement.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

**Item 52.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

     In the prospectus supplement, Morgan Stanley and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

     (a)      The weighted-average original LTV of the subset of mortgage loans in loan group 1 was 69.14%. CWALT 2007-17CB Pros. Sup. S-5.

     (b)      The weighted-average original LTV of the subset of mortgage loans in loan group 2 was 72.44%. CWALT 2007-17CB Pros. Sup. S-5.

     (c)      "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2007-17CB Pros. Sup. S-33.

     (d)      In Annex A of the prospectus supplement ("The Mortgage Pool"), Morgan Stanley and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2007-17CB Pros. Sup. A-1 to A-19. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 13 such tables in Annex A for the subset of mortgage loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from three to 35. Thus, in Annex A, Morgan Stanley and CWALT made hundreds of statements about the original LTVs of the loans in loan group 1. CWALT 2007-17CB Pros. Sup. A-1 to A-10.

     (e)      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 69.14%." CWALT 2007-17CB Pros. Sup. A-5.

-2-

1      (f)     In Annex A, Morgan Stanley and CWALT presented similar tables of statistics

2  about the subset of mortgage loans in loan group 2. In these tables, Morgan Stanley and CWALT

3  similarly made hundreds of statements about the original LTVs of the loans in loan group 2.

4  CWALT 2007-17CB Pros. Sup. A-11 to A-19.

5

6      (g)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

7  mortgage loans in loan group 2 was approximately 72.44%." CWALT 2007-17CB Pros. Sup. A-

8  14.

9  **Item 62.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 3,090 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,863 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,235 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $82,232,424 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 187 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,102,680 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 213 |
| Weighted-average LTV, as stated by Defendants (group 2) | 72.4% |
| Weighted-average LTV, as determined by the model (group 2) | 83.3% |

20  **Item 65.**    **Evidence from subsequent sales of refinanced properties:**

21      Of the 3,090 mortgage loans in the collateral pool, 1,823 were taken out to refinance,

22  rather than to purchase, properties. For those 1,823 loans, the value (denominator) in the LTV

23  was an appraised value rather than a sale price. Of those 1,823 properties, 68 were subsequently

24  sold for a total of approximately $21,736,303. The total value ascribed to those same properties in

25  the LTV data reported in the prospectus supplements and other documents sent to the Bank was

26  $30,011,084. Thus, those properties were sold for 72.4% of the value ascribed to them, a

27

28                            -3-

1  difference of 27.6%. This difference cannot be accounted for by declines in house prices in the

2  areas in which those properties were located.

3  **Item 82.        Untrue or misleading statements about compliance with USPAP:**

4  In the prospectus supplement, Morgan Stanley and CWALT made the following statement

5
6  about the appraisals of the properties that secured the mortgage loans originated by Countrywide:

7  "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

8  effect." CWALT 2007-17CB Pros. Sup. S-39.

9  **Item 88.        Untrue or misleading statements about owner-occupancy of the properties
          that secured the mortgage loans:**

10
11  In the prospectus supplement, Morgan Stanley and CWALT made the following

12  statements about the occupancy status of the properties that secured the mortgage loans in the

13  collateral pool of this securitization.

14  (a)        In Annex A of the prospectus supplement, described in Item 52, Morgan Stanley

15  and CWALT presented a table entitled "Occupancy Types." This table divided the subset of

16  mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property,"

17
18  and "Secondary Residence." The table made untrue and misleading statements about the number

19  of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

20  principal balance outstanding in each of these categories. CWALT 2007-17CB Pros. Sup. A-8.

21  (b)        In the "Occupancy Types" table, Morgan Stanley and CWALT stated that 92.46%

22  of the subset of mortgage loans in loan group 1 were secured by a "Primary Residence," 4.41%

23  by an "Investment Property," and 3.13% by a "Second Residence." CWALT 2007-17CB Pros.

24  Sup. A-8.

25
26  (c)        In Annex A, Morgan Stanley and CWALT presented another table entitled

27  "Occupancy Types." This table divided the subset of mortgage loans in loan group 1 into the

28  categories "Primary Residence," "Investment Property," and "Secondary Residence." The table

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   made untrue and misleading statements about the number of mortgage loans, the aggregate

2   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

3   of these categories. CWALT 2007-17CB Pros. Sup. A-17.

4           (d)     In the "Occupancy Types" table, Morgan Stanley and CWALT stated that 89.31%

5

6   of the subset of mortgage loans in loan group 1 were secured by a "Primary Residence," 6.69%

7   by an "Investment Property," and 4% by a "Secondary Residence." CWALT 2007-17CB Pros.

8   Sup. A-17.

9   **Item 96.    Details of properties that were stated to be owner-occupied, but were not:**

10          **(a)    Number of loans on which the owner of the property instructed tax
11                   authorities to send property tax bills to him or her at a different address: 223**

12          **(b)    Number of loans on which the owner of the property could have, but did not,
                     designate the property as his or her homestead: 379**
13

14          **(c)    Number of loans on which the owner of the property owned three or more
                     properties: 33**

15          **(d)    Number of loans that went straight from current to foreclosure or ownership
16                   by lender: 1**

17          **(e)    Eliminating duplicates, number of loans about which one or more of
                     statements (a) through (d) is true: 577**
18

19  **Item 99.    Untrue or misleading statements about the underwriting standards of the
                  originators of the mortgage loans:**

20  On pages S-36 through S-42 of the prospectus supplement, Morgan Stanley and CWALT

21  made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those

22  statements are incorporated here by reference. In particular, Morgan Stanley and CWALT stated

23  that:

24
25          (a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

26  if compensating factors are demonstrated by a prospective borrower." CWALT 2007-17CB Pros.

27  Sup. S-38.

28
                                        -5-

1    (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

2    Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

3    ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-17CB

4    Pros. Sup. S-38.

5

6    **Item 108.    30+ days delinquencies in this securitization:**

7        **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 499**

8        **(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 16.1%**

9

10       **(c)    Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

11

12   **Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:**

13   On pages S-6 to S-7 of the prospectus supplement, Morgan Stanley and CWALT made

14   statements about the ratings assigned to the certificates issued in this securitization. Morgan

15   Stanley and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors

16   Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings

17   available from these two rating agencies.

18   Morgan Stanley and CWALT also stated: "The offered certificates will not be offered

19

20   unless they are assigned the indicated ratings by Standard & Poor's, a division of The McGraw

21   Hill Companies, Inc. ("S&P"), Fitch Ratings ("Fitch") and Moody's Investors Service, Inc.

22   ("Moody's"). "N/R" indicates that the agency was not asked to rate the certificates." The

23   requirement for class 2-A-1, from which this certificate was to be paid, was for AAA from

24   Standard & Poor's and Aaa from Moody's. CWALT 2007-17CB Pros. Sup. S-7 to S-8.

25   Morgan Stanley and CWALT also stated: "It is a condition to the issuance of the offered

26

27   certificates that they be assigned the respective ratings set forth in the Summary of this prospectus

28   supplement." CWALT 2007-17CB Pros. Sup. S-110.

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

**Item 120.**   Summary of loans about which the Defendants made untrue or misleading statements:

    **(a)**   Number of loans whose LTVs were materially understated: 1,235

    **(b)**   Number of loans in which the properties were stated to be owner-occupied but were not: 577

    **(c)**   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,508

    **(e)**   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.8%

-7-

1

## SCHEDULE 46 TO THE AMENDED COMPLAINT

2    To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Morgan Stanley, CWALT, and

4    Countrywide Financial Corporation.

5

6    **Item 44.    Details of trust and certificate(s).**

7        **(a)    Dealer that sold the certificate(s) to the Bank:** Morgan Stanley.

8        **(b)    Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

9    Certificates, Series 2005-86CB was a securitization in December 2005 of 4,133 mortgage loans,[4]

10   in one group. The mortgage loans in the collateral pool of this securitization were originated or

11   acquired by Countrywide Home Loans, Inc. CWALT 2005-86CB Pros. Sup. S-4, S-14, and S-26.

12       **(c)    Description of the certificate(s) that the Bank purchased:** Morgan Stanley

13   offered and sold to San Francisco Bank two senior certificates in this securitization, in tranche A-

14
15   6 and tranche A-8, for which San Francisco Bank paid $99,062,500 and $282,161,133 plus

16   accrued interest, respectively, on December 30, 2005.

17       **(d)    Ratings of the certificate(s) when the Bank purchased them:**

18       Certificate: A-6; Standard & Poor's—AAA; Moody's— Aaa.

19       Certificate: A-8; Standard & Poor's— AAA; Moody's— Aaa.

20
21       **(e)    Current ratings of the certificate(s):**

22       Certificate: A-6; Standard & Poor's— AA-; Moody's— Caa1.

23       Certificate: A-8; Standard & Poor's— AA-; Moody's— Caa1.

24       **(f)    URL of prospectus supplement for this securitization:**

25   http://www.sec.gov/Archives/edgar/data/1269518/000095012905012355/v15567e424b5.txt

26

27   ───────────

[4] CWALT 2005-86CB was a prefunded securitization. On the closing date of the
28   securitization there were 4,133 mortgage loans in the trust. After the closing date of the
     securitization, the trust purchased an additional 700 mortgage loans.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  (g)    **Registration statement pursuant or traceable to which the certificate(s) were**

2  **issued:** Certificates in this trust, including the certificates that the Bank purchased, were issued

3  pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3

4  on July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was

5  
6  amended from time to time by prospectus supplements whenever a new series of certificates was

7  issued pursuant or traceable to that registration statement.

8  **Item 52.    Untrue or misleading statements about the LTVs of the mortgage loans:**

9  In the prospectus supplement, Morgan Stanley and CWALT made the following

10  statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

11  (a)    "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than

12  98.00%." CWALT 2005-86CB Pros. Sup. S-15.

13  
14  (b)    In the section of the prospectus supplement entitled "The Mortgage Pool," Morgan

15  Stanley and CWALT presented tables of statistics about the mortgage loans in the collateral pool.

16  Each table focused on a certain characteristic of the loans (for example, current principal balance)

17  and divided the loans into categories based on that characteristic (for example, loans with current

18  principal balance of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.).

19  Each table then presented various data about the loans in each category. Among these data was

20  
21  the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The

22  Mortgage Pool" section for all of the loans in the collateral pool. In each table, the number of

23  categories into which the loans were divided ranged from three to 29. Thus, in "The Mortgage

24  Pool" section, Morgan Stanley and CWALT made hundreds of statements about the original

25  LTVs of the loans in the collateral pool. CWALT 2005-86CB Pros. Sup. S-17 to S-23.

26  (c)    "As of the initial cut-off date, the weighted-average original Loan-to-Value Ratio

27  of the Initial Mortgage Loans was approximately 69.82%." CWALT 2005-86CB Pros. Sup. S-20.

28  

-2-

1    Item 62.    Details of the results of the AVM analysis:

| | |
|---|---|
| Number of loans | 4,833 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,781 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,523 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $76,470,725 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 423 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $21,568,555 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 154 |
| Weighted-average LTV, as stated by Defendants | 69.8% |
| Weighted-average LTV, as determined by the model | 76.9% |

Item 65.    Evidence from subsequent sales of refinanced properties:

Of the 4,833 mortgage loans in the collateral pool, 2,009 were taken out to refinance,

rather than to purchase, properties. For those 2,009 loans, the value (denominator) in the LTV

was an appraised value rather than a sale price. Of those 2,009 properties, 220 were subsequently

sold for a total of approximately $63,069,728. The total value ascribed to those same properties in

the LTV data reported in the prospectus supplements and other documents sent to the Bank was

$77,130,850. Thus, those properties were sold for 81.8% of the value ascribed to them, a

difference of 18.2%. This difference cannot be accounted for by declines in house prices in the

areas in which those properties were located.

Item 71.    Undisclosed additional liens:

(a)    Minimum number of properties with additional liens: 389

(b)    Total reduction in equity from additional liens: $22,022,925

(c)    Weighted-average reduction in equity from additional liens: 74.4%

-3-

1   **Item 82.     Untrue or misleading statements about compliance with USPAP:**

2          In the prospectus supplement, Morgan Stanley and CWALT made the following statement

3   about the appraisals of the properties that secured the mortgage loans originated by Countrywide:

4
5   "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

6   effect." CWALT 2005-86CB Pros. Sup. S-28.

7   **Item 88.     Untrue or misleading statements about owner-occupancy of the properties
                  that secured the mortgage loans:**

8          In the prospectus supplement, Morgan Stanley and CWALT made the following

9
10  statements about the occupancy status of the properties that secured the mortgage loans in the

11  collateral pool of this securitization.

12          (a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item

13  52, Morgan Stanley and CWALT presented a table entitled "Occupancy Types." This table

14  divided all of the loans in the collateral pool into the categories "Primary Residence,"

15  "Investment Property," and "Secondary Residence." The table made untrue and misleading

16  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

17  the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-

18
19  86CB Pros. Sup. S-22.

20          (b)     In the "Occupancy Types" table, Morgan Stanley and CWALT stated that 88.06%

21  of the mortgage loans in the collateral pool were secured by a "Primary Residence," 5.65% by an

22  "Investment Property," and 6.29% by a "Secondary Residence." CWALT 2005-86CB Pros. Sup.

23  S-22.

24  **Item 96.     Details of properties that were stated to be owner-occupied, but were not:**

25
26          (a)     **Number of loans on which the owner of the property instructed tax
                    authorities to send property tax bills to him or her at a different address: 394**

27          (b)     **Number of loans on which the owner of the property could have, but did not,
                    designate the property as his or her homestead: 482**

28
                                          -4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

      (c)     **Number of loans on which the owner of the property owned three or more properties: 28**

      (d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 789**

**Item 99.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-31 of the prospectus supplement, Morgan Stanley and CWALT

made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those

statements are incorporated here by reference. In particular, Morgan Stanley and CWALT stated

that:

      (a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

if compensating factors are demonstrated by a prospective borrower." CWALT 2005-86CB Pros.

Sup. S-27.

      (b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of

Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-86CB

Pros. Sup. S-27.

**Item 107.**     **90+ days delinquencies:**

      (a)     **Number of the mortgage loans that suffered 90+ days delinquencies: 824**

      (b)     **Percent of the mortgage loans that suffered 90+ days delinquencies: 17.0%**

      (c)     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

**Item 108.**     **30+ days delinquencies in this securitization:**

      (a)     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 887**

      (b)     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 18.4%**

-5-

(c)     **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 117.     Statements about the ratings of the certificate(s) that the Bank purchased:**

On page S-3 of the prospectus supplement, Morgan Stanley and CWALT made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley and CWALT also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") and by Moody's Investors Service, Inc. ("Moody's")." The requirement for classes A-6 and A-8, from which these certificates were to be paid, was AAA from Standard & Poor's and Aaa from Moody's. CWALT 2005-86CB Pros. Sup. S-3.

Morgan Stanley and CWALT also stated: "It is a condition to the issuance of the senior certificates that they be rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"). It is a condition to the issuance of the senior certificates (other than the Class A-3 Certificates) that they be rated "Aaa" by Moody's Investors Service, Inc. ("Moody's")." CWALT 2005-86CB Pros. Sup. S-70.

**Item 120.     Summary of loans about which the Defendants made untrue or misleading statements:**

(a)     **Number of loans whose LTVs were materially understated: 1,523**

(b)     **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 389**

(c)     **Number of loans in which the properties were stated to be owner-occupied but were not: 789**

-6-

(d)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 2,241

(e)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 46.4%

-7-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    **SCHEDULE 47 TO THE AMENDED COMPLAINT**

2        To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Morgan Stanley, CWALT, and

4    Countrywide Financial Corporation.

5

6    **Item 44.        Details of trust and certificate(s).**

7        **(a)        Dealer that sold the certificate(s) to the Bank:** Morgan Stanley.

8        **(b)        Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

9    Certificates, Series 2005-47CB was a securitization in August 2005 of 1,847 mortgage loans, in

10   one group.[5] The mortgage loans in the collateral pool of this securitization were originated or

11   acquired by Countrywide Home Loans, Inc. CWALT 2005-47CB Pros. Sup. S-3, S-14, and S-26.

12       **(c)        Description of the certificate(s) that the Bank purchased:** Morgan Stanley

13   offered and sold to the Bank two senior certificates in this securitization, in tranche A-10 and

14   tranche A-8, for which the Bank paid $99,937,500 and $66,558,877 plus accrued interest, on

15   August 31, 2005 and September 30, 2005, respectively.

16

17       **(d)        Ratings of the certificate(s) when the Bank purchased them:**

18       Certificate: A-10; Standard & Poor's— AAA; Moody's— Aaa.

19       Certificate: A-8; Standard & Poor's— AAA; Moody's— Aaa.

20       **(e)        Current ratings of the certificate(s):**

21       Certificate: A-10; Standard & Poor's— AAA; Moody's— Caa1.

22       Certificate: A-8; Standard & Poor's— AAA; Moody's— Caa1.

23

24

25

26       [5] CWALT 2005-47CB was a prefunded securitization. On the closing date of the
27   securitization there were 1,847 mortgage loans in the trust. After the closing date of the
     securitization, the trust purchased an additional 94 mortgage loans.
28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

(f)     **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1269518/000095012905008836/v11893e424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3 on July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 52.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Morgan Stanley and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2005-47CB Pros. Sup. S-15.

(b)     In the section of the prospectus supplement entitled "The Mortgage Pool," Morgan Stanley and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for all of the loans in the collateral pool. In each table, the number of categories into which the loans were divided ranged from three to 25. Thus, in "The Mortgage Pool" section, Morgan Stanley and CWALT made hundreds of statements about the original LTVs of the loans in the collateral pool. CWALT 2005-47CB Pros. Sup. S-17 to S-23.

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (c)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

2    of the Initial Mortgage Loans is approximately 73.92%." CWALT 2005-47CB Pros. Sup. S-20.

3    **Item 62.    Details of the results of the AVM analysis:**

4

| | |
|---|---|
| Number of loans | 1,941 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,170 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 596 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $27,502,411 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 199 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $10,761,917 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 87 |
| Weighted-average LTV, as stated by Defendants | 73.9% |
| Weighted-average LTV, as determined by the model | 80.6% |

14   **Item 71.    Undisclosed additional liens:**

15        **(a)    Minimum number of properties with additional liens: 240**

16        **(b)    Total reduction in equity from additional liens: $11,049,365**

17        **(c)    Weighted-average reduction in equity from additional liens: 62.8%**

18   **Item 82.    Untrue or misleading statements about compliance with USPAP:**

19        In the prospectus supplement, Morgan Stanley and CWALT made the following statement

20   about the appraisals of the properties that secured the mortgage loans originated by Countrywide:

21

22   "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

23   effect." CWALT 2005-47CB Pros. Sup. S-28.

24   **Item 88.    Untrue or misleading statements about owner-occupancy of the properties
             that secured the mortgage loans:**

25

26        In the prospectus supplement, Morgan Stanley and CWALT made the following

27   statements about the occupancy status of the properties that secured the mortgage loans in the

28   collateral pool of this securitization.

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1       (a)     In "The Mortgage Pool" section of the prospectus supplement, Morgan Stanley

2  and CWALT presented a table entitled "Occupancy Types." This table divided all of the

3  mortgage loans in the collateral pool into the categories "Primary Residence," "Investment

4
  Property," and "Secondary Residence." The table made untrue and misleading statements about
5
  the number of mortgage loans, the aggregate principal balance outstanding, and the percent of
6

7  aggregate principal balance outstanding in each of these categories. CWALT 2005-47CB Pros.

8  Sup. S-22.

9       (b)     In the "Occupancy Types" table, Morgan Stanley and CWALT stated that 93.67%

10  of the mortgage loans in the collateral pool were secured by a "Primary Residence," 2.75% by an

11  "Investment Property," and 3.59% by a "Secondary Residence." CWALT 2005-47CB Pros. Sup.

12
  S-22.
13

**Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**
14

15      **(a)**     **Number of loans on which the owner of the property instructed tax
         authorities to send property tax bills to him or her at a different address: 151**

16      **(b)**     **Number of loans on which the owner of the property could have, but did not,
17         designate the property as his or her homestead: 192**

18      **(c)**     **Number of loans on which the owner of the property owned three or more
         properties: 11**
19

20      **(d)**     **Eliminating duplicates, number of loans about which one or more of
         statements (a) through (c) is true: 301**

21
**Item 99.**    **Untrue or misleading statements about the underwriting standards of the
22         originators of the mortgage loans:**

23      On pages S-26 through S-31 of the prospectus supplement, Morgan Stanley and CWALT

24  made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those

25  statements are incorporated here by reference. In particular, Morgan Stanley and CWALT stated

26  that:
27

28

-4-

1     (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

2 if compensating factors are demonstrated by a prospective borrower." CWALT 2005-47CB Pros.

3 Sup. S-27.

4
5     (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

6 Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

7 ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-47CB

8 Pros. Sup. S-27.

9 **Item 107.**    **90+ days delinquencies:**

10     **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies: 299**

11     **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies: 15.4%**

12     **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
13         made at the same time as the loans in the collateral pool that suffered 90+
14         days delinquencies: 16.5%**

15 **Item 108.**    **30+ days delinquencies in this securitization:**

16     **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31,
         2010: 312**

17     **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31,
18         2010: 16.1%**

19     **(c)**    **Percent of all mortgage loans in the United States that were 30+ days
20         delinquent on March 31, 2010: 14.7%**

21 **Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

22     On page S-3 of the prospectus supplement, Morgan Stanley and CWALT made statements

23 about the ratings assigned to the certificates issued in this securitization. Morgan Stanley and

24 CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and

25 AAA by Standard & Poor's Rating Services. These were the highest ratings available from these

26 two rating agencies.

27
28
-5-

1   Morgan Stanley and CWALT also stated: "The classes of certificates listed below will not

2   be offered unless they are assigned the following ratings by Standard and Poor's Ratings

3   Services, a division of The McGraw-Hill Companies, Inc. ("S&P") and Moody's Investors

4   Service, Inc. ("Moody's")." The requirement for classes A-10 and A-8, from which these

5

6   certificates were to be paid, was for AAA from Standard & Poor's and Aaa from Moody's.

7   CWALT 2005-47CB Pros. Sup. S-3.

8       Morgan Stanley and CWALT also stated: "It is a condition to the issuance of the senior

9   certificates other than the Class A-1, Class A-4, Class A-5 and Class A-6 Certificates, that they be

10  rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P")

11  and "Aaa" by Moody's Investors Service, Inc. ("Moody's")." CWALT 2005-47CB Pros. Sup. S-

12  77.

13

14  **Item 120.    Summary of loans about which the Defendants made untrue or misleading
               statements:**

15

16      (a)   **Number of loans whose LTVs were materially understated: 596**

17      (b)   **Number of loans in which the owner's equity was reduced by 5% or more by
               undisclosed additional liens: 240**

18

19      (c)   **Number of loans in which the properties were stated to be owner-occupied
               but were not: 301**

20      (d)   **Eliminating duplicates, number of loans about which the Defendants made
               untrue or misleading statements: 923**

21

22      (e)   **Eliminating duplicates, percent of loans about which the Defendants made
               untrue or misleading statements: 47.6%**

23

24

25

26

27

28

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

## SCHEDULE 48 TO THE AMENDED COMPLAINT

2      To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants UBS and MAST.

4    **Item 44.          Details of trust and certificate(s).**

5          **(a)      Dealer that sold the certificate(s) to the Bank: UBS.**

6

7          **(b)      Description of the trust:** MASTR Adjustable Rate Mortgages Trust, Mortgage

8    Pass-Through Certificates, Series 2007-2 was a securitization in February 2007 of 1,355

9    mortgage loans, in one group. The mortgage loans in the collateral pool of this securitization were

10   originated by Countrywide Home Loans, Inc. and various undisclosed originators. Countrywide

11   Home Loans, Inc. originated or acquired 99.29% of all of the loans in the collateral pool. MARM

12   2007-2 Pros. Sup. S-10 and S-33.

13
         **(c)      Description of the certificate(s) that the Bank purchased:** UBS offered and sold
14
     to the Bank a senior certificate in this securitization, in tranche A-1, for which the Bank paid
15
     $143,000,000 plus accrued interest on February 27, 2007.
16

17         **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard &

18   Poor's— AAA; Moody's— Aaa.

19         **(e)      Current ratings of the certificate(s):** Standard & Poor's— CCC; Moody's—

20   Caa1.

21
           **(f)      URL of prospectus supplement for this securitization:**
22
     http://www.sec.gov/Archives/edgar/data/815018/000116231807000230/combined.htm.
23

24   **Item 52.          Untrue or misleading statements about the LTVs of the mortgage loans:**

25         In the prospectus supplement, UBS and MAST made the following statements about the

26   LTVs of the mortgage loans in the collateral pool of this securitization.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (a)    The original LTVs of the mortgage loans in the collateral pool ranged from 8.17%

2    to 95%, with a weighted average of 72.7%. MARM 2007-2 Pros. Sup. S-12.

3    (b)    "Approximately 1.22% of the loans (by aggregate principal balance as of the cut-

4

5    off date) had loan-to-value ratios in excess of 80%, but no more than 100% at origination."

6    MARM 2007-2 Pros. Sup. S-25.

7    (c)    "Approximately 1.22% of the Loans, by Cut-Off Date Pool Balance of the Loans,

8    had LTV Ratios at origination of greater than 80% . . . ." MARM 2007-2 Pros. Sup. S-31.

9    (d)    "[A]s of the Cut-Off Date, the range of original Loan-to-Value Ratios of the Loans

10    is approximately 8.17% to 95.00% and approximately 1.22% of the Loans by aggregate Stated

11    Principal Balance of the loans as of the Cut-Off Date, had Loan-to-Value Ratios at origination in

12

13    excess of 80%." MARM 2007-2 Pros. Sup. S-90.

14    (e)    In Annex II of the prospectus supplement ("Mortgage Loan Statistical

15    Information"), UBS and MAST presented tables of statistics about all of the mortgage loans in

16    the collateral pool. MARM 2007-2 Pros. Sup. II-4 to II-11. Each table focused on a certain

17    characteristic of the loans (for example, original principal balance) and divided the loans into

18    categories based on that characteristic (for example, loans with original principal balances of

19    $200,000 or less, $200,001 to $250,000, $250,001 to $300,000, etc.). Each table then presented

20

21    various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value

22    Ratios," divided the loans into 10 categories of original LTV (for example, 50% or less, 50.01%

23    to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the

24    number of mortgage loans, the aggregate principal balance outstanding, and the percent of

25    aggregate principal balance outstanding in each of these categories. MARM 2007-2 Pros. Sup. II-

26    8.

27

28

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1     (f)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Loans,

2 by Cut-Off Date Pool Balance of the Loans, was approximately 72.70% per annum." MARM

3 2007-2 Pros. Sup. II-8.

4
5 **Item 62.**    **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,355 |
| Number of properties on which there was enough information for the model to determine a true market value | 634 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 446 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $93,653,923 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 46 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,445,060 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 107 |
| Weighted-average LTV, as stated by Defendants | 72.7% |
| Weighted-average LTV, as determined by the model | 91.2% |

**Item 65.**    **Evidence from subsequent sales of refinanced properties:**

Of the 1,355 mortgage loans in the collateral pool, 815 were taken out to refinance, rather than to purchase, properties. For those 815 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 815 properties, 10 were subsequently sold for a total of approximately $5,443,077. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents sent to the Bank was $7,733,000. Thus, those properties were sold for 70.4% of the value ascribed to them, a difference of 29.6%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71.**    **Undisclosed additional liens:**

   **(a)**    **Minimum number of properties with additional liens: 104**

   **(b)**    **Total reduction in equity from additional liens: $14,325,816**

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)