1    (c)    Weighted-average reduction in equity from additional liens: 57.5%

2    **Item 82.    Untrue or misleading statements about compliance with USPAP:**

3    In the prospectus supplement, UBS and MAST made the following statement about the

4    appraisals of the properties that secured the mortgage loans originated by Countrywide: "All

5    appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

6    effect." MARM 2007-2 Pros. Sup. S-36.

7

8    **Item 88.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

9    In the prospectus supplement, UBS and MAST made the following statements about the

10   occupancy status of the properties that secured the mortgage loans in the collateral pool of this

11   securitization.

12

13   (a)    In Annex II of the prospectus supplement, described in Item 52, UBS and MAST

14   presented a table entitled "Occupancy Status." This table divided all of the mortgage loans in the

15   collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue

16   and misleading statements about the number of mortgage loans, the aggregate principal balance

17   outstanding, and the percent of aggregate principal balance outstanding in each of these

18   categories. MARM 2007-2 Pros. Sup. II-9.

19

20   (b)    In the "Occupancy Status" table, UBS and MAST stated that 83.3% of the

21   mortgage loans in the collateral pool were secured by a "Primary" residence, 10.77% by an

22   "Investor" property, and 5.92% by a "Secondary" residence. MARM 2007-2 Pros. Sup. II-9.

23   **Item 96.    Details of properties that were stated to be owner-occupied, but were not:**

24   **(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 81**

25

26   **(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 149**

27

28

-4-

   (c)   **Number of loans on which the owner of the property owned three or more properties: 19**

   (d)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 215**

**Item 99.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-34 through S-39 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 99.29% of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference. In particular, UBS and MAST stated that:

   (a)   "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." MARM 2007-2 Pros. Sup. S-35.

   (b)   "Countrywide Home Loans' underwriting standards are applied by, or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." MARM 2007-2 Pros. Sup. S-35.

**Item 106.**   **Early payment defaults:**

   (d)   **Number of the mortgage loans that suffered EPDs: 37**

   (e)   **Percent of the mortgage loans that suffered EPDs: 2.7%**

   (f)   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%**

**Item 107.**   **90+ days delinquencies:**

   (a)   **Number of the mortgage loans that suffered 90+ days delinquencies: 588**

   (b)   **Percent of the mortgage loans that suffered 90+ days delinquencies: 43.4%**

-5-

(c) Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 33.9%

**Item 108.** 30+ days delinquencies in this securitization:

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 573

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 42.3%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item 117.** Statements about the ratings of the certificate(s) that the Bank purchased:

On page S-7 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated that: "It is a condition to the issuance of the offered certificates that they receive the ratings set forth in the table entitled 'The Series 2007-2 Certificates' beginning on page S-7 in this prospectus supplement." MARM 2007-2 Pros. Sup. S-107.

**Item 120.** Summary of loans about which the Defendants made untrue or misleading statements:

(a) Number of loans whose LTVs were materially understated: 446

(b) Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 104

(c) Number of loans that suffered EPDs: 37

(d) Number of loans in which the properties were stated to be owner-occupied but were not: 215

-6-

(e)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 602

(f)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 44.4%

-7-

1

2 **SCHEDULE 49 TO THE AMENDED COMPLAINT**

3 To the extent that this Schedule is incorporated by reference into allegations in the

4 complaint, those allegations are made against Defendants UBS and MAST.

5 **Item 44.** **Details of trust and certificate(s).**

6     **(a)** **Dealer that sold the certificate(s) to the Bank:** UBS.

7     **(b)** **Description of the trust:** MASTR Alternative Loan Trust, Mortgage Pass-

8 Through Certificates, Series 2005-6 was a securitization in November 2005 of 2,539 mortgage

9 loans, in three groups. The mortgage loans in the collateral pool of this securitization were

10 previously acquired by UBS Real Estate Securities Inc. from Impac Funding Corporation,

11 IndyMac, F.S.B., JPMorgan Chase Bank, N.A., MortgageIT, Inc., SunTrust Mortgage, Inc., and

12 various undisclosed loan sellers. MALT 2005-6 Pros. Sup. S-8.

13

14     **(c)** **Description of the certificate(s) that the Bank purchased:** UBS offered and sold

15 to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which the Bank paid

16 $247,470,703 plus accrued interest on November 30, 2005.

17

18     **(d)** **Ratings of the certificate(s) when the Bank purchased them:** Standard &

19 Poor's— AAA; Moody's— Aaa.

20     **(e)** **Current ratings of the certificate(s):** Standard & Poor's— CCC; Moody's— B2.

21     **(f)** **URL of prospectus supplement for this securitization:**

22 http://www.sec.gov/Archives/edgar/data/815018/000112528205006282/b409994_424b5.txt.

23 **Item 52.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

24 In the prospectus summary, UBS and MAST made the following statements about the

25 LTVs of the mortgage loans in the collateral pool of this securitization.

26

27

28

-8-

1    (a)    "Approximately 17.24% of the Loans, by Cut-Off Date Pool Balance for all the

2    Loan Groups, had LTV Ratios at origination of greater than 80% . . . ." MALT 2005-6 Pros. Sup.

3    S-28.

4    (b)    In Annex A of the prospectus supplement ("Mortgage Loan Statistical

5    Information"), UBS and MAST presented tables of statistics about all of the mortgage loans in

6    the collateral pool. MALT 2005-6 Pros. Sup. A-1 to A-24. Each table focused on a certain

7    characteristic of the loans (for example, current principal balance) and divided the loans into

8    categories based on that characteristic (for example, loans with current principal balances of $1 to

9    $25,000, $25,001 to $50,000, $50,001 to $75,000, etc.). Each table then presented various data

10   about the loans in each category. One of the tables, entitled "Original LTV Ratios," divided the

11   loans in Group 1 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%,

12   55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

13   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

14   principal balance outstanding in each of these categories. MALT 2005-6 Pros. Sup. A-2.

15   (c)    "The weighted average original LTV Ratio of the Group 1 Loans, by Cut-Off Date

16   Pool Balance of the Group 1 Loans, was approximately 73.06." MALT 2005-6 Pros. Sup. A-2.

17   (d)    In Annex A, UBS and MAST presented another table entitled "Original LTV

18   Ratios." This table divided the mortgage loans in Group 2 into 11 categories of original LTV (for

19   example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

20   misleading statements about the number of mortgage loans, the aggregate principal balance

21   outstanding, and the percent of aggregate principal balance outstanding in each of these

22   categories. MALT 2005-6 Pros. Sup. A-7.

23   (e)    "The weighted average original LTV Ratio of the Group 2 Loans, by Cut-Off Date

24   Pool Balance of the Group 2 Loans, was approximately 78.10%." MALT 2005-6 Pros. Sup. A-7.

-9-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1        (f)     In Annex A, UBS and MAST presented another table entitled "Original LTV

2  Ratios." This table divided the loans in Pool 1, which consisted of all of the loans in Groups 1 and

3  2, into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%,

4

5  etc.). The table made untrue and misleading statements about the number of mortgage loans, the

6  aggregate principal balance outstanding, and the percent of aggregate principal balance

7  outstanding in each of these categories. MALT 2005-6 Pros. Sup. A-12.

8        (g)     "The weighted average original LTV Ratio of the Pool 1 Loans, by Cut-Off Date

9  Pool Balance of the Pool 1 Loans, was approximately 73.67%." MALT 2005-6 Pros. Sup. A-12.

10        (h)     In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

11  Value Ratios." This table divided the mortgage loans in Group 3 into nine categories of original

12  LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

13

14  misleading statements about the number of mortgage loans, the aggregate principal balance

15  outstanding, and the percent of aggregate principal balance outstanding in each of these

16  categories. MALT 2005-6 Pros. Sup. A-17.

17        (i)     "The weighted average original LTV Ratio of the Group 3 Loans by Cut-Off Date

18  Pool Balance of the Group 3 Loans, was approximately 60.63%." MALT 2005-6 Pros. Sup. A-17.

19        (j)     In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

20  Value Ratios." This table divided all of the mortgage loans in the collateral pool into 11

21  categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The

22

23  table made untrue and misleading statements about the number of mortgage loans, the aggregate

24  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

25  of these categories. MALT 2005-6 Pros. Sup. A-21.

26        (k)     "The weighted average original LTV Ratio of the Loans, by Cut-Off Date Pool

27  Balance of the Loans, was approximately 72.23%." MALT 2005-6 Pros. Sup. A-21.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

**Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,539 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,502 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 780 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $68,534,076 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 241 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $17,193,600 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 262 |
| Weighted-average LTV, as stated by Defendants | 72.2% |
| Weighted-average LTV, as determined by the model | 79.7% |

**Item 65.     Evidence from subsequent sales of refinanced properties:**

Of the 2,539 mortgage loans in the collateral pool, 1,117 were taken out to refinance, rather than to purchase, properties. For those 1,117 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,117 properties, 131 were subsequently sold for a total of approximately $52,548,384. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents sent to the Bank was $59,585,612. Thus, those properties were sold for 88.2% of the value ascribed to them, a difference of 11.8%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71.     Undisclosed additional liens:**

     **(a)     Minimum number of properties with additional liens: 161**

     **(b)     Total reduction in equity from additional liens: $16,882,582**

     **(d)     Weighted-average reduction in equity from additional liens: 51.8%**

-11-

**Item 82.** **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and MAST made the following statements about the appraisals of the properties that secured the mortgage loans in the collateral pool of this securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." MALT 2005-6 Pros. Sup. S-30.

**Item 88.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex A of the prospectus supplement, described in Item 52, UBS and MAST presented a table entitled "Occupancy Status." This table divided the mortgage loans in Group 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2005-6 Pros. Sup. A-3.

(b) In the "Occupancy Status" table, UBS and MAST stated that 89.97% of the mortgage loans in Group 1 were secured by a "Primary" residence, 7.26% by an "Investor" property, and 2.77% by a "Secondary" residence. MALT 2005-6 Pros. Sup. A-3.

(c) In Annex A, UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Group 2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage

-12-

1    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

2    outstanding in each of these categories. MALT 2005-6 Pros. Sup. A-8.

3        (d)    In the "Occupancy Status" table, UBS and MAST stated that 88.07% of the

4    mortgage loans in Group 2 were secured by a "Primary" residence, 8.85% by an "Investor"

5

6    property, and 3.08% by a "Secondary" residence. MALT 2005-6 Pros. Sup. A-8.

7        (e)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

8    This table divided the loans in Pool 1, which consisted of all of the loans in Groups 1 and 2, into

9    the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading

10    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

11    the percent of aggregate principal balance outstanding in each of these categories. MALT 2005-6

12    Pros. Sup. A-12.

13

14        (f)    In the "Occupancy Status" table, UBS stated that 89.74% of the mortgage loans in

15    Pool 1 were secured by a "Primary" residence, 7.45% by an "Investor" property, and 2.8% by a

16    "Secondary" residence. MALT 2005-6 Pros. Sup. A-12.

17        (g)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

18    This table divided the mortgage loans in Group 3 into the categories "Primary," "Investor," and

19    "Secondary." The table made untrue and misleading statements about the number of mortgage

20

21    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

22    outstanding in each of these categories. MALT 2005-6 Pros. Sup. A-17.

23        (h)    In the "Occupancy Status" table, UBS and MAST stated that 84.64% of the

24    mortgage loans in Group 3 , by aggregate principal balance, were secured by a "Primary"

25    residence, 9.7% by an "Investor" property, and 5.66% by a "Secondary" residence. MALT 2005-

26    6 Pros. Sup. A-17.

27

28

-13-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

(i)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status." This table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2005-6 Pros. Sup. A-22.

(j)     In the "Occupancy Status" table, UBS and MAST stated that 89.18% of the mortgage loans in the collateral pool of this securitization were secured by a "Primary" residence, 7.7% by an "Investor" property, and 3.12% by a "Secondary" residence. MALT 2005-6 Pros. Sup. A-22.

**Item 96.      Details of properties that were stated to be owner-occupied, but were not:**

    **(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 206**

    **(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 371**

    **(c)     Number of loans on which the owner of the property owned three or more properties: 21**

    **(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 1**

    **(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 513**

**Item 99.      Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-29 through S-30 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of all of the originators of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference. In particular, UBS and MAST stated that:

-14-

(a)     "[E]xceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower." MALT 2005-6 Pros. Sup. S-29.

(b)     "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator." MALT 2005-6 Pros. Sup. S-30.

On pages S-30 through S-38 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of Impac Funding Corporation, which originated or acquired more than 10% of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference. In particular, UBS and MAST stated that:

(c)     "Impac uses the following parameters as guidelines only. On a case-by-case basis, Impac may determine that the prospective mortgagor warrants an exception outside the standard program guidelines. An exception may be allowed if the loan application reflects certain compensating factors . . . ." MALT 2005-6 Pros. Sup. S-30 to 31.

(d)     "The following provisions apply to all of the Mortgage Loans originated under Impac's Progressive Series Program and Progressive Express ™ Program . . . has net worth substantial enough to suggest that repayment of the loan is within the prospective mortgagor's ability. . . ." MALT 2005-6 Pros. Sup. S-30 through S-31.

(e)     "The underwriting guidelines utilized in the Progressive Series Program, as developed by Impac, are intended to assess the borrower's ability and willingness to repay the mortgage loan obligation and to assess the adequacy of the mortgaged property as collateral for the mortgage loan." MALT 2005-6 Pros. Sup. S-31.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

| | | |
|---|---|---|
| 1 | **Item 106.** | **Early payment defaults:** |
| 2 | **(a)** | **Number of the mortgage loans that suffered EPDs: 7** |
| 3 | **(b)** | **Percent of the mortgage loans that suffered EPDs: 0.3%** |
| 4. 5 | **(c)** | **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%** |
| 6 | **Item 107.** | **90+ days delinquencies:** |
| 7 | **(a)** | **Number of the mortgage loans that suffered 90+ days delinquencies: 377** |
| 8 | **(b)** | **Percent of the mortgage loans that suffered 90+ days delinquencies: 14.8%** |
| 9 10 | **(c)** | **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%** |
| 10 | **Item 108.** | **30+ days delinquencies in this securitization:** |
| 11 12 | **(a)** | **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 381** |
| 13 14 | **(b)** | **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 15.0%** |
| 15 | **(c)** | **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%** |
| 16 | **Item 117.** | **Statements about the ratings of the certificate(s) that the Bank purchased:** |

On page S-5 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth in the table beginning on page S-5 by each of Moody's Investors Service, Inc. and Standard & Poor's Ratings Services . . . ." MALT 2005-6 Pros. Sup. S-16.

-16-

1     UBS and MAST also stated that: "It is a condition to the original issuance of the offered

2     certificates that each class of offered certificates will have received the ratings set forth on the

3     table beginning on page S-5 of this prospectus supplement." MALT 2005-6 Pros. Sup. S-91

4     **Item 120.** **Summary of loans about which the Defendants made untrue or misleading**
5               **statements:**

6          (a)    **Number of loans whose LTVs were materially understated: 780**

7          (b)    **Number of loans in which the owner's equity was reduced by 5% or more by**
8                 **undisclosed additional liens: 161**

9          (c)    **Number of loans that suffered EPDs: 7**

10         (d)    **Number of loans in which the properties were stated to be owner-occupied**
11                **but were not: 513**

12         (e)    **Eliminating duplicates, number of loans about which the Defendants made**
                  **untrue or misleading statements: 1,235**

13         (f)    **Eliminating duplicates, percent of loans about which the Defendants made**
14                **untrue or misleading statements: 48.6%**

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          -17-

**SCHEDULE 50 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants UBS and MAST.

**Item 44.      Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** UBS.

(b)      **Description of the trust:** MASTR Adjustable Rate Mortgages Trust, Mortgage Pass-Through Certificates, Series 2005-7 was a securitization in August of 2005 of 1,567 mortgage loans, in three groups. The mortgage loans in the collateral pool of this securitization were previously acquired by UBS Real Estate Securities Inc. from Countrywide Home Loans, Inc., Market Street Mortgage Corporation, MortgageIT, Inc., SunTrust Mortgage, Inc., Lydian Private Bank, and various undisclosed originators. MortgageIT, Inc. originated or acquired 28.86% of all of the loans in the collateral pool, and SunTrust Mortgage, Inc. originated or acquired 22.35%. MARM 2005-7 Pros. Sup. S-6, S-27 and S-29.

(c)      **Description of the certificate(s) that the Bank purchased:** UBS Securities offered and sold to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which the Bank paid $74,065,301 plus accrued interest on August 30, 2005.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's— AAA; Moody's— Aaa.

(e)      **Current ratings of the certificate(s):** Standard & Poor's— CCC; Moody's— Caa3.

(f)      **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/815018/000116231805000739/m388_424b.htm.

-18-

1    **Item 52.       Untrue or misleading statements about the LTVs of the mortgage loans:**

2         In the prospectus supplement, UBS and MAST made the following statements about the

3    LTVs of the mortgage loans in the collateral pool of this securitization.

4         (a)     The original LTVs of the mortgage loans in Group 1 ranged from 45.45% to 95%,

5
     with a weighted average of 79.87%. MARM 2005-7 Pros. Sup. S-8 .
6

7         (b)     The original LTVs of the mortgage loans in Group 2 ranged from 9.28% to 100%,

8    with a weighted average of 75.25%. MARM 2005-7 Pros. Sup. S-9.

9         (c)     The original LTVs of the mortgage loans in Group 3 ranged from 42.64% to 97%,

10   with a weighted average of 77.78%. MARM 2005-7 Pros. Sup. S-9.

11        (d)     The original LTVs of all of the mortgage loans in the collateral pool ranged from

12
     9.28% to 100%, with a weighted average of 76.52%. MARM 2005-7 Pros. Sup. S-9.
13

14        (e)     "Approximately 6.41% of the loans had loan-to-value ratios at origination in

15   excess of 80%." MARM 2005-7 Pros. Sup. S-18.

16        (f)     "Approximately 6.41% of the Loans, by Cut-Off Date Pool Balance of the Loans,

17   had LTV Ratios at origination of greater than 80% . . . ." MARM 2005-7 Pros. Sup. S-23.

18        (g)     In Annex A of the prospectus supplement, ("Mortgage Loan Statistical

19   Information"), UBS and MAST presented tables of statistics about the mortgage loans in the

20   collateral pool. MARM 2005-7 Pros. Sup. A-1 to A-25. Each table focused on a certain

21
     characteristic of the loans (for example, original principal balance) and divided the loans into
22

23   categories based on that characteristic (for example, loans with original principal balances of

24   $200,000 or less, $200,001 to $250,000, $250,001 to $300,000, etc,). Each table then presented

25   various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value

26   Ratios," divided the loans in Group 1 into 10 categories of original LTV (for example, 50% or

27   less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements

28
                                              -19-

1    about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

2    of aggregate principal balance outstanding in each of these categories. MARM 2005-7 Pros. Sup.

3    A-4.

4
5    (h)      "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 1

6    loans, by Cut-Off Date Pool Balance of the Group 1 Loans, was approximately 79.87% per

7    annum." MARM 2005-7 Pros. Sup. A-4.

8    (i)      In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

9    Value Ratios." This table divided the mortgage loans in Group 2 into 11 categories of original

10   LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

11   misleading statements about the number of mortgage loans, the aggregate principal balance

12   outstanding, and the percent of aggregate principal balance outstanding in each of these

13
14   categories. MARM 2005-7 Pros. Sup. A-11.

15   (j)      "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 2

16   loans, by Cut-Off Date Pool Balance of the Group 2 Loans, was approximately 75.25% per

17   annum." MARM 2005-7 Pros. Sup. A-11.

18   (k)      In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

19   Value Ratios." This table divided the mortgage loans in Group 3 into nine categories of original

20
21   LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

22   misleading statements about the number of mortgage loans, the aggregate principal balance

23   outstanding, and the percent of aggregate principal balance outstanding in each of these

24   categories. MARM 2005-7 Pros. Sup. A-17.

25   (l)      "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 3

26   loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 77.78% per

27   annum." MARM 2005-7 Pros. Sup. A-17.

28

-20-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    (m)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

2    Value Ratios." This table divided all of the mortgage loans in the collateral pool into 11

3    categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The

4    table made untrue and misleading statements about the number of mortgage loans, the aggregate

5
6    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

7    of these categories. MARM 2005-7 Pros. Sup. A-22.

8    (n)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Loans in

9    the Aggregate, by Cut-Off Date Pool Balance of the Loans in the Aggregate, was approximately

10    76.52% per annum." MARM 2005-7 Pros. Sup. A-22.

11    **Item 62.**    **Details of the results of the AVM analysis:**

12

| | |
|---|---|
| Number of loans | 1,567 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,042 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 533 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $29,849,212 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 171 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,126,934 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 96 |
| Weighted-average LTV, as stated by Defendants | 76.5% |
| Weighted-average LTV, as determined by the model | 85.3% |

22    **Item 65.**    **Evidence from subsequent sales of refinanced properties:**

23    Of the 1,567 mortgage loans in the collateral pool, 390 were taken out to refinance, rather

24    than to purchase, properties. For those 390 loans, the value (denominator) in the LTV was an

25    appraised value rather than a sale price. Of those 390 properties, 78 were subsequently sold for a

26    total of approximately $27,187,655. The total value ascribed to those same properties in the LTV

27    data reported in the prospectus supplement and other documents sent to the Bank was

28
-21-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   $31,655,095. Thus, those properties were sold for 85.9% of the value ascribed to them, a

2   difference of 14.1%. This difference cannot be accounted for by declines in house prices in the

3   areas in which those properties were located.

4   **Item 71.      Undisclosed additional liens:**

5       **(a)      Minimum number of properties with additional liens: 809**

6

7       **(b)      Total reduction in equity from additional liens: $51,112,092**

8       **(c)      Weighted-average reduction in equity from additional liens: 86.2%**

    **Item 82.      Untrue or misleading statements about compliance with USPAP:**

9

10      In the prospectus supplement, UBS and MAST made the following statement about the

11  appraisals of the properties that secured the mortgage loans in the collateral pool of this

12  securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal

13  Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . ." MARM

14  2005-7 Pros. Sup. S-26.

15  **Item 88.      Untrue or misleading statements about owner-occupancy of the properties
            that secured the mortgage loans:**
16

17      In the prospectus supplement, UBS and MAST made the following statements about the

18  occupancy status of the properties that secured the mortgage loans in the collateral pool of this

19  securitization.

20      (a)      In Annex A of the prospectus supplement, described in Item 52, UBS and MAST

21  presented a table entitled "Occupancy Status." This table divided the mortgage loans in Group 1

22  into the categories "Primary," "Investor," and "Secondary." The table made untrue and

23  misleading statements about the number of mortgage loans, the aggregate principal balance

24  outstanding, and the percent of aggregate principal balance outstanding in each of these

25  categories. MARM 2005-7 Pros. Sup. A-4.

26

27

28

-22-

1       (b)     In the "Occupancy Status" table, UBS and MAST stated that 64.37% of the

2 mortgage loans in Group 1 were secured by a "Primary" residence, 30.21% by an "Investor"

3 property, and 5.42% by a "Secondary" residence. MARM 2005-7 Pros. Sup. A-4.

4

5       (c)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

6 This table divided the mortgage loans in Group 2 into the categories "Primary," "Investor," and

7 "Secondary." The table made untrue and misleading statements about the number of mortgage

8 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

9 outstanding in each of these categories. MARM 2005-7 Pros. Sup. A-11.

10      (d)     In the "Occupancy Status" table, UBS and MAST stated that 83.4% of the

11 mortgage loans in Group 2 were secured by a "Primary" residence, 8.92% by an "Investor"

12 property, and 7.68% by a "Secondary" residence. MARM 2005-7 Pros. Sup. A-11.

13

14      (e)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

15 This table divided the mortgage loans in Group 3 into the categories "Primary," "Investor," and

16 "Secondary." The table made untrue and misleading statements about the number of mortgage

17 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

18 outstanding in each of these categories. MARM 2005-7 Pros. Sup. A-17.

19      (f)     In the "Occupancy Status" table, UBS and MAST stated that 89.86% of the

20 mortgage loans in Group 3 were secured by a "Primary" residence, 9.11% by an "Investor"

21 property, and 1.02% by a "Secondary" residence. MARM 2005-7 Pros. Sup. A-17.

22

23      (g)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

24 This table divided all of the mortgage loans in the collateral pool into the categories "Primary,"

25 "Investor," and "Secondary." The table made untrue and misleading statements about the number

26 of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

27 principal balance outstanding in each of these categories. MARM 2005-7 Pros. Sup. A-23.

28

-23-

| | | |
|---|---|---|
| 1 | (h) | In the "Occupancy Status" table, UBS and MAST stated that 79.76% of the |

2 mortgage loans in the collateral pool were secured by a "Primary" residence, 13.69% by an

3 "Investor" property, and 6.55% by a "Secondary" residence. MARM 2005-7 Pros. Sup. A-23.

4

5 **Item 96.** **Details of properties that were stated to be owner-occupied, but were not:**

6 **(a)** **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 102**

7

8 **(b)** **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 192**

9 **(c)** **Number of loans on which the owner of the property owned three or more properties: 11**

10

11 **(d)** **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 251**

12 **Item 99.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

13

14 On pages S-25 through S-27 of the prospectus supplement, UBS and MAST made

15 statements about the underwriting guidelines of the originators of all of the mortgage loans in the

16 collateral pool of this securitization. All of those statements are incorporated here by reference. In

17 particular, UBS and MAST stated that:

18 (a) "[E]xceptions to the underwriting standards described in this prospectus

19

20 supplement are made in the event that compensating factors are demonstrated by a prospective

21 borrower." MARM 2005-7 Pros. Sup. S-25.

22 (b) "The adequacy of the mortgaged property as security for repayment of the related

23 mortgage loan will generally have been determined by an appraisal in accordance with pre-

24 established appraisal procedure guidelines for appraisals established by or acceptable to the

25 originator." MARM 2005-7 Pros. Sup. S-26.

26

27

28

-24-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    On pages S-27 through S-29 of the prospectus supplement, UBS and MAST made

2    statements about the underwriting guidelines of MortgageIT, Inc. All of those statements are

3    incorporated here by reference. In particular, UBS and MAST stated that:

4
       (c)    "[E]xceptions to these underwriting guidelines are considered, so long as the
5
6    borrower has other reasonable compensating factors, on a case-by-case basis." MARM 2005-7

7    Pros. Sup. S-29.

8        (d)    "When evaluating the ratio of all monthly debt payments to the borrower's

9    monthly income (debt-to-income ratio), the underwriter should be aware of the degree and

10   frequency of credit usage and its impact on the borrower's ability to repay the loan." MARM

11   2005-7 Pros. Sup. S-27.

12
     On pages S-29 through S-30 of the prospectus supplement, UBS and MAST made
13
14   statements about the underwriting guidelines of SunTrust Mortgage, Inc. All of those statements

15   are incorporated here by reference. In particular, UBS and MAST stated that:

16       (e)    "They are designed to evaluate the borrower's capacity to repay the loan, to

17   evaluate the credit history of the borrower, to verify the availability of funds required for closing

18   and cash reserves for fully documented loans, and to evaluate the acceptability and marketability

19   of the property to be used as collateral." MARM 2005-7 Pros. Sup. S-29.

20
     **Item 106.    Early payment defaults:**
21
22       **(a)    Number of the mortgage loans that suffered EPDs: 15**

         **(b)    Percent of the mortgage loans that suffered EPDs: 1.0%**
23
         **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**
24            **made at the same time as the loans in the collateral pool that experienced**
              **EPDs: 0.18%**
25
     **Item 107.    90+ days delinquencies:**
26
         **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 369**
27
         **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 23.5%**
28

-25-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

    (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

**Item 108.**    **30+ days delinquencies in this securitization:**

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 364**

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 23.2%**

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On page S-5 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth in the table beginning on page S-5 by each of Standard and Poor's Ratings Services . . . and Moody's Investors Service, Inc." MARM 2005-7 Pros. Sup. S-12.

UBS and MAST also stated that: "It is a condition to the original issuance of the offered certificates that each class of offered certificates will have received the ratings set forth on the table beginning on page S-5 of this prospectus supplement." MARM 2005-7 Pros. Sup. S-70.

**Item 120.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

    (a)    **Number of loans whose LTVs were materially understated: 533**

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 809**

    (c)    **Number of loans that suffered EPDs: 15**

-26-

1

2    (d)   Number of loans in which the properties were stated to be owner-occupied but were not: 251

3    (e)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,086

4

5    (f)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 69.3%

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-27-

1
2          **SCHEDULE 51 TO THE AMENDED COMPLAINT**

3          To the extent that this Schedule is incorporated by reference into allegations in the

4     complaint, those allegations are made against Defendants UBS and MAST.

5     **Item 44.        Details of trust and certificate(s).**

6          **(a)     Dealer that sold the certificate(s) to the Bank: UBS.**

7          **(b)     Description of the trust:** MASTR Adjustable Rate Mortgages Trust, Mortgage

8     Pass-Through Certificates, Series 2005-3 was a securitization in March 2005 of 1,064 mortgage
9
      loans, in five groups. The mortgage loans in the collateral pool of this securitization were
10
      previously acquired by UBS Real Estate Securities Inc. from GreenPoint Mortgage Funding, Inc.,
11
12    National City Mortgage Co., Secured Bankers Mortgage Company, SouthStar Funding, LLC, and

13    various undisclosed originators. MARM 2005-3 Pros. Sup. S-7 to S-8. GreenPoint Mortgage

14    Funding, Inc originated 27.61% of all of the loans in the collateral pool. MARM 2005-3 Pros.

15    Sup. S-32.

16         **(c)     Description of the certificate(s) that the Bank purchased:** UBS offered and sold
17
18    to the Bank a senior certificate in this securitization, in tranche 3-A-1, for which the Bank paid

19    $93,582,528 plus accrued interest on March 31, 2005.

20         **(d)     Ratings of the certificate(s) when the Bank purchased them:** Standard &

21    Poor's— AAA; Moody's— Aaa.

22         **(e)     Current ratings of the certificate(s):** Standard & Poor's— A+; Moody's— B3.

23         **(f)     URL of prospectus supplement for this securitization:**
24
      http://www.sec.gov/Archives/edgar/data/815018/000095011705001187/a39506.txt.
25
26    **Item 52.        Untrue or misleading statements about the LTVs of the mortgage loans:**

27         In the prospectus supplement, UBS and MAST made the following statements about the

28    LTVs of the mortgage loans in the collateral pool of this securitization.

      SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (a)    The original LTVs of the mortgage loans in Group 1 ranged from 12% to 95%,

2    with a weighted average of 76.3%. MARM 2005-3 Pros. Sup. S-10.

3    (b)    The original LTVs of the mortgage loans in Group 2 ranged from 13.84% to 95%,

4    with a weighted average of 77.78%. MARM 2005-3 Pros. Sup. S-10.

5

6    (c)    The original LTVs of the mortgage loans in Group 3 ranged from 16.67% to 95%,

7    with a weighted average of 75.65%. MARM 2005-3 Pros. Sup. S-11.

8    (d)    The original LTVs of the mortgage loans in Group 4 ranged from 25.41% to 95%,

9    with a weighted average of 73.05%. MARM 2005-3 Pros. Sup. S-11.

10    (e)    The original LTVs of the mortgage loans in Group 5 ranged from 49.26% to 95%,

11    with a weighted average of 74.23%. MARM 2005-3 Pros. Sup. S-12.

12

13    (f)    The original LTVs of all of the mortgage loans in the collateral pool ranged from

14    12% to 95%, with a weighted average of 76.24%. MARM 2005-3 Pros. Sup. S-12.

15    (g)    "Approximately 5.19% of the loans had loan-to-value ratios at origination in

16    excess of 80%." MARM 2005-3 Pros. Sup. S-22.

17    (h)    "Approximately 5.19% of the Loans, by Cut-Off Date Pool Balance of the Loans,

18    had LTV Ratios at origination of greater than 80% . . . ." MARM 2005-3 Pros. Sup. S-27.

19    (i)    In Annex A of the prospectus supplement ("Mortgage Loan Statistical

20
     Information"), UBS and MAST presented tables of statistics about the mortgage loans in the
21
     collateral pool. MARM 2005-3 Pros. Sup. A-1 through A-44. Each table focused on a certain
22
23    characteristic of the loans (for example, original principal balance) and divided the loans into

24    categories based on that characteristic (for example, loans with original principal balances of

25    $200,000 or less, $200,001 to $250,000, $250,001 to $300,000, etc.). Each table then presented

26    various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value

27    Ratios," divided the loans in Group 1 into 10 categories of original LTV (for example, 50% or

28

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements

2   about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

3   of aggregate principal balance outstanding in each of these categories. MARM 2005-3 Pros. Sup.

4   A-5.

5

6   (j)   "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 1

7   Loans, by Cut-Off Date Pool Balance of the Group 1 Loans, was approximately 76.30%."

8   MARM 2005-3 Pros. Sup. A-5.

9   (k)   In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

10  Value Ratios." This table divided the mortgage loans in Group 2 into 10 categories of original

11  LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

12  misleading statements about the number of mortgage loans, the aggregate principal balance

13
    outstanding, and the percent of aggregate principal balance outstanding in each of these
14
    categories. MARM 2005-3 Pros. Sup. A-12.
15

16  (l)   "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 2

17  Loans, by Cut-Off Date Pool Balance of the Group 2 Loans, was approximately 77.78%."

18  MARM 2005-3 Pros. Sup. A-12.

19  (m)   In Annex A, UBS and MAST presented another table entitled "Original Loan-to-
20
    Value Ratios." This table divided the mortgage loans in Group 3 into 10 categories of original
21
22  LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

23  misleading statements about the number of mortgage loans, the aggregate principal balance

24  outstanding, and the percent of aggregate principal balance outstanding in each of these

25  categories. MARM 2005-3 Pros. Sup. A-19.

26

27

28

-3-



1      (n)     "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 3

2    Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 75.65%."

3    MARM 2005-3 Pros. Sup. A-19.

4
       (o)     In Annex A, UBS and MAST presented another table entitled "Original Loan-to-
5
6    Value Ratios." This table divided the mortgage loans in Group 4 into 10 categories of original

7    LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

8    misleading statements about the number of mortgage loans, the aggregate principal balance

9    outstanding, and the percent of aggregate principal balance outstanding in each of these

10   categories. MARM 2005-3 Pros. Sup. A-26.

11
       (p)     "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 4
12
     Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was approximately 73.05%."
13

14   MARM 2005-3 Pros. Sup. A-26.

15     (q)     In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

16   Value Ratios." This table divided the mortgage loans in Group 5 into nine categories of original

17   LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

18   misleading statements about the number of mortgage loans, the aggregate principal balance

19   outstanding, and the percent of aggregate principal balance outstanding in each of these
20
     categories. MARM 2005-3 Pros. Sup. A-32.
21

22     (r)     "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 5

23   Loans, by Cut-Off Date Pool Balance of the Group 5 Loans, was approximately 74.23%."

24   MARM 2005-3 Pros. Sup. A-32.

25
       (s)     In Annex A, UBS and MAST presented another table entitled "Original Loan-to-
26
     Value Ratios." This table divided all of the mortgage loans in the collateral pool into 10
27
     categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The
28

-4-

1  table made untrue and misleading statements about the number of mortgage loans, the aggregate

2  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

3  of these categories. MARM 2005-3 Pros. Sup. A-41.

4      (t)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Loans in

5
   the aggregate, by Cut-Off Date Pool Balance of the Loans in the aggregate, was approximately
6

7  76.24%." MARM 2005-3 Pros. Sup. A-41.

8  **Item 62.    Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,064 |
| Number of properties on which there was enough information for the model to determine a true market value | 726 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 356 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $22,699,657 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 123 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,194,450 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 53 |
| Weighted-average LTV, as stated by Defendants | 76.2% |
| Weighted-average LTV, as determined by the model | 84.8% |

18
19  **Item 71.    Undisclosed additional liens:**

20      **(a)    Minimum number of properties with additional liens: 79**

21      **(b)    Total reduction in equity from additional liens: $4,467,341**

22      **(c)    Weighted-average reduction in equity from additional liens: 57.5%**

23  **Item 82.    Untrue or misleading statements about compliance with USPAP:**

24     In the prospectus supplement, UBS and MAST made the following statement about the

25  appraisals of the properties that secured the mortgage loans in the collateral pool of this

26  securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal

27
28
                                -5-

1  Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on

2  forms acceptable to Fannie Mae and/or Freddie Mac." MARM 2005-3 Pros. Sup. S-32.

3  **Item 88.        Untrue or misleading statements about owner-occupancy of the properties
4          that secured the mortgage loans:**

5      In the prospectus supplement, UBS and MAST made the following statements about the

6  occupancy status of the properties that secured the mortgage loans in the collateral pool of this

7  securitization.

8      (a)    In Annex A of the prospectus supplement, described in Item 52, UBS and MAST
9
10 presented a table entitled "Occupancy Status." This table divided the mortgage loans in Group 1

11 into the categories "Primary," "Investor," and "Secondary." The table made untrue and

12 misleading statements about the number of mortgage loans, the aggregate principal balance

13 outstanding, and the percent of aggregate principal balance outstanding in each of these

14 categories. MARM 2005-3 Pros. Sup. A-6.

15     (b)    In the "Occupancy Status" table, UBS and MAST stated that 73.94% of the
16 mortgage loans in Group 1 were secured by a "Primary" residence, 23.16% by an "Investor"
17
18 property, and 2.89% by a "Secondary" residence. MARM 2005-3 Pros. Sup. A-6.

19     (c)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

20 This table divided the mortgage loans in Group 2 into the categories "Primary," "Investor," and

21 "Secondary." The table made untrue and misleading statements about the number of mortgage

22 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

23 outstanding in each of these categories. MARM 2005-3 Pros. Sup. A-12.
24
25     (d)    In the "Occupancy Status" table, UBS and MAST stated that 95.2% of the

26 mortgage loans in Group 2 were secured by a "Primary" residence, 4.33% by an "Investor"

27 property, and 0.47% by a "Secondary" residence. MARM 2005-3 Pros. Sup. A-12.

28
-6-
SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (e)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

2    This table divided the mortgage loans in Group 3 into the categories "Primary," "Investor," and

3    "Secondary." The table made untrue and misleading statements about the number of mortgage

4    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

5

6    outstanding in each of these categories. MARM 2005-3 Pros. Sup. A-20.

7    (f)    In the "Occupancy Status" table, UBS and MAST stated that 82.76% of the

8    mortgage loans in Group 3 were secured by a "Primary" residence, 12.19% by an "Investor"

9    property, and 5.06% by a "Secondary" residence. MARM 2005-3 Pros. Sup. A-20.

10    (g)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

11    This table divided the mortgage loans in Group 4 into the categories "Primary," "Investor," and

12    "Secondary." The table made untrue and misleading statements about the number of mortgage

13

14    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

15    outstanding in each of these categories. MARM 2005-3 Pros. Sup. A-26.

16    (h)    In the "Occupancy Status" table, UBS and MAST stated that 79.59% of the

17    mortgage loans in Group 4 were secured by a "Primary" residence, 18.67% by an "Investor"

18    property, and 1.74% by a "Secondary" residence. MARM 2005-3 Pros. Sup. A-26.

19

20    (i)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

21    This table divided the mortgage loans in Group 5 into the categories "Primary," "Investor," and

22    "Secondary." The table made untrue and misleading statements about the number of mortgage

23    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

24    outstanding in each of these categories. MARM 2005-3 Pros. Sup. A-32.

25    (j)    In the "Occupancy Status" table, UBS and MAST stated that 97.25% of the

26    mortgage loans in Group 5 were secured by a "Primary" residence, 1.83% by an "Investor"

27    property, and 0.92% by a "Secondary" residence. MARM 2005-3 Pros. Sup. A-32.

28

-7-

(k)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status." This table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2005-3 Pros. Sup. A-41.

(l)     In the "Occupancy Status" table, UBS and MAST stated that 84.54% of all of the mortgage loans in the collateral pool were secured by a "Primary" residence, 12.53% by an "Investor" property, and 2.94% by a "Secondary" residence. MARM 2005-3 Pros. Sup. A-41.

**Item 96.     Details of properties that were stated to be owner-occupied, but were not:**

     **(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 74**

     **(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 112**

     **(c)     Number of loans on which the owner of the property owned three or more properties: 6**

     **(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 2**

     **(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 167**

**Item 99.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-30 through S-32 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of the originators of all of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference. In particular, UBS and MAST stated that:

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)



1    (a)    "[E]xceptions to the underwriting standards described in this prospectus

2 supplement are made in the event that compensating factors are demonstrated by a prospective

3 borrower." MARM 2005-3 Pros. Sup. S-31.

4
     (b)    "The adequacy of the mortgaged property as security for repayment of the related
5
6 Loan will generally have been determined by an appraisal in accordance with pre-established

7 appraisal procedure guidelines for appraisals established by or acceptable to the originator."

8 MARM 2005-3 Pros. Sup. S-32.

9         On S-32 through S-33 of the prospectus supplement, UBS and MAST made statements

10 about the underwriting guidelines of GreenPoint Mortgage Funding, Inc. All of those statements

11 are incorporated here by reference. In particular, UBS and MAST stated that:

12
     (c)    "Exceptions to the GreenPoint Underwriting Guidelines are permitted where
13
14 compensating factors are present." MARM 2005-3 Pros. Sup. S-32.

15    (d)    "Generally, the GreenPoint Underwriting Guidelines are applied to evaluate the

16 prospective borrower's credit standing and repayment ability and the value and adequacy of the

17 mortgaged property as collateral." MARM 2005-3 Pros. Sup. S-32.

18 **Item 106.    Early payment defaults:**

19    **(a)    Number of the mortgage loans that suffered EPDs: 10**

20    **(b)    Percent of the mortgage loans that suffered EPDs: 0.9%**

21
     **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage
22        loans made at the same time as the loans in the collateral pool that
         experienced EPDs: 0.18%**
23
24 **Item 107.    90+ days delinquencies:**

25    **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 174**

26    **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 16.4%**

27

28
                                -9-

(c) Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%

**Item 108.** 30+ days delinquencies in this securitization:

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 168

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 15.8%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item 117.** Statements about the ratings of the certificate(s) that the Bank purchased:

On page S-5 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth in the table beginning on page S-5 by each of Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies and Moody's Investors Service Inc." MARM 2005-3 Pros. Sup. S-15.

UBS and MAST also stated that: "It is a condition to the original issuance of the offered certificates that each class of offered certificates will have received the ratings set forth on the table beginning on page S-5 of this prospectus supplement." MARM 2005-3 Pros. Sup. S-77.

**Item 120.** Summary of loans about which the Defendants made untrue or misleading statements:

(a) Number of loans whose LTVs were materially understated: 356

(b) Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 79

(c) Number of loans that suffered EPDs: 10

-10-

(d)  Number of loans in which the properties were stated to be owner-occupied but were not: 167

(e)  Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 515

(f)  Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.4%

-11-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

2       **SCHEDULE 52 TO THE AMENDED COMPLAINT**

3       To the extent that this Schedule is incorporated by reference into allegations in the

4       complaint, those allegations are made against Defendants UBS and MAST.

5       **Item 44.    Details of trust and certificate(s).**

6           **(a)    Dealer that sold the certificate(s) to the Bank: UBS.**

7           **(b)    Description of the trust:** MASTR Adjustable Rate Mortgages Trust, Mortgage

8
9       Pass-Through Certificates, Series 2005-2 was a securitization in February 2005 of 2,046

10      mortgage loans, in seven groups. The mortgage loans in the collateral group of this securitization

11      were previously acquired by UBS Real Estate Securities Inc. from GreenPoint Mortgage Funding,

12      Inc., MortgageIT, Inc., PHH Mortgage Corporation, Provident Funding Associates, L.P., and

13      various undisclosed originators. MARM 2005-2 Pros. Sup. S-7. GreenPoint Mortgage Funding

14      originated 33.88% of all of the loans in the collateral pool, and Provident Funding Associates,

15      L.P. originated 21.55%. MARM 2005-2 Pros. Sup. S-32.

16          **(c)    Description of the certificate(s) that the Bank purchased:** UBS offered and sold
17
18      to the Bank a senior certificate in this securitization, in tranche 7-A-1, for which the Bank paid

19      $96,918,066 plus accrued interest on February 28, 2005.

20          **(d)    Ratings of the certificate(s) when the Bank purchased them:** Standard &

21      Poor's— AAA; Moody's— Aaa.

22          **(e)    Current ratings of the certificate(s):** Standard & Poor's— AA+; Moody's—

23      Caa2.
24
25          **(f)    URL of prospectus supplement for this securitization:**

26      http://www.sec.gov/Archives/edgar/data/815018/000095011705000759/a39305.txt.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1 **Item 52.    Untrue or misleading statements about the LTVs of the mortgage loans:**

2       In the prospectus supplement, UBS and MAST made the following statements about the

3  LTVs of the mortgage loans in the collateral pool of this securitization.

4       (a)    The original LTVs of the mortgage loans in Group 1 ranged from 50.52% to

5
6  100%, with a weighted average of 76.98%. MARM 2005-2 Pros. Sup. S-10.

7       (b)    The original LTVs of the mortgage loans in Group 2 ranged from 44.01% to

8  94.97%, with a weighted average of 79.22%. MARM 2005-2 Pros. Sup. S-10.

9       (c)    The original LTVs of the mortgage loans in Group 3 ranged from 28.75% to 95%,

10  with a weighted average of 75.83%.MARM 2005-2 Pros. Sup. S-10.

11       (d)    The original LTVs of the mortgage loans in Group 4 ranged from 75.94% to 95%,

12  with a weighted average of 79.94%. MARM 2005-2 Pros. Sup. S-11.

13
14       (e)    The original LTVs of the mortgage loans in Group 5 ranged from 30.61% to 95%,

15  with a weighted average of 73.14%. MARM 2005-2 Pros. Sup. S-11.

16       (f)    The original LTVs of the mortgage loans in Group 6 ranged from 25.48% to

17  100%, with a weighted average of 73.97%. MARM 2005-2 Pros. Sup. S-11.

18       (g)    The original LTVs of the mortgage loans in Group 7 ranged from 22.74% to

19  100%, with a weighted average of 74.23%. MARM 2005-2 Pros. Sup. S-12.

20       (h)    The original LTVs of all of the mortgage loans in the collateral pool ranged from

21
22  22.74% to 100%., with a weighted average of 75.82%. MARM 2005-2 Pros. Sup. S-12.

23       (i)    "Approximately 2.85% of the loans had loan-to-value ratios at origination in

24  excess of 80%." MARM 2005-2 Pros. Sup. S-21.

25       (j)    "Approximately 2.85% of the Loans, by Cut-Off Date Pool Balance of the Loans,

26  had LTV Ratios at origination of greater than 80%." MARM 2005-2 Pros. Sup. S-26.

27

28
                                    -2-

1    (k)    In Annex A of the prospectus supplement ("Mortgage Loan Statistical

2    Information"), UBS and MAST presented tables of statistics about the mortgage loans in the

3    collateral pool. MARM 2005-2 Pros. Sup. A-1 through A-59. Each table focused on a certain

4    characteristic of the loans (for example, original principal balance) and divided the loans into

5

6    categories based on that characteristic (for example, original principal balances of $200,000 or

7    less, $200,001 to $250,000, $250,001 to $300,000, etc.). Each table then presented various data

8    about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios,"

9    divided the loans in Group 1 into 10 categories of original LTV (for example, 50.01% to 55%,

10   55.01% to 60%, 60.01% to 65%, etc.). The table made untrue and misleading statements about

11   the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

12   aggregate principal balance outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-

13   5.

14

15   (l)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 1

16   Loans, by Cut-Off Date Pool Balance of the Group 1 Loans, was approximately 76.98%."

17   MARM 2005-2 Pros. Sup. A-5.

18   (m)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

19   Value Ratios." This table divided the mortgage loans in Group 2 into 10 categories of original

20   LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

21

22   misleading statements about the number of mortgage loans, the aggregate principal balance

23   outstanding, and the percent of aggregate principal balance outstanding in each of these

24   categories. MARM 2005-2 Pros. Sup. A-12.

25   (n)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 2

26   Loans, by Cut-Off Date Pool Balance of the Group 2 Loans, was approximately 79.22%."

27   MARM 2005-2 Pros. Sup. A-12.

28

-3-

1    (o)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-
2  Value Ratios." This table divided the mortgage loans in Group 3 into 10 categories of original
3  LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and
4  misleading statements about the number of mortgage loans, the aggregate principal balance
5
6  outstanding, and the percent of aggregate principal balance outstanding in each of these
7  categories. MARM 2005-2 Pros. Sup. A-19.

8    (p)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 3
9  Loans, by Cut-Off Date Pool Balance of the Group 3 Loans, was approximately 75.83%."
10  MARM 2005-2 Pros. Sup. A-19.

11    (q)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-
12  Value Ratios." This table divided the mortgage loans in Group 4 into four categories of original
13  LTV (75.01% to 80%, 80.01% to 85%, 85.01% to 90%, etc.). The table made untrue and
14  misleading statements about the number of mortgage loans, the aggregate principal balance
15  outstanding, and the percent of aggregate principal balance outstanding in each of these
16  categories. MARM 2005-2 Pros. Sup. A-26.
17

18    (r)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 4
19  Loans, by Cut-Off Date Pool Balance of the Group 4 Loans, was approximately 79.94%."
20  MARM 2005-2 Pros. Sup. A-26.
21

22    (s)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-
23  Value Ratios." This table divided the mortgage loans in Group 5 into 10 categories of original
24  LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and
25  misleading statements about the number of mortgage loans, the aggregate principal balance
26  outstanding, and the percent of aggregate principal balance outstanding in each of these
27  categories. MARM 2005-2 Pros. Sup. A-33.
28

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    (t)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 5

2    Loans, by Cut-Off Date Pool Balance of the Group 5 Loans, was approximately 73.14%.".

3    MARM 2005-2 Pros. Sup. A-33.

4    (u)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

5

6    Value Ratios." This table divided the mortgage loans in Group 6 into 11 categories of original

7    LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

8    misleading statements about the number of mortgage loans, the aggregate principal balance

9    outstanding, and the percent of aggregate principal balance outstanding in each of these

10    categories. MARM 2005-2 Pros. Sup. A-40.

11    (v)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the

12

13    Group 6 Loans, by Cut-Off Date Pool Balance of the Group 6 Loans, was approximately

14    73.97%." MARM 2005-2 Pros. Sup. A-40.

15    (w)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

16    Value Ratios." This table divided the mortgage loans in Group 7 into 11 categories of original

17    LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

18    misleading statements about the number of mortgage loans, the aggregate principal balance

19    outstanding, and the percent of aggregate principal balance outstanding in each of these

20

21    categories. MARM 2005-2 Pros. Sup. A-47.

22    (x)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group 7

23    Loans, by Cut-Off Date Pool Balance of the Group 7 Loans, was approximately 74.23%."

24    MARM 2005-2 Pros. Sup. A-47.

25    (y)    In Annex A, UBS and MAST presented another table entitled "Original Loan-to-

26    Value Ratios." This table divided all of the loans in the collateral pool into 11 categories of

27    original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made

28

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

 

1  untrue and misleading statements about the number of mortgage loans, the aggregate principal

2  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

3  categories. MARM 2005-2 Pros. Sup. A-56.

4
5          (z)     "As of the Cut-Off Date, the weighted average original LTV Ratio of the Loans in

6  the aggregate, by Cut-Off Date Pool Balance of the Loans in the aggregate, was approximately

7  75.82%." MARM 2005-2 Pros. Sup. A-56.

8  **Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,046 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,408 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 659 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $46,016,427 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 226 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,629,617 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 108 |
| Weighted-average LTV, as stated by Defendants | 75.8% |
| Weighted-average LTV, as determined by the model | 83.7% |

19  **Item 71.     Undisclosed additional liens:**

20          **(a)     Minimum number of properties with additional liens: 155**

21          **(b)     Total reduction in equity from additional liens: $13,591,362**

22          **(c)     Weighted-average reduction in equity from additional liens: 61.8%**

23  **Item 82.     Untrue or misleading statements about compliance with USPAP:**

24          In the prospectus supplement, UBS and MAST made the following statement about the

25  appraisals of the properties that secured the mortgage loans in the collateral pool of this

26  securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal

27

28                                              -6-

1   Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on

2   forms acceptable to Fannie Mae and/or Freddie Mac." MARM 2005-2 Pros. Sup. S-31.

3
4   **Item 88.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

5      In the prospectus supplement, UBS and MAST made the following statements about the

6   status of the properties that secured the mortgage loans in the collateral pool of this securitization.

7      (a)     In Annex A of the prospectus supplement, described in Item 52, UBS and MAST

8
9   presented a table entitled "Occupancy Status." This table divided the mortgage loans in Group 1

10   into the categories "Primary," "Investor," and "Secondary." The table made untrue and

11   misleading statements about the number of mortgage loans, the aggregate principal balance

12   outstanding, and the percent of aggregate principal balance outstanding in each of these

13   categories. MARM 2005-2 Pros. Sup. A-6.

14      (b)     In the "Occupancy Status" table, UBS and MAST stated that 77.18% of the

15   mortgage loans in Group 1, by aggregate principal balance, were secured by a "Primary"

16
17   residence, 16.07% by an "Investor" property, and 6.75% by a "Secondary" residence. MARM

18   2005-2 Pros. Sup. A-6.

19      (c)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

20   This table divided the mortgage loans in Group 2 into the categories "Primary," "Investor," and

21   "Secondary." The table made untrue and misleading statements about the number of mortgage

22   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

23   outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-12.

24
25      (d)     In the "Occupancy Status" table, UBS and MAST stated that 92.52% of the

26   mortgage loans in Group 2, by aggregate principal balance, were secured by a "Primary"

27   residence, 5.04% by an "Investor" property, and 2.44% by a "Secondary" residence. MARM

28   2005-2 Pros. Sup. A-12.

-7-

1      (e)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

2 This table divided the mortgage loans in Group 3 into the categories "Primary," "Investor," and

3 "Secondary." The table made untrue and misleading statements about the number of mortgage

4
5 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

6 outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-20.

7      (f)    In the "Occupancy Status" table, UBS and MAST stated that 91.66% of the

8 mortgage loans in Group 3 were secured by a "Primary" residence, 3.49% by an "Investor"

9 property, and 4.55% by a "Secondary" residence. MARM 2005-2 Pros. Sup. A-20.

10      (g)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

11 This table divided the loans in Group 4 into the categories "Primary," "Investor," and

12
13 "Secondary." The table made untrue and misleading statements about the number of mortgage

14 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

15 outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-26.

16      (h)    In the "Occupancy Status" table, UBS and MAST stated that 97.02% of the

17 mortgage loans in Group 4 were secured by a "Primary" residence, 2.11% by an "Investor"

18 property, and 0.87% by a "Secondary" residence. MARM 2005-2 Pros. Sup. A-26.

19      (i)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

20
21 This table divided the mortgage loans in Group 5 into the categories "Primary," "Investor," and

22 "Secondary." The table made untrue and misleading statements about the number of mortgage

23 loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

24 outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-34.

25      (j)    In the "Occupancy Status" table, UBS and MAST stated that 94.64% of the

26 mortgage loans in Group 5 were secured by a "Primary" residence, 3.25% by an "Investor"

27 property, and 2.1% by a "Secondary" residence. MARM 2005-2 Pros. Sup. A-34.

28

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

(k)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Group 6 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-40.

(l)     In the "Occupancy Status" table, UBS and MAST stated that 88.99% of the mortgage loans in Group 6 of this securitization were secured by a "Primary" residence, 6.78% by an "Investor" property, and 4.22% by a "Secondary" residence. MARM 2005-2 Pros. Sup. A-40.

(m)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Group 7 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-48.

(n)     In the "Occupancy Status" table, UBS and MAST stated that 90.5% of the mortgage loans in Group 7 were secured by a "Primary" residence, 6.38% by an "Investor" property, and 3.13% by a "Secondary" residence. MARM 2005-2 Pros. Sup. A-48.

(o)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status." This table divided all of the loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2005-2 Pros. Sup. A-57.

(p)     In the "Occupancy Status" table, UBS and MAST stated that 92.02% of the mortgage loans in the collateral pool were secured by a "Primary" residence, 4.77% by an "Investor" property, and 3.22% by a "Secondary" residence. MARM 2005-2 Pros. Sup. A-57.

-9-

**Item 96.**     **Details of properties that were stated to be owner-occupied, but were not:**

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 139

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 274

(c)     Number of loans on which the owner of the property owned three or more properties: 11

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 362

**Item 99.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-30 through S-32 of the prospectus supplement, UBS and MAST made

statements about the underwriting guidelines of the originators of all of the mortgage loans in the

collateral pool of this securitization. All of those statements are incorporated herein by reference.

In particular, UBS and MAST stated that:

(a)     "[E]xceptions to the underwriting standards described in this prospectus

supplement are made in the event that compensating factors are demonstrated by a prospective

borrower." MARM-2 005-2 Pros. Sup. S-30.

(b)     "The adequacy of the mortgaged property as security for repayment of the related

Loan will generally have been determined by an appraisal in accordance with pre-established

appraisal procedure guidelines for appraisals established by or acceptable to the originator."

MARM 2005-2 Pros. Sup. S-31.

On page S-32 of the prospectus supplement, UBS and MAST made statements about the

underwriting guidelines of GreenPoint Mortgage Funding, Inc. All of those statements are

incorporated here by reference. In particular, UBS and MAST stated that:

(c)     "Exceptions to the GreenPoint Underwriting Guidelines are permitted where

compensating factors are present." MARM 2005-2 Pros. Sup. S-32.

-10-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)




1    (d)    "Generally, the GreenPoint Underwriting Guidelines are applied to evaluate the

2    prospective borrower's credit standing and repayment ability and the value and adequacy of the

3    mortgaged property as collateral." MARM 2005-2 Pros. Sup. S-32.

4    On pages S-32 through S-33 of the prospectus supplement, UBS and MAST made

5    statements about the underwriting guidelines of Provident Funding Associates, L.P. All of those

6

7    statements are incorporated here by reference. In particular, UBS and MAST stated that:

8    (e)    "From time to time, exceptions to Provident's underwriting policies may be made.

9    Such exceptions may be made on a loan-by-loan basis at the discretion of Provident's senior

10   management. Such exceptions may be made on a loan-by-loan basis at the discretion of

11   Provident's senior management. Exceptions may be made after careful consideration of certain

12   mitigating factors . . . ." MARM 2005-2 Pros. Sup. S-33.

13

14   (f)    "Underwriting standards are applied by or on behalf of Provident to evaluate a

15   borrower's credit standing and repayment ability, and the value and adequacy of the related

16   mortgaged property as collateral." MARM 2005-2 Pros. Sup. S-33.

17   **Item 106.    Early payment defaults:**

18       **(a)    Number of the mortgage loans that suffered EPDs: 12**

19       **(b)    Percent of the mortgage loans that suffered EPDs: 0.6%**

20       **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
21       made at the same time as the loans in the collateral pool that experienced
         EPDs: 0.18%**

22

23   **Item 107.    90+ days delinquencies:**

24       **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 339**

25       **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 16.6%**

26       **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
         made at the same time as the loans in the collateral pool that suffered 90+
27       days delinquencies: 16.5%**

28

-11-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)




**Item 108.**   **30+ days delinquencies in this securitization:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 311**

    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 15.2%**

    **(c)**   **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 117.**   **Statements about the ratings of the certificate(s) that the Bank purchased:**

On page S-5 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth in the table beginning on page S-5 by each of Standard and Poor's Ratings Services, . . . Dominion Bond Rating Service, Inc. and Moody's Investors Service Inc." MARM 2005-2 Pros. Sup. S-15.

UBS and MAST also stated that: "It is a condition to the original issuance of the offered certificates that each class of offered certificates will have received the ratings set forth on the table beginning on page S-5 of this prospectus supplement." MARM 2005-2 Pros. Sup. S-79.

**Item 120.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated: 659**

    **(b)**   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 155**

    **(c)**   **Number of loans that suffered EPDs: 12**

    **(d)**   **Number of loans in which the properties were stated to be owner-occupied but were not: 362**

-12-

1    (e)    Eliminating duplicates, number of loans about which the Defendants made
2           untrue or misleading statements: 1,002

3    (f)    Eliminating duplicates, percent of loans about which the Defendants made
4           untrue or misleading statements: 49.0%

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    -13-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1
2

## SCHEDULE 53 TO THE AMENDED COMPLAINT

3      To the extent that this Schedule is incorporated by reference into allegations in the

4   complaint, those allegations are made against Defendants UBS and MAST.

5   **Item 44.      Details of trust and certificate(s).**

6      **(a)      Dealer that sold the certificate(s) to the Bank:** UBS.

7      **(b)      Description of the trust:** MASTR Alternative Loan Trust, Mortgage Pass-

8
Through Certificates, Series 2005-1 was a securitization in January 2005 of 3,339 mortgage
9
loans, in seven groups. The mortgage loans in the collateral pool of this securitization were
10
previously acquired by UBS Real Estate Securities Inc. from Cendant Mortgage Corporation,
11
Chase Home Finance LLC, CitiMortgage, Inc., GMAC Mortgage Corporation, RBC Mortgage
12
Company, and Wachovia Mortgage Corporation. MALT 2005-1 Pros. Sup. S-7.
13

14      **(c)      Description of the certificate(s) that the Bank purchased:** UBS offered and sold

15   to the Bank a senior certificate in this securitization, in tranche 6-A-4, for which the Bank paid

16   $114,547,734 plus accrued interest on January 31, 2005.

17
18      **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard &

19   Poor's— AAA; Fitch— AAA.

20      **(e)      Current ratings of the certificate(s):** Standard & Poor's— AAA; Fitch— A.

21      **(f)      URL of prospectus supplement for this securitization:**

22   http://www.sec.gov/Archives/edgar/data/815018/000112528205000308/b404216_424b.txt.

23   **Item 52.      Untrue or misleading statements about the LTVs of the mortgage loans:**

24      In the prospectus supplement, UBS and MAST made the following statements about the
25
LTVs of the mortgage loans in the collateral pool of this securitization.
26

27      (a)      The original LTVs of the mortgage loans in Group 1 ranged from 16.67% to 90%,

28   with a weighted average of 67%. MALT 2005-1 Pros. Sup. S-10.

-14-




(b)     The original LTVs of the mortgage loans in Group 2 loans ranged from 8.59% to 90%, with a weighted average of 69.89%. MALT 2005-1 Pros. Sup. S-10.

(c)     The original LTVs of the mortgage loans in Group 3 ranged from 15.56% to 94.92%, with a weighted average of 76.81%.MALT 2005-1 Pros. Sup. S-11.

(d)     The original LTVs of the mortgage loans in Group 4 ranged from 14.42% to 90%, with a weighted average of 62.17%. MALT 2005-1 Pros. Sup. S-11.

(e)     The original LTVs of the mortgage loans in Group 5 ranged from 11.54% to 90%, with a weighted average of 64.13%. MALT 2005-1 Pros. Sup. S-11.

(f)     The original LTVs of the mortgage loans in Group 6 ranged from 15.63% to 100%, with a weighted average of 79.79%. MALT 2005-1 Pros. Sup. S-12.

(g)     The original LTVs of the mortgage loans in Group 7 ranged from 20.67% to 100%, with a weighted average of 81.24%. MALT 2005-1 Pros. Sup. S-12.

(h)     The original LTVs of all of the mortgage loans in the collateral pool ranged from 8.59% to 100%, with a weighted average of 75.4%. MALT 2005-1 Pros. Sup. S-12.

(i)     The original LTVs of all of the mortgage loans in Groups 6 and 7 ranged from 15.63% to 100%, with a weighted average of 80.03%. MALT 2005-1 Pros. Sup. S-13.

(j)     The original LTVs of all of the mortgage loans in Groups 1 through 5 ranged from 8.59% to 94.92%, with a weighted average of 69.85%. MALT 2005-1 Pros. Sup. S-13.

(k)     "Approximately 25.79% of the loans had loan to value ratios at origination in excess of 80%." MALT 2005-1 Pros. Sup. S-20.

(l)     "Approximately 25.79% of the Loans, by Cut-Off Date Pool Balance for all of the Loan Groups, had LTV Ratios at origination of greater than 80% . . . ." MALT 2005-1 Pros. Sup. S-26.

-15-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)



(m)     In Annex A of the prospectus supplement ("Mortgage Loan Statistical Information"), UBS and MAST presented tables of statistics about the mortgage loans in the collateral pool. MALT 2005-1 Pros. Sup. S-104 through S-148. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $1 to $25,000, $25,001 to $50,000, $50,001 to $75,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original LTV Ratios," divided the loans in Group 1 into nine categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2005-1 Pros. Sup. S-105.

(n)     "The weighted average original LTV Ratio of the Group 1 Loans, by Cut-Off Date Pool Balance of the Group 1 Loans, was approximately 67.00%." MALT 2005-1 Pros. Sup. S-105.

(o)     In Annex A, UBS and MAST presented another table entitled "Original LTV Ratios." This table divided the mortgage loans in Group 2 into nine categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2005-1 Pros. Sup. S-109.

(p)     "The weighted average original LTV Ratio of the Group 2 Loans, by Cut-Off Date Pool Balance of the Group 2 Loans, was approximately 69.89%." MALT 2005-1 Pros. Sup. S-109.

-16-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)



1    (q)    In Annex A, UBS and MAST presented another table entitled "Original LTV

2    Ratios." This table divided the mortgage loans in Group 3 into 10 categories of original LTV (for

3    example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

4    misleading statements about the number of mortgage loans, the aggregate principal balance

5    outstanding, and the percent of aggregate principal balance outstanding in each of these

6    
7    categories. MALT 2005-1 Pros. Sup. S-113.

8    (r)    "The weighted average original LTV Ratio of the Group 3 Loans, by Cut-Off Date

9    Pool Balance of the Group 3 Loans, was approximately 76.81%." MALT 2005-1 Pros. Sup.

10   S-113.

11   (s)    In Annex A, UBS and MAST presented another table entitled "Original LTV

12   Ratios." This table divided the mortgage loans in Group 4 into nine categories of original LTV

13   (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

14   misleading statements about the number of mortgage loans, the aggregate principal balance

15   
16   outstanding, and the percent of aggregate principal balance outstanding in each of these

17   categories. MALT 2005-1 Pros. Sup. S-117.

18   (t)    "The weighted average original LTV Ratio of the Group 4 Loans, by Cut-Off Date

19   Pool Balance of the Group 4 Loans, was approximately 62.17%." MALT 2005-1 Pros. Sup.

20   
21   S-117.

22   (u)    In Annex A, UBS and MAST presented another table entitled "Original LTV

23   Ratios." This table divided the mortgage loans in Group 5 into nine categories of original LTV

24   (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

25   misleading statements about the number of mortgage loans, the aggregate principal balance

26   outstanding, and the percent of aggregate principal balance outstanding in each of these

27   categories. MALT 2005-1 Pros. Sup. S-121.

28   

-17-



1   (v)     "The weighted average original LTV Ratio of the Group 5 Loans, by Cut-Off Date

2   Pool Balance of the Group 5 Loans, was approximately 64.13%." MALT 2005-1 Pros. Sup.

3   S-121.

4
5   (w)     In Annex A, UBS and MAST presented another table entitled "Original LTV

6   Ratios." This table divided the mortgage loans in Group 6 into 11 categories of original LTV (for

7   example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

8   misleading statements about the number of mortgage loans, the aggregate principal balance

9   outstanding, and the percent of aggregate principal balance outstanding in each of these

10  categories. MALT 2005-1 Pros. Sup. S-124.

11  (x)     "The weighted average original LTV Ratio of the Group 6 Loans, by Cut-Off Date

12
13  Pool Balance of the Group 6 Loans, was approximately 79.79%." MALT 2005-1 Pros. Sup.

14  S-124.

15  (y)     In Annex A, UBS and MAST presented another table entitled "Original LTV

16  Ratios." This table divided the mortgage loans in Group 7 into 11 categories of original LTV (for

17  example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

18  misleading statements about the number of mortgage loans, the aggregate principal balance

19  outstanding, and the percent of aggregate principal balance outstanding in each of these
20
21  categories. MALT 2005-1 Pros. Sup. S-128.

22  (z)     "The weighted average original LTV Ratio of the Group 7 Loans, by Cut-Off Date

23  Pool Balance of the Group 7 Loans, was approximately 81.24%." MALT 2005-1 Pros. Sup.

24  S-128.

25  (aa)    In Annex A, UBS and MAST presented another table entitled "Original LTV

26  Ratios." This table divided all of the mortgage loans in the collateral pool into 11 categories of
27
28  original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made

-18-

 

1  untrue and misleading statements about the number of mortgage loans, the aggregate principal

2  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

3  categories. MALT 2005-1 Pros. Sup. S-134.

4
5  (bb)   "The weighted average original LTV Ratio of the Loans, by Cut-Off Date Pool

6  Balance of the Loans, was approximately 75.40%." MALT 2005-1 Pros. Sup. S-134.

7  (cc)   In Annex A, UBS and MAST presented another table entitled "Original LTV

8  Ratios." This table divided all of the mortgage loans in Groups 6 and 7 into 11 categories of

9  original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made

10  untrue and misleading statements about the number of mortgage loans, the aggregate principal

11  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

12  categories. MALT 2005-1 Pros. Sup. S-139.

13
14  (dd)   "The weighted average original LTV Ratio of the Group 6 and Group 7 Loans, by

15  Cut-Off Date Pool Balance of the Group 6 and Group 7 Loans, was approximately 80.03%."

16  MALT 2005-1 Pros. Sup. S-139.

17  (ee)   In Annex A, UBS and MAST presented another table entitled "Original LTV

18  Ratios." This table divided all of the mortgage loans in Groups 1 through 5 into 10 categories of

19  original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made

20
21  untrue and misleading statements about the number of mortgage loans, the aggregate principal

22  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

23  categories. MALT 2005-1 Pros. S-145.

24  (ff)   "The weighted average original LTV Ratio of the Group 1, Group 2, Group 3,

25  Group 4 and Group 5 Loans, by Cut-Off Date pool Balance of the Group 1, Group 2, Group 3,

26  Group 4 and Group 5 Loans, was approximately 69.85%." MALT 2005-1 Pros. S-145.

27
28
-19-

**Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 3,339 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,412 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 618 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $26,067,196 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 373 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $20,173,910 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 208 |
| Weighted-average LTV, as stated by Defendants | 75.4% |
| Weighted-average LTV, as determined by the model | 80.9% |

**Item 71.     Undisclosed additional liens:**

    **(a)     Minimum number of properties with additional liens: 311**

    **(b)     Total reduction in equity from additional liens: $15,919,079**

    **(d)     Weighted-average reduction in equity from additional liens: 76.1%**

**Item 82.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of this securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac" MALT 2005-1 Pros. Sup. S-27.

**Item 88.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

-20-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (a)    In Annex A of the prospectus supplement, described in Item 52, UBS and MAST

2    presented a table entitled "Occupancy Status." This table stated that 100% of the mortgage loans

3    in Group 1 were secured by an "Investor" property. MALT 2005-1 Pros. Sup. S-105.

4

5    (b)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

6    This table stated that 100% of the mortgage loans in Group 2 were secured by an "Investor"

7    property. MALT 2005-1 Pros. Sup. S-109.

8    (c)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

9    This table stated that 100% of the mortgage loans in Group 3 were secured by an "Investor"

10    property. MALT 2005-1 Pros. Sup. S-113.

11    (d)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

12

13    This table stated that 100% of the mortgage loans in Group 4 were secured by an "Investor"

14    property. MALT 2005-1 Pros. Sup. S-117.

15    (e)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

16    This table stated that 100% of the mortgage loans in Group 5 were secured by an "Investor"

17    property. MALT 2005-1 Pros. Sup. S-121.

18    (f)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

19    This table divided the mortgage loans in Group 6 into the categories "Primary," "Investor," and

20

21    "Secondary." The table made untrue and misleading statements about the number of mortgage

22    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

23    outstanding in each of these categories. MALT 2005-1 Pros. Sup. S-125.

24    (g)    In the "Occupancy Status" table, UBS and MAST stated that 94.92% of the

25    mortgage loans in Group 6 were secured by a "Primary" residence, 1.87% by an "Investor"

26    property, and 3.21% by a "Secondary" residence. MALT 2005-1 Pros. Sup. S-125.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (h)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

2    This table divided the mortgage loans in Group 7 into the categories "Primary" and "Secondary."

3    The table made untrue and misleading statements about the number of mortgage loans, the

4    aggregate principal balance outstanding, and the percent of aggregate principal balance

5    outstanding in each of these categories. MALT 2005-1 Pros. Sup. S-129.

6

7    (i)    In the "Occupancy Status" table, UBS and MAST stated that 95.43% of the

8    mortgage loans in Group 7 were secured by a "Primary" residence and 4.57% by a "Secondary"

9    residence. MALT 2005-1 Pros. Sup. S-129.

10    (j)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

11    This table divided all of the mortgage loans in the collateral pool into the categories "Primary,"

12    "Investor," and "Secondary." The table made untrue and misleading statements about the number

13

14    of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

15    principal balance outstanding in each of these categories. MALT 2005-1 Pros. Sup. S-134.

16    (k)    In the "Occupancy Status" table, UBS and MAST stated that 51.78% of the

17    mortgage loans in the aggregate group were secured by a "Primary" residence, 46.34% by an

18    "Investor" property, and 1.87% by a "Secondary" residence. MALT 2005-1 Pros. Sup. S-134.

19

20    (l)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

21    This table divided all of the mortgage loans in Groups 6 and 7 into the categories "Primary,"

22    "Investor," and "Secondary." The table made untrue and misleading statements about the number

23    of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

24    principal balance outstanding in each of these categories. MALT 2005-1 Pros. Sup. S-140.

25    (m)    In the "Occupancy Status" table, UBS and MAST stated that 95% of the mortgage

26    loans in Groups 6 and 7 were secured by a "Primary" residence, 1.56% by an Investor property,

27    and 3.44% by a "Secondary" residence. MALT 2005-1 Pros. Sup. S-140.

28

-22-

1       (n)    In Annex A, UBS and MAST presented another table entitled "Occupancy Status."

This table stated that 100% of the mortgage loans in Groups 1 through 5 were secured by an

"Investor" property. MALT 2005-1 Pros. Sup. S-146.

**Item 96.**     **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 140**

    **(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 161**

    **(c)**     **Number of loans on which the owner of the property owned three or more properties: 5**

    **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 265**

**Item 99.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-27 of the prospectus supplement, UBS and MAST made

statements about the underwriting guidelines of the originators of all of the mortgage loans in the

collateral pool. All of those statements are incorporated here by reference. In particular, UBS and

MAST stated that:

    (a)    "[E]xceptions to the underwriting standards described in this prospectus

supplement are made in the event that compensating factors are demonstrated by a prospective

borrower." MALT 2005-1 Pros. Sup. S-26 to S-27.

    (b)    "The adequacy of the mortgaged property as security for repayment of the related

Loan will generally have been determined by an appraisal in accordance with pre-established

appraisal procedure guidelines for appraisals established by or acceptable to the originator."

MALT 2005-1 Pros. Sup. S-27.

-23-

1    On pages S-27 through S-31 of the prospectus supplement, UBS and MAST made

2    statements about the underwriting guidelines of CitiMortgage, Inc. All of those statements are

3    incorporated here by reference. In particular, UBS and MAST stated that:

4        (c)    "Since January 1995, each affiliated originator has used a credit scoring system as

5

6    part of its underwriting process an/or an automated underwriting system to assist in making a

7    credit decision. The credit scoring system assesses a prospective borrower's ability to repay a

8    mortgage loan based upon predetermined mortgage loan characteristics and credit risk factors."

9    MALT 2005-1 Pros. Sup. S-28.

10       (d)    "CitiMortgage will fully or partly credit score or re-underwrite the third party

11   loans to determine whether the original underwriting process adequately assessed the borrower's

12

13   ability to repay and the adequacy of the property as collateral, based on CitiMortgage's

14   underwriting standards." MALT 2005-1 Pros. Sup. S-31.

15   **Item 106.**    **Early payment defaults:**

16       **(a)**    **Number of the mortgage loans that suffered EPDs: 16**

17       **(b)**    **Percent of the mortgage loans that suffered EPDs: 0.5%**

18       **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**
         **made at the same time as the loans in the collateral pool that experienced**
19       **EPDs: 0.18%**

20   **Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

21       On page S-5 of the prospectus supplement, UBS and MAST made statements about the

22

23   ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the

24   Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard &

25   Poor's Rating Services. These were the highest ratings available from these two rating agencies.

26

27

28

-24-

1    UBS and MAST also stated that: "On the closing date, the offered certificates must have

2    ratings not lower than those set forth in the table beginning on page S-5 by each of Fitch, Inc. and

3    Standard & Poor's Ratings Services, . . . ." MALT 2005-1 Pros. Sup. S-15.

4    UBS and MAST also stated that: "It is a condition to the original issuance of the offered

5    certificates that each class of offered certificates will have received the ratings set forth on the

6    table beginning on page S-5 of this prospectus supplement." MALT 2005-1 Pros. Sup. S-83.

7

8    **Item 120.    Summary of loans about which the Defendants made untrue or misleading**

9    **statements:**

10

11       (a)    **Number of loans whose LTVs were materially understated: 618**

12       (b)    **Number of loans in which the owner's equity was reduced by 5% or more by**
              **undisclosed additional liens: 311**

13

14       (c)    **Number of loans that suffered EPDs: 16**

15       (d)    **Number of loans in which the properties were stated to be owner-occupied**
              **but were not: 265**

16       (e)    **Eliminating duplicates, number of loans about which the Defendants made**
              **untrue or misleading statements: 1,044**
17

18       (f)    **Eliminating duplicates, percent of loans about which the Defendants made**
              **untrue or misleading statements: 31.3%**

19

20

21

22

23

24

25

26

27

28
                                          -25-

1

2 **SCHEDULE 54 TO THE AMENDED COMPLAINT**

3     To the extent that this Schedule is incorporated by reference into allegations in the

4 complaint, those allegations are made against Defendants UBS, CWALT, and Countrywide

5 Financial Corporation.

6 **Item 44.**    **Details of trust and certificate(s).**

7     **(a)**    **Dealer that sold the certificate(s) to the Bank:** UBS.

8     **(b)**    **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

9
10 Certificates, Series 2006-HY13 was a securitization in December 2006 of 1,346 mortgage loans,

11 in four groups. The mortgage loans in the collateral pool of this securitization were originated or

12 acquired by Countrywide Home Loans, Inc. CWALT 2006-HY13 Pros. Sup. S-85.

13     **(c)**    **Description of the certificate(s) that the Bank purchased:** UBS offered and sold

14 to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which the Bank paid

15 $205,526,851 plus accrued interest on December 29, 2006.

16     **(d)**    **Ratings of the certificate(s) when the Bank purchased them:** Standard &

17
18 Poor's— AAA; Fitch— AAA.

19     **(e)**    **Current ratings of the certificate(s):** Standard & Poor's— CCC; Fitch— CC.

20     **(f)**    **URL of prospectus supplement for this securitization:**

21 http://www.sec.gov/Archives/edgar/data/1269518/000095012407000048/v26025b5e424b5.txt.

22     **(g)**    **Registration statement pursuant or traceable to which the certificate(s) were**

23 **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

24
25 pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on

26 March 6, 2006. Annexed to the registration statement was a prospectus. The prospectus was

27 amended from time to time by prospectus supplements whenever a new series of certificates was

28 issued pursuant or traceable to that registration statement.

**Item 52.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The weighted-average original LTV of the mortgage loans in loan group 1 was 72.12%. CWALT 2006-HY13 Pros. Sup. S-5.

(b)     The weighted-average original LTV of the mortgage loans in loan group 2 was 72.68%. CWALT 2006-HY13 Pros. Sup. S-5.

(c)     The weighted-average original LTV of the mortgage loans in loan group 3 was 73.2%. CWALT 2006-HY13 Pros. Sup. S-5.

(d)     The weighted-average original LTV of the mortgage loans in loan group 4 was 74.74%. CWALT 2006-HY13 Pros. Sup. S-6.

(e)     "No Mortgage Loan in any loan group will have has a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%." CWALT 2006-HY13 Pros. Sup. S-32.

(f)     In the section of the prospectus supplement entitled "The Mortgage Pool", UBS and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2006-HY13 Pros. Sup. S-35 to S-83. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $350,000.01 to $400,000, $400,000.01 to $450,000, $450,000.01 to $500,000., etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 20 such tables for the loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from one to 23. Thus, in "The Mortgage Pool" section, UBS and CWALT made hundreds of

-2-

1  statements about the original LTVs of the loans in loan group 1. CWALT 2006-HY13 Pros. Sup.

2  S-35 to S-46.

3      (g)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

4  group 1 mortgage loans was approximately 72.12%." CWALT 2006-HY13 Pros. Sup. S-38.

5

6      (h)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

7  statistics about the mortgage loans in loan group 2. In these tables, UBS and CWALT similarly

8  made hundreds of statements about the original LTVs of the loans in loan group 2. CWALT

9  2006-HY13 Pros. Sup. S-47 to S-57.

10     (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

11  group 2 mortgage loans was approximately 72.68%." CWALT 2006-HY13 Pros. Sup. S-49.

12

13     (j)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

14  statistics about the mortgage loans in loan group 3. In these tables, UBS and CWALT similarly

15  made hundreds of statements about the original LTVs of the loans in loan group 3. CWALT

16  2006-HY13 Pros. Sup. S-58 to S-70.

17     (k)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

18  group 3 mortgage loans was approximately 73.20%." CWALT 2006-HY13 Pros. Sup. S-61.

19
     (l)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of
20
   statistics about the mortgage loans in loan group 4. In these tables. UBS and CWALT similarly
21
22  made hundreds of statements about the original LTVs of the loans in loan group 4. CWALT

23  2006-HY13 Pros. Sup. S-71 to S-83.

24     (m)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

25  group 4 mortgage loans was approximately 74.74%." CWALT 2006-HY13 Pros. Sup. S-74.

26

27

28

                                          -3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

**Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,346 |
| Number of properties on which there was enough information for the model to determine a true market value | 908 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 615 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $110,930,086 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 81 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,534,592 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 140 |
| Weighted-average LTV, as stated by Defendants (group 1) | 77.1% |
| Weighted-average LTV, as determined by the model (group 1) | 90.3% |

**Item 65.     Evidence from subsequent sales of refinanced properties:**

Of the 1,346 mortgage loans in the collateral pool, 774 were taken out to refinance, rather than to purchase, properties. For those 774 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 774 properties, 98 were subsequently sold for a total of approximately $77,856,973. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents sent to the Bank was $96,148,000. Thus, those properties were sold for 81.0% of the value ascribed to them, a difference of 19.0%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 82.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans in this securitization: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-HY13 Pros. Sup. S-87.

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)



**Item 88.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, UBS and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-HY13 Pros. Sup. S-41.

(b)    In the "Occupancy Types" table, UBS and CWALT stated that 82.29% of the mortgage loans in loan group 1 were secured by a "Primary Residence," 10.27% by an "Investment Property," and 7.45% by a "Secondary Residence." CWALT 2006-HY13 Pros. Sup. S-41.

(c)    In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the categories "Primary Residence" and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-HY13 Pros. Sup. S-52.

(d)    In the "Occupancy Types" table, UBS and CWALT stated that 88.43% of the mortgage loans in loan group 2 were secured by a "Primary Residence" and 11.57 % by a "Secondary Residence." CWALT 2006-HY13 Pros. Sup. S-52.

-5-

1    (e)    In "The Mortgage Pool" section, UBS and CWALT presented another table

2    entitled "Occupancy Types." This table divided the mortgage loans in loan group 3 into the

3    categories "Primary Residence" and "Secondary Residence." The table made untrue and

4    misleading statements about the number of mortgage loans, the aggregate principal balance

5

6    outstanding, and the percent of aggregate principal balance outstanding in each of these

7    categories. CWALT 2006-HY13 Pros. Sup. S-65.

8    (f)    In the "Occupancy Types" table, UBS and CWALT stated that 94.63% of the

9    mortgage loans in loan group 3 were secured by a "Primary Residence" and 4.37% by a

10    "Secondary Residence." CWALT 2006-HY13 Pros. Sup. S-65.

11    (g)    In "The Mortgage Pool" section, UBS and CWALT presented another table

12    entitled "Occupancy Types." This table divided the mortgage loans in loan group 4 into the

13

14    categories "Primary Residence" and "Secondary Residence." The table made untrue and

15    misleading statements about the number of mortgage loans, the aggregate principal balance

16    outstanding, and the percent of aggregate principal balance outstanding in each of these

17    categories. CWALT 2006-HY13 Pros. Sup. S-78.

18    (h)    In the "Occupancy Types" table, UBS and CWALT stated that 94.28% of the

19    mortgage loans in loan group 4 were secured by a "Primary Residence" and 5.72% by a

20

21    "Secondary Residence." CWALT 2006-HY13 Pros. Sup. S-78.

22    **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

23    **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 114**

24

25    **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 262**

26    **(c)**    **Number of loans on which the owner of the property owned three or more properties: 27**

27

28

-6-



(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 348

**Item 99.** Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:

On pages S-85 through S-90 of the prospectus supplement, UBS and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated or acquired all of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference. In particular, UBS and CWALT stated that:

(a) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-HY13 Pros. Sup. S-86.

(b) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-HY13 Pros. Sup. S-86.

**Item 108.** 30+ days delinquencies in this securitization:

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 378

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 28.1%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item 117.** Statements about the ratings of the certificate(s) that the Bank purchased:

On pages S-7 to S-9 of the prospectus supplement, UBS and CWALT made statements about the ratings assigned to the certificates issued in this securitization. UBS and CWALT stated that the Bank's certificate was rated AAA by Standard & Poor's Rating Services and Fitch. These were the highest ratings available from these two rating agencies.

-7-

1    UBS and CWALT also stated that: "The offered certificates will not be offered unless

2    they are assigned the indicated ratings by Standard & Poor's, . . . and Fitch Ratings, Inc.

3    ("FITCH"). "N/R" indicates that the agency was not asked to rate the certificates." The

4    requirement for class 1-A-1, from which this certificate was to be paid, was for AAA from

5    Standard & Poor's and Fitch. CWALT 2006-HY13 Pros. Sup. S-9.

6

7    UBS and CWALT also stated that: "It is a condition to the issuance of the senior

8    certificates that they be rated AAA by each of Standard & Poor's, . . . and Fitch Ratings

9    ("FITCH")." CWALT 2006-HY13 Pros. Sup. S-152.

10   **Item 120.    Summary of loans about which the Defendants made untrue or misleading
11   statements:**

12       (a)    **Number of loans whose LTVs were materially understated: 615**

13       (b)    **Number of loans in which the properties were stated to be owner-occupied
14              but were not: 348**

15       (c)    **Eliminating duplicates, number of loans about which the Defendants made
16              untrue or misleading statements: 768**

17       (d)    **Eliminating duplicates, percent of loans about which the Defendants made
              untrue or misleading statements: 57.1%**

18

19

20

21

22

23

24

25

26

27

28

-8-

## SCHEDULE 55 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants UBS, CWALT, and Countrywide Financial Corporation.

Item 44.    **Details of trust and certificate(s).**

(a)    **Dealer that sold the certificate(s) to the Bank: UBS.**

(b)    **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-4CB was a securitization in February 2006 of 2,835 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-4CB Pros. Sup. S-50.

(c)    **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in tranche 2-A-1, for which the Bank paid $98,949,200 plus accrued interest on February 28, 2006.

(d)    **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's— AAA; Moody's— Aaa.

(e)    **Current ratings of the certificate(s):** Standard & Poor's— CCC; Moody's— B3.

(f)    **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1269518/000095012906002020/v17514b5e424b5.txt.

(g)    **Registration statement pursuant or traceable to which the certificate(s) were issued:**
Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

**Item 52.**       **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in loan group 1 was 68.58%. CWALT 2006-4CB Pros. Sup. S-5.

(b)       As of the cut-off date, the weighted average original LTV of the mortgage loans in loan group 2 was 67.21%. CWALT 2006-4CB Pros. Sup. S-5.

(c)       "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%." CWALT 2006-4CB Pros. Sup. S-5.

(d)       In the section of the prospectus supplement entitled "The Mortgage Pool," UBS and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2006-4CB Pros. Sup. S-33 to S-48. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000. etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables for the loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from three to 32. Thus, in the prospectus supplement, UBS and CWALT made hundreds of statements about the original LTVs of the loans in loan group 1. CWALT 2006-4CB Pros. Sup. S-33 to S-40.

(e)       "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 68.58%." CWALT 2006-4CB Pros. Sup. S-36.

(f)       In "The Mortgage Pool" section, UBS and CWALT presented similar tables of statistics about the mortgage loans in loan group 2. In these tables, UBS and CWALT similarly

-2-

1   made hundreds of statements about the original LTVs of the loans in loan group 2. CWALT

2   2006-4CB Pros. Sup. S-41 to S-48.

3       (g)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

4   mortgage loans in loan group 2 was approximately 67.21%." CWALT 2006-4CB Pros. Sup. S-44.

5

6   **Item 62.      Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,835 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,580 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 867 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $59,245,912 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 230 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,811,246 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 94 |
| Weighted-average LTV, as stated by Defendants (group 2) | 67.2% |
| Weighted-average LTV, as determined by the model (group 2) | 73.3% |

16  **Item 65.      Evidence from subsequent sales of refinanced properties:**

17      Of the 2,835 mortgage loans in the collateral pool, 1,506 were taken out to refinance,

18  rather than to purchase, properties. For those 1,506 loans, the value (denominator) in the LTV

19

20  was an appraised value rather than a sale price. Of those 1,506 properties, 136 were subsequently

21  sold for a total of approximately $41,822,814. The total value ascribed to those same properties in

22  the LTV data reported in the prospectus supplement and other documents sent to the Bank was

23  $54,323,700. Thus, those properties were sold for 77.0% of the value ascribed to them, a

24  difference of 23.0%. This difference cannot be accounted for by declines in house prices in the

25  areas in which those properties were located.

26

27  **Item 71.      Undisclosed additional liens:**

28      (a)     **Minimum number of properties with additional liens: 188**

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    **(b)**    **Total reduction in equity from additional liens: $16,026,640**

2    **(c)**    **Weighted-average reduction in equity from additional liens: 63.5%**

3    **Item 82.**    **Untrue or misleading statements about compliance with USPAP:**

4        In the prospectus supplement, UBS and CWALT made the following statement about the

5    appraisals of the properties that secured the mortgage loans originated by Countrywide: "All

6    appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

7

8    effect." CWALT 2006-4CB Pros. Sup. S-52.

9    **Item 88.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

10       In the prospectus supplement, UBS and CWALT made the following statements about the

11

12   occupancy status of the properties that secured the mortgage loans in the collateral pool of this

13   securitization.

14       **(a)**    In "The Mortgage Pool" section of the prospectus supplement, described in Item

15   52, UBS and CWALT presented a table entitled "Occupancy Types." This table divided the

16   mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property,"

17   and "Secondary Residence." The table made untrue and misleading statements about the number

18   of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

19   principal balance outstanding in each of these categories. 2006-4CB Pros. Sup. S-38.

20

21       **(b)**    In the "Occupancy Types" table, UBS and CWALT stated that 87.05% of the

22   mortgage loans in loan group 1 were secured by a "Primary Residence," 6.98% by an "Investment

23   Property," and 5.97% by a "Secondary Residence." CWALT 2006-4CB Pros. Sup. S-38.

24       **(c)**    In the "The Mortgage Pool" section, UBS and CWALT presented another table

25   entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the

26   categories "Primary Residence," "Investment Property," and "Secondary Residence." The table

27   made untrue and misleading statements about the number of mortgage loans, the aggregate

28

-4-

1  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

2  of these categories. CWALT 2006-4CB Pros. Sup. S-46.

3      (d)    In the "Occupancy Types" table, UBS and CWALT stated that 92.66% of the

4
5  mortgage loans in loan group 2 were secured by a "Primary Residence," 2.02% by an "Investment

6  Property," and 5.32% by a "Secondary Residence." CWALT 2006-4CB Pros. Sup. S-46.

7  **Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

8      **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 210**

9
10      **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 320**

11      **(c)**    **Number of loans on which the owner of the property owned three or more properties: 28**

12
13      **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 494**

14
15  **Item 99.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

16  On pages S-50 through S-55 of the prospectus supplement, UBS and CWALT made

17  statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated

18  or acquired all of the mortgage loans in the collateral pool of this securitization. All of those

19
20  statements are incorporated here by reference. In particular, UBS and CWALT stated that:

21      (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

22  if compensating factors are demonstrated by a prospective borrower." CWALT 2006-4CB Pros.

23  Sup. S-51.

24      (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

25  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

26  ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-4CB

27  Pros. Sup. S-51.

28

-5-

**Item 108.** **30+ days delinquencies in this securitization:**

    **(a)** **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 541**

    **(b)** **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 19.1%**

    **(c)** **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 117.** **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-6 and S-7 of the prospectus supplement, UBS and CWALT made statements about the ratings assigned to the certificates issued in this securitization. UBS and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and CWALT also stated that: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's, . . . and Moody's Investors Service, Inc. ("Moody's")." CWALT 2006-4CB Pros. Sup. S-7.

UBS and CWALT also stated that: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, . . . . It is a condition to the issuance of the senior certificates, other than the Class 1-A-7 and Class 2-A-7 Certificates, that they be rated Aaa by Moody's Investors Service, Inc. ("Moody's")." CWALT 2006-4CB Pros. Sup. S-124.

**Item 120.** **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated: 867**

    **(b)** **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 188**

    **(c)** **Number of loans in which the properties were stated to be owner-occupied but were not: 494**

-6-

(e)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,289

(f)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 45.5%

-7-

1
2          **SCHEDULE 56 TO THE AMENDED COMPLAINT**

3          To the extent that this Schedule is incorporated by reference into allegations in the

4     complaint, those allegations are made against Defendants UBS, CWALT, and Countrywide

5     Financial Corporation.

6     **Item 44.     Details of trust and certificate(s).**

7          (a)     **Dealer that sold the certificate(s) to the Bank:** UBS.

8          (b)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through
9
      Certificates, Series 2005-63 was a securitization in October 2005 of 2,535 mortgage loans, in five
10
      groups. The mortgage loans in the collateral pool of this securitization were originated by
11
12    Countrywide Home Loans, Inc. CWALT 2005-63 Pros. Sup. S-78.

13         (c)     **Description of the certificate(s) that the Bank purchased:** UBS offered and sold

14    to the Bank three senior certificates in this securitization, in tranche 1-A-1, tranche 2-A-1, and

15    tranche 4-A-1, for which the Bank paid $150,536,855, $60,685,882, and $64,325,760 plus

16    accrued interest, respectively, on October 31, 2005.
17
18         (d)     **Ratings of the certificate(s) when the Bank purchased them:** Certificate: 1-A-1;

19    Standard & Poor's— AAA; Moody's— Aaa.

20    Certificate: 2-A-1; Standard & Poor's— AAA; Moody's— Aaa.

21    Certificate: 4-A-1; Standard & Poor's— AAA; Moody's— Aaa.

22         (e)     **Current ratings of the certificate(s):**

23    Certificate: 1-A-1; Standard & Poor's— CCC; Moody's— Caa3.
24
      Certificate: 2-A-1; Standard & Poor's— CCC; Moody's— Caa3.
25
26    Certificate: 4-A-1; Standard & Poor's— CCC; Moody's— Caa3.

27
28

      SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

(f)   **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1269518/000095014805000114/v13640e424b5.txt.

(g)   **Registration statement pursuant or traceable to which the certificate(s) were issued:**

Certificates in this trust, including the certificates that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 52.   Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)   "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2005-63 Pros. Sup. S-17.

(b)   In the section of the prospectus supplement entitled "The Mortgage Pool," UBS and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-63 Pros. Sup. S-19 to S-76. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 18 such tables for the loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from one to 63. Thus, in "The Mortgage Pool" section, UBS and CWALT made hundreds of statements about the original LTVs of the loans in loan group 1. CWALT 2005-63 Pros. Sup. S-19 to S-31.

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1      (c)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

2  group 1 mortgage loans was approximately 77.57%." CWALT 2005-63 Pros. Sup. S-23.

3      (d)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

4
5  statistics about the mortgage loans in loan group 2. In these tables, UBS and CWALT similarly

6  made hundreds of statements about the original LTVs of the loans in loan group 2. CWALT

7  2005-63 Pros. Sup. S-32 to S-43.

8      (e)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

9  group 2 mortgage loans was approximately 76.42%." CWALT 2005-63 Pros. Sup. S-35.

10      (f)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

11
12  statistics about the mortgage loans in loan group 3. In these tables, UBS and CWALT similarly

13  made hundreds of statements about the original LTVs of the loans in loan group 3. CWALT

14  2005-63 Pros. Sup. S-44 to S-54.

15      (g)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

16  group 3 mortgage loans was approximately 75.96%." CWALT 2005-63 Pros. Sup. S-47.

17      (h)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

18
19  statistics about the mortgage loans in loan group 4. In these tables, UBS and CWALT similarly

20  made hundreds of statements about the original LTVs of the loans in loan group 4. CWALT

21  2005-63 Pros. Sup. S-55 to S-65.

22      (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

23  group 4 mortgage loans was approximately 76.21%." CWALT 2005-63 Pros. Sup. S-58.

24      (j)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

25  statistics about the mortgage loans in loan group 5. In these tables, UBS and CWALT similarly

26  made hundreds of statements about the original LTVs of the loans in loan group 5. CWALT

27  2005-63 Pros. Sup. S-66 to S-76.

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (k)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

2    group 5 mortgage loans was approximately 76.57%." CWALT 2005-63 Pros. Sup. S-69.

3    **Item 62.    Details of the results of the AVM analysis:**

4

| | |
|---|---|
| Number of loans | 2,535 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,664 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 903 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $56,136,951 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 219 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,713,753 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 146 |
| Weighted-average LTV, as stated by Defendants (group 4) | 76.2% |
| Weighted-average LTV, as determined by the model (group 4) | 94.2% |

14    **Item 65.    Evidence from subsequent sales of refinanced properties:**

15    Of the 2,535 mortgage loans in the collateral pool, 722 were taken out to refinance, rather

16    than to purchase, properties. For those 722 loans, the value (denominator) in the LTV was an

17    appraised value rather than a sale price. Of those 722 properties, 136 were subsequently sold for a

18    total of approximately $45,613,853. The total value ascribed to those same properties in the LTV

19    data reported in the prospectus supplement and other documents sent to the Bank was

20    $55,293,100. Thus, those properties were sold for 82.5% of the value ascribed to them, a

21    difference of 17.5%. This difference cannot be accounted for by declines in house prices in the

22    areas in which those properties were located.

23

24    **Item 71.    Undisclosed additional liens:**

25    **(a)    Minimum number of properties with additional liens: 1,258**

26    **(b)    Total reduction in equity from additional liens: $76,642,380**

27    **(c)    Weighted-average reduction in equity from additional liens: 76.8%**

28

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

**Item 82.**    **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-63 Pros. Sup. S-80.

**Item 88.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, UBS and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-63 Pros. Sup. S-25.

(b)    In the "Occupancy Types" table, UBS and CWALT stated that 83.35% of the mortgage loans in loan group 1 were secured by a "Primary Residence," 5.29% by an "Investment Property," and 11.36% by a "Secondary Residence." CWALT 2005-63 Pros. Sup. S-25.

(c)    In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-63 Pros. Sup. S-38.

-5-

(d)     In the "Occupancy Types" table, UBS and CWALT stated that 87.66% of the mortgage loans in loan group 2 were secured by a "Primary Residence," 2.75% by an "Investment Property," and 9.59% by a "Secondary Residence." CWALT 2005-63 Pros. Sup. S-38.

(e)     In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 3 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-63 Pros. Sup. S-50.

(f)     In the "Occupancy Types" table, UBS and CWALT stated that 80.71% of the mortgage loans in loan group 3 were secured by a "Primary Residence," 11.74% by an "Investment Property," and 7.54% by a "Secondary Residence." CWALT 2005-63 Pros. Sup. S-50.

(g)     In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 4 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-63 Pros. Sup. S-61.

(h)     In the "Occupancy Types" table, UBS and CWALT stated that 85.58% of the mortgage loans in loan group 4 were secured by a "Primary Residence," 10.1% by an "Investment Property," and 4.32% by a "Secondary Residence." CWALT 2005-63 Pros. Sup. S-61.

(i)     In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 5 into the

-6-

1   categories "Primary Residence," and "Secondary Residence." The table made untrue and

2   misleading statements about the number of mortgage loans, the aggregate principal balance

3   outstanding, and the percent of aggregate principal balance outstanding in each of these

4   categories. CWALT 2005-63 Pros. Sup. S-72.

5

6      (j)    In the "Occupancy Types" table, UBS and CWALT stated that 92.77% of the

7   mortgage loans in loan group 5 were secured by a "Primary Residence" and 7.23% by a

8   "Secondary Residence." CWALT 2005-63 Pros. Sup. S-72.

9   **Item 96.    Details of properties that were stated to be owner-occupied, but were not:**

10     **(a)    Number of loans on which the owner of the property instructed tax**
11     **authorities to send property tax bills to him or her at a different address: 250**

12     **(b)    Number of loans on which the owner of the property could have, but did not,**
       **designate the property as his or her homestead: 383**
13
       **(c)    Number of loans on which the owner of the property owned three or more**
14     **properties: 17**

15     **(d)    Eliminating duplicates, number of loans about which one or more of**
       **statements (a) through (c) is true: 541**
16

17  **Item 99.    Untrue or misleading statements about the underwriting standards of the**
                 **originators of the mortgage loans:**
18
       On pages S-78 through S-83 of the prospectus supplement, UBS and CWALT made
19
20  statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated

21  or acquired all of the mortgage loans in the collateral pool of this securitization. All of those

22  statements are incorporated here by reference. In particular, UBS and CWALT stated that:

23     (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

24  if compensating factors are demonstrated by a prospective borrower." CWALT 2005-63 Pros.

25  Sup. S-79.

26     (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of
27
28  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

                                    -7-

1   ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-63

2   Pros. Sup. S-79.

3   **Item 106.    Early payment defaults:**

4       **(a)    Number of the mortgage loans that suffered EPDs: 11**

5       **(b)    Percent of the mortgage loans that suffered EPDs: 0.4%**

6       **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
7               made at the same time as the loans in the collateral pool that experienced
8               EPDs: 0.18%**

9   **Item 107.    90+ days delinquencies:**

10      **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 748**

11      **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 29.5%**

12      **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
13              made at the same time as the loans in the collateral pool that suffered 90+
                days delinquencies: 16.5%**

14  **Item 108.    30+ days delinquencies in this securitization:**

15      **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31,
16              2010: 784**

17      **(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31,
18              2010: 30.9%**

19      **(c)    Percent of all mortgage loans in the United States that were 30+ days
                delinquent on March 31, 2010: 14.7%**

20  **Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:**

21      On page S-3 of the prospectus supplement, UBS and CWALT made statements about the

22  ratings assigned to the certificates issued in this securitization. UBS and CWALT stated that the

23  Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard &

24  Poor's Rating Services. These were the highest ratings available from these two rating agencies.

26      UBS and CWALT also stated that: "The classes of certificates listed below will not be

27  offered unless they receive the respective ratings at least as high as those set forth below from

28
                                    -8-

1    Standard & Poor's . . . and from Moody's Investors Service, Inc. . . ." The requirement for classes

2    1-A-1, 2-A-1, and 4-A-1, from which these certificates were to be paid, was for AAA from

3    Standard & Poor's and Aaa from Moody's. CWALT 2005-63 Pros. Sup. S-3.

4         UBS and CWALT also stated that: "It is a condition to the issuance of the senior

5    certificates that they be rated AAA by Standard & Poor's, . . . and Aaa by Moody's Investors

6    Service, Inc. ("S&P")." CWALT 2005-63 Pros. Sup. S-119.

7

8    **Item 120.    Summary of loans about which the Defendants made untrue or misleading statements:**

9

10        **(a)    Number of loans whose LTVs were materially understated: 903**

11        **(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 1,258**

12        **(c)    Number of loans that suffered EPDs: 11**

13        **(d)    Number of loans in which the properties were stated to be owner-occupied but were not: 541**

14

15        **(e)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,777**

16

17        **(f)    Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 70.1%**

18

19

20

21

22

23

24

25

26

27

28

-9-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1
2
### SCHEDULE 57 TO THE AMENDED COMPLAINT

3      To the extent that this Schedule is incorporated by reference into allegations in the

4    complaint, those allegations are made against Defendants UBS, CWALT, and Countrywide

5    Financial Corporation.

6    **Item 44.     Details of trust and certificate(s).**

7         **(a)     Dealer that sold the certificate(s) to the Bank: UBS.**

8         **(b)     Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through
9
10   Certificates, Series 2005-27 was a securitization in June 2005 of 3,914 mortgage loans, in three

11   groups. The mortgage loans in the collateral pool of this securitization were originated or

12   acquired by Countrywide Home Loans, Inc. CWALT 2005-27 Pros. Sup. S-72.

13        **(c)     Description of the certificate(s) that the Bank purchased:** UBS offered and sold

14   to the Bank a senior certificate in this securitization, in tranche 1-A-7, for which the Bank paid

15   $105,000,000 plus accrued interest on June 29, 2005.

16        **(d)     Ratings of the certificate(s) when the Bank purchased them:** Standard &
17
18   Poor's— AAA; Moody's— Aaa.

19        **(e)     Current ratings of the certificate(s):** Standard & Poor's— CCC; Moody's— B2.

20        **(f)     URL of prospectus supplement for this securitization:**

21   http://www.sec.gov/Archives/edgar/data/1269518/000095012905006851/v10082e424b5.txt.

22        **(g)     Registration statement pursuant or traceable to which the certificate(s) were
23
     issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued
24
     pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on
25
26   April 21, 2005. Annexed to the registration statement was a prospectus. The prospectus was

27   amended from time to time by prospectus supplements whenever a new series of certificates was

28   issued pursuant or traceable to that registration statement.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

**Item 52.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2005-27 Pros. Sup. S-21.

(b)      In the section of the prospectus supplement entitled "The Mortgage Pool," UBS and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-27 Pros. Sup. S-23 to S-70. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 17 such tables for the loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from one to 89. Thus, in "The Mortgage Pool" section, UBS and CWALT made hundreds of statements about the original LTVs of the loans in loan group 1. CWALT 2005-27 Pros. Sup. S-23 to S-40.

(c)      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the group 1 mortgage loans was approximately 74.62%." CWALT 2005-27 Pros. Sup. S-28.

(d)      In "The Mortgage Pool" section, UBS and CWALT presented similar tables of statistics about the mortgage loans in loan group 2. In these tables, UBS and CWALT similarly made hundreds of statements about the original LTVs of the loans in loan group 2. CWALT 2005-27 Pros. Sup. S-41 to S-56.

(e)      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the group 2 mortgage loans was approximately 75.40%." CWALT 2005-27 Pros. Sup. S-46.

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (f)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

2  statistics about the mortgage loans in loan group 3. In these tables, UBS and CWALT similarly

3  made hundreds of statements about the original LTVs of the loans in loan group 3. CWALT

4  2005-27 Pros. Sup. S-57 to S-70.

5
6    (g)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

7  group 3 mortgage loans was approximately 75.07%." CWALT 2005-27 Pros. Sup. S-61.

8  **Item 62.    Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 3,914 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,688 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,347 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $135,775,376 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 490 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $37,238,874 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 245 |
| Weighted-average LTV, as stated by Defendants (group 1) | 74.6% |
| Weighted-average LTV, as determined by the model (group 1) | 83.8% |

19  **Item 65.    Evidence from subsequent sales of refinanced properties:**

20    Of the 3,914 mortgage loans in the collateral pool, 2,355 were taken out to refinance,

21  rather than to purchase, properties. For those 2,355 loans, the value (denominator) in the LTV

22  was an appraised value rather than a sale price. Of those 2,355 properties, 549 were subsequently

23  sold for a total of approximately $250,163,657. The total value ascribed to those same properties

24  in the LTV data reported in the prospectus supplement and other documents sent to the Bank was

25  $296,632,400. Thus, those properties were sold for 84.3% of the value ascribed to them, a

26  difference of 15.7%. This difference cannot be accounted for by declines in house prices in the

27
28  areas in which those properties were located.

-3-

**Item 71.** **Undisclosed additional liens:**

    **(a)** **Minimum number of properties with additional liens: 438**

    **(b)** **Total reduction in equity from additional liens: $33,542,202**

    **(c)** **Weighted-average reduction in equity from additional liens: 51.2%**

**Item 82.** **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-27 Pros. Sup. S-74.

**Item 88.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, UBS and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-27 Pros. Sup. S-31.

    (b) In the "Occupancy Types" table, UBS and CWALT stated that 82.05 % of the mortgage loans in loan group 1 were secured by a "Primary Residence," 11.96% by an "Investor Property," and 5.98% by a "Secondary Residence." CWALT 2005-27 Pros. Sup. S-31.

    (c) In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the

-4-

categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-27 Pros. Sup. S-49.

(d)     In the "Occupancy Types" table, UBS and CWALT stated that 84.56% of the mortgage loans in loan group 2 were secured by a "Primary Residence," 11.65% by an "Investor Property," and 3.8% by a "Secondary Residence." CWALT 2005-27 Pros. Sup. S-49.

(e)     In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 3 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-27 Pros. Sup. S-64.

(f)     In the "Occupancy Types" table, UBS and CWALT stated that 70.26% of the mortgage loans in loan group 3, were secured by a "Primary Residence," 22.39% by an "Investment Property," and 7.35% by a "Secondary Residence." CWALT 2005-27 Pros. Sup. S-64.

Item 96.     Details of properties that were stated to be owner-occupied, but were not:

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 298

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 554

(c)     Number of loans on which the owner of the property owned three or more properties: 51

(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 1

-5-

(e)  Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 746

**Item 99.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-72 through S-77 of the prospectus supplement, UBS and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated or acquired the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference. In particular, UBS and CWALT stated that:

(a)  "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-27 Pros. Sup. S-73.

(b)  "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-27 Pros. Sup. S-73.

**Item 106.    Early payment defaults:**

(a)  **Number of the mortgage loans that suffered EPDs: 14**

(b)  **Percent of the mortgage loans that suffered EPDs: 0.4%**

(c)  **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

**Item 107.    90+ days delinquencies:**

(a)  **Number of the mortgage loans that suffered 90+ days delinquencies: 912**

(b)  **Percent of the mortgage loans that suffered 90+ days delinquencies: 23.3%**

(c)  **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

-6-

Item 108.    30+ days delinquencies in this securitization:

(a)    Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 890

(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 22.7%

(c)    Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

Item 117.    Statements about the ratings of the certificate(s) that the Bank purchased:

On pages S-3 and S-4 of the prospectus supplement, UBS and CWALT made statements about the ratings assigned to the certificates issued in this securitization. UBS and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and CWALT also stated that: "The following chart lists certain characteristics of the classes of the offered certificates. The classes of certificates listed below will not be offered unless they receive the respective ratings at least as high as those set forth below from Standard & Poor's Ratings Services, . . . and from Moody's Investors Service, Inc. ("MOODY'S")." CWALT 2005-27 Pros. Sup. S-3.

UBS and CWALT also stated that: "It is a condition to the issuance of the offered certificates that they be rated the respective ratings set forth on page S-3 of the Summary of this prospectus supplement by Standard & Poor's Ratings Services, . . . and by Moody's Investors Service, Inc. ("MOODY'S")." CWALT 2005-27 Pros. Sup. S-127.

Item 120.    Summary of loans about which the Defendants made untrue or misleading statements:

(a)    Number of loans whose LTVs were materially understated: 1,347

(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 438

-7-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    (c)    **Number of loans that suffered EPDs:** 14

2    (d)    **Number of loans in which the properties were stated to be owner-occupied
3           but were not:** 746

4    (e)    **Eliminating duplicates, number of loans about which the Defendants made
            untrue or misleading statements:** 2,018

5
     (f)    **Eliminating duplicates, percent of loans about which the Defendants made
6           untrue or misleading statements:** 51.6%

7                    **SCHEDULE 58 TO THE AMENDED COMPLAINT**

8        To the extent that this Schedule is incorporated by reference into allegations in the

9    complaint, those allegations are made against Defendants UBS, CWALT, and Countrywide
10
     Financial Corporation.
11

12   **Item 44.    Details of trust and certificate(s).**

13       (a)    **Dealer that sold the certificate(s) to the Bank:** UBS.

14       (b)    **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

15   Certificates, Series 2005-17 was a securitization in May 2005 of 3,420 mortgage loans, in two

16   groups. The mortgage loans in the collateral pool of this securitization were originated by

17   Countrywide Home Loans, Inc. CWALT 2005-17 Pros. Sup. S-78.

18
         (c)    **Description of the certificate(s) that the Bank purchased:** UBS offered and sold
19
20   to the Bank a senior certificate in this securitization, in tranche 1-A-2, for which the Bank paid

21   $100,000,000 plus accrued interest on May 31, 2005.

22       (d)    **Ratings of the certificate(s) when the Bank purchased them:** Standard &

23   Poor's— AAA; Moody's— Aaa.

24       (e)    **Current ratings of the certificate(s):** Standard & Poor's— B-; Moody's— B1.

25       (f)    **URL of prospectus supplement for this securitization:**
26
     http://www.sec.gov/Archives/edgar/data/1269518/000095012905005838/v09353b5e424b5.txt.
27

28
                                            -8-

(g)  **Registration statement pursuant or traceable to which the certificate(s) were issued:**

Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on April 21, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 52.**  **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)  "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2005-17 Pros. Sup. S-20.

(b)  In the section of the prospectus supplement entitled "The Mortgage Pool," UBS and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-17 Pros. Sup. S-22 to S-76. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 17 such tables for the loans in loan group 1A. In each table, the number of categories into which the loans were divided ranged from one to 58. Thus, in "The Mortgage Pool" section, UBS and CWALT made hundreds of statements about the original LTVs of the loans in loan group 1A. CWALT 2005-17 Pros. Sup. S-22 to S-36.

(c)  "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the group 1A mortgage loans was approximately 75.13%." CWALT 2005-17 Pros. Sup. S-26.

-9-

1      (d)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

2  statistics about the mortgage loans in loan group 1B. In these tables, UBS and CWALT similarly

3  made hundreds of statements about the original LTVs of the loans in loan group 1B. CWALT

4  2005-17 Pros. Sup. S-37 to S-49.

5

6      (e)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

7  group 1B mortgage loans was approximately 73.76%." CWALT 2005-17 Pros. Sup. S-40.

8      (f)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

9  statistics about the mortgage loans in loan group 1C. In these tables, UBS and CWALT similarly

10  made hundreds of statements about the original LTVs of the loans in loan group 1C. CWALT

11  2005-17 Pros. Sup. S-50 to S-61.

12      (g)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

13

14  group 1C mortgage loans was approximately 73.89%." CWALT 2005-17 Pros. Sup. S-53.

15      (h)    In "The Mortgage Pool" section, UBS and CWALT presented similar tables of

16  statistics about the mortgage loans in loan group 2. In these tables, UBS and CWALT similarly

17  made hundreds of statements about the original LTVs of the loans in loan group 2. CWALT

18  2005-17 Pros. Sup. S-62 to S-76.

19      (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

20

21  group 2 mortgage loans was approximately 75.67%." CWALT 2005-17 Pros. Sup. S-66.

22  **Item 62.**    Details of the results of the AVM analysis:

| | |
|---|---|
| Number of loans | 3,420 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,269 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,121 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $96,126,743 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 401 |

-10-



| | |
|---|---|
| Aggregate amount by which the true market values of those properties exceed their stated values | $28,512,301 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 182 |
| Weighted-average LTV, as stated by Defendants (group 1A) | 75.1% |
| Weighted-average LTV, as determined by the model (group 1A) | 83.4% |

**Item 71.    Undisclosed additional liens:**

    **(a)    Minimum number of properties with additional liens: 1,046**

    **(b)    Total reduction in equity from additional liens: $86,497,800**

    **(c)    Weighted-average reduction in equity from additional liens: 66.3%**

**Item 82.    Untrue or misleading statements about compliance with USPAP:**

    In the prospectus supplement, UBS and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-17 Pros. Sup. S-80.

**Item 88.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

    In the prospectus supplement, UBS and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, UBS and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1A into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-17 Pros. Sup. S-29.

(b) In the "Occupancy Types" table, UBS and CWALT stated that 73.63% of the mortgage loans in loan group 1A were secured by a "Primary Residence," 20.22% by an "Investment Property," and 6.15% by a "Secondary Residence." CWALT 2005-17 Pros. Sup. S-29.

(c) In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1B into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-17 Pros. Sup. S-43.

(d) In the "Occupancy Types" table, UBS and CWALT stated that 79.14% of the mortgage loans in loan group 1B were secured by a "Primary Residence," 15.42% by an "Investment Property," and 5.44% by a "Secondary Residence." CWALT 2005-17 Pros. Sup. S-43.

(e) In "The Mortgage Pool" section, UBS and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1C into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-17 Pros. Sup. S-56.

(f) In the "Occupancy Types" table, UBS and CWALT stated that 87.6% of the mortgage loans in loan group 1C were secured by a "Primary Residence," 9.3% by an "Investment Property," and 3.09% by a "Secondary Residence." CWALT 2005-17 Pros. Sup. S-56.

-12-

1    (g)    In "The Mortgage Pool" section, UBS and CWALT presented another table

2    entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the

3    categories "Primary Residence," "Investment Property," and "Secondary Residence." The table

4    made untrue and misleading statements about the number of mortgage loans, the aggregate

5    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

6    of these categories. CWALT 2005-17 Pros. Sup. S-68.

7

8    (h)    In the "Occupancy Types" table, UBS and CWALT stated that 75.45% of the

9    mortgage loans in loan group 2 were secured by a "Primary Residence," 18.49% by an

10   "Investment Property," and 6.06% by a "Secondary Residence." CWALT 2005-17 Pros. Sup.

11   S-68.

12   **Item 96.    Details of properties that were stated to be owner-occupied, but were not:**

13
     **(a)    Number of loans on which the owner of the property instructed tax**
14   **authorities to send property tax bills to him or her at a different address: 244**

15   **(b)    Number of loans on which the owner of the property could have, but did not,**
16   **designate the property as his or her homestead: 430**

17   **(c)    Number of loans on which the owner of the property owned three or more**
     **properties: 49**
18
     **(d)    Eliminating duplicates, number of loans about which one or more of**
19   **statements (a) through (c) is true: 571**

20   **Item 99.    Untrue or misleading statements about the underwriting standards of the**
21   **originators of the mortgage loans:**

22   On pages S-78 through S-83 of the prospectus supplement, UBS and CWALT made

23   statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated

24   or acquired all of the mortgage loans in the collateral pool of this securitization. All of those

25   statements are incorporated here by reference. In particular, UBS and CWALT stated that:

26

27

28
                                          -13-
     SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

(i) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-17 Pros. Sup. S-79.

(j) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-17 Pros. Sup. S-79.

**Item 106.    Early payment defaults:**

    **(a)    Number of the mortgage loans that suffered EPDs: 6**

    **(b)    Percent of the mortgage loans that suffered EPDs: 0.2%**

    **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

**Item 107.    90+ days delinquencies:**

    **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 609**

    **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 17.8%**

    **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

**Item 108.    30+ days delinquencies in this securitization:**

    **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 581**

    **(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 17.0%**

    **(c)    Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

1  **Item 117.**  **Statements about the ratings of the certificate(s) that the Bank purchased:**

2  On pages S-3 and S-4 of the prospectus supplement, UBS and CWALT made statements

3  about the ratings assigned to the certificates issued in this securitization. UBS and CWALT stated

4  that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by

5  Standard & Poor's Rating Services. These were the highest ratings available from these two

6  rating agencies.

7

8  UBS and CWALT also stated that: "The classes of certificates listed below will not be

9  offered unless they receive the respective ratings at least as high as those set forth below from

10  Standard & Poor's Ratings Services, . . . and from Moody's Investors Service, Inc.,

11  ('MOODY'S')." The requirement for class 1-A-2, from which this certificate was to be paid, was

12  for AAA from Standard & Poor's and Aaa from Moody's. CWALT 2005-17 Pros. Sup. S-3.

13  UBS and CWALT also stated that: "It is a condition to the issuance of the offered

14  certificates that they be rated the respective ratings set forth on page S-3 of the Summary of this

15  prospectus supplement by Standard & Poor's Ratings Services, . . . and by Moody's Investors

16

17  Service, Inc. ('MOODY'S')." CWALT 2005-17 Pros. Sup. S-130.

18  **Item 120.**  **Summary of loans about which the Defendants made untrue or misleading**

19  **statements:**

20

21  (a)  **Number of loans whose LTVs were materially understated: 1,121**

22  (b)  **Number of loans in which the owner's equity was reduced by 5% or more by**

23  **undisclosed additional liens: 1,046**

24  (c)  **Number of loans that suffered EPDs: 6**

25  (d)  **Number of loans in which the properties were stated to be owner-occupied**

26  **but were not: 571**

27  (e)  **Eliminating duplicates, number of loans about which the Defendants made**

28  **untrue or misleading statements: 1,651**

-15-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1

(f) Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.8%

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-16-

1 **SCHEDULE 59 TO THE AMENDED COMPLAINT**

2 To the extent that this Schedule is incorporated by reference into allegations in the

3 complaint, those allegations are made against Defendants UBS, CWALT, and Countrywide

4 Financial Corporation.

5

6 **Item 44.** **Details of trust and certificate(s).**

7 (a) **Dealer that sold the certificate(s) to the Bank:** UBS.

8 (b) **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through

9 Certificates, Series 2005-16 was a securitization in April 2005 of 1,804 mortgage loans, in one

10 pool. The mortgage loans in the collateral pool of this securitization were originated or acquired

11 by Countrywide Home Loans, Inc. CWALT 2005-16 Pros. Sup. S-37.

12 (c) **Description of the certificate(s) that the Bank purchased:** UBS offered and sold

13 to the Bank a senior certificate in this securitization, in tranche A-5, for which the Bank paid

14 $100,000,000 plus accrued interest on April 29, 2005.

15

16 (d) **Ratings of the certificate(s) when the Bank purchased them:** Standard &

17 Poor's— AAA; Moody's— Aaa.

18 (e) **Current ratings of the certificate(s):** Standard & Poor's— BB+; Moody's—

19 Ba3.

20

21 (f) **URL of prospectus supplement for this securitization:**

22 http://www.sec.gov/Archives/edgar/data/1269518/000095012905004500/v08052b5e424b5.txt.

23 (g) **Registration statement pursuant or traceable to which the certificate(s) were issued:**

24 Certificates in this trust, including the certificate that the Bank purchased, were issued

25 pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on

26 April 21, 2005. Annexed to the registration statement was a prospectus. The prospectus was

27

28

1   amended from time to time by prospectus supplements whenever a new series of certificates was

2   issued pursuant or traceable to that registration statement.

3   **Item 52.      Untrue or misleading statements about the LTVs of the mortgage loans:**

4           In the prospectus supplement, UBS and CWALT made the following statements about the

5   LTVs of the mortgage loans in the collateral pool of this securitization.

6

7           (a)     "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more

8   than 95.00%." CWALT 2005-16 Pros. Sup. S-18.

9           (b)     In the section of the prospectus supplement entitled "The Mortgage Pool," UBS

10  and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each

11  table focused on a certain characteristic of the loans (for example, current mortgage loan principal

12  balance) and divided the loans into categories based on that characteristic (for example, loans

13  with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to

14  $150,000, etc.). Each table then presented various data about the loans in each category. Among

15  these data was the "Weighted Average Original Loan-to-Value Ratio." There were 16 such tables

16  for the loans in the collateral pool. In each table, the number of categories into which the loans

17  were divided ranged from one to 79. Thus, in "The Mortgage Pool" section, UBS and CWALT

18  made hundreds of statements about the original LTVs of the loans in the collateral pool. CWALT

19  2005-16 Pros. Sup. S-20 to S-35.

20

21          (c)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

22  Mortgage Loans was approximately 74.09%." CWALT 2005-16 Pros. Sup. S-24.

-18-

1  **Item 62.    Details of the results of the AVM analysis:**

| Number of loans | 1,804 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 1,192 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 610 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $56,269,031 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 207 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,441,602 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 97 |
| Weighted-average LTV, as stated by Defendants | 74.1% |
| Weighted-average LTV, as determined by the model | 83.9% |

**Item 65.    Evidence from subsequent sales of refinanced properties:**

Of the 1,804 mortgage loans in the collateral pool, 1,047 were taken out to refinance, rather than to purchase, properties. For those 1,047 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,047 properties, 218 were subsequently sold for a total of approximately $101,186,250. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents sent to the Bank was $115,925,300. Thus, those properties were sold for 87.3% of the value ascribed to them, a difference of 12.7%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71.    Undisclosed additional liens:**

    (a)    **Minimum number of properties with additional liens: 169**

    (b)    **Total reduction in equity from additional liens: $10,964,010**

    (c)    **Weighted-average reduction in equity from additional liens: 52.0**

-19-

**Item 82.**    **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-16 Pros. Sup. S-39.

**Item 88.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, UBS and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-16 Pros. Sup. S-27.

(b)    In the "Occupancy Types" table, UBS and CWALT stated that 80.04% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 15.18% by an "Investment Property," and 4.77% by a "Secondary Residence." CWALT 2005-16 Pros. Sup. S-27.

**Item 96.**    **Details of properties that were stated to be owner-occupied, but were not:**

(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 136

(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 234

-20-

(c)     Number of loans on which the owner of the property owned three or more properties: 20

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 325

**Item 99.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-37 through S-42 of the prospectus supplement, UBS and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated or acquired all of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference. In particular, UBS and CWALT stated that:

(a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-16 Pros. Sup. S-38.

(b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-16 Pros. Sup. S-38.

**Item 106.     Early payment defaults:**

(a)     Number of the mortgage loans that suffered EPDs: 3

(b)     Percent of the mortgage loans that suffered EPDs: 0.2%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%

**Item 107.     90+ days delinquencies:**

(a)     Number of the mortgage loans that suffered 90+ days delinquencies: 326

(b)     Percent of the mortgage loans that suffered 90+ days delinquencies: 18.1%

-21-

(c)   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

**Item 108.**   **30+ days delinquencies in this securitization:**

(a)   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 311

(b)   **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 17.2%

(c)   **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 117.**   **Statements about the ratings of the certificate(s) that the Bank purchased:**

On page S-3 of the prospectus supplement, UBS and CWALT made statements about the ratings assigned to the certificates issued in this securitization. UBS and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and CWALT also stated that: "The classes of certificates listed below will not be offered unless they receive the respective ratings at least as high as those set forth below from Standard & Poor's Ratings Services . . . and from Moody's Investors Service, Inc. ("MOODY'S")." The requirement for class A-5 was for AAA from Standard & Poor's and Aaa from Moody's. CWALT 2005-16 Pros. Sup. S-3.

UBS and CWALT also stated that: "It is a condition to the issuance of the offered certificates that they be rated the respective ratings set forth on page S-3 of the Summary of this prospectus supplement by Standard & Poor's Ratings Services, . . . and by Moody's Investors Service, Inc. ("MOODY'S")." CWALT 2005-16 Pros. Sup. S-83.

**Item 120.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)   **Number of loans whose LTVs were materially understated:** 610

-22-

1
2

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 169**

3

    (c)    **Number of loans that suffered EPDs: 3**

4

    (d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 325**

5
6

    (e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 902**

7
8

    (f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 50.0%**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

1    **SCHEDULE 60 TO THE AMENDED COMPLAINT**

2        To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendants Banc of America and Banc of America

4    Funding.

5        **Item 44.    Details of trust and certificate(s).**

6

7        **(a)    Dealer that sold the certificate(s) to the Bank:** Banc of America.

8        **(b)    Description of the trust:** Banc of America Funding, Mortgage Certificate-Backed

9    Certificates, Series 2007-R1 was a re-securitization in September 2007. The assets of Banc of

10   America Funding, Mortgage Certificate-Backed Certificates consisted primarily of two senior

11   classes of mortgage pass-through certificates issued by Countrywide Alternative Loan Trust

12   2007-HY6 (referred to as the "Underlying Securitization"). Those certificates were in tranches A-

13   1 and A-3 of that trust.

14

15       The Underlying Securitization was a securitization in June 2007 of 1,338 mortgage loans,

16   in one group. Countrywide Home Loans, Inc. originated or acquired the mortgage loans in the

17   collateral pool of the Underlying Securitization. CWALT 2007-HY6 Pros. Sup. S-35.

18       In connection with its offer and sale of this certificate to the Bank, Banc of America and

19   Banc of America Funding sent numerous documents to the Bank at its office in San Francisco

20   County. These documents included an offering memorandum and the prospectus supplement filed

21   with the SEC for the Underlying Securitization. the offering memorandum, Banc of America and

22

23   Banc of America Funding made, and in the prospectus supplement, Banc of America made,

24   statements of material fact about the certificate that it offered and sold to the Bank and the

25   certificates that served as collateral for Banc of America Funding, Mortgage Certificate-Backed

26   Certificates, Series 2007-R1.

27

28

-24-

1    (c)    **Description of the certificate(s) that the Bank purchased:** Banc of America

2    offered and sold to the Bank a senior certificate in Banc of America Funding, Mortgage

3    Certificate-Backed Certificates, Series 2007-R1, in tranche A-1, for which the Bank paid

4    $137,779,383 plus accrued interest on September 28, 2007.

5
6    (d)    **Ratings of the certificate(s) when the Bank purchased them:** Standard &

7    Poor's – AAA; Fitch – AAA.

8    (e)    **Current ratings of the certificate(s):** Standard & Poor's ·  AAA; Fitch ·  B.

9    (f)    **URL of prospectus supplement for this securitization:** A true copy of the

10   prospectus supplement for the Underlying Securitization is available at

11   http://www.sec.gov/Archives/edgar/data/1269518/000136231007001250/c70737e424b5.htm.

12   **Item 52.**    **Untrue or misleading statements about the LTVs of the mortgage loans:**

13
14   In the prospectus supplement and offering memorandum, Banc of America and Bank of

15   America Funding made the following statements about the LTVs of the mortgage loans in the

16   collateral pool of the Underlying Securitization.

17   As of the cut-off date, the weighted average original LTV of the mortgage loans in the

18   collateral pool of the Underlying Securitization was 73.94%. CWALT 2007-HY6 Pros. Sup. S-5.

19   "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than

20   100%." CWALT 2007-HY6 Pros. Sup. S-32.

21
22   In Annex A of the prospectus supplement ("The Mortgage Pool"), Banc of America

23   presented tables of statistics about the mortgage loans in the collateral pool of the Underlying

24   Securitization. Each table focused on a certain characteristic of the loans (for example, current

25   mortgage loan principal balance) and divided the loans into categories based on that characteristic

26   (for example, loans with current principal balances of $100,000.01 to $150,000, $150,000.01 to

27   $200,000, $200,000.01 to $250,000, etc.). Each table then presented various data about the loans

28
                                    -25-

1   in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio."

2   There were 21 such tables in Annex A for all of the mortgage loans in the collateral pool. In each

3   table, the number of categories into which the loans were divided ranged from two to 56. Thus, in

4   Annex A, Banc of America made hundreds of statements about the original LTVs of the loans in

5   the collateral pool. CWALT 2007-HY6 Pros. Sup. A-1 through A-17.

6

7       "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

8   Mortgage Loans was approximately 73.94%." CWALT 2007-HY6 Pros. Sup. A-6.

9       In Exhibit 5 of the offering memorandum ("Mortgage Loan Data"), Banc of America and

10  Banc of America Funding presented tables of statistics about the mortgage loans in the collateral

11  pool of the Underlying Securitization. BAFC 2007-R1 Off. Mem. 5-2 to 5-13. Each table focused

12  on a certain characteristic of the loans (for example, current mortgage loan principal balance) and

13  divided the loans into categories based on that characteristic (for example, loans with current

14  principal balances of $100,000.01 to $150,000, $150,000.01 to $200,000, $200,000.01 to

15  $250,000, etc.). Each table then presented various data about the loans in each category. Among

16  these data was the "Weighted Average Original Loan-to-Value Ratio." There were 19 such tables

17  in Exhibit 5 for all of the mortgage loans in the collateral pool. In each table, the number of

18  categories into which the loans were divided ranged from two to 56. Thus, in Exhibit 5, Banc of

19  America and Banc of America Funding made hundreds of statements about the original LTVs of

20

21  all of the loans in the collateral pool. BAFC 2007-R1 Off. Mem. 5-2 to 5-13.

22

23      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

24  Mortgage Loans was approximately 74.02%." BAFC 2007-R1 Off. Mem. 5-4.

25

26

27

28

-26-

**Item 62.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,338 |
| Number of properties on which there was enough information for the model to determine a true market value | 907 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 711 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $131,388,128 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 49 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,310,500 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 249 |
| Weighted-average LTV, as stated by Defendants (as presented in BAFC 2007-R1 Off. Mem. for collateral pool) | 74.02% |
| Weighted-average LTV, as stated by Defendants (as presented in CWALT 2007-HY6 Pros. Sup. For collateral pool) | 73.94% |
| Weighted-average LTV, as determined by the model | 94.8% |

**Item 65.     Evidence from subsequent sales of refinanced properties:**

Of the 1,338 mortgage loans in the collateral pool, 688 were taken out to refinance, rather than to purchase, properties. For those 688 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 688 properties, 100 were subsequently sold for a total of approximately $52,847,838. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $94,747,800. Thus, those properties were sold for 55.8% of the value ascribed to them, a difference of 44.2%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 82.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Banc of America made statements about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc.: "All

-27-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1   appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

2   effect." CWALT 2007-HY6 Pros. Sup. S-37.

3   **Item 88.     Untrue or misleading statements about owner-occupancy of the properties**

4   **that secured the mortgage loans:**

5

6       In the prospectus supplement and the offering memorandum, Banc of America and Banc

7   of America Funding made the following statements about the occupancy status of the properties

8   that secured the mortgage loans in the collateral pool of the Underlying Securitization.

9       In Annex A of the prospectus supplement, described in Item 52, Banc of America

10  presented a table entitled "Occupancy Types." This table divided the mortgage loans in the

11  collateral pool of the Underlying Securitization into the categories "Primary Residence,"

12  "Investment Property," and "Secondary Residence." The table made untrue and misleading

13

14  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

15  the percent of aggregate principal balance outstanding in each of these categories. CWALT 2007-

16  HY6 Pros. Sup. A-9.

17      In the "Occupancy Types" table, Banc of America stated that 81.39% of all of the

18  mortgage loans in the collateral pool of the Underlying Securitization were secured by a "Primary

19  Residence," 11.81% by an "Investment Property," and 6.8% by a "Secondary Residence."

20  CWALT 2007-HY6 Pros. Sup. A-9.

21

22      In Exhibit 5 of the offering memorandum, described in Item 52, Banc of America and

23  Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the

24  Mortgage Loans." This table divided the mortgage loans in the collateral pool of the Underlying

25  Securitization into the categories " "Primary Residence," "Investment Property," and "Second

26  Home." The table made untrue and misleading statements about the number of mortgage loans,

27

28

-28-

the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2007-R1 Off. Mem. 5-2.

In the "Occupancy of Mortgaged Properties of the Mortgage Loans." table, Banc of America and Bank of America Funding stated that 81.33% of all of the mortgage loans in the collateral pool of the Underlying Securitization were secured by a "Primary Residence," 11.85% by an "Investment Property," and 6.82% by a "Second Home."

**Item 96.** **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)** **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 119**

    **(b)** **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 273**

    **(c)** **Number of loans on which the owner of the property owned three or more properties: 27**

    **(d)** **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 354**

**Item 99.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-35 through S-40 the prospectus supplement, Banc of America made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, Banc of America stated that:

"Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-HY6 Pros. Sup. S-36.

**Item 106.** **Early payment defaults:**

    **(a)** **Number of the mortgage loans that suffered EPDs: 85**

    **(b)** **Percent of the mortgage loans that suffered EPDs: 6.4%**

-29-

   (c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%

Item 107.   90+ days delinquencies:

   (a)   Number of the mortgage loans that suffered 90+ days delinquencies: 735

   (b)   Percent of the mortgage loans that suffered 90+ days delinquencies: 54.9%

   (c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 33.9%

Item 108.   30+ days delinquencies in this securitization:

   (a)   Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 723

   (b)   Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 54.0%

   (c)   Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

Item 117.   Statements about the ratings of the certificate(s) that the Bank purchased:

On pages ii, 8 and 72 of the offering memorandum, Banc of America and Banc of America Funding made statements about the ratings assigned to the certificate issued in this securitization. Banc of America and Banc of America Funding stated that the Bank's certificate was rated AAA by each of Standard & Poor's Rating Services and Fitch Ratings. These were the highest ratings available from these two rating agencies.

Banc of America and Banc of America Funding also stated: "It is a condition to the issuance of the [Bank's certificate] that [it] receive the ratings of [AAA] by Fitch Ratings and Standard & Poor's . . . ." DBALT BAFC 2007-R1 Off. Mem. 8.

Item 120.   Summary of loans about which the Defendants made untrue or misleading statements:

   (a)   Number of loans whose LTVs were materially understated: 711

-30-

1      (b)    **Number of loans that suffered EPDs: 85**

2      (c)    **Number of loans in which the properties were stated to be owner-occupied but were not: 354**

3

4      (d)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 871**

5

6      (e)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 65.1%**

7

3428/001/X119859.v1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-31-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)



1   GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
    ROBERT A. GOODIN, State Bar No. 061302
2       rgoodin@goodinmacbride.com
3   FRANCINE T. RADFORD, State Bar No. 168269
        fradford@goodinmacbride.com
4   ANNE H. HARTMAN, State Bar No. 184556
        ahartman@goodinmacbride.com
5   505 Sansome Street, Suite 900
    San Francisco, California 94111
6   Telephone:    (415) 392-7900
7   Facsimile:    (415) 398-4321

8   GRAIS & ELLSWORTH LLP
    DAVID J. GRAIS (pro hac application submitted herewith)
9   KATHRYN C. ELLSWORTH (pro hac app. submitted herewith)
    OWEN L. CYRULNIK (pro hac application submitted herewith)
10  70 East 55th Street
11  New York, New York 10022
    Telephone:    (212) 755-0100
12  Facsimile:    (212) 755-0052

13  Attorneys for Plaintiff
14  Federal Home Loan Bank of San Francisco

15          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

16          IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

17

18  FEDERAL HOME LOAN BANK OF SAN          No. CGC-10-497840
19  FRANCISCO,
                                           **VOLUME 4 OF SCHEDULES OF**
20          Plaintiff,                     **FIRST AMENDED COMPLAINT**
                                           **(SCHEDULES 61-78)**
21  v.

22  CREDIT SUISSE SECURITIES (USA) LLC,
    F/K/A CREDIT SUISSE FIRST BOSTON
23  LLC;
24  CREDIT SUISSE FIRST BOSTON
    MORTGAGE SECURITIES CORP.;
25  DEUTSCHE BANK SECURITIES, INC.;
    DEUTSCHE ALT-A SECURITIES, INC.;
26  J.P. MORGAN SECURITIES, INC., F/K/A
27  BEAR STEARNS & CO., INC.;
    STRUCTURED ASSET MORTGAGE
28  INVESTMENTS II, INC.;

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  THE BEAR STEARNS COMPANIES, LLC,
   F/K/A THE BEAR STEARNS COMPANIES,
2  INC.;
3  RBS SECURITIES, INC., F/K/A
   GREENWICH CAPITAL MARKETS, INC.;
4  RBS ACCEPTANCE, INC. F/K/A
   GREENWICH CAPITAL ACCEPTANCE,
5  INC.;
   MORGAN STANLEY & CO.
6  INCORPORATED;
7  UBS SECURITIES, LLC;
   MORTGAGE ASSET SECURITIZATION
8  TRANSACTIONS, INC.;
   BANC OF AMERICA SECURITIES LLC;
9  BANC OF AMERICA FUNDING
   CORPORATION;
10 BANC OF AMERICA MORTGAGE
11 SECURITIES, INC.;
   COUNTRYWIDE SECURITIES
12 CORPORATION;
   CWALT, INC.;
13 COUNTRYWIDE FINANCIAL
   CORPORATION; AND,
14 DOES 1-50,
15
            Defendants.
16
17
18
19
20
21
22
23
24
25
26
27
28
                        -2-
     SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

 

1

## SCHEDULE 61 TO THE AMENDED COMPLAINT

2      To the extent that this Schedule is incorporated by reference into allegations in the

3   complaint, those allegations are made against Defendants Banc of America and Banc of America

4   Funding.

5

6   **Item 44.      Details of trust and certificate(s).**

7      **(a)      Dealer that sold the certificate(s) to the Bank:** Banc of America.

8      **(b)      Description of the trust:** Banc of America Funding Corporation, Mortgage Pass-

9   Through Certificates, Series 2007-E was a securitization in September 2007 of 1,549 mortgage

10   loans, in 12 groups. The mortgage loans in the collateral pool of this securitization were

11   originated by Bank of America, N.A. BAFC 2007-E Pros. Sup. S-9, S-13 and S-28.

12      **(c)      Description of the certificate(s) that the Bank purchased:** Banc of America

13   offered and sold to the Bank two senior certificates in this securitization, in tranche C-A-1 and

14   tranche C-A-2, for which the Bank paid $165,714,052 and $211,425,110 plus accrued interest,

15   respectively, on September 28, 2007.

16      **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard &

17   Poor's—AAA; Fitch—AAA.

18

19      **(e)      Current ratings of the certificate(s):** Standard & Poor's —CCC. Fitch—CC.

20      **(f)      URL of prospectus supplement for this securitization:**

21   http://www.sec.gov/Archives/edgar/data/934377/000137943407000160/prosupp.txt

22

23   **Item 52.      Untrue or misleading statements about the LTVs of the mortgage loans:**

24      In the prospectus supplement, Banc of America and Banc of America Funding made the

25   following statements about the LTVs of the borrowers whose mortgage loans were in the

26   collateral pool of this securitization.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     (a)    The original LTVs of the mortgage loans in Group 1 ranged from 40% to 80%,

2   with a weighted average of 76.22%. BAFC 2007-E Pros. Sup. S-13.

3     (b)    The original LTVs of the mortgage loans in Group 2 ranged from 37.68% to 90%,

4
5   with a weighted average of 75.57% BAFC 2007-E Pros. Sup. S-14.

6     (c)    The original LTVs of the mortgage loans in Group 3 ranged from 31.2% to 80%,

7   with a weighted average of 74.14%. BAFC 2007-E Pros. Sup. S-14.

8     (d)    The original LTVs of the mortgage loans in Group 4 ranged from 36.58% to

9   100%, with a weighted average of 73.81%. BAFC 2007-E Pros. Sup. S-15.

10    (e)    The original LTVs of the mortgage loans in Group 5 ranged from 14.93% to 85%,

11   with a weighted average of 71.19%. BAFC 2007-E Pros. Sup. S-15.

12    (f)    The original LTVs of the mortgage loans in Group 6 ranged from 30.81% to 80%,

13
14   with a weighted average of 71.85%. BAFC 2007-E Pros. Sup. S-16.

15    (g)    The original LTVs of the mortgage loans in Group 7 ranged from 33.2% to 90%,

16   with a weighted average of 74.02%. BAFC 2007-E Pros. Sup. S-16.

17    (h)    The original LTVs of the mortgage loans in Group 8 ranged from 18.18% to 95%,

18   with a weighted average of 75.46%. BAFC 2007-E Pros. Sup. S-17.

19    (i)    The original LTVs of the mortgage loans in Group 9 ranged from 45.15% to 85%,

20
21   with a weighted average of 76.73%. BAFC 2007-E Pros. Sup. S-17.

22    (j)    The original LTVs of the mortgage loans in Group 10 ranged from 65% to 95%,

23   with a weighted average of 79.25%. BAFC 2007-E Pros. Sup. S-18.

24    (k)    The original LTVs of the mortgage loans in Group 11 ranged from 51.02% to

25   90%, with a weighted average of 77.56%. BAFC 2007-E Pros. Sup. S-18.

26    (l)    The original LTVs of the mortgage loans in Group 12 ranged from 70% to 100%,

27
28   with a weighted average of 78.17%. BAFC 2007-E Pros. Sup. S-19.

-2-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(m)   The original LTVs of the mortgage loans in Group J, which consists of the loans in Groups 1 through 6, ranged from 14.93% to 100%, with a weighted average of 73.71%. BAFC 2007-E Pros. Sup. S-19.

(n)   The original LTVs of the mortgage loans in Group X, which consists of the loans in Groups 7 through 12, ranged from 18.18% to 100%, with a weighted average of 77%. BAFC 2007-E Pros. Sup. S-20.

(o)   In Appendix A of the prospectus supplement ("Mortgage Loan Data"), Banc of America and Banc of America Funding presented tables of statistics about the mortgage loans in the collateral pool. BAFC 2007-E Pros. Sup. A-2 to A-112. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $50,000.01 to $100,000, $100,000.01 to $150,000, $150,000.01 to $200,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 16 such tables in Appendix A for the loans in Group 1. In each table, the number of categories into which the loans were divided ranged from one to 19. Thus, in Appendix A, Banc of America and Banc of America Funding made hundreds of statements about the original LTVs of the loans in Group 1. BAFC 2007-E Pros. Sup. A-2 to A-9.

(p)   "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 1 Mortgage Loans is expected to be approximately 76.22%." BAFC 2007-E Pros. Sup. A-5.

(q)   In Appendix A, Banc of America and Banc of America Funding presented similar tables of statistics about the mortgage loans in Group 2. In these tables, Banc of America and

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1    Banc of America Funding similarly made hundreds of statements about the original LTVs of the

2    loans in Group 2. BAFC 2007-E Pros. Sup. A-10 to A-17.

3         (r)      "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

4    of the Group 2 Mortgage Loans is expected to be approximately 75.57%." BAFC 2007-E Pros.

5
     Sup. A-13.
6

7         (s)      In Appendix A, Banc of America and Banc of America Funding presented similar

8    tables of statistics about the mortgage loans in Group 3. In these tables, Banc of America and

9    Banc of America Funding similarly made hundreds of statements about the original LTVs of the

10   loans in Group 3. BAFC 2007-E Pros. Sup. A-18 to A-24.

11        (t)      "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

12   of the Group 3 Mortgage Loans is expected to be approximately 74.14%." BAFC 2007-E Pros.

13
     Sup. A-21.
14

15        (u)      In Appendix A, Banc of America and Banc of America Funding presented similar

16   tables of statistics about the mortgage loans in Group 4. In these tables, Banc of America and

17   Banc of America Funding similarly made hundreds of statements about the original LTVs of the

18   loans in Group 4. BAFC 2007-E Pros. Sup. A-25 to A-32.

19
          (v)      "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination
20
     of the Group 4 Mortgage Loans is expected to be approximately 73.81%." BAFC 2007-E Pros.
21
     Sup. A-28.
22

23        (w)      In Appendix A, Banc of America and Banc of America Funding presented similar

24   tables of statistics about the mortgage loans in Group 5. In these tables, Banc of America and

25   Banc of America Funding similarly made hundreds of statements about the original LTVs of the

26   loans in Group 5. BAFC 2007-E Pros. Sup. A-33 to A-40.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     (x)     "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

2  of the Group 5 Mortgage Loans is expected to be approximately 71.19%." BAFC 2007-E Pros.

3  Sup. A-36.

4

5     (y)     In Appendix A, Banc of America and Banc of America Funding presented similar

6  tables of statistics about the mortgage loans in Group 6. In these tables, Banc of America and

7  Banc of America Funding similarly made hundreds of statements about the original LTVs of the

8  loans in Group 6. BAFC 2007-E Pros. Sup. A-41 to A-46.

9     (z)     "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

10  of the Group 6 Mortgage Loans is expected to be approximately 71.85%." BAFC 2007-E Pros.

11  Sup. A-43.

12

13     (aa)     In Appendix A, Banc of America and Banc of America Funding presented similar

14  tables of statistics about the mortgage loans in Group 7. In these tables, Banc of America and

15  Banc of America Funding similarly made hundreds of statements about the original LTVs of the

16  loans in Group 7. BAFC 2007-E Pros. Sup. A-47 to A-54.

17     (bb)     "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

18  of the Group 7 Mortgage Loans is expected to be approximately 74.02%." BAFC 2007-E Pros.

19  Sup. A-50.

20

21     (cc)     In Appendix A, Banc of America and Banc of America Funding presented similar

22  tables of statistics about the mortgage loans in Group 8. In these tables, Banc of America and

23  Banc of America Funding similarly made hundreds of statements about the original LTVs of the

24  loans in Group 8. BAFC 2007-E Pros. Sup. A-55 to A-62.

25     (dd)     "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

26  of the Group 8 Mortgage Loans is expected to be approximately 75.46%." BAFC 2007-E Pros.

27  Sup. A-58.

28



GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (ee)    In Appendix A, Banc of America and Banc of America Funding presented similar
2    tables of statistics about the mortgage loans in Group 9. In these tables, Banc of America and
3    Banc of America Funding similarly made hundreds of statements about the original LTVs of the
4    loans in Group 9. BAFC 2007-E Pros. Sup. A-63 to A-70.
5
6    (ff)    "As of the Cut-off Date, the weighted average Loan to Value Ratio at origination
7    of the Group 9 Mortgage Loans is expected to be approximately 76.73%." BAFC 2007-E Pros.
8    Sup. A-66.

9    (gg)    In Appendix A, Banc of America and Banc of America Funding presented similar
10   tables of statistics about the mortgage loans in Group 10. In these tables, Banc of America and
11   Banc of America Funding similarly made hundreds of statements about the original LTVs of the
12   loans in Group 10. BAFC 2007-E Pros. Sup. A-71 to A-78.

13   (hh)    "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination
14   of the Group 10 Mortgage Loans is expected to be approximately 79.25%." BAFC 2007-E Pros.
15   Sup. A-74.

17   (ii)    In Appendix A, Banc of America and Banc of America Funding presented similar
18   tables of statistics about the mortgage loans in Group 11. In these tables, Banc of America and
19   Banc of America Funding similarly made hundreds of statements about the original LTVs of the
20   loans in Group 11. BAFC 2007-E Pros. Sup. A-79 to A-86.
21
22   (jj)    "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination
23   of the Group 11 Mortgage Loans is expected to be approximately 77.56%." BAFC 2007-E Pros.
24   Sup. A-82.

25   (kk)    In Appendix A, Banc of America and Banc of America Funding presented similar
26   tables of statistics about the mortgage loans in Group 12. In these tables, Banc of America and
27
28

-6-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Banc of America Funding similarly made hundreds of statements about the original LTVs of the

2   loans in Group 12. BAFC 2007-E Pros. Sup. A-87 to A-92.

3       (ll)   "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

4   of the Group 12 Mortgage Loans is expected to be approximately 78.17%." BAFC 2007-E Pros.

5

6   Sup. A-89.

7       (mm)   In Appendix A, Banc of America and Banc of America Funding presented similar

8   tables of statistics about the mortgage loans in Group J, which consists of the loans in Groups 1

9   through 6. In these tables, Banc of America and Banc of America Funding similarly made

10  hundreds of statements about the original LTVs of the loans in Group J. BAFC 2007-E Pros. Sup.

11  A-93 to A-102.

12      (nn)   "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

13  of the Group J Mortgage Loans is expected to be approximately 73.71%." BAFC 2007-E Pros.

14

15  Sup. A-97.

16      (oo)   In Appendix A, Banc of America and Banc of America Funding presented similar

17  tables of statistics about the mortgage loans in Group X, which consists of the loans in Groups 7

18  through 12. In these tables, Banc of America and Banc of America Funding similarly made

19  hundreds of statements about the original LTVs of all of the loans in Group X. BAFC 2007-E

20

21  Pros. Sup. A-103 to A-112.

22      (pp)   "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination

23  of the Group X Mortgage Loans is expected to be approximately 77.00%." BAFC 2007-E Pros.

24  Sup. A-107.

25

26

27

28

-7-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

**Item 62.    Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,549 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,006 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 762 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $149,707,574 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 72 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $10,248,500 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 266 |
| Weighted-average LTV, as stated by Defendants | 76.22 |
| Weighted-average LTV, as determined by the model | 95.1% |

**Item 65.    Evidence from subsequent sales of refinanced properties:**

Of the 1,549 mortgage loans in the collateral pool, 800 were taken out to refinance, rather

than to purchase, properties. For those 800 loans, the value (denominator) in the LTV was an

appraised value rather than a sale price. Of those 800 properties, 68 were subsequently sold for a

total of approximately $52,692,605. The total value ascribed to those same properties in the LTV

data reported in the prospectus supplements and other documents sent to the Bank was

$76,469,800. Thus, those properties were sold for 68.9% of the value ascribed to them, a

difference of 31.1%. This difference cannot be accounted for by declines in house prices in the

areas in which those properties were located.

**Item 71.    Undisclosed additional liens:**

  **(a)    Minimum number of properties with additional liens: 277**

  **(b)    Total reduction in equity from additional liens: $36,406,155**

  **(c)    Weighted-average reduction in equity from additional liens: 52.9%**

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse,* 497840)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 88.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Funding made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Appendix A of the prospectus supplement, described in Item 52, Banc of America and Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the Group 1 Mortgage Loans." This table divided the mortgage loans in Group 1 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-2.

(b) In the "Occupancy of Mortgaged Properties of the Group 1 Mortgage Loans" table, Banc of America and Banc of America Funding stated that 83.81% of the mortgage loans in Group 1 were secured by a "Primary Residence," 6.48% by an "Investor Property," and 9.71% by a "Second Home." BAFC 2007-E Pros. Sup. A-2.

(c) In Appendix A, Banc of America and Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the Group 2 Mortgage Loans." This table divided the mortgage loans in Group 2 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-10.

(d) In the "Occupancy of Mortgaged Properties of the Group 2 Mortgage Loans" table, Banc of America and Banc of America Funding stated that 83.54% of the mortgage loans in

-9-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Group 2 were secured by a "Primary Residence," 6.65% by an "Investor Property," and 9.81% by a "Second Home." BAFC 2007-E Pros. Sup. A-10.

(e) In Appendix A, Banc of America and Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the Group 3 Mortgage Loans." This table divided the mortgage loans in Group 3 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-18.

(f) In the "Occupancy of Mortgaged Properties of the Group 3 Mortgage Loans" table, Banc of America and Banc of America Funding stated that 87.68% of the mortgage loans in Group 3 were secured by a "Primary Residence," 7.6% by an "Investor Property," and 4.71% by a "Second Home." BAFC 2007-E Pros. Sup. A-18.

(g) In Appendix A, Banc of America and Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the Group 4 Mortgage Loans." This table divided the mortgage loans in Group 4 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-25.

(h) In the "Occupancy of Mortgaged Properties of the Group 4 Mortgage Loans" table, Banc of America and Banc of America Funding stated that 85.67% of the mortgage loans in Group 4 were secured by a "Primary Residence," 4.62% by an "Investor Property," and 9.71% by a "Second Home." BAFC 2007-E Pros. Sup. A-25.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(i)     In Appendix A, Banc of America and Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the Group 5 Mortgage Loans." This table divided the mortgage loans in Group 5 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-33.

(j)     In the "Occupancy of Mortgaged Properties of the Group 5 Mortgage Loans" table, Banc of America and Banc of America Funding stated that 91.54% of the mortgage loans in Group 5 were secured by a "Primary Residence," 2.12% by an "Investor Property," and 6.34% by a "Second Home." BAFC 2007-E Pros. Sup. A-33.

(k)     In Appendix A, Banc of America and Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the Group 6 Mortgage Loans." This table divided the mortgage loans in Group 6 into the categories "Primary Residence" and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-41.

(l)     In the "Occupancy of Mortgaged Properties of the Group 6 Mortgage Loans" table, Banc of America and Banc of America Funding stated that 93.92% of the mortgage loans in Group 6 were secured by a "Primary Residence" and 6.08% by a "Second Home." BAFC 2007-E Pros. Sup. A-41.

(m)     In Appendix A, Banc of America and Banc of America Funding presented a table entitled "Occupancy of Mortgaged Properties of the Group 7 Mortgage Loans." This table divided the mortgage loans in Group 7 into the categories "Primary Residence," "Investor

-11-

1  Property," and "Second Home." The table made untrue and misleading statements about the

2  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

3  aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-

4  47.

5

6      (n)    In the "Occupancy of Mortgaged Properties of the Group 7 Mortgage Loans"

7  table, Banc of America and Banc of America Funding stated that 86.44% of the mortgage loans in

8  Group 7 were secured by a "Primary Residence," 10.42% by an "Investor Property," and 3.15%

9  by a "Second Home." BAFC 2007-E Pros. Sup. A-47.

10      (o)    In Appendix A, Banc of America and Banc of America Funding presented a table

11  entitled "Occupancy of Mortgaged Properties of the Group 8 Mortgage Loans." This table

12  divided the mortgage loans in Group 8 into the categories "Primary Residence," "Investor

13  Property," and "Second Home." The table made untrue and misleading statements about the

14  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

15  aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-

16  55.

17

18      (p)    In the "Occupancy of Mortgaged Properties of the Group 8 Mortgage Loans"

19  table, Banc of America and Banc of America Funding stated that 85.28% of the mortgage loans in

20  Group 8 were secured by a "Primary Residence," 8.81% by an "Investor Property," and 5.91% by

21  a "Second Home." BAFC 2007-E Pros. Sup. A-55.

22

23      (q)    In Appendix A, Banc of America and Banc of America Funding presented a table

24  entitled "Occupancy of Mortgaged Properties of the Group 9 Mortgage Loans." This table

25  divided the mortgage loans in Group 9 into the categories "Primary Residence," "Investor

26  Property," and "Second Home." The table made untrue and misleading statements about the

27  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

28

-12-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-

2  63.

3  (r)  In the "Occupancy of Mortgaged Properties of the Group 9 Mortgage Loans"

4  table, Banc of America and Banc of America Funding stated that 81.11% of the mortgage loans in

5  
6  Group 9 were secured by a "Primary Residence," 13.98% by an "Investor Property," and 4.9% by

7  a "Second Home." BAFC 2007-E Pros. Sup. A-63.

8  (s)  In Appendix A, Banc of America and Banc of America Funding presented a table

9  entitled "Occupancy of Mortgaged Properties of the Group 10 Mortgage Loans." This table

10  divided the mortgage loans in Group 10 into the categories "Primary Residence," "Investor

11  Property," and "Second Home." The table made untrue and misleading statements about the

12  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

13  
14  aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-

15  71.

16  (t)  In the "Occupancy of Mortgaged Properties of the Group 10 Mortgage Loans"

17  table, Banc of America and Banc of America Funding stated that 82.44% of the mortgage loans in

18  Group 10 were secured by a "Primary Residence," 10.34% by an "Investor Property," and 7.22%

19  by a "Second Home." BAFC 2007-E Pros. Sup. A-71.

20  
21  (u)  In Appendix A, Banc of America and Banc of America Funding presented a table

22  entitled "Occupancy of Mortgaged Properties of the Group 11 Mortgage Loans." This table

23  divided the mortgage loans in Group 11 into the categories "Primary Residence," "Investor

24  Property," and "Second Home." The table made untrue and misleading statements about the

25  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

26  aggregate principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-

27  79.

28

-13-

1    (v)    In the "Occupancy of Mortgaged Properties of the Group 11 Mortgage Loans"

2    table, Banc of America and Banc of America Funding stated that 80.67% of the mortgage loans in

3    Group 11 were secured by a "Primary Residence," 15.52% by an "Investor Property," and 3.81%

4    by a "Second Home." BAFC 2007-E Pros. Sup. A-79.

5

6    (w)    In Appendix A, Banc of America and Banc of America Funding presented a table

7    entitled "Occupancy of Mortgaged Properties of the Group 12 Mortgage Loans." This table

8    divided the mortgage loans in Group 12 into the categories "Primary Residence," "Investor

9    Property," "Second Home." The table made untrue and misleading statements about the number

10   of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

11   principal balance outstanding in each of these categories. BAFC 2007-E Pros. Sup. A-87.

12

13   (x)    In the "Occupancy of Mortgaged Properties of the Group 12 Mortgage Loans"

14   table, Banc of America and Banc of America Funding stated that 83.12% of the mortgage loans in

15   Group 12 were secured by a "Primary Residence," 10.42% by an "Investor Property," and 6.47%

16   by a "Second Home." BAFC 2007-E Pros. Sup. A-87.

17   (y)    In Appendix A, Banc of America and Banc of America Funding presented a table

18   entitled "Occupancy of Mortgaged Properties of the Group J Mortgage Loans." This table divided

19   the mortgage loans in Group J, which consists of the loans in Groups 1 through 6, into the

20   categories "Primary Residence," "Investor Property," and "Second Home. The table made untrue

21

22   and misleading statements about the number of mortgage loans, the aggregate principal balance

23   outstanding, and the percent of aggregate principal balance outstanding in each of these

24   categories. BAFC 2007-E Pros. Sup. A-93.

25   (z)    In the "Occupancy of Mortgaged Properties of the Group J Mortgage Loans" table,

26   Banc of America and Banc of America Funding stated that 87.42% of the mortgage loans in

27

28

-14-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

1  Group J were secured by a "Primary Residence," 4.48% by an "Investor Property," and 8.09% by

2  a "Second Home." BAFC 2007-E Pros. Sup. A-93.

3      (aa)    In Appendix A, Banc of America and Banc of America Funding presented a table

4
   entitled "Occupancy of Mortgaged Properties of the Group X Mortgage Loans." This table
5
   divided the mortgage loans in Group X, which consists of the loans in Groups 7 through 12, into
6
7  the categories "Primary Residence," "Investor Property," and "Second Home." The table made

8  untrue and misleading statements about the number of mortgage loans, the aggregate principal

9  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

10 categories. BAFC 2007-E Pros. Sup. A-103.

11     (bb)    In the "Occupancy of Mortgaged Properties of the Group X Mortgage Loans"

12 table, Banc of America and Banc of America Funding stated that 82.83% of the mortgage loans in

13 Group X were secured by a "Primary Residence," 11.84% by an "Investor Property," and 5.33%
14
15 by a "Second Home." BAFC 2007-E Pros. Sup. A-103.

16 **Item 96.    Details of properties that were stated to be owner-occupied, but were not:**

17     **(a)    Number of loans on which the owner of the property instructed tax
              authorities to send property tax bills to him or her at a different address: 151**
18
19     **(b)    Number of loans on which the owner of the property could have, but did not,
              designate the property as his or her homestead: 350**
20
21     **(c)    Number of loans on which the owner of the property owned three or more
              properties: 35**
22
       **(d)    Eliminating duplicates, number of loans about which one or more of
23            statements (a) through (c) is true: 462**

24 **Item 99.    Untrue or misleading statements about the underwriting standards of the
              originators of the mortgage loans:**
25
   On pages S-42 through S-48 of the prospectus supplement, Banc of America and Banc of
26
   America Funding made statements about the underwriting guidelines of Bank of America, N.A.
27

28
                                    -15-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO