

aggregate principal balance outstanding in each of these categories. BOAA 2005-5 Pros. Sup. S-55.

(dd) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Mortgage Loans is expected to be approximately 73.16%." BOAA 2005-5 Pros. Sup. S-55.

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,353 |
| Number of properties on which there was enough information for the model to determine a true market value | 522 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 216 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $8,033,776 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 156 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,869,873 |
| Number of loans with LTVs over 100%, as stated by Defendants | 8 |
| Number of loans with LTVs over 100%, as determined by the model | 28 |
| Weighted-average LTV, as stated by Defendants | 73.2% |
| Weighted-average LTV, as determined by the model | 77.8% |

**Item 71. Undisclosed additional liens:**

(a) **Minimum number of properties with additional liens:** 300

(b) **Total reduction in equity from additional liens:** $11,726,167

(c) **Weighted-average reduction in equity from additional liens:** 92.4%

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Mortgage Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Banc of America and Banc of America Mortgage Securities presented a table entitled

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 1 into the categories "Investor Property" and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-5 Pros. Sup. S-28.

(b) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 97.18% of the mortgage loans in Group 1 were secured by an "Investor Property" and 2.82% by a "Second Home." BOAA 2005-5 Pros. Sup. S-28.

(c) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 2 into the categories "Investor Property" and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-5 Pros. Sup. S-33.

(d) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 97.9% of the mortgage loans in Group 2 by an "Investor Property" and 2.1% by a "Second Home." BOAA 2005-5 Pros. Sup. S-33.

(e) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table stated that 100% of the mortgage loans in Group 3 were secured by a "Primary Residence.". BOAA 2005-5 Pros. Sup. S-38.

(f) "In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 4 into the categories "Primary Residence," "Investor

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-5 Pros. Sup. S-43.

(g) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 7.88% of the mortgage loans in Group 4 were secured by a "Primary Residence," 89.68% by an "Investor Property," and 2.44% by a "Second Home." BOAA 2005-5 Pros. Sup. S-43.

(h) "In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties.". This table stated that the mortgage loans in Group 5 were secured by a "Primary Residence." BOAA 2005-5 Pros. Sup. S-48.

(i) "In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-5 Pros. Sup. S-53.

(j) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 47.11% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 51.6% by an "Investor Property," and 1.3% by a "Second Home." BOAA 2005-5 Pros. Sup. S-53.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

**(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 35

**(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 63

**(c) Number of loans on which the owner of the property owned three or more properties:** 1

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 87

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 24 through 28 of the prospectus, Banc of America made statements about the underwriting guidelines of Bank of America, N.A. All of those statements are incorporated herein by reference. In particular, Banc of America stated that:

(a) "Bank of America will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting guidelines. Even if one or more specific criteria included in such underwriting guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with the underwriting guidelines." BOAA 2005-5 Pros. 24.

(b) "These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing and assets available for downpayment, closing costs and cash reserves. Additionally, guidelines are established regarding the adequacy of the property as collateral for the loan requested." BOAA 2005-5 Pros. 24.

**Item 106. Early payment defaults:**

**(a) Number of the mortgage loans that suffered EPDs:** 3

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



(b) **Percent of the mortgage loans that suffered EPDs:** 0.2%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-4 to S-5 and S-113 of the prospectus supplement Banc of America and Banc of America Mortgage Securities made statements about the ratings assigned to the certificate issued in this securitization. Banc of America and Banc of America Mortgage Securities stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Banc of America and Banc of America Mortgage Securities also stated: "At their issuance, each class of Offered Certificates is required to receive from Moody's Investors Service, Inc. (Moody's) and Fitch Ratings ("Fitch") at least the rating set forth in . . . this Prospectus Supplement." BOAA 2005-5 Pros. Sup. S-113.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 216

(b) **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 300

(c) **Number of loans that suffered EPDs:** 3

(d) **Number of loans in which the properties were stated to be owner-occupied but were not:** 87

(e) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 475

(f) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 35.1%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 70 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Banc of America and Banc of America Mortgage Securities.

**Item 44.     Details of trust and certificate(s).**

(a)     **Dealer that sold the certificate(s) to the Bank:** Banc of America.

(b)     **Description of the trust:** Banc of America Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-2 was a securitization in February 2005 of 1,824 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Bank of America, N.A. BOAA 2005-2 Pros. Sup. S-6 and S-23.

(c)     **Description of the certificate(s) that the Bank purchased:** Banc of America offered and sold to the Bank a senior certificate in this securitization, in tranche 1-CB-2, for which the Bank paid $60,467,626 plus accrued interest on April 29, 2005.

(d)     **Ratings of the certificate(s) when the Bank purchased them:** Moody's • Aaa; Fitch • AAA.

(e)     **Current ratings of the certificate(s):** Moody's • Caa1; Fitch • BB.

(f)     **URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1207409/000119312505034840/d424b5.htm

**Item 52.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Mortgage Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The original LTVs of the mortgage loans in Group 1 ranged from 11.61% to 103%, with a weighted average of 72.63%. BOAA 2005-2 Pros. Sup. S-7 and S-25.

(b) The original LTVs of the mortgage loans in Group 2 ranged from 13.47% to 103%, with a weighted average of 74.08%. BOAA 2005-2 Pros. Sup. S-7 and S-30.

(c) The original LTVs of the mortgage loans in Group 3 ranged from 18.39% to 94.49%, with a weighted average of 63.57%. BOAA 2005-2 Pros. Sup. S-8 and S-35.

(d) The original LTVs of the mortgage loans in Group 4 ranged from 11.5% to 90%, with a weighted average of 58.95%. BOAA 2005-2 Pros. Sup. S-8 and S-40.

(e) The original LTVs of all of the loans in the collateral pool ranged from 11.5% to 103%, with a weighted average of 70.33%. BOAA 2005-2 Pros. Sup. S-9 and S-45.

(f) The original LTVs of the discount loans in Group 1 ranged from 18.33% to 103%, with a weighted average of 70.06%. BOAA 2005-2 Pros. Sup. S-25.

(g) The original LTVs of the premium loans in Group 1 ranged from 11.61% to 103%, with a weighted average of 72.96%. BOAA 2005-2 Pros. Sup.S-25

(h) In the section of the prospectus supplement entitled "The Mortgage Pool," Banc of America and Banc of America Mortgage Securities presented tables of statistics about the mortgage loans in the collateral pool. BOAA 2005-2 Pros. Sup. S-25 to S-50. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios," divided the loans in Group 1 into 19 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-28.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(i) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 1 Mortgage Loans is expected to be approximately 72.63%." BOAA 2005-2 Pros. Sup. S-28.

(j) The original LTVs of the premium loans in Group 2 ranged from 13.47% to 103%, with a weighted average of 74.08%. BOAA 2005-2 Pros. Sup.S-30.

(k) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans in Group 2 into 17 categories of original LTV (for example, 10.01% to 15%, 20.01% to 25%, 25.01% to 30%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-33.

(l) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 2 Mortgage Loans is expected to be approximately 74.08%." BOAA 2005-2 Pros. Sup. S-33.

(m) The original LTVs of the discount loans in Group 3 ranged from 20.69% to 94.49%, with a weighted average of 62.4%. BOAA 2005-2 Pros. Sup. S-35.

(n) The original LTVs of the premium loans in Group 3 ranged from 18.39% to 90.43%, with a weighted average of %. BOAA 2005-2 Pros. Sup.S-35.

(o) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans in Group 3 into 16 categories of original LTV (for example, 15.01% to 20%, 20.01% to 25%, 25.01% to 30%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-38.

(p) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 3 Mortgage Loans is expected to be approximately 63.57%." BOAA 2005-2 Pros. Sup. S-38.

(q) The original LTVs of the discount loans in Group 4 ranged from 11.5% to 90%, with a weighted average of 56.39%. BOAA 2005-2 Pros. Sup. S-40.

(r) The original LTVs of the premium loans in Group 4 ranged from 15.13% to 90%, with a weighted average of 62.49%. BOAA 2005-2 Pros. Sup.S-40.

(s) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans in Group 4 into 16 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-43.

(t) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 4 Mortgage Loans is expected to be approximately 58.95%." BOAA 2005-2 Pros. Sup. S-43.

(u) The original LTVs of the discount mortgage loans in all of the loans in the collateral pool ranged from 11.5% to 103%, with a weighted average of 63.53%. BOAA 2005-2 Pros. Sup. S-45.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

 

(v) The original LTVs of the premium mortgage loans in all of the loans in the collateral pool ranged from 11.61% to 103%, with a weighted average of 71.77%. BOAA 2005-2 Pros. Sup.S-45.

(w) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Original Loan-to-Value Ratios." This table divided all of the mortgage loans in the collateral pool into 19 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-49.

(x) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Mortgage Loans is expected to be approximately 70.33%." BOAA 2005-2 Pros. Sup. S-49.

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,824 |
| Number of properties on which there was enough information for the model to determine a true market value | 435 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 180 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $7,757,148 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 139 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,149,539 |
| Number of loans with LTVs over 100%, as stated by Defendants | 20 |
| Number of loans with LTVs over 100%, as determined by the model | 40 |
| Weighted-average LTV, as stated by Defendants | 70.3% |
| Weighted-average LTV, as determined by the model | 74.4% |

**Item 71. Undisclosed additional liens:**

(a) **Minimum number of properties with additional liens: 165**

(b) **Total reduction in equity from additional liens: $7,503,275**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

 

(c) **Weighted-average reduction in equity from additional liens: 83.2%**

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Mortgage Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Banc of America and Banc of America Mortgage Securities presented a table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 1 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-26.

(b) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 49.74% of the mortgage loans in Group 1 were secured by a "Primary Residence," 47.9% by an "Investor Property," and 2.36% by a "Second Home." BOAA 2005-2 Pros. Sup. S-26.

(c) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 2 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-31.



GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



(d) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 33.96% of the mortgage loans in Group 2 were secured by a "Primary Residence," 58.23% by an "Investor Property," and 7.81% by a "Second Home." BOAA 2005-2 Pros. Sup. S-31.

(e) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 3 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-36.

(f) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 51.62% of the mortgage loans in Group 3 were secured by a "Primary Residence," 41.93% by an "Investor Property," and 6.44% by a "Second Home." BOAA 2005-2 Pros. Sup. S-36.

(g) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities, presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 4 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-2 Pros. Sup. S-41.

(h) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 18.39% of the mortgage loans in Group 4

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

 

(i) were secured by a "Primary Residence," 74.21% by an "Investor Property," and 7.4% by a "Second Home." BOAA 2005-2 Pros. Sup. S-41.

(j) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories.. BOAA 2005-2 Pros. Sup. S-46.

(k) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 44.89% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 51.23% by an "Investor Property," and 3.88% by a "Second Home." BOAA 2005-2 Pros. Sup. S-46.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

**(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 36

**(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 54

**(c) Number of loans on which the owner of the property owned three or more properties:** 5

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 79

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 24 through 28 of the prospectus, Banc of America and Banc of America Mortgage Securities made statements about the underwriting guidelines of Bank of America,

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

 

N.A. All of those statements are incorporated herein by reference. In particular, Banc of America and Banc of America Mortgage Securities stated that:

(a) "Bank of America will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting guidelines. Even if one or more specific criteria included in such underwriting guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with the underwriting guidelines." BOAA 2005-2 Pros. 24.

(b) "These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing and assets available for downpayment, closing costs and cash reserves. Additionally, guidelines are established regarding the adequacy of the property as collateral for the loan requested." BOAA 2005-2 Pros. 24.

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-4 and S-107 of the prospectus supplement Banc of America and Banc of America Mortgage Securities made statements about the ratings assigned to the certificate issued in this securitization. Banc of America and Banc of America Mortgage Securities stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Banc of America and Banc of America Mortgage Securities also stated: "At their issuance, each class of Offered Certificates is required to receive from Moody's Investors Service, Inc. (Moody's) and Fitch Ratings ("Fitch") at least the rating set forth in . . . this Prospectus Supplement." BOAA 2005-2 Pros. Sup. S-107.

 

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

**(a) Number of loans whose LTVs were materially understated:** 180

**(b) Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 165

**(c) Number of loans in which the properties were stated to be owner-occupied but were not:** 79

**(d) Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 302

**(e) Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 16.6%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

 

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 71 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Banc of America and Banc of America Funding.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Banc of America.

(b) **Description of the trust:** Banc of America Funding Corporation, Mortgage Pass-Through Certificates, Series 2005-A was a securitization in January 2005 of 2,630 mortgage loans, in five groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Wells Fargo Bank, N.A., GreenPoint Mortgage Funding, Inc., Bank of America, N.A., and Countrywide Home Loans, Inc. Bank of America, N.A. originated or acquired 20.94% of the loans in Group 1, Countrywide Home Loans, Inc. originated or acquired 23.17%, and GreenPoint Mortgage Funding, Inc. originated or acquired 55.89%. Bank of America, N.A. originated or acquired 83.07% of the loans in Group 2 and GreenPoint Mortgage Funding, Inc. originated or acquired 16.93%. Bank of America, N.A. originated or acquired 100% of the mortgage loans in Group 3. Countrywide Home Loans, Inc. originated or acquired 30.94% of the loans in Group 4 and Wells Fargo Bank, N.A. originated or acquired 61.72%. Bank of America, N.A. originated or acquired 20.94% of the loans in Group 5, Countrywide Home Loans, Inc. originated or acquired 23.17%, and GreenPoint Mortgage Funding, Inc. originated or acquired 55.89%. Bank of America, N.A. originated or acquired 59.24% of the mortgage loans in the CB Crossed Loan Group, which consists of the loans in Groups 1 through 3, Countrywide Home Loans, Inc. originated or acquired 9.47%, and GreenPoint Mortgage Funding, Inc. originated or acquired 31.29%. BAFC 2005-A Pros. Sup. S-10 and S-38.

 

(c) **Description of the certificate(s) that the Bank purchased:** Banc of America offered and sold to the Bank senior certificates in this securitization, in tranche 2-A-2, for which the Bank paid $129,402,210 plus accrued interest on January 27, 2005.

(d) **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

(e) **Current ratings of the certificate(s):** Standard & Poor's • CCC; Moody's • Baa2.

(f) **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/934377/000119312505013227/d424b5.htm

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Funding made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The original LTVs of the mortgage loans in Group 1 ranged from 6.8% to 95%, with a weighted average of 75%. BAFC 2005-A Pros. Sup. S-11.

(b) The original LTVs of the mortgage loans in Group 2 ranged from 17.39% to 100%, with a weighted average of 73.64%. BAFC 2005-A Pros. Sup. S-11.

(c) The original LTVs of the mortgage loans in Group 3 ranged from 17.39% to 95%, with a weighted average of 66.04%. BAFC 2005-A Pros. Sup. S-12.

(d) The original LTVs of the mortgage loans in Group 4 ranged from 27.78% to 90%, with a weighted average of 69.9%. BAFC 2005-A Pros. Sup. S-12.

(e) The original LTVs of the mortgage loans in Group 5 ranged from 7% to 100%, with a weighted average of 76.91%. BAFC 2005-A Pros. Sup. S-13.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



(f) The original LTVs of the mortgage loans in Subgroup 5A ranged from 11.84% to 100%, with a weighted average of 78.73%. BAFC 2005-A Pros. Sup. S-14.

(g) The original LTVs of the mortgage loans in Subgroup 5B ranged from 7% to 95%, with a weighted average of 74.4%. BAFC 2005-A Pros. Sup. S-5.

(h) The original LTVs of the mortgage loans in the CB Crossed Loan Groups, which consists of the loans in Groups 1 through 3, ranged from 6.8% to 100%,with a weighted average of 73.49%. BAFC 2005-A Pros. Sup. S-5.

(i) In the section of the prospectus supplement entitled "The Mortgage Pool," Banc of America and Banc of America Funding presented tables of statistics about the mortgage loans in the collateral pool. BAFC 2005-A Pros. Sup. S-39 to S-82. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios," divided the loans in Group 1 into 15 categories of original LTV (for example, 5.01% to 10%, 20.01% to 25%, 25.01% to 30%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-42.

(j) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 1 Mortgage Loans is expected to be approximately 75.00%." BAFC 2005-A Pros. Sup. S-42.

(k) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

loans in Group 2 into 17 categories of original LTV (for example, 15.01% to 20%, 20.01% to 25%, 25.01% to 30%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-47.

(l) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 2 Mortgage Loans is expected to be approximately 73.64%." BAFC 2005-A Pros. Sup. S-47.

(m) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans in Group 3 into 15 categories of original LTV (for example, 15.01% to 20%, 20.01% to 25%, 25.01% to 30%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-52.

(n) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 3 Mortgage Loans is expected to be approximately 66.04%." BAFC 2005-A Pros. Sup. S-52.

(o) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans in Group 4 into 13 categories of original LTV (for example, 25.01% to 30%, 30.01% to 35%, 35.01% to 40%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-57.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(p) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 4 Mortgage Loans is expected to be approximately 69.90%." BAFC 2005-A Pros. Sup. S-57.

(q) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans into 18 categories of original LTV (for example, 5.01% to 10%, 10.01% to 15%, 15.01% to 20%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-62.

(r) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 5 Mortgage Loans is expected to be approximately 76.91%." BAFC 2005-A Pros. Sup. S-62.

(s) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Original Loan-to-Value Ratios.". This table divided the mortgage loans in Subgroup 5A into 16 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-68.

(t) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Subgroup 5A Mortgage Loans is expected to be approximately 78.73%." BAFC 2005-A Pros. Sup. S-68.

(u) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

loans in Subgroup 5B into 12 categories of original LTV (for example, 5.01% to 10%, 20.01% to 25%, 40.01% to 45%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-74.

(v) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Subgroup 5B Mortgage Loans is expected to be approximately 74.40%." BAFC 2005-A Pros. Sup. S-74.

(w) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans in the CB Crossed Loan Group, which consists of the loans in Groups 1 through 3, into 18 categories of original LTV (for example, 5.01% to 10%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-79.

(x) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the CB Crossed Group Mortgage Loans is expected to be approximately 73.49%." BAFC 2005-A Pros. Sup. S-79.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,630 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,251 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 598 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $55,405,965 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 295 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $23,179,219 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 98 |
| Weighted-average LTV, as stated by Defendants (group 2) | 73.6% |
| Weighted-average LTV, as determined by the model (group 2) | 79.1% |

**Item 71. Undisclosed additional liens:**

(a) **Minimum number of properties with additional liens:** 948

(b) **Total reduction in equity from additional liens:** $59,656,386

(c) **Weighted-average reduction in equity from additional liens:** 65.5%

**Item 82. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Banc of America and Banc of America Funding made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." BAFC 2005-A Pros. Sup. S-89.

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Funding made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Banc of America and Banc of America Funding presented a table entitled "Occupancy of

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP ATTORNEYS AT LAW SAN FRANCISCO

Mortgaged Properties." This table divided the mortgage loans in Group 1 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-39.

(b) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 81.69% of the mortgage loans in Group 1 were secured by a "Primary Residence," 14.22% by an "Investor Property," and 4.09% by a "Second Home." BAFC 2005-A Pros. Sup. S-39.

(c) In "The Mortgage Pool" section, Banc of America and Banc of America Funding, presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 2 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-45.

(d) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 89.2% of the mortgage loans in Group 2 were secured by a "Primary Residence," 4.94% by an "Investor Property," and 5.87% by a "Second Home." BAFC 2005-A Pros. Sup. S-45.

(e) In "The Mortgage Pool" section, Banc of America and Banc of America Funding, presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 3 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage

loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-50.

(f) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 89.43% of the mortgage loans in Group 3 were secured by a "Primary Residence," 0.92% by an "Investor Property," and 9.64% by a "Second Home." BAFC 2005-A Pros. Sup. S-50.

(g) "In "The Mortgage Pool" section, Banc of America and Banc of America Funding, presented another table entitled "Occupancy of Mortgaged Properties.". This table divided the mortgage loans in Group 4 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-55.

(h) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 96% of the mortgage loans in Group 4 were secured by a "Primary Residence," 0.29% by an "Investor Property," and 3.71% by a "Second Home." BAFC 2005-A Pros. Sup. S-55.

(i) "In "The Mortgage Pool" section Banc of America and Banc of America Funding, presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 5 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-60.

(j) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 55.82% of the mortgage loans in Group 5 were secured by a

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"Primary Residence," 40% by an "Investor Property," and 4.18% by a "Second Home." BAFC 2005-A Pros. Sup. S-60.

(k) In "The Mortgage Pool" section Banc of America and Banc of America Funding, presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Subgroup 5A into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-66.

(l) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 40.68% of the mortgage loans in Subgroup 5A were secured by a "Primary Residence," 55.85% by an "Investor Property," and 3.47% by a "Second Home." BAFC 2005-A Pros. Sup. S-66.

(m) In "The Mortgage Pool" section, Banc of America and Banc of America Funding presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Subgroup 5B into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-72.

(n) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 76.68% of the mortgage loans in Subgroup 5B were secured by a "Primary Residence," 18.15% by an "Investor Property," and 5.17% by a "Second Home." BAFC 2005-A Pros. Sup. S-72.

(o) In "The Mortgage Pool" section, Banc of America and Banc of America Funding, presented another table entitled "Occupancy of Mortgaged Properties." This table divided the

mortgage loans in the CB Crossed Loan Group, which consists of the loans in Groups 1 through 3, into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BAFC 2005-A Pros. Sup. S-77.

(p) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Funding stated that 86.15% of the mortgage loans in the CB Crossed Loan Groups were secured by a "Primary Residence," 8.36% by an "Investor Property," and 5.49% by a "Second Home." BAFC 2005-A Pros. Sup. S-77.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

**(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 152**

**(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 224**

**(c) Number of loans on which the owner of the property owned three or more properties: 14**

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 326**

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-83 through S-85 of the prospectus supplement, Banc of America and Banc of America Funding made statements about the underwriting guidelines of Bank of America, N.A. All of those statements are incorporated herein by reference. In particular, Banc of America and Banc of America Funding stated that:

(a) "Bank of America will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting guidelines. Even if one or more specific criteria

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

included in such underwriting guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with the underwriting guidelines." BAFC 2005-A Pros. Sup. S-83.

(b) "These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing and assets available for downpayment, closing costs and cash reserves. Additionally, guidelines are established regarding the adequacy of the property as collateral for the loan requested." BAFC 2005-A Pros. Sup. S-83.

On pages S-87 through S-92 of the prospectus supplement, Banc of America and Banc of America Funding made statements about the underwriting guidelines of Wells Fargo Bank. All of those statements are incorporated herein by reference. In particular, Banc of America and Banc of America Funding stated that:

(a) "The Wells Fargo Bank underwriting guidelines evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." BAFC 2005-A Pros. Sup. S-85.

(b) "A mortgage loan secured by two- and four-family mortgaged property is considered to be an owner-occupied property if the borrower occupies one of the units; rental income on the other units is generally taken into account in evaluating the borrower's ability to repay the mortgage loan." BAFC 2005-A Pros. Sup. S-86.

**Item 106. Early payment defaults:**

(a) **Number of the mortgage loans that suffered EPDs:** 9

(b) **Percent of the mortgage loans that suffered EPDs:** 0.3%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 107. 90+ days delinquencies:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 365

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 13.9%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

**Item 108. 30+ days delinquencies in this securitization:**

(a) **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 336

(b) **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 12.8%

(c) **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-5 and S-166 to S-167 of the prospectus supplement Banc of America and Banc of America Funding made statements about the ratings assigned to the certificate issued in this securitization. Banc of America and Banc of America Funding stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Banc of America and Banc of America Funding also stated: "At their issuance, each class of Offered Certificates is required to receive from Standard & Poor's, . . . Moody's Investors Service, Inc.("Moody's") and Fitch Ratings ("Fitch") at least the rating set forth in this Prospectus Supplement." BAFC 2005-A Pros. Sup. S-166.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 598

(b) **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 948

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(c) **Number of loans that suffered EPDs:** 9

(d) **Number of loans in which the properties were stated to be owner-occupied but were not:** 326

(e) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,474

(f) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 56.1%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



## SCHEDULE 72 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Banc of America and Banc of America Mortgage Securities.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Banc of America.

(b) **Description of the trust:** Banc of America Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-1 was a securitization in January 2005 of 2,027 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by Bank of America, N.A. BOAA 2005-1 Pros. Sup. S-6 and S-21.

(c) **Description of the certificate(s) that the Bank purchased:** Banc of America offered and sold to the Bank a senior certificate in this securitization, in tranche 1-CB-1, for which the Bank paid $134,626,406 plus accrued interest on January 31, 2005.

(d) **Ratings of the certificate(s) when the Bank purchased them:** Moody's• Aaa; Fitch• AAA.

(e) **Current ratings of the certificate(s):** Moody's • Caa1; Fitch• BB.

(f) **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1207409/000119312505011248/d424b5.htm

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Mortgage Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The original LTVs of the mortgage loans in Group 1 ranged from 11.04% to 103%, with a weighted average of 73.52%. BOAA 2005-1 Pros. Sup. S-6 and S-23.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(b) The original LTVs of the mortgage loans in Group 2 ranged from 7.34% to 94.69%, with a weighted average of 60.87%. BOAA 2005-1 Pros. Sup. S-7 and S-28.

(c) The original LTVs for all of the mortgage loans in the collateral pool ranged from 7.34% to 103%, with a weighted average of 71.41%. BOAA 2005-1 Pros. Sup. S-7 and S-33.

(d) "As of the Cut-off Date, no Mortgage Loan will have a Loan-to-Value Ratio of more than 103.00%." BOAA 2005-1 Pros. Sup. S-22.

(e) The original LTVs of the discount mortgage loans in Group 1 ranged from 18.69% to 101.19%, with a weighted average of 70.98%. BOAA 2005-1 Pros. Sup. S-23.

(f) The original LTVs of the premium mortgage loans in Group 1 ranged from 11.04% to 103%, with a weighted average of 73.79%. BOAA 2005-1 Pros. Sup. S-23.

(g) In the section of the prospectus supplement entitled "The Mortgage Pool," Banc of America and Banc of America Mortgage Securities presented tables of statistics about the mortgage loans in the collateral pool. BOAA 2005-1 Pros. Sup. S-23 to S-37. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios," divided the loans in Group 1 into 19 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-1 Pros. Sup. S-26.

(h) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 1 Mortgage Loans is expected to be approximately 73.52%." BOAA 2005-1 Pros. Sup. S-26.

(i) The original LTVs of the discount mortgage loans in Group 2 ranged from 7.34% to 94.69%, with a weighted average of 58.97%. BOAA 2005-1 Pros. Sup. S-28.

(j) The original LTVs of the premium mortgage loans in Group 2 ranged from 14.14% to 90%, with a weighted average of 67.26%. BOAA 2005-1 Pros. Sup. S-28.

(k) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Original Loan-to-Value Ratios." This table divided the mortgage loans in Group 2 into 18 categories of original LTV (for example, 5.01% to 10%, 10.01% to 15%, 15.01% to 20%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-1 Pros. Sup. S-31.

(l) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 2 Mortgage Loans is expected to be approximately 60.87%." BOAA 2005-1 Pros. Sup. S-31.

(m) The original LTVs of the discount mortgage loans in the collateral pool ranged from 7.34% to 101.19%, with a weighted average of 63.5%. BOAA 2005-1 Pros. Sup. S-33.

(n) The original LTVs of the premium mortgage loans in the collateral pool ranged from 11.04% to 103%, with a weighted average of 73.47%. BOAA 2005-1 Pros. Sup. S-33.

(o) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Original Loan-to-Value Ratios." This table divided all of the mortgage loans in the collateral pool into 20 categories of original LTV (for example,

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5.01% to 10%, 10.01% to 15%, 15.01% to 20%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-1 Pros. Sup. S-36.

(p) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Mortgage Loans is expected to be approximately 71.41%." BOAA 2005-1 Pros. Sup. S-36.

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,027 |
| Number of properties on which there was enough information for the model to determine a true market value | 509 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 204 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $8,472,657 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 162 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,790,057 |
| Number of loans with LTVs over 100%, as stated by Defendants | 16 |
| Number of loans with LTVs over 100%, as determined by the model | 37 |
| Weighted-average LTV, as stated by Defendants | 71.4 |
| Weighted-average LTV, as determined by the model | 76.0% |

**Item 71. Undisclosed additional liens:**

**(a) Minimum number of properties with additional liens: 33**

**(b) Total reduction in equity from additional liens: $3,043,987**

**(c) Weighted-average reduction in equity from additional liens: 92.1%**

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Banc of America and Banc of America Mortgage Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Banc of America and Banc of America Mortgage Securities presented a table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 1 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-1 Pros. Sup. S-24.

(b) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 48.61% of the mortgage loans in Group 1 were secured by a "Primary Residence," 50.22% by an "Investor Property," and 1.18% were secured by a "Second Home." BOAA 2005-1 Pros. Sup. S-24.

(c) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 2 into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-1 Pros. Sup. S-29.

(d) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 24.33% of the mortgage loans in Group 2 were secured by a "Primary Residence," 73.22% by an "Investor Property," and 2.46% by a "Second Home." BOAA 2005-1 Pros. Sup. S-29.

(e) In "The Mortgage Pool" section, Banc of America and Banc of America Mortgage Securities presented another table entitled "Occupancy of Mortgaged Properties." This table

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investor Property," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. BOAA 2005-1 Pros. Sup. S-34.

(f) In the "Occupancy of Mortgaged Properties" table, Banc of America and Banc of America Mortgage Securities stated that 44.54% of all of the mortgage loans in the collateral pool were secured by a "Primary Residence," 54.07% by an "Investor Property," and 1.39% by a "Second Home." BOAA 2005-1 Pros. Sup. S-34.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

**(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 46

**(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 76

**(c) Number of loans on which the owner of the property owned three or more properties:** 3

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 106

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 24 through 28 of the prospectus, Banc of America and Banc of America Mortgage Securities made statements about the underwriting guidelines of Bank of America, N.A. All of those statements are incorporated herein by reference. In particular, Banc of America and Banc of America Mortgage Securities stated that:

(a) "Bank of America will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting guidelines. Even if one or more specific criteria

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP ATTORNEYS AT LAW SAN FRANCISCO

included in such underwriting guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with the underwriting guidelines." BOAA 2005-1 Pros. 24.

(b) "These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing and assets available for downpayment, closing costs and cash reserves. Additionally, guidelines are established regarding the adequacy of the property as collateral for the loan requested." BOAA 2005-1 Pros. 24.

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-4 and S-90 of the prospectus supplement Banc of America and Banc of America Mortgage Securities made statements about the ratings assigned to the certificate issued in this securitization. Banc of America and Banc of America Mortgage Securities stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Banc of America and Banc of America Mortgage Securities also stated: "At their issuance, each class of Offered Certificates is required to receive from Moody's Investors Service, Inc. ("Moody's") and Fitch Ratings ("Fitch") at least the rating set forth in . . . this Prospectus Supplement." BOAA 2005-1 Pros. Sup. S-90.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 204

(b) **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 33

(c) **Number of loans that suffered EPDs:** 1

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case3:10-cv-03045-SC Document1-7 Filed07/12/10 Page37 of 81

(d) **Number of loans in which the properties were stated to be owner-occupied but were not:** 106

(e) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 303

(f) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 15.0%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-8-
SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 73 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Banc of America and CWALT.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Banc of America.

(b) **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2004-33 was a securitization in November 2004 of 2,422 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2004-33 Pros. Sup. S-4, S-14, and S-74.

(c) **Description of the certificate(s) that the Bank purchased:** Banc of America offered and sold to the Bank a senior certificate in this securitization, in tranche 3-A-2, for which the Bank paid $194,922,901 plus accrued interest on November 30, 2004.

(d) **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

(e) **Current ratings of the certificate(s):** Standard & Poor's • B; Moody's • Baa1.

(f) **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1269518/000095012904009426/v03472e424b5.txt.

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Banc of America and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) "No mortgage loan will have had a Loan-to-Value Ratio at origination of more than 100%." CWALT 2004-33 Pros. Sup. S-16.

(b) In the section of the prospectus supplement entitled "The Mortgage Pool," Banc of America presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2004-33 Pros. Sup. S-18 to S-72. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $300,000.01 to $350,000, $350,000 to $400,000, $400,000.01 to $450,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted-Average Original Loan-to-Value Ratio." There were 18 such tables in "The Mortgage Pool" section for the subset of loans in group 1. In each table, the number of categories into which the loans were divided ranged from one to 28. Thus, in "The Mortgage Loans" section, Banc of America and CWALT made hundreds of statements about the weighted-average original LTVs of the loans in group 1. CWALT 2004-33 Pros. Sup. S-18 to S-29.

(c) As of the cut-off date, the weighted average original Loan-to-Value Ratio of the group 1 mortgage loans was approximately 71.95%." CWALT 2004-33 Pros. Sup. S-21.

(d) In "The Mortgage Pool" section, Banc of America and CWALT presented similar tables of statistics about the subset of mortgage loans in group 2. In these tables, Banc of America and CWALT similarly made hundreds of statements about the original LTVs of the loans in group 2. CWALT 2004-33 Pros. Sup. S-30 to S-43.

(e) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the group 2 mortgage loans was approximately 75.23%." CWALT 2004-33 Pros. Sup. S-34.

(f) In "The Mortgage Pool" section, Banc of America and CWALT presented similar tables of statistics about the subset of mortgage loans in group 3. In these tables, Banc of America and CWALT similarly made hundreds of statements about the original LTVs of the loans in group 3. CWALT 2004-33 Pros. Sup. S-44 to S-57.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(g) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the group 3 mortgage loans was approximately 74.70%." CWALT 2004-33 Pros. Sup. S-48.

(h) In "The Mortgage Pool" section, Banc of America and CWALT presented similar tables of statistics about the subset of mortgage loans in group 4. In these tables, Banc of America and CWALT similarly made hundreds of statements about the original LTVs of the loans in group 4. CWALT 2004-33 Pros. Sup. S-58 to S-72.

(i) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the group 4 mortgage loans was approximately 78.60%." CWALT 2004-33 Pros. Sup. S-63.

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,422 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,499 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 798 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $71,264,803 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 253 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $18,349,522 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 151 |
| Weighted-average LTV, as stated by Defendants | 74.70% |
| Weighted-average LTV, as determined by the model | 84.6% |

**Item 71. Undisclosed additional liens:**

**(a) Minimum number of properties with additional liens: 498**

**(b) Total reduction in equity from additional liens: $34,023,868**

**(c) Weighted-average reduction in equity from additional liens: 70.1%**

**Item 82. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement Banc of America and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2004-33 Pros. Sup. S-76.

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Banc of America and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Banc of America and CWALT presented a table entitled "Occupancy Types." This table divided the subset of mortgage loans in group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2004-33 Pros. Sup. S-24.

(b) In the "Occupancy Types" table, Banc of America and CWALT stated that 77.5% of the subset of loans in group 1 were secured by a "Primary Residence," 16.65% by an "Investment Property," and 5.86% by a "Secondary Residence." CWALT 2004-33 Pros. Sup. S-24.

(c) In "The Mortgage Pool" section, Banc of America and CWALT presented a similar table entitled "Occupancy Types." This table divided the subset of mortgage loans in group 2 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2004-33 Pros. Sup. S-38.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(d) In the "Occupancy Types" table, Banc of America and CWALT stated that 89.07% of the subset of mortgage loans in group 2 were secured by an "Investment Property," 7.16% by an "Investment Property," and 3.77% by a "Secondary Residence." CWALT 2004-33 Pros. Sup. S-38.

(e) In "The Mortgage Pool" section, Banc of America and CWALT presented a similar table entitled "Occupancy Types." This table divided the subset of mortgage loans in group 3 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2004-33 Pros. Sup. S-52.

(f) In the "Occupancy Types" table, Banc of America and CWALT stated that 94.29% of the subset of mortgage loans in group 3 were secured by a "Primary Residence," 3.16% by an "Investment Property," and 2.55% by a "Secondary Residence." CWALT 2004-33 Pros. Sup. S-52.

(g) In "The Mortgage Pool" section, Banc of America and CWALT presented a similar table entitled "Occupancy Types." This table divided the subset of mortgage loans in group 4 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2004-33 Pros. Sup. S-67.

(h) In the "Occupancy Types" table, Banc of America and CWALT stated that 90.33% of the subset of mortgage loans in group 4 were secured by an "Investment Property," 6.49% by an "Investment Property," and 3.19% by a "Secondary Residence." CWALT 2004-33 Pros. Sup. S-67.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

(a) **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 159

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 255

(c) **Number of loans on which the owner of the property owned three or more properties:** 16

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 357

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-74 to S-79 of the prospectus supplement, Banc of America and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, Banc of America and CWALT stated that:

(a) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2004-33 Pros. Sup. S-75.

**Item 106. Early payment defaults:**

(a) **Number of the mortgage loans that suffered EPDs:** 14

(b) **Percent of the mortgage loans that suffered EPDs:** 0.6%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.14%

**Item 107. 90+ days delinquencies:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 350

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 14.5%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 7.2%

**Item 108. 30+ days delinquencies in this securitization:**

(a) **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 331

(b) **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 13.7%

(c) **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-126 of the prospectus supplement, Banc of America and CWALT made statements about the ratings assigned to the certificates in Class 3-A-2 issued in this securitization. Banc of America and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Banc of America and CWALT also stated: "It is a condition to the issuance of the Class 3-A-2 Certificates that they be rated at least AAA by S&P and Aa1 by Moody's." CWALT 2004-33 Pros. Sup. S-126.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 798

(b) **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 498

(c) **Number of loans that suffered EPDs:** 14

(d) **Number of loans in which the properties were stated to be owner-occupied but were not:** 357

(e) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,280

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



(f) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 52.9%

**SCHEDULE 74 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Countrywide.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Countrywide.

(b) **Description of the trust:** CitiMortgage Alternative Loan Trust, REMIC Pass-Through Certificates, Series 2007-A7 was a securitization in July 2007 of 2,869 mortgage loans, in three pools. The mortgage loans in the collateral pool of this securitization were originated by CitiMortgage, Inc., ABN AMRO Mortgage Group, Inc., and various undisclosed originators. CitiMortgage, Inc. originated 34.88% of the loans in Pool I and ABN AMRO Mortgage Group, Inc. originated 23.98%. CitiMortgage, Inc. originated 38.46 % of the loans in Pool II and ABN AMRO Mortgage Group, Inc. originated 28%. CitiMortgage, Inc. originated 78.96 % of the loans in Pool III and ABN AMRO Mortgage Group, Inc. originated 25.65%. CMALT 2007-A7 Pros. Sup. 26.

(c) **Description of the certificate(s) that the Bank purchased:** Countrywide offered and sold to the Bank two senior certificates in this securitization, in tranches IA-1 and IA-3, for which the Bank paid $204,188,420 and $75,940,366, respectively, plus accrued interest, on July 30, 2007.

(d) **Ratings of the certificate(s) when the Bank purchased them:**

Class IA-1: Moody's – Aaa; Fitch – AAA.
Class IA-3: Moody's – Aaa; Fitch – AAA.

(e) **Current ratings of the certificate(s):**

Class IA-1: Moody's – Caa1; Fitch – CCC.
Class IA-3: Moody's – Caa2; Fitch – CCC.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(f) **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/811785/000140102507000040/cmalt2007-a7424b5.htm

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Countrywide made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

**(a)** At origination, 7.28% of the mortgage loans in Pool I had an LTV greater than 80% and 1.01% had an LTV greater than 90%. CMALT 2007-A7 Pros. Sup. 10.

**(b)** The weighted-average LTV at origination of the mortgage loans in Pool I was 74.71%. CWALT 2007-A7 Pros. Sup. 10.

**(c)** At origination, 1.24% of the mortgage loans in Pool II had an LTV greater than 80% and 0.03% had an LTV greater than 90%. CMALT 2007-A7 Pros. Sup. 10.

**(d)** The weighted-average LTV at origination of the mortgage loans in Pool II was 71.71%. CMALT 2007-A7 Pros. Sup. 10.

**(e)** At origination, 4.41% of the mortgage loans in Pool III had an LTV greater than 80%. CMALT 2007-A7 Pros. Sup. 10.

**(f)** The weighted-average LTV at origination of the mortgage loans in Pool III was 56.98%. CMALT 2007-A7 Pros. Sup. 10.

**(g)** At origination, 3.79% of the mortgage loans in the collateral pool had an LTV greater than 80% and 0.43% had an LTV greater than 90%. CMALT 2007-A7 Pros. Sup. 10.

**(h)** At origination, none of the mortgage loans in the collateral pool had an LTV greater than 95%. CMALT 2007-A7 Pros. Sup. 10.

**(i)** The weighted-average LTV at origination of all of the loans in the collateral pool was 72.57%." CMALT 2007-A7 Pros. Sup. 10.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(j) In the Appendix to the prospectus supplement ("Detailed description of the mortgage loans"), Countrywide presented a table entitled "Distribution by loan-to-value ratio at origination." This table divided the mortgage loans in Pool I, the loans in Pool II, the loans in Pool III, and all of the loans in the collateral pool into six categories of original LTV (for example, 65% and below, 65.001% to 75%, 75.001% to 80%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CMALT 2007-A7 Pros. Sup. 34.

(k) In the Appendix, Countrywide presented a table entitled "Distribution by FICO scores and loan-to-value ratios at origination." This table divided the mortgage loans in Pool I, the loans in Pool II, and the loans in Pool III into six categories of FICO scores (for example, less than 620, 620 to 649, 650 to 699, etc.). This table then divided each FICO score category into six ranges of LTV at origination (for example, 65% and below, 65.001% to 75%, 75.001% to 80%, etc.). For each FICO score category, Countrywide stated the percentage of the loans in that category that fell within each LTV range. In addition, Countrywide also stated the percentage of the loans in each of Pool I, Pool II, and Pool III that fell into each LTV range. CMALT 2007-A7 Pros. Sup. 37.

(l) "Each mortgage loan will usually have an original principal balance that is not more than 95% of the value of the mortgaged property (a 95% loan-to-value ratio)." CMALT 2007-A7 Pros. 76.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2869 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,701 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,205 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $129,351,540 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 148 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $12,944,230 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 271 |
| Weighted-average LTV, as stated by Defendants | 72.57% |
| Weighted-average LTV, as determined by the model | 88.6% |

**Item 65. Evidence from subsequent sales of refinanced properties:**

Of the 2,869 mortgage loans in the collateral pool, 1,870 were taken out to refinance, rather than to purchase, properties. For those 1,870 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,870 properties, 116 were subsequently sold for a total of approximately $37,994,059. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $56,418,000. Thus, those properties were sold for 67.3% of the value ascribed to them, a difference of 32.7%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Countrywide made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

1    (a)    As of the cut-off date, 83.12% of the mortgage loans in Pool I were determined by

2    Citicorp Mortgage Securities, Inc. ("CMSI") to be the primary residence of the homeowner.

3    CMALT 2007-A7 Pros. Sup. 9.

4
     (b)    As of the cut-off date, 93.04% of the mortgage loans in Pool II were determined
5
     by CMSI to be the primary residence of the homeowner. CMALT 2007-A7 Pros. Sup. 9.
6

7    (c)    As of the cut-off date, 84.41% of the mortgage loans in Pool III were determined

8    by CMSI to be the primary residence of the homeowner. CMALT 2007-A7 Pros. Sup. 9.

9    (d)    As of the cut-off date, 88.76% of all of the mortgage loans combined were

10   determined by CMSI to be the primary residence of the homeowner. CMALT 2007-A7 Pros. Sup.

11   9.

12
     (e)    As of the cut-off date, 14.41% of the mortgage loans in Pool I were determined by
13
     CMSI to be investment properties. CMALT 2007-A7 Pros. Sup. 9.
14

15   (f)    As of the cut-off date, 4.98% of the mortgage loans in Pool II were determined by

16   CMSI to be investment properties. CMALT 2007-A7 Pros. Sup. 9.

17   (g)    As of the cut-off date, 15.40% of the mortgage loans in Pool III were determined

18   by CMSI to be investment properties. CMALT 2007-A7 Pros. Sup. 9.

19
     (h)    As of the cut-off date, 9.11% of all of the mortgage loans combined were
20
     determined by CMSI to be investment properties. CMALT 2007-A7 Pros. Sup. 9.
21

22   **Item 96.    Details of properties that were stated to be owner-occupied, but were not:**

23   **(a)    Number of loans on which the owner of the property instructed tax
            authorities to send property tax bills to him or her at a different address: 223**

24
     **(b)    Number of loans on which the owner of the property could have, but did not,
25          designate the property as his or her homestead: 337**

26   **(c)    Number of loans on which the owner of the property owned three or more
            properties: 60**
27

28

-5-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



(d) **Number of loans that went straight from current to foreclosure or ownership by lender:** 1

(e) **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true:** 551

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 80 through 83 of the prospectus, Countrywide made statements about the underwriting guidelines of CitiMortgage, Inc. All of those statements are incorporated herein by reference.

On page 83 of the prospectus, Countrywide made statements about the underwriting guidelines of third party originators, including ABN AMRO Mortgage Group, Inc. All of those statements are incorporated herein by reference. In particular, Countrywide stated that:

(a) "Mortgage loan underwriting assesses a prospective borrower's ability and willingness to repay, and the adequacy of the property as collateral for, a requested loan." CMALT 2007-A7 Pros. Sup. 80.

**Item 106. Early payment defaults:**

(a) **Number of the mortgage loans that suffered EPDs:** 38

(b) **Percent of the mortgage loans that suffered EPDs:** 1.3%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.83%

**Item 107. 90+ days delinquencies:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 820

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 28.6%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    **Item 108.**    **30+ days delinquencies in this securitization:**

2

      **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31,**
3             **2010: 822**

4       **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31,**
            **2010: 28.7%**
5

      **(c)**    **Percent of all mortgage loans in the United States that were 30+ days**
6             **delinquent on March 31, 2010: 14.7%**

7    **Item 117.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

8        On page S-3 and of the prospectus supplement and pages 41 to 42 of the prospectus,

9 Countrywide Home Loans, Inc. and CWALT made statements about the ratings assigned to the

10 certificates issued in this securitization. Countrywide Home Loans, Inc. and CWALT stated that

11 the Bank's certificates were rated Aaa by Moody's Investors Service, Inc. and AAA by Fitch

12 Ratings. These were the highest ratings available from these two rating agencies.

13

14    **Item 120.**    **Summary of loans about which the Defendants made untrue or misleading**
            **statements:**
15

16       **(a)**    **Number of loans whose LTVs were materially understated: 1,205**

17       **(b)**    **Number of loans that suffered EPDs: 38**

18       **(c)**    **Number of loans in which the properties were stated to be owner-occupied**
            **but were not: 551**
19

20       **(d)**    **Eliminating duplicates, number of loans about which the Defendants made**
            **untrue or misleading statements: 1,505**
21

      **(e)**    **Eliminating duplicates, percent of loans about which the Defendants made**
22             **untrue or misleading statements: 52.5%**

23

24

25

26

27

28

-7-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 75 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Countrywide, CWALT, and Countrywide Financial Corporation.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Countrywide.

(b) **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-2CB was a securitization in January 2006 of 3,307 mortgage loans, in one pool. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-2CB Pros. Sup. S-4, S-24, and S-37.

(c) **Description of the certificate(s) that the Bank purchased:** Countrywide offered and sold to the Bank a senior certificate in this securitization, in tranche A-1, for which the Bank paid $214,521,291 plus accrued interest on January 30, 2006.

(d) **Ratings of the certificate(s) when the Bank purchased them:**

Moody's – Aaa; Fitch – AAA.

(e) **Current ratings of the certificate(s):**

Moody's – B3; Fitch – CC.

(f) **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1269518/000095012906000810/v16185b5e424b5.txt

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3 on July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

 

amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Countrywide and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The weighted-average original LTV of all of the mortgage loans in the collateral pool was 76.57%. CWALT 2006-2CB Pros. Sup. S-5.

(b) "No mortgage loan had a loan-to-value ratio at origination of more than 95.00%." CWALT 2006-2CB Pros. Sup. S-25.

(c) In the section of the prospectus supplement entitled "The Mortgage Pool," Countrywide and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted-Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section. In each table, the number of categories into which the loans were divided ranged from two to 40. Thus, in "The Mortgage Pool" section, Countrywide and CWALT made hundreds of statements about the original LTVs of the loans in the collateral pool. CWALT 2006-2CB S-27 to S-35.

(d) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 76.57%." CWALT 2006-2CB Pros. Sup. S-31.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 3,307 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,142 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,209 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $73,629,865 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 264 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,173,923 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 196 |
| Weighted-average LTV, as stated by Defendants | 76.57% |
| Weighted-average LTV, as determined by the model | 84.3% |

**Item 65. Evidence from subsequent sales of refinanced properties:**

Of the 3,307 mortgage loans in the collateral pool, 1,267 were taken out to refinance, rather than to purchase, properties. For those 1,267 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,267 properties, 152 were subsequently sold for a total of approximately $45,063,860. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $60,303,400. Thus, those properties were sold for 74.7% of the value ascribed to them, a difference of 25.3%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 82. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Countrywide and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc. "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-2CB Pros. Sup S-39.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO




**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Countrywide and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Countrywide and CWALT presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-2CB Pros. Sup. S-33.

(b) In the "Occupancy Types" table, Countrywide and CWALT stated that 86.37% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 8.29% by an "Investment Property," and 5.34% by a "Secondary Residence." CWALT 2006-2CB Pros. Sup. S-33.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

(a) **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 256

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 374

(c) **Number of loans on which the owner of the property owned three or more properties:** 19

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 564

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-37 through S-41 of the prospectus supplement, Countrywide and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, Countrywide and CWALT stated that:

(a) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-2CB Pros. Sup. S-38.

(b) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-2CB Pros. Sup. S-38.

**Item 107. 90+ days delinquencies:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 924

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 27.9%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 32.7%

**Item 108. 30+ days delinquencies in this securitization:**

(a) **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 946

(b) **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 28.6%

(c) **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-7 and S-92 of the prospectus supplement, Countrywide Home Loans, Inc. and CWALT made statements about the ratings assigned to the certificates issued in this securitization. Countrywide Home Loans, Inc. and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Countrywide Home Loans, Inc. and CWALT also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings ('FITCH') and by Moody's Investors Service, Inc. ('MOODY'S')." CWALT 2006-2CB Pros. Sup. S-7.

Countrywide Home Loans, Inc. and CWALT also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated "AAA" by Fitch Ratings, Inc. ("Fitch") and "Aaa" by Moody's Investors Service, Inc.("Moody's")." CWALT 2006-2CB Pros. Sup. S-92.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 1,209

(b) **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 394

(c) **Number of loans in which the properties were stated to be owner-occupied but were not:** 564

(d) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,744

(e) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 52.7%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 76 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Countrywide, CWALT, and Countrywide Financial Corporation.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Countrywide.

(b) **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-75CB was a securitization in November 2005 of 2,000 mortgage loans, in one pool. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-75CB Pros. Sup. S-3, S-13, and S-24.

(c) **Description of the certificate(s) that the Bank purchased:** Countrywide offered and sold to the Bank a senior certificate in this securitization, in tranche A-1, for which the Bank paid $200,000,000 plus accrued interest on November 21, 2005.

(d) **Ratings of the certificate(s) when the Bank purchased them:**

Moody's – Aaa; Standard & Poor's. – AAA.

(e) **Current ratings of the certificate(s):**

Moody's – Caa1; Standard & Poor's. – BB+.

(f) **URL of prospectus supplement for this securitization**: A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1269518/000095012905011393/v14708b5e424b5.txt

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

on July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Countrywide and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) "No mortgage loan had a Loan-to-Value ratio at origination of more than 100.00%." CWALT 2005-75CB Pros. Sup. S-14.

(b) In the section of the prospectus supplement entitled "The Mortgage Pool," Countrywide and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted-Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section. In each table, the number of categories into which the loans were divided ranged from three to 30. Thus, in "The Mortgage Pool" section, Countrywide and CWALT made hundreds of statements about the original LTVs of the loans in the collateral pool. CWALT 2005-75CB S-16 to S-22.

(c) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 67.99%." CWALT 2005-75CB Pros. Sup. S-19.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,000 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,140 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 636 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $34,877,697 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 166 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,167,500 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 55 |
| Weighted-average LTV, as stated by Defendants | 67.99% |
| Weighted-average LTV, as determined by the model | 74.3% |

**Item 65. Evidence from subsequent sales of refinanced properties:**

Of the 2,000 mortgage loans in the collateral pool, 1,426 were taken out to refinance, rather than to purchase, properties. For those 1,426 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,426 properties, 143 were subsequently sold for a total of approximately $40,702,604. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $47,687,600. Thus, those properties were sold for 85.4% of the value ascribed to them, a difference of 14.6%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71. Undisclosed additional liens:**

(a) **Minimum number of properties with additional liens:** 176

(b) **Total reduction in equity from additional liens: $8,783,838**

(c) **Weighted-average reduction in equity from additional liens:** 54.3%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO




**Item 82. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Countrywide Home Loans, Inc. and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc. "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-75CB Pros. Sup S-26.

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Countrywide and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Countrywide and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-75CB Pros. Sup. S-22.

(b) In the "Occupancy Types" table, Countrywide and CWALT stated that 91.86% of the mortgage loans in the collateral pool were secured by a "Primary Residence," 3.43% by an "Investment Property," and 4.71% by a "Secondary Residence." CWALT 2005-75CB Pros. Sup. S-22.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

(a) **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 166

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 189

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**(c) Number of loans on which the owner of the property owned three or more properties: 16**

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 321

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-24 through S-29 of the prospectus supplement, Countrywide made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, Countrywide stated that:

**(a)** "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-75CB Pros. Sup. S-25.

**(b)** "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-75CB Pros. Sup. S-25.

**Item 108. 30+ days delinquencies in this securitization:**

**(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 265

**(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 13.3%**

**(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-70 of the prospectus supplement, Countrywide Home Loans, Inc. and CWALT made statements about the ratings assigned to the certificates issued in this securitization. Countrywide Home Loans, Inc. and CWALT stated that the Bank's certificate was

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's. These were the highest ratings available from these two rating agencies.

Countrywide Home Loans, Inc. and CWALT also stated: "It is a condition to the issuance of the senior certificates that they be rated 'AAA' by Standard & Poor's. . . .('S&P'). It is a condition to the issuance of the senior certificates that they be rated "Aaa" by Moody's Investors Service, Inc. ('Moody's').." CWALT 2005-75CB Pros. Sup. S-70.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 636

(b) **Number of loans in which the properties were stated to be owner-occupied but were not:** 321

(d) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,462

(e) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 44.2%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**SCHEDULE 77 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Countrywide, CWALT, and Countrywide Financial Corporation.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Countrywide.

(b) **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-57CB was a securitization in October 2005 of 4,080 mortgage loans,[2] in three groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-57CB Pros. Sup. S-4, S-17 and S-43.

(c) **Description of the certificate(s) that the Bank purchased:** Countrywide offered and sold to the Bank two senior certificates in this securitization, in tranche 3-A-1 and tranche 4-A-1, for which the Bank paid $108,461,000 and $116,488,000 plus accrued interest, respectively, on October 31, 2005.

(d) **Ratings of the certificate(s) when the Bank purchased them:**

Class 3-A-1 certificate: Moody's – Aaa; Fitch AAA.

Class 4-A-1 certificate: Moody's – Aaa; Fitch AAA.

(e) **Current ratings of the certificate(s):**

Class 3-A-1 certificate: Moody's – Caa2; Fitch CCC.

Class 4-A-1 certificate: Moody's – Caa2; Fitch CCC.

[2] CWALT 2005-57CB was a prefunded securitization. On the closing date of the securitization there were 4,080 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 156 mortgage loans.

(f) **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1269518/000095012905010428/v13636e424b5.txt.

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3 on July 25, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Countrywide and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) "No Initial Mortgage Loan in any loan group had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-57CB Pros. Sup. S-18.

(b) In the section of the prospectus supplement entitled "The Mortgage Pool," Countrywide and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-57CB Pros. Sup. S-20 to S-40. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from one to 25. Thus, in "The Mortgage Loans" section of the prospectus supplement, Countrywide

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



and CWALT made hundreds of statements about original loan-to-value ratios in loan group 1. CWALT 2005-57CB S-20 to S-26.

(c) "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 1 is approximately 79.03%." CWALT 2005-57CB Pros. Sup. S-23.

(d) In "The Mortgage Pool" section, Countrywide and CWALT presented similar tables of statistics about the mortgage loans in group 3. In these tables, Countrywide and CWALT similarly made hundreds of statements about the original LTVs of the loans in loan group 3. CWALT 2005-57CB S-26 to S-33.

(e) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 3 is approximately 71.84%." CWALT 2005-57CB Pros. Sup. S-30.

(f) In "The Mortgage Pool" section, Countrywide and CWALT presented similar tables of statistics about the mortgage loans in loan group 4. In these tables, Countrywide and CWALT similarly made hundreds of statements about the original LTVs of the loans in loan group 4. CWALT 2005-57CB S-34 to S-40.

(g) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 4 is approximately 70.88%." CWALT 2005-57CB Pros. Sup. S-37.

 

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 4,236 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,490 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,368 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $67,340,935 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 359 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $16,843,876 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 186 |
| Weighted-average LTV, as stated by Defendants (group 3) | 71.84% |
| Weighted-average LTV, as determined by the model (group 3) | 79.68% |
| Weighted-average LTV, as stated by Defendants (group 4) | 70.88% |
| Weighted-average LTV, as determined by the model (group 4) | 77.73% |

**Item 65. Evidence from subsequent sales of refinanced properties:**

Of the 4,236 mortgage loans in the collateral pool, 1,710 were taken out to refinance, rather than to purchase, properties. For those 1,710 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,710 properties, 190 were subsequently sold for a total of approximately $54,890,945. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $62,926,900. Thus, those properties were sold for 87.2% of the value ascribed to them, a difference of 12.8%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71. Undisclosed additional liens:**

(a) **Minimum number of properties with additional liens:** 1,604

(b) **Total reduction in equity from additional liens:** $67,935,152

(c) **Weighted-average reduction in equity from additional liens:** 77.3%

**Item 82. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Countrywide Home Loans, Inc. and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc. "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-57CB Pros. Sup S-45.

**Item 88. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Countrywide made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Countrywide and CWALT presented a table entitled "Occupancy Types." This table stated that 100% of the mortgage loans in loan group 1 were secured by a "Primary Residence." CWALT 2005-57CB Pros. Sup. S-25.

(b) In "The Mortgage Pool" section, Countrywide and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 3 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-57CB Pros. Sup. S-33.

(c) In the "Occupancy Types" table, Countrywide and CWALT stated that 84.52% of the mortgage loans in loan group 3 were secured by a "Primary Residence" 9.34% by an "Investment Property," and 6.14% by a "Secondary Residence." CWALT 2005-57CB Pros. Sup. S-33.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(d) In "The Mortgage Pool" section, Countrywide and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 4 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-57CB Pros. Sup. S-40.

(e) In the "Occupancy Types" table, Countrywide stated that 85.83% of the mortgage loans in loan group 4 were secured by a "Primary Residence," 7.12% by an "Investment Property," and 7.06% by a "Secondary Residence." CWALT 2005-57CB Pros. Sup. S-40.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

**(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 287**

**(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 358**

**(c) Number of loans on which the owner of the property owned three or more properties: 24**

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 589**

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-43 through S-48 of the prospectus supplement, Countrywide made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, Countrywide stated that:

(a) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-57CB Pros. Sup. S-44.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



(b) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-57CB Pros. Sup. S-44.

**Item 106. Early payment defaults:**

(a) **Number of the mortgage loans that suffered EPDs:** 13

(b) **Percent of the mortgage loans that suffered EPDs:** 0.3%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

**Item 107. 90+ days delinquencies:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 600

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 14.2%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

**Item 108. 30+ days delinquencies in this securitization:**

(a) **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 666

(b) **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 15.7%

(c) **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-104 of the prospectus supplement, Countrywide Home Loans, Inc. and CWALT made statements about the ratings assigned to the certificates issued in this securitization. Countrywide Home Loans, Inc. and CWALT stated that the Bank's certificate was

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

rated Aaa by Moody's Investors Service, Inc. and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Countrywide Home Loans, Inc. and CWALT also stated that: "It is a condition to the issuance of the senior certificates . . . that they be rated AAA by Fitch Ratings, Inc. ('Fitch') and Aaa by Moody's Investors Service, Inc. ('Moody's')." CWALT 2005-57CB Pros. Sup. S-104.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

**(a) Number of loans whose LTVs were materially understated:** 1,368

**(b) Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 1,604

**(c) Number of loans that suffered EPDs:** 13

**(d) Number of loans in which the properties were stated to be owner-occupied but were not:** 589

**(e) Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 2,642

**(f) Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 62.4%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

 

**SCHEDULE 78 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Countrywide, CWALT, and Countrywide Financial Corporation.

**Item 44. Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Countrywide.

(b) **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-36 was a securitization in June 2005 of 2,097 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-36 Pros. Sup. S-5, S-19, and S-63.

(c) **Description of the certificate(s) that the Bank purchased:** Countrywide offered and sold to the Bank a senior certificate in this securitization, in tranche 4-A-1, for which the Bank paid $92,112,000 plus accrued interest on June 24, 2005.

(d) **Ratings of the certificate(s) when the Bank purchased them:**

Moody's – Aaa; Standard & Poor's – AAA.

(e) **Current ratings of the certificate(s):**

Moody's – B3; Standard & Poor's – AAA.

(f) **URL of prospectus supplement for this securitization:**

A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1269518/000089109205001122/e22080_424b5.txt.

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued:**

Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

on April 21, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 52. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Countrywide and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

**(a)** "No mortgage loan will have had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-36 Pros. Sup. S-22.

**(b)** In the section of the prospectus supplement entitled "The Mortgage Pool," Countrywide and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-57CB Pros. Sup. S-24 to S-61. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 19 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each table, the number of categories into which the loans were divided ranged from one to 26. Thus, in "The Mortgage Pool" section, Countrywide and CWALT made hundreds of statements about the original LTV of the loans in loan group 1. CWALT 2005-36 Pros. Sup. S-24 to S-32.

**(c)** "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in loan group 1 was approximately 75.82%." CWALT 2005-36 Pros. Sup. S-27.

**(d)** In "The Mortgage Pool" section, Countrywide and CWALT presented similar tables of statistics about the mortgage loans in loan group 2. In these tables, Countrywide and

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  CWALT similarly made hundreds of statements about the original LTVs of the loans in Loan

2  Group 2. CWALT 2005-36 Pros Sup. S-33 to S-41.

3      (e)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

4  Mortgage Loans in loan group 2 was approximately 75.87%." CWALT 2005-36 Pros. Sup. S-36.

5

6      (f)    In "The Mortgage Pool" section, Countrywide and CWALT presented similar

7  tables of statistics about the mortgage loans in loan group 3. In these tables, Countrywide and

8  CWALT similarly made hundreds of statements about the original LTVs of the loans in loan

9  group 3. CWALT 2005-36 Pros. Sup. S-42 to S-51.

10      (g)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

11  Mortgage Loans in loan group 3 was approximately 75.97%." CWALT 2005-36 Pros. Sup. S-45.

12

13      (h)    In "The Mortgage Pool" section, Countrywide and CWALT presented similar

14  tables of statistics about the mortgage loans in loan group 4. In these tables, Countrywide and

15  CWALT similarly made hundreds of statements about the original LTVs of the loans in loan

16  group 4. CWALT 2005-36 Pros. Sup. S-52 to S-61.

17      (i)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

18  Mortgage Loans in loan group 4 was approximately 72.68%." CWALT 2005-36 Pros. Sup. S-55.

19

20

21

22

23

24

25

26

27

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Credit Suisse*, 497840)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 62. Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,097 |
| Number of properties on which there was enough information for the model to determine a true market value | 870 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 466 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $38,033,593 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 117 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $10,426,900 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 74 |
| Weighted-average LTV, as stated by Defendants (group 4) | 72.68% |
| Weighted-average LTV, as determined by the model (group 4) | 81.43% |

**Item 65. Evidence from subsequent sales of refinanced properties:**

Of the 2,097 mortgage loans in the collateral pool, 1,120 were taken out to refinance, rather than to purchase, properties. For those 1,120 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,120 properties, 40 were subsequently sold for a total of approximately $13,394,642. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $17,701,500. Thus, those properties were sold for 75.7% of the value ascribed to them, a difference of 24.3%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 71. Undisclosed additional liens:**

(a) **Minimum number of properties with additional liens:** 133

(b) **Total reduction in equity from additional liens:** $11,306,447

(c) **Weighted-average reduction in equity from additional liens:** 67.5%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item 82.**      **Untrue or misleading statements about compliance with USPAP:**

     In the prospectus supplement, Countrywide Home Loans, Inc. and CWALT made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc. "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-36 Pros. Sup S-45.

**Item 88.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

     In the prospectus supplement, Countrywide and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

     **(a)**      In "The Mortgage Pool" section of the prospectus supplement, described in Item 52, Countrywide and CWALT presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-36 Pros. Sup. S-28.

     **(b)**      In the "Occupancy Types" table, Countrywide and CWALT stated that 82.34% of the mortgage loans in loan group 1 were secured by a "Primary Residence," 13.21% by an "Investment Property," and 4.45% by a "Secondary Residence." CWALT 2005-36 Pros. Sup. S-28.

     **(c)**      In "The Mortgage Pool" section, Countrywide and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate

-5-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-36 Pros. Sup. S-37.

**(d)** In the "Occupancy Types" table, Countrywide and CWALT stated that 86.24% of the mortgage loans in loan group 2 were secured by a "Primary Residence," 9.82% by an "Investment Property," and 3.93% by a "Secondary Residence." CWALT 2005-36 Pros. Sup. S-37.

**(e)** In "The Mortgage Pool" section, Countrywide and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 3 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-36 Pros. Sup. S-46.

**(f)** In the "Occupancy Types" table, Countrywide and CWALT stated that 91.71% of the mortgage loans in loan group 3 were secured by a "Primary Residence," 4.43% by an "Investment Property," and 3.86% by a "Secondary Residence." CWALT 2005-36 Pros. Sup. S-46.

**(g)** In "The Mortgage Pool" section, Countrywide and CWALT presented another table entitled "Occupancy Types." This table divided the mortgage loans in loan group 4 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-36 Pros. Sup. S-56.

**(h)** In the "Occupancy Types" table, Countrywide and CWALT stated that 91.66% of the mortgage loans in Loan Group 4 were secured by a "Primary Residence," 5.63% by an

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"Investment Property," and 2.71% by a "Secondary Residence." CWALT 2005-36 Pros. Sup. S-56.

**Item 96. Details of properties that were stated to be owner-occupied, but were not:**

(a) **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 108

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 196

(c) **Number of loans on which the owner of the property owned three or more properties:** 11

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 260

**Item 99. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-63 through S-68 of the prospectus supplement, Countrywide and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, Countrywide and CWALT stated that:

(a) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-36 Pros. Sup. S-64.

(b) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-36 Pros. Sup. S-64.

**Item 106. Early payment defaults:**

(a) **Number of the mortgage loans that suffered EPDs:** 13

(b) **Percent of the mortgage loans that suffered EPDs:** 0.6%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**(c) Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

**Item 107. 90+ days delinquencies:**

**(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 581

**(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 27.7%

**(c) Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

**Item 108. 30+ days delinquencies in this securitization:**

**(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 558

**(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 26.6%

**(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 117. Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 to S-4 and S-124 of the prospectus supplement, Countrywide Home Loans, Inc. and CWALT made statements about the ratings assigned to the certificates issued in this securitization. Countrywide Home Loans, Inc. and CWALT stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Countrywide Home Loans, Inc. and CWALT also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated AAA by Fitch Ratings, Inc. ('Fitch') and Aaa by Moody's Investors Service, Inc. ('Moody's')." CWALT 2005-36 Pros. Sup. S-124.

**Item 120. Summary of loans about which the Defendants made untrue or misleading statements:**

**(a) Number of loans whose LTVs were materially understated:** 466

(b) **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 133

(c) **Number of loans that suffered EPDs:** 13

(d) **Number of loans in which the properties were stated to be owner-occupied but were not:** 260

(e) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 655

(f) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 31.2%

3428/001/X119857.v1

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO